**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(Eastern Division)**

In re

CASHMAN EQUIPMENT CORP.,[1]

Debtor

Chapter 11

Case No. 17-12205

## AFFIDAVIT OF JAMES M. CASHMAN IN SUPPORT OF FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, James M. Cashman, hereby declare as follows:

1.       I serve in the following roles for the following affiliated entities: (a) I am the President and a director of Cashman Equipment Corporation ("CEC"); (b) I am the Manager of Cashman Scrap & Salvage, LLC ("CSS"); (c) I am the General Manager of Servicio Marina Superior, LLC ("SMS"); (d) I am the President and a director of Cashman Canada, Inc. ("CCI"); and (e) SMS is the Manager of Mystic Adventure Sails, LLC ("Mystic"), and in my role as Manager of SMS, I oversee the management of Mystic.[2]   In these capacities, I am familiar with the Debtors' day-to-day operations, business and financial matters.

2.       I make this affidavit in support of the following motions filed by the Debtors: (a) *Motion For an Order (1) Authorizing The Use of Cash Collateral, (2) Granting Replacement Liens, (3) Scheduling a Hearing on The Further Use of Cash Collateral, And (4) Granting Other Relief* (the "Cash Collateral Motion"); (b) *Motion by Debtors And Debtors-In-Possession to (A)*

---

[1] Joint administration requested.  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Cashman Equipment Corp. (7969), Cashman Scrap & Salvage, LLC (6088), Servicio Marina Superior, LLC (6919), Mystic Adventure Sails, LLC (2137) and Cashman Canada, Inc. (1296).

[2] CEC, CSS, SMS, CCI and Mystic are collectively referred to in this affidavit as the "Debtors."

*Pay Prepetition Wages, Salaries, Expenses, And Benefits And (B) Use Existing Payroll Accounts And Business Forms* (the "Wage Motion"); and (c) *Debtors' Motion Pursuant to 11 U.S.C. §§ 363(B) And 105(A) For Entry of Interim And Final Orders Authorizing, But Not Directing, Debtors to Pay Prepetition Obligations Owed to Certain Foreign Vendor*s (the "Foreign Vendor Motion", and together with the Cash Collateral Motion and the Wage Motion the "First Day Motions").

3.      Except as otherwise indicated, all statements in this affidavit are based upon (a) my personal knowledge as an officer, director, manager or member of the Debtors, (b) my review of relevant documents, including the Debtors' books and records; (c) information supplied to me by other members of the Debtors' management and employees, or other professionals retained by the Debtors; and (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial affairs.

4.      As an officer, director, and/or a manager of the Debtors, I participated in the Debtors' decision to file a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on June 9, 2017 (the "Petition Date").

5.      I have reviewed the Debtor's voluntary petitions and the First Day Motions.  The First Day Motions seek to ensure, among other things, the continuation of the Debtors' business operations without interruption, and to maintain the support and confidence of the Debtors' employees, suppliers, and customers, all of which will be critical to the Debtors' reorganization efforts.

## I.      BACKGROUND

6.      The Debtors specialize in the charter and sale of ocean going and inland barges and tugboats servicing the marine construction, oil and gas, scrap and salvage and marine

2

remediation industries worldwide.  The Debtors have also been involved in heavy marine construction including, among other things, dredging, pile driving, concrete work, pier and dock construction, bridge construction, shore protection and other marine structures, demolition, oil spill and other marine remediation work, and marine salvage work.

7.      Beginning with CEC, which was formed in 1995 with a fleet of only ten (10) barges servicing the New England construction industry, the Debtors have expanded and now include a fleet (the "Fleet") of 147 vessels, consisting of forty-one (41) inland/coastal barges, eighty-three (83) ocean going barges, eight (8) tug/push boats, two (2) floating hotels, fourteen (14) sectional construction barges, one (1) three-masted schooner, and various items of general and specialized construction equipment, including cranes and related construction equipment and marine pollution and clean-up equipment.

8.      The Fleet includes inland and ocean going barges ranging in size from 120 to 400 feet in length.  Nearly seventy-five (75%) of the Fleet barges are less than fourteen (14) years old, and can be retrofitted to accommodate the unique project needs of customers across the public and private sectors and a variety of industries.  CEC is the largest operator of offshore barges in the world.

9.      The Debtors provide services in and maintain or have maintained fleets on the U.S. East Coast and Gulf of Mexico, Mexico, Singapore, Australia, the Persian Gulf, West Africa, the Caspian Sea and South and Central America.  Due to the size and versatility of the Fleet, the Debtors are able to deploy vessels and service customers across the world.

10.      CEC currently has barges based in Africa, Indonesia, Korea, the Middle East, Mexico, Singapore and the states of Louisiana, New Jersey, South Carolina, Virginia, Florida, Massachusetts and New York.  CCI's barges are based in Canada.

3

11.     The Debtors' current financial issues are due to the unprecedented and prolonged downtown in the oil and gas industry.  A substantial portion of the Debtors' revenue is derived from the sale and charter of vessels to companies involved in the exploration for and development of oil and gas assets, as well as oil clean up and related petroleum projects.  The sharp and sustained decline in the price of oil has resulted in financial workouts and bankruptcy filings for many companies engaged in and associated with the oil and gas industry.

12.     The Debtors intend to continue their operations in the ordinary course of business while reducing the size of the Fleet and the related indebtedness through the orderly sale of vessels, in order to restructure their businesses and remaining indebtedness.

**A.      The Debtors' Businesses.**

13.     The Debtors' primary source of revenue is the charter and sale of the vessels and equipment in the Fleet, with secondary revenue sources being vessel and equipment sales and its construction contracting business.  In recent years, a substantial portion of the Debtors' revenue has come from the oil and gas industry.  In 2014 and 2015, the Debtors generated consolidated gross revenue from the charter and sale of vessels of approximately $74.3 and $86.6 million, respectively.  In 2016, as a result of the downturn in the oil and gas industry, the consolidated revenue was approximately $44.7 million.

14.     The Debtors operations are integrated, with CEC providing administrative functions for each of the Debtors, CSS providing repair and maintenance services for the Fleet, SMS providing tug and tow services and CCI and Mystic owning discrete assets.  I have over forty (40) years of experience in the marine services and construction business, both offshore and on-shore.  In addition to providing management to the Debtors, I am responsible for the charter and sale of vessels worldwide.

4

15.     Since the dramatic downturn in the oil and gas industry, the Debtors have taken steps to reduce costs and streamline operations.  Among other things, the Debtors have reduced their overhead, have placed their tugs and Mystic's schooner in storage with the intention to sell or enter into long term charters for those vessels, and have substantially reduced their overseas operations[3] pending an improvement in the oil and gas industry.

16.     The length of CEC's barge charters run from daily, to monthly, to, in some instances, more than a year, with daily charter rates between $300 and $3,000 per day.  Once a barge is on charter, the party chartering the barge covers the costs of operating the barge, including crew costs, dock and harbor fees, pilotage and insurance.  The charter and sale of vessels is accomplished by utilizing my extensive industry network.

**B.     The Debtors' Structure.**

17.     CEC, a Massachusetts corporation, was formed in 1995 and currently employs nineteen (19) people, all of whom are based in the United States.  CEC is headquartered in Braintree, Massachusetts, and owns 140 of the vessels in the Fleet, as well as other equipment utilized in its operations.  In addition to chartering and managing the Fleet, CEC has provided marine and general (heavy civil) construction services.

18.     CSS, a Louisiana limited liability company, was formed in 2003 and currently employs five (5) people, all of whom are based in the United States.  CSS operations are located in Louisiana and consist of managing the repair and maintenance yard utilized by CEC to maintain the Fleet.  CSS also provides the Debtors with scrapping and salvaging services for vessels and equipment, and provides waterfront facilities for logistical support.

---

[3] The Debtors integrated operations previously included the operations of various foreign affiliates, including affiliates in Singapore, Mexico and Kazakhstan.  The affiliates' operations have ceased, and they do not currently have any material assets.  These entities have not, therefore, filed Chapter 11 cases.

19.     SMS, is a Louisiana limited liability company, was formed in 2006 and currently employs two (2) people based in the United States.  SMS owns eight (8) tug/push boats in the Fleet.  SMS historically provided towing and heavy haul services, primarily to the off shore drilling industry in the Gulf of Mexico and in Southeast Asia.  SMS' tug/push boats are all currently in storage pending the sale or long term charter of those vessels.

20.     CCI is a Canadian corporation that owns and operates four (4) of the barges in the Fleet.  Mystic is a Massachusetts limited liability company whose sole asset is an ocean-going three-masted sailing schooner called the *Mystic* (the "Schooner") that is currently in storage pending the sale or long term charter of the Schooner.  The Schooner has operated pleasure cruises across the eastern seaboard.

21.     The holders of the equity interests in CEC are myself, the Ashly Cashman Irrevocable Trust and the Casey Cashman Irrevocable Trust.  I am the sole holder of the equity interests in CSS.  The James M. Cashman Insurance Trust is the sole equity holder of SMS.  CEC is the sole holder of the equity interests in CCI, and SMS is the sole holder of the equity interests in Mystic.  My children are the beneficiaries of each of the trusts referenced above.

**C.     The Debtors' Financing.**

22.     As of the Petition Date, CEC and SMS had borrowed money from the Lenders in order to finance the acquisition and construction of new Fleet vessels, to refinance prior debt, and to support general working capital needs.  The aggregate amount asserted to be owed by the Lenders is approximately $142,500,000.  All of the Debtors have guaranteed some or all of the

Lenders' indebtedness.[4]  Attached as <u>Exhibit A</u> is a chart of the Debtors' respective obligations as borrowers and guarantors for each financing arrangement.

23.      I understand that there are liens on some, but not all, of the Debtors' vessels.  I understand that a preliminary analysis indicates that there may be as many as seventeen (17) barges that are unencumbered, and the Debtors may own other assets that are unencumbered.  I understand that the seventeen (17) unencumbered barges have an orderly liquidation value totaling approximately $22,350,000.

24.      In conjunction with obtaining financing, the Debtors obtained appraisals of their vessels (collectively the "<u>Appraisals</u>").  Based on these appraisals, I understand that the aggregate fair market value of the assets against which the Lenders assert liens is approximately $357,700,000, and the orderly liquidation value of those assets is approximately $301,300,000. My understanding of the details of the loans from the Lenders follows.[5]

**i.      MARAD Bonds.**

25.      As of the Petition Date, the Debtors had an aggregate of approximately $1,700,000 in obligations outstanding under two groups of bonds (collectively, the "<u>MARAD Bonds</u>") that are guaranteed by the U.S. Secretary of Transportation acting through the U.S. Maritime Administration ("<u>MARAD</u>").

26.      I understand that MARAD asserts first priority liens on five (5) barges owned by CEC, and on the charter revenue generated by those vessels.  Based on the Appraisals, the

---

[4]  The following non-debtor affiliates have also guaranteed some of the obligations to the Lenders: (a) Cashman Consulting, Singapore, Pte Ltd., (b) CHM Maritime, SAPI de CV, and (c) Cashman Caspian, LLP (collectively the "Non-Debtor Guarantors").

[5]  The Debtors reserve all of their rights, claims and defenses with respect to any claims or liens asserted by the Lenders, including, without limitation, the right to contest the extent, priority and validity of any lien and the value of any asserted item of collateral.

aggregate fair market value of those vessels is approximately $13,700,000, and the aggregate

orderly liquidation value is approximately $11,350,000.

27.     I understand that MARAD asserts a first lien on accounts receivable that are

associated with the vessels against which it asserts first liens.  As of the Petition Date, the value

of the accounts receivable against which MARAD asserts a first lien that are aged 120 days or

less and net of uncollectible receivables totaled approximately $108,000.

**ii.     Rockland Trust Company.**

28.     As of the Petition Date, the Debtors had an aggregate of approximately

$29,920,000 in obligations outstanding under two revolving lines of credit with Rockland Trust

Company ("Rockland"), and $17,300,000 in obligations outstanding under four term loan

facilities with Rockland.

29.     I understand that Rockland asserts first priority liens on approximately forty-

seven (47) barges owned by CEC and four (4) tug/push boats owned by CEC or SMS, the charter

revenue generated by those vessels, and substantially all of CEC's and SMS' non-vessel assets.

Rockland asserts second priority liens on other non-vessel assets owned by CEC and SMS, but

those liens are subject to senior liens asserted by other Lenders.  With the exception of five (5)

barges, Rockland does not have second lien positions on the vessels in the Fleet.

30.     Based on the Appraisals, the assets against which Rockland asserts a first lien

have an aggregate fair market value of approximately $178,000,000, and an aggregate orderly

liquidation value of approximately $148,200,000.  The Rockland Facilities are guaranteed by

SMS, CSS, CCI, Mystic, myself and certain of the Non-Debtor Guarantors.

31.     I understand that Rockland asserts a first lien on accounts receivable that are

associated with the vessels against which it asserts first liens, and a second lien on the accounts

receivable subject to senior liens asserted by other Lenders.  As of the Petition Date, the value of the accounts receivable against which Rockland asserts a first lien that are aged 120 days or less and net of uncollectible receivables totaled approximately $628,000.

### iii.        Santander.

32.        As of the Petition Date, the Debtors had an aggregate of approximately $26,600,000 in obligations outstanding to Santander Bank, N.A. ("Santander") under the terms of several credit facilities (collectively, the "Santander Facilities").

33.        I understand that Santander asserts first liens on twelve (12) vessels consisting of ten (10) ABS deck barges, a tugboat, and the Schooner, and on the charter revenue generated by those vessels.  Based on the Appraisals, the aggregate fair market value of those vessels is approximately $54,072,000, and the aggregate orderly liquidation value is approximately $43,100,000.  The Santander Facilities are guaranteed by SMS, CSS and myself.

34.        CEC is also obligated to Santander under the terms of a separate loan agreement, in the initial principal amount of $350,000, of which approximately $208,000 remained outstanding as of the Petition Date (the "Santander Consumer Loan").  The Santander Consumer Loan is secured by a mortgage on a single Manitowoc crane with, based on the Appraisals, a fair market value of approximately $300,000.

35.        I understand that Santander asserts a first lien on accounts receivable that are associated with the vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts receivable against which Santander asserts a first lien that are aged 120 days or less and net of uncollectible receivables totaled approximately $131,000.

9

iv.       **Wells Fargo.**

36.       As of the Petition Date, the Debtors had an aggregate of approximately

$22,200,000 in obligations outstanding to Wells Fargo, N.A.[6] ("Wells Fargo") under the terms of

two credit facilities (collectively, the "Wells Fargo Term Loans").

37.       I understand that  Wells Fargo asserts liens on sixteen (16) barges and two (2)

cranes, and on the charter revenue generated by those barges.  Based on the Appraisals, the

aggregate fair market value of the assets against which Wells Fargo asserts first liens is

approximately $32,900,000, and the aggregate orderly liquidation value is approximately

$28,000,000.  The Wells Fargo Term Loans are guaranteed by SMS, CSS and myself.

38.       I understand that Wells Fargo asserts a first lien on accounts receivable that are

associated with the vessels against which it asserts first liens.  As of the Petition Date, the value

of the accounts receivable against which Wells Fargo asserts a first lien that are aged 120 days or

less and net of uncollectible receivables totaled approximately $341,000.

v.       **Citizens.**

39.       As of the Petition Date, the Debtors had an aggregate of approximately

$13,820,000 in obligations outstanding under three term loan facilities (collectively the "Citizens

Term Loans") with Citizens Asset Finance, Inc. ("Citizens").

40.       I understand that Citizens asserts liens on twelve (12) barges with, and on the

charter revenue generated by those vessels.  Based on the Appraisals, the aggregate fair market

value of those vessels is approximately $26,022,000, and the aggregate orderly liquidation value

---

[6] The Wells Fargo Loans were initially made by GE Capital Commercial, Inc. ("GE") and CF Marine ("CF").  Wells
Fargo succeeded to GE's and CF's interests in the loans.

is approximately $19,000,000.  The Citizens Term Loans are guaranteed by SMS, CSS and myself.

41.     I understand that Citizens asserts a first lien on accounts receivable that are associated with the vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts receivable against which Citizens asserts a first lien that are aged 120 days or less and net of uncollectible receivables totaled approximately $376,000.

### vi.     Bank of America.

42.     As of the Petition Date, the Debtors had an aggregate of approximately $12,000,000 in obligations outstanding under two promissory notes (the "BOA Notes") made payable to Bank of America Leasing and Capital, LLC ("Bank of America").

43.     I understand that Bank of America asserts liens on five (5) barges, and on the charter revenue generated by those vessels.  Based on the Appraisals, the aggregate fair market value of those vessels is approximately $28,000,000, and the aggregate orderly liquidation value is approximately $23,500,000.  The BOA Notes are guaranteed by SMS, CSS, myself and certain of the Non-Debtor Guarantors.

44.     I understand that Bank of America asserts a first lien on accounts receivable that are associated with the vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts receivable against which Bank of America asserts a first lien that are aged 120 days or less and net of uncollectible receivables totaled approximately $397,000.

### vii.     U.S. Bank.

45.     As of the Petition Date, the Debtors had an aggregate of approximately $2,292,000 in obligations outstanding to U.S. Bank Equipment Finance ("US Bank") under a promissory note (the "US Bank Note"), the proceeds were used to finance five barges.

46.     I understand that US Bank asserts liens on three (3) barges, and on the charter revenue generated by those vessels.  Based on the Appraisals, the aggregate fair market value of those vessels is approximately $2,350,000, and the aggregate orderly liquidation value is approximately $2,000,000.  The US Bank Note is guaranteed by SMS, CSS and myself.

47.     I understand that US Bank asserts a first lien on accounts receivable that are associated with the vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts receivable against which US Bank asserts a first lien that are aged 120 days or less and net of uncollectible receivables totaled approximately $173,000.

**viii.      Key Bank.**

48.     As of the Petition Date, the Debtors had an aggregate of approximately $6,350,000 in obligations outstanding to KeyBank National Association ("KeyBank") under a promissory note (the "KeyBank Note"), the proceeds of which were used to refinance certain outstanding indebtedness of CEC.

49.     I understand that KeyBank asserts liens on two (2) barges and two (2) Manitowoc cranes, and on the charter revenue generated by those barges.  Based on the Appraisals, the aggregate fair market value of those barges is approximately $8,146,864, and the aggregate orderly liquidation value is approximately $8,000,000.  The KeyBank Note is guaranteed by SMS, CSS and myself.

50.     I understand that Key Bank asserts a first lien on accounts receivable that are associated with the vessels against which it asserts first liens.  As of the Petition Date, none of the Debtors' accounts receivable that were aged less than 120 days and were net of uncollectible receivables were subject to a lien asserted by Key Bank.

12

ix.     **Fifth Third Bank.**

51.     As of the Petition Date, the Debtors had an aggregate of approximately $4,010,000 in obligations outstanding to Fifth Third Bank ("Fifth Third") under a promissory note (the "Fifth Third Note"), the proceeds of which were used to refinance certain outstanding indebtedness of CEC.

52.     I understand that Fifth Third asserts liens on two (2) barges, and on the charter revenue generated by those vessels.  Based on the Appraisals, the aggregate fair market value of those vessels is approximately $6,000,000, and the aggregate orderly liquidation value is approximately $5,100,000.  The Fifth Third Note is guaranteed by CSS and myself.

53.     I understand that Fifth Third asserts a first lien on accounts receivable that are associated with the vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts receivable against which Fifth Third asserts a first lien that are aged 120 days or less and net of uncollectible receivables totaled approximately $58,000.

x.     **Radius Bank.**

54.     As of the Petition Date, the Debtors had an aggregate of approximately $4,285,000 in obligations outstanding to Radius Bank ("Radius") under a promissory note (the "Radius Note"), the proceeds of which were used to refinance existing indebtedness of CEC and to finance the purchase of a self-ballastable deck barge.

55.     I understand that Radius asserts liens on ten (10) barges with, and on the charter revenue generated by those vessels.  Based on the Appraisals, the aggregate fair market value of those vessels is approximately $9,700,000, and the aggregate orderly liquidation value is approximately $7,900,000.  The Radius Note is guaranteed by CSS and myself.

13

56.     I understand that Radius asserts a first lien on accounts receivable that are associated with the vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts receivable against which Radius asserts a first lien that are aged 120 days or less and net of uncollectible receivables totaled approximately $266,000.

xi.      **Pacific Western Bank.**

57.     As of the Petition Date, the Debtors had an aggregate of approximately $685,000 in obligations outstanding to Pacific Western Bank ("PacWestern") under a promissory note (the "PacWestern Note"), the proceeds of which were used to refinance existing obligations of CEC associated with the purchase of three (3) barges.

58.     I understand that PacWestern asserts liens on two (2) barges, and on the charter revenue generated by those vessels.  Based on the Appraisals, the aggregate fair market value of those vessels is approximately $4,600,000, and the aggregate orderly liquidation value is approximately $3,400,000.  The PacWestern Note is guaranteed by CSS and myself.

59.     I understand that PacWestern asserts a first lien on accounts receivable that are associated with the vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts receivable against which PacWestern asserts a first lien that are aged 120 days or less and net of uncollectible receivables totaled approximately $113,000.

xii.     **Equitable Bank.**

60.     As of the Petition Date, CEC had an aggregate of approximately $1,140,000 in obligations outstanding to Equitable Bank ("Equitable")[7] under a promissory note executed by CEC (the "Equitable Note").

---

[7]  The loan represented by the Equitable Note was initially made by Weymouth Bank ("Weymouth").  Equitable succeeded to Weymouth's interests in the loan

61.    I understand that Equitable asserts a lien on a Manitowoc Crane.  Based on the

Appraisals, the aggregate fair market value of that crane is approximately $1,300,000, and the

aggregate orderly liquidation value is approximately $1,000,000.  The Equitable Note is

guaranteed by the Ashly Cashman 2012 Irrevocable Trust and the Casey Cashman 2012

Irrevocable Trust, and by myself.

62.    As of the Petition Date, none of the Debtors' accounts receivable that were aged

less than 120 days and were net of uncollectible receivables were subject to a lien asserted by

Equitable.

## II.    ASSETS AND LIABILITIES

**A.    The Debtors' Assets.**

63.    The Debtors respective assets are generally described as follows:

a.    **CEC.**  CEC tangible assets include, without limitation, (a) 124 barges
ocean going and inland/coastal barges, including deck barges, spud barges
and hopper barges, (b) two (2) floating hotels; (c) approximately fifteen
(15) cranes, primarily consisting of crawler cranes, (d) various items of
other marine and construction equipment, including generators, anchors,
pumps, welding equipment, air compressors, and various tools; (e) an
inventory of parts used to maintain the Fleet and CEC's other equipment;
and (f) office furniture and equipment.  CEC's intangible assets consist of
its equity interests in CCI and accounts receivable, aged less than 120 days
and net of uncollectible receivables, of approximately $2,040,000, and
cash on the Petition Date of approximately $3,190,000.

b.    **CSS.**  CSS' tangible assets consist of various items of equipment and tools
used to maintain the Fleet and the marine scrap and salvage operations and
nominal cash.

c.    **SMS.**  SMS' tangible assets consist of eight (8) tug/push boats and
miscellaneous equipment.  SMS' intangible assets consist of its equity
interests in Mystic and cash on the Petition Date of approximately $5,300.

15

d.   **CCI.**  CCI's assets consist of four (4) barges, accounts receivable aged less than 120 days and net of uncollectible receivables totaling approximately $340,000, and cash of approximately $10,000.

e.   **Mystic.**  Mystic's sole asset is the Schooner.

B.   **The Debtors' Liabilities.[8]**

i.   **Secured Claims.**

64.   The secured claims asserted against the Debtors are described above.  The aggregate of the secured claims asserted against the Debtors is $142,500,000.

65.   Under applicable maritime law, certain charges associated with the operation and/or maintenance of a flagged vessel may constitute liens against the vessel.  I understand that, as of the Petition Date, no such claims secured by such liens have been asserted.

ii.   **Priority Claims.**

66.   As of the Petition Date, CEC, SMS and CSS had unpaid, ordinary course of business, wages and benefits owed to their employees that total as follows: (a) CEC – $110,073.10; (b) SMS – $7,087.40; and (c) CSS – $6,538.12.

67.   Because they have net operating losses and other tax attributes, the Debtors do not believe that they will owe any income taxes.

iii.   **Non-Priority Unsecured Claims.**

68.   The Debtors estimate that the non-priority unsecured claims against each, excluding any inter-company debt, are approximately as follows: (a) CEC – $11,000,000;[9] (b)

---

[8]  The Debtors reserve all of their rights, claims and defenses with respect to all of the claims asserted against it, including the extent, priority and validity of any secured claims.

[9]  In addition, there are disputed claims and counterclaims in lawsuits by and against CEC that total approximately $18,800,000.  CEC reserves all of its rights, claims and defenses with respect to such litigation.

16

SMS – $289,000; (c) CSS – $2,900; (d) CCI – all of CCI's unsecured debt is owed to CEC, who

manages CCI's operations; and (e) Mystic – $2,100.

### III.   CHAPTER 11 PROCEEDINGS

69.     The purpose of the Debtors' Chapter 11 proceedings is to restructure their

obligations in order to refinance their current obligations and/or recapitalize their businesses.  As

part of their reorganization efforts, the Debtors seek the following relief:

**A.     The Cash Collateral Motion.**

70.     The Debtors filed the Cash Collateral Motion seeking authority to use cash

collateral in which some or all of the Lenders may assert an interest.  Attached to the Cash

Collateral Motion is a budget showing the Debtors' projected receipts and disbursements during

the period for which cash collateral usage is requested.  The Debtors require the use of cash

collateral to pay the usual and necessary expenses of operating their businesses, including the

costs of maintaining and deploying the Fleet, the costs of insuring the Fleet, and the payroll costs

associated with their employees.  The proposed use of cash collateral includes the payment of all

expenses necessary to maintain their operations and the value of their assets.  As is demonstrated

by the Cash Collateral Motion, the Debtors have sufficient cash collateral to fund their

operations and maintain their assets during the period for which cash collateral usage is

requested.

71.     Absent the use of the cash collateral, the Debtors would be required to cease

operations, resulting in, among other things, the forced liquidation of their assets at a

dramatically reduced return to the Debtors' estates, the material diminution in the value of their

accounts receivable, and the termination of the Debtors' employees – all to the detriment of the

Debtors, the Debtors' estates, and all creditors and interest holders.  The approval of the use of

17

the cash collateral on the terms set forth in the Cash Collateral Motion is, therefore, in the best interests of the Debtors, their bankruptcy estates and their creditors.

72.     I have reviewed the budget attached to the Cash Collateral Motion and I believe that it represents the reasonable projections for the Debtors operations over the period for which cash collateral usage is requested.

**B.     The Motion to Pay Prepetition Wages and Benefits.**

73.     The Debtors filed the Wage Motion seeking authority to pay or honor, in the ordinary course of business, their employees' prepetition wages, reimbursable expenses, associated taxes, and vacation and sick pay obligations.  Under the Debtors' standard payroll procedures, the payrolls are processed weekly in arrears – on the Wednesday of the week following the relevant weekly pay period.  The total amount of the Debtors' prepetition wage obligations is approximately $124,000.  The Debtors customarily reimburse employees who incur a variety of business expenses in the ordinary course of performing their duties on behalf of the Debtors, including, among others, those incurred in connection with travel, lodging, long-distance telephone charges, and cellular phone charges.  The Debtors provide between 40 and 160 hours of paid vacation for employees per year.  The Debtors also provide up to five (5) days' sick pay for employees per year.  No employee will receive more than $12,850 on account of payment of the pre-petition wage obligations and the continued compliance with the Debtors' vacation and sick leave policies.

74.     The Wage Motion also seeks authority to pay the reported prepetition claims under their health care plan (the "Health Plan") and their workers' compensation insurance in the ordinary course.  The Debtors offer a health and dental plan that is administered by Health Plans, Inc.  The Debtors pay monthly premiums under the Health Plan and also pay the direct employee

18

health claims, less any deductibles or co-pays paid by employees.  I understand that the proposed

payments will not exceed the statutory ceilings set forth in 11 U.S.C. § 507(a)(5).

75.     Finally, the Debtors request authority to use existing payroll accounts and

business forms for a limited period of time to allow the payments requested to be made to be

honored in the ordinary course of business.

76.     It is crucial that the Debtors be permitted to pay their prepetition wage

obligations, to fund their benefit programs, and to honor prepetition vacation and sick pay in the

ordinary course of business.  A potential loss (or delay in receipt) of earned wages or salaries

would impose a hardship on the employees, may damage employee morale and may result in the

loss of employees at a critical time in these cases.  Approval of such payments will assist in

maintaining the continuity of the Debtors' businesses and will preserve the value of the Debtors'

operations, assets and bankruptcy estates.

**C.     The Foreign Vendor Motion.**

77.     CEC and the other Debtors operate in a specialized industry that requires them to

maintain and develop relationships with certain foreign vendors to supply goods and services on

which their operations depend (collectively the "Foreign Vendors").  Absent the ability to pay

the Foreign Vendors, CEC may not be able to obtain the specialized goods and services post-

petition.  The continued provision of goods and services by the Foreign Vendors is essential to

CEC's continuation, the preservation of its assets and its ability to provide adequate protection to

those parties asserting secured claims against such assets.

78.     The Foreign Vendors are located in jurisdictions in Central America, Africa, and

the Middle East.  I understand that all or almost all of the Foreign Vendors do not have a

presence in the United States.  Absent payment of prepetition amounts due, the Foreign Vendors

may commence arrest or insolvency proceedings in foreign jurisdictions, attempt to assert

maritime liens on CEC's assets, or otherwise attempt to seize CEC's assets.  In addition to the

attendant costs, such foreign proceedings may significantly impede CEC's operations and ability

to generate revenues in those foreign countries.

79.    To identity the Foreign Vendors, CEC analyzed its suppliers and service providers

and the needs of their businesses.  In examining their vendor relationships, CEC considered

whether:

- the vendor is a sole-source or limited-source supplier or service provider;

- the vendor has the ability to exercise remedies against CEC's assets or disrupt CEC's operations, including the charter and/or sale of vessels;

- the vendor has the ability to assert a maritime or other statutory lien against CEC's assets;

- the vendor provides services that are so vital to CEC's businesses that even brief disruption would harm CEC's operations;

- CEC would be able to cost-effectively obtain comparable products or services from alternative sources within a reasonable timeframe; and

- the vendor is able or likely to refuse providing essential supplies or services to CEC if prepetition balances are not paid.

80.    Based on these criteria, CEC identified a limited roster of Foreign Vendors whose

services generally fall into one or more of the following categories: (a) fleeting vendors; (b)

repair vendors; (c) labor vendors; and (d) tug and tow vendors.  The roster of Foreign Vendors is

attached to the Foreign Vendor Motion.

81.    The payment of the Foreign Vendors is necessary to ensure that CEC does not

risk the disruption of its operations and the corresponding decline in the value of its assets.

Permitting the payment of the Foreign Vendor Claims will preserve the value of CEC's estate

and its assets, and will therefore provide adequate protection to the parties asserting secured claims in those assets.  CEC has carefully reviewed its accounts payable and undertaken a process to identify only those vendors essential to ongoing operations.

82.     CEC has proposed terms for the payment of Foreign Vendors that will permit CEC to receive the maximum value for the payment of the Foreign Vendor Claims.

83.     CEC will use reasonable efforts where practicable to condition payments to Critical Vendors on each such vendor's agreement to (a) accept such payment in satisfaction of the claim being paid; (b) continue to provide supplies or services to CEC during these Chapter 11 cases consistent with those practices (including credit limits, pricing, timing of payments, and availability) in place in the 12 months before the Petition Date; and (c) waive lien rights it may hold in respect of prepetition obligations against a vessel owned by CEC.

**D.      Emergency Relief is Warranted.**

84.     It is my understanding that the Bankruptcy Code requires the existence of immediate and irreparable harm to the Debtors if a pre-petition claim is to be paid within twenty-one (21) days of the Petition Date.

85.     As is described above, the Debtors may suffer immediate and irreparable harm if the Wage Motion is not granted and the Debtors are unable to pay or honor the pre-petition wages and benefits to their employees.

86.     As described above, obtaining the continued and uninterrupted goods and services provided by the Critical and Foreign Vendors is necessary to preserve the Debtors' operations, assets and the value of their bankruptcy estates.  Absent the approval of the Foreign Vendor Motion, the Debtors may suffer immediate and irreparable harm.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

_James M. Cashman, President_

Dated: June 12, 2017

727645

IN RE: CASHMAN EQUIPMENT CORP., *ET AL.*
BANKRUPTCY NO. 17-12205
(JOINTLY ADMINISTERED)

EXHIBIT A TO

AFFIDAVIT OF JAMES M. CASHMAN IN SUPPORT OF FIRST DAY MOTIONS

| Type | Date | Bank | Borrowers | | | | Guarantors | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | CEC | SMS | CSS | Mystic | CEC | SMS | Mystic | CSS | CCI | JMC |
| Term Loan | 6/30/2010 | Rockland Trust | X | *X* | *X* | | | X | | X | X | X |
| Revolver | 6/24/2011 | Rockland Trust | X | X | | | X | X | | X | | X |
| Term Loan | 6/6/2013 | Rockland Trust | | X | | | X | | | X | X | X |
| Revolver | 6/28/2013 | Rockland Trust | X | | | | | X | | X | X | X |
| Term Loan | 8/20/2015 | Rockland Trust | X | | | | | X | X | X | | X |
| Term Loan | 1/26/2016 | Rockland Trust | X | | | | | X | X | X | X | X |
| Term Loan | 1/26/2016 | Rockland Trust | X | | | | | X | X | X | X | X |
| | | | | | | | | | | | | |
| Consumer Loan | 11/21/2005 | Santander | X | | | | | | | | | |
| Term Loan | 6/25/2013 | Santander | X | | | | | | | | | X |
| Term Loan | 7/28/2014 | Santander | X | X | | X | | | | | | X |
| Term Loan | 10/10/2014 | Santander | X | X | | X | | | | | | X |
| Term Loan | 9/17/2015 | Santander | X | X | | X | X | X | X | | | X |
| | | | | | | | | | | | | |
| Term Loan | 12/26/2014 | Wells Fargo | X | | | | | X | | X | | X |
| Term Loan | 12/4/2015 | Wells Fargo | X | | | | | X | | X | | X |
| Term Loan | 12/4/2015 | U.S. Bank | X | | | | | X | | X | | X |
| Term Loan | 12/4/2015 | Key Bank | X | | | | | X | | X | | X |
| Term Loan | 12/9/2015 | Pacific Western Bank | X | | | | | X | | X | | X |
| Term Loan | 12/14/2015 | Fifth Third Bank | X | | | | | X | | X | | X |
| | | | | | | | | | | | | |
| Term Loan | 6/3/2011 | Citizens | X | X | X | | | | | | | X |
| Term Loan | 5/9/2014 | Citizens | X | | | | | X | | X | | X |
| Term Loan | 8/28/2015 | Citizens | X | | | | | X | | X | | X |
| | | | | | | | | | | | | |
| Term Loan | 6/26/2012 | Bank of America | X | | | | | X | | X | | X |
| Term Loan | 8/15/2014 | Bank of America | X | X | | | | | | X | | X |
| | | | | | | | | | | | | |
| Term Loan | 9/15/2015 | Equitable | X | | | | | | | | | X |
| | | | | | | | | | | | | |
| Term Loan | 12/15/2014 | Radius Bank | X | | | | | | | X | | X |
| | | | | | | | | | | | | |
| Bonds | 12/4/1997 | MARAD | X | | | | | | | | | |
| Bonds | 4/14/1999 | MARAD | X | | | | | | | | | |