## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (Eastern Division)

| | |
|---|---|
| **In re** | **Chapter 11** |
| **CASHMAN EQUIPMENT CORP.,**[1] | **Case No. 17-12205** |
| **Debtor** | |

## MOTION FOR AN ORDER (1) AUTHORIZING THE USE OF CASH COLLATERAL, (2) GRANTING REPLACEMENT LIENS, (3) SCHEDULING A HEARING ON THE FURTHER USE OF CASH COLLATERAL, AND (4) GRANTING OTHER RELIEF
### (*Emergency Determination Requested*)

Cashman Equipment Corp. ("CEC"), Cashman Scrap & Salvage, LLC ("CSS"), Servicio Marina Superior, LLC ("SMS"), Cashman Canada, Inc. ("CCI"), and Mystic Adventure Sails, LLC ("Mystic", and together with CEC, CSS, SMS and CCI the "Debtors") move the Court for the entry of an order, pursuant to Sections 105 and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002 and 4001, and MLBR 4001-2, authorizing the use of Cash Collateral (as that term is defined in Section 363(a) of the Bankruptcy Code). The Debtors request:

(i)     The entry of an order authorizing the interim use of Cash Collateral on an emergency basis;

(ii)    The entry of a final order authorizing the use of Cash Collateral after further hearing;

(iii)   The granting of replacement liens to those creditors asserting liens on the Debtors' Cash Collateral: (1) to the same extent, priority and validity of such liens that existed as of the Petition Date (as defined below), (2) to be recognized only to the extent of any diminution in the value of the

---

[1] Joint administration requested. The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Cashman Equipment Corp. (7969), Cashman Scrap & Salvage, LLC (6088), Servicio Marina Superior, LLC (6919), Mystic Adventure Sails, LLC (2137) and Cashman Canada, Inc. (1296).

creditor's prepetition collateral arising from the Debtors' use of Cash Collateral, (3) on the same types on the same types of collateral that the creditors had valid liens on as of the Petition Date; and

(iv)     The scheduling of a final hearing date on the use of Cash Collateral.

The relief requested is necessary to preserve the value of the Debtors' ongoing operations and assets, the jobs of the Debtors' employees, and the value of the Debtors' bankruptcy estates. As is described below, there are twelve (12) banks (collectively the "Lenders") that may assert a lien on Cash Collateral.  The Debtors reserve all of their rights, claims and defenses with respect to any claims or liens asserted by the Lenders, including, without limitation, the right to contest the extent, priority and validity of any lien and the value of any asserted item of collateral.

Emergency determination of this motion is necessary to permit the Debtors to continue their operations in the ordinary course of business.  In support of this motion, the Debtors aver as follows:

## JURISDICTION

1.     This Court has jurisdiction to consider and determine this Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.     The Chapter 11 Cases.

2.     On June 9, 2017 (the "Petition Date"), each of the Debtors, along with their principal, James M. Cashman ("JM Cashman"), filed a petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Court").  The Debtors continue to operate their

businesses and manage their assets as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code.

3.       Along with this motion, the Debtors have filed motions seeking the authority to pay pre-petition wages, the authority to pay certain critical and foreign vendors, and to jointly administer their cases and JM Cashman's bankruptcy case.

**B.       The Debtors and Their Businesses.**

4.       The Debtors specialize in the charter and sale of ocean going and inland barges and tugboats servicing the marine construction, oil and gas, scrap and salvage and marine remediation industries worldwide.  The Debtors have also been involved in heavy marine construction including, among other things, dredging, pile driving, concrete work, pier and dock construction, bridge construction, shore protection and other marine structures, demolition, oil spill and other marine remediation work, and marine salvage work.

5.       Beginning with CEC, which was formed in 1995 with a fleet of only ten (10) barges servicing the New England construction industry, the Debtors have expanded and now include a fleet (the "Fleet") of 147 vessels, consisting of forty-one (41) inland/coastal barges, eighty-three (81) ocean going barges, eight (8) tug/push boats, two (2) floating hotels, fourteen (14) sectional construction barges, one (1) three-masted schooner, and various items of general and specialized construction equipment, including cranes and related construction equipment and marine pollution and clean-up equipment.

6.       The Fleet includes inland and ocean going barges ranging in size from 120 to 400 feet in length.  Nearly seventy-five (75%) of the Fleet barges are less than fourteen (14) years old, and can be retrofitted to accommodate the unique project needs of customers across the

public and private sectors and a variety of industries.  CEC is the largest operator of offshore barges in the world.

7.      The Debtors provide services in and maintain or have maintained fleets on the U.S. East Coast and Gulf of Mexico, Mexico, Singapore, Australia, the Persian Gulf, West Africa, the Caspian Sea and South and Central America.  Due to the size and versatility of the Fleet, the Debtors are able to deploy vessels and service customers across the world.

8.      CEC currently has barges based in Africa, Indonesia, Korea, the Middle East, Mexico, Singapore and the states of Louisiana, New Jersey, South Carolina, Virginia, Florida, Massachusetts and New York.  CCI's barges are based in Canada.

9.      The Debtors' current financial issues are due to the unprecedented and prolonged downturn in the oil and gas industry.  A substantial portion of the Debtors' revenue is derived from the sale and charter of vessels to companies involved in the exploration for and development of oil and gas assets, as well as oil clean up and related petroleum projects.  The sharp and sustained decline in the price of oil has resulted in financial workouts and bankruptcy filings for many companies engaged in and associated with the oil and gas industry.

10.     The Debtors intend to continue their operations in the ordinary course of business while reducing the size of the Fleet and the related indebtedness through the orderly sale of vessels, in order to restructure their businesses and remaining indebtedness.

        **i.       The Debtors' Businesses.**

11.     The Debtors' primary source of revenue is the charter and sale of the vessels and equipment in the Fleet, with secondary revenue sources being vessel and equipment sales and its construction contracting business.  In recent years, a substantial portion of the Debtors' revenue has come from the oil and gas industry.  In 2014 and 2015, the Debtors generated consolidated

gross revenue from the charter and sale of vessels of approximately $74.3 and $86.6 million, respectively. In 2016, as a result of the downturn in the oil and gas industry, the consolidated revenue was approximately $44.7 million.

12.     The Debtors operations are integrated, with CEC providing administrative functions for each of the Debtors, CSS providing repair and maintenance services for the Fleet, SMS providing tug and tow services and CCI and Mystic owning discrete assets. JM Cashman, the Debtors' principal, has over forty (40) years of experience in the marine services and construction business, both offshore and on-shore. In addition to providing management to the Debtors, JM Cashman is responsible for the charter and sale of vessels worldwide.

13.     Since the dramatic downturn in the oil and gas industry, the Debtors have taken steps to reduce costs and streamline operations. Among other things, the Debtors have reduced their overhead, have placed their tugs and Mystic's schooner in storage with the intention to sell or enter into long term charters for those vessels, and have substantially reduced their overseas operations[2] pending an improvement in the oil and gas industry.

14.     The length of CEC's barge charters run from daily, to monthly, to, in some instances, more than a year, with daily charter rates between $300 and $3,000 per day. Once a barge is on charter, the party chartering the barge covers the costs of operating the barge, including crew costs, dock and harbor fees, pilotage and insurance. The charter and sale of vessels is accomplished by utilizing JM Cashman's extensive industry network.[3]

---

[2]  The Debtors integrated operations previously included the operations of various foreign affiliates, including affiliates in Singapore, Mexico and Kazakhstan. The affiliates' operations have ceased, and they do not currently have any material assets. These entities have not, therefore, filed Chapter 11 cases.

[3]  The Debtors intend to file a motion requesting the establishment of procedures for the sales of vessels in the ordinary course of business.

ii.       **The Debtors' Structure.**

15.       CEC, a Massachusetts corporation, was formed in 1995 and currently employs

nineteen (19) people, all of whom are based in the United States.  CEC is headquartered in

Braintree, Massachusetts, and owns 140 of the vessels in the Fleet, as well as other equipment

utilized in its operations.  In addition to chartering and managing the Fleet, CEC has provided

marine and general (heavy civil) construction services.

16.       CSS, a Louisiana limited liability company, was formed in 2003 and currently

employs five (5) people, all of whom are based in the United States.  CSS operations are located

in Louisiana and consist of managing the repair and maintenance yard utilized by CEC to

maintain the Fleet.  CSS also provides the Debtors with scrapping and salvaging services for

vessels and equipment, and provides waterfront facilities for logistical support.

17.       SMS, is a Louisiana limited liability company, was formed in 2006 and currently

employs two (2) people based in the United States.  SMS owns eight (8) tug/push boats in the

Fleet.  SMS historically provided towing and heavy haul services, primarily to the off shore

drilling industry in the Gulf of Mexico and in Southeast Asia.  SMS' tug/push boats are all

currently in storage pending the sale or long term charter of those vessels.

18.       CCI is a Canadian corporation that owns and operates four (4) of the barges in the

Fleet.  Mystic is a Massachusetts limited liability company whose sole asset is an ocean-going

three-masted sailing schooner called the *Mystic* (the "Schooner") that is currently in storage

pending the sale or long term charter of the Schooner.  The Schooner has operated pleasure

cruises across the eastern seaboard.

19.       The holders of the equity interests in CEC are JM Cashman, the Ashly Cashman

Irrevocable Trust and the Casey Cashman Irrevocable Trust.  JM Cashman is the sole holder of

the equity interests in CSS.  The James M. Cashman Insurance Trust is the sole equity holder of

SMS.  CEC is the sole holder of the equity interests in CCI, and SMS is the sole holder of the

equity interests in Mystic.  JM Cashman's children are the beneficiaries of each of the trusts

referenced above.

###### C.    **The Debtors' Capital Structure**.

20.     As of the Petition Date, CEC and SMS had borrowed money from the Lenders in

order to finance the acquisition and construction of new Fleet vessels, to refinance prior debt,

and to support general working capital needs.  The aggregate amount asserted to be owed by the

Lenders is approximately $142,500,000.  All of the Debtors have guaranteed some or all of the

Lenders' indebtedness.[4]  Attached as Exhibit A is a chart of the Debtors' respective obligations

as borrowers and guarantors for each financing arrangement.

21.     There are liens on some, but not all, of the Debtors' vessels.  In order to obtain a

lien on a flagged vessel, a lender must record a vessel mortgage in the jurisdiction in which the

vessel is flagged.[5]  A preliminary analysis indicates that there may be as many as seventeen (17)

barges that are unencumbered, and the Debtors may own other assets that are unencumbered.

The Debtors estimate that the seventeen (17) unencumbered barges have an orderly liquidation

value totaling approximately $22,350,000.

22.     In conjunction with obtaining financing, the Debtors obtained appraisals of their

vessels (collectively the "Appraisals").  Based on the Appraisals, the aggregate fair market value

of the assets against which the Lenders assert liens is approximately $357,700,000, and the

---

[4]  The following non-debtor affiliates have also guaranteed some of the obligations to the Lenders: (a) Cashman Consulting, Singapore, Pte Ltd., (b) CHM Maritime, SAPI de CV, and (c) Cashman Caspian, LLP (collectively the "Non-Debtor Guarantors").
[5]  In order to obtain a lien on the charter revenue generated by a flagged vessel, a lender must have a separate grant of the charter revenue – a mortgage on the vessel is not, by itself, sufficient to create a lien on the vessels' charter revenue.  Not all of the Lenders have liens on charter revenue from the vessels against which they assert vessel mortgages.

orderly liquidation value of those assets is approximately $301,300,000.  In addition to the
unencumbered vessels, there is substantial equity in virtually all of the Lenders' collateral pools.
Details regarding each financing arrangement with the Lenders follows.

### i.      MARAD Bonds.

23.      As of the Petition Date, the Debtors had an aggregate of approximately
$1,700,000 in obligations outstanding under two groups of bonds (collectively, the "MARAD
Bonds") that are guaranteed by the U.S. Secretary of Transportation acting through the U.S.
Maritime Administration ("MARAD").

24.      MARAD asserts first priority liens on five (5) barges owned by CEC, and on the
charter revenue generated by those vessels.  Based on the Appraisals, the aggregate fair market
value of those vessels is approximately $13,700,000, and the aggregate orderly liquidation value
is approximately $11,350,000.

25.      MARAD asserts a first lien on accounts receivable that are associated with the
vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts
receivable against which MARAD asserts a first lien that are aged 120 days or less and net of
uncollectible receivables totaled approximately $108,000.

### ii.      Rockland Trust Company.

26.      As of the Petition Date, the Debtors had an aggregate of approximately
$29,920,000 in obligations outstanding under two revolving lines of credit with Rockland Trust
Company ("Rockland"), and $17,300,000 in obligations outstanding under four term loan
facilities with Rockland.

27.      Rockland asserts first priority liens on approximately forty-seven (47) barges
owned by CEC and four (4) tug/push boats owned by CEC or SMS, the charter revenue
generated by those vessels, and substantially all of CEC's and SMS' non-vessel assets.

Rockland asserts second priority liens on other non-vessel assets owned by CEC and SMS, but those liens are subject to senior liens asserted by other Lenders.  With the exception of five (5) barges, Rockland does not have second lien positions on the vessels in the Fleet.

28.     Based on the Appraisals, the assets against which Rockland asserts a first lien have an aggregate fair market value of approximately $178,000,000, and an aggregate orderly liquidation value of approximately $148,200,000.  The Rockland Facilities are guaranteed by SMS, CSS, CCI, Mystic, James Cashman and certain of the Non-Debtor Guarantors.

29.     Rockland asserts a first lien on accounts receivable that are associated with the vessels against which it asserts first liens, and a second lien on the accounts receivable subject to senior liens asserted by other Lenders.  As of the Petition Date, the value of the accounts receivable against which Rockland asserts a first lien that are aged 120 days or less and net of uncollectible receivables totaled approximately $628,000.

**iii.     Santander.**

30.     As of the Petition Date, the Debtors had an aggregate of approximately $26,600,000 in obligations outstanding to Santander Bank, N.A. ("Santander") under the terms of several credit facilities (collectively, the "Santander Facilities").

31.     Santander asserts first liens on twelve (12) vessels consisting of ten (10) ABS deck barges, a tugboat, and the Schooner, and on the charter revenue generated by those vessels. Based on the Appraisals, the aggregate fair market value of those vessels is approximately $54,072,000, and the aggregate orderly liquidation value is approximately $43,100,000.  The Santander Facilities are guaranteed by SMS, CSS and James Cashman.

32.     CEC is also obligated to Santander under the terms of a separate loan agreement, in the initial principal amount of $350,000, of which approximately $208,000 remained outstanding as of the Petition Date (the "Santander Consumer Loan").  The Santander Consumer

Loan is secured by a mortgage on a single Manitowoc crane with, based on the Appraisals, a fair market value of approximately $300,000.

33.     Santander asserts a first lien on accounts receivable that are associated with the vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts receivable against which Santander asserts a first lien that are aged 120 days or less and net of uncollectible receivables totaled approximately $131,000.

**iv.     Wells Fargo.**

34.     As of the Petition Date, the Debtors had an aggregate of approximately $22,200,000 in obligations outstanding to Wells Fargo, N.A.[6] ("Wells Fargo") under the terms of two credit facilities (collectively, the "Wells Fargo Term Loans").

35.      Wells Fargo asserts liens on sixteen (16) barges and two (2) cranes, and on the charter revenue generated by those barges.  Based on the Appraisals, the aggregate fair market value of the assets against which Wells Fargo asserts first liens is approximately $32,900,000, and the aggregate orderly liquidation value is approximately $28,000,000.  The Wells Fargo Term Loans are guaranteed by SMS, CSS and James Cashman.

36.     Wells Fargo asserts a first lien on accounts receivable that are associated with the vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts receivable against which Wells Fargo asserts a first lien that are aged 120 days or less and net of uncollectible receivables totaled approximately $341,000.

---

[6]  The Wells Fargo Loans were initially made by GE Capital Commercial, Inc. ("GE") and CF Marine ("CF"). Wells Fargo succeeded to GE's and CF's interests in the loans.

v.        **Citizens.**

37.      As of the Petition Date, the Debtors had an aggregate of approximately

$13,820,000 in obligations outstanding under three term loan facilities (collectively the "<u>Citizens</u>

<u>Term Loans</u>") with Citizens Asset Finance, Inc. ("<u>Citizens</u>").

38.      Citizens asserts liens on twelve (12) barges with, and on the charter revenue

generated by those vessels.  Based on the Appraisals, the aggregate fair market value of those

vessels is approximately $26,022,000, and the aggregate orderly liquidation value is

approximately $19,000,000.  The Citizens Term Loans are guaranteed by SMS, CSS and James

Cashman.

39.      Citizens asserts a first lien on accounts receivable that are associated with the

vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts

receivable against which Citizens asserts a first lien that are aged 120 days or less and net of

uncollectible receivables totaled approximately $376,000.

vi.       **Bank of America.**

40.      As of the Petition Date, the Debtors had an aggregate of approximately

$12,000,000 in obligations outstanding under two promissory notes (the "<u>BOA Notes</u>") made

payable to Bank of America Leasing and Capital, LLC ("<u>Bank of America</u>").

41.      Bank of America asserts liens on five (5) barges, and on the charter revenue

generated by those vessels.  Based on the Appraisals, the aggregate fair market value of those

vessels is approximately $28,000,000, and the aggregate orderly liquidation value is

approximately $23,500,000.  The BOA Notes are guaranteed by SMS, CSS, James Cashman and

certain of the Non-Debtor Guarantors.

42.      Bank of America asserts a first lien on accounts receivable that are associated

with the vessels against which it asserts first liens.  As of the Petition Date, the value of the

accounts receivable against which Bank of America asserts a first lien that are aged 120 days or less and net of uncollectible receivables totaled approximately $397,000.

### vii.    U.S. Bank.

43.     As of the Petition Date, the Debtors had an aggregate of approximately $2,292,000 in obligations outstanding to U.S. Bank Equipment Finance ("US Bank") under a promissory note (the "US Bank Note"), the proceeds were used to finance five barges.

44.     US Bank asserts liens on three (3) barges, and on the charter revenue generated by those vessels.  Based on the Appraisals, the aggregate fair market value of those vessels is approximately $2,350,000, and the aggregate orderly liquidation value is approximately $2,000,000.  The US Bank Note is guaranteed by SMS, CSS and James Cashman.

45.     US Bank asserts a first lien on accounts receivable that are associated with the vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts receivable against which US Bank asserts a first lien that are aged 120 days or less and net of uncollectible receivables totaled approximately $173,000.

### viii.    Key Bank.

46.     As of the Petition Date, the Debtors had an aggregate of approximately $6,350,000 in obligations outstanding to KeyBank National Association ("KeyBank") under a promissory note (the "KeyBank Note"), the proceeds of which were used to refinance certain outstanding indebtedness of CEC.

47.     KeyBank asserts liens on two (2) barges and two (2) Manitowoc cranes, and on the charter revenue generated by those barges.  Based on the Appraisals, the aggregate fair market value of those barges is approximately $8,146,864, and the aggregate orderly liquidation value is approximately $8,000,000.  The KeyBank Note is guaranteed by SMS, CSS and James Cashman.

48.     Key Bank asserts a first lien on accounts receivable that are associated with the vessels against which it asserts first liens.  As of the Petition Date, none of the Debtors' accounts receivable that were aged less than 120 days and were net of uncollectible receivables were subject to a lien asserted by Key Bank.

**ix.      Fifth Third Bank.**

49.     As of the Petition Date, the Debtors had an aggregate of approximately $4,010,000 in obligations outstanding to Fifth Third Bank ("Fifth Third") under a promissory note (the "Fifth Third Note"), the proceeds of which were used to refinance certain outstanding indebtedness of CEC.

50.     Fifth Third asserts liens on two (2) barges, and on the charter revenue generated by those vessels.  Based on the Appraisals, the aggregate fair market value of those vessels is approximately $6,000,000, and the aggregate orderly liquidation value is approximately $5,100,000.  The Fifth Third Note is guaranteed by CSS and James Cashman.

51.     Fifth Third asserts a first lien on accounts receivable that are associated with the vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts receivable against which Fifth Third asserts a first lien that are aged 120 days or less and net of uncollectible receivables totaled approximately $58,000.

**x.      Radius Bank.**

52.     As of the Petition Date, the Debtors had an aggregate of approximately $4,285,000 in obligations outstanding to Radius Bank ("Radius") under a promissory note (the "Radius Note"), the proceeds of which were used to refinance existing indebtedness of CEC and to finance the purchase of a self-ballastable deck barge.

53.     Radius asserts liens on ten (10) barges with, and on the charter revenue generated by those vessels.  Based on the Appraisals, the aggregate fair market value of those vessels is

approximately $9,700,000, and the aggregate orderly liquidation value is approximately

$7,900,000.  The Radius Note is guaranteed by CSS and James Cashman.

54.     Radius asserts a first lien on accounts receivable that are associated with the

vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts

receivable against which Radius asserts a first lien that are aged 120 days or less and net of

uncollectible receivables totaled approximately $266,000.

  **xi.**  **Pacific Western Bank.**

55.     As of the Petition Date, the Debtors had an aggregate of approximately $685,000

in obligations outstanding to Pacific Western Bank ("PacWestern") under a promissory note (the

"PacWestern Note"), the proceeds of which were used to refinance existing obligations of CEC

associated with the purchase of three (3) barges.

56.     PacWestern asserts liens on two (2) barges, and on the charter revenue generated

by those vessels.  Based on the Appraisals, the aggregate fair market value of those vessels is

approximately $4,600,000, and the aggregate orderly liquidation value is approximately

$3,400,000.  The PacWestern Note is guaranteed by CSS and James Cashman.

57.     PacWestern asserts a first lien on accounts receivable that are associated with the

vessels against which it asserts first liens.  As of the Petition Date, the value of the accounts

receivable against which PacWestern asserts a first lien that are aged 120 days or less and net of

uncollectible receivables totaled approximately $113,000.

xii.        **Equitable Bank.**

58.        As of the Petition Date, CEC had an aggregate of approximately $1,140,000 in

obligations outstanding to Equitable Bank ("Equitable")[7] under a promissory note executed by

CEC (the "Equitable Note").

59.        Equitable asserts a lien on a Manitowoc Crane.  Based on the Appraisals, the

aggregate fair market value of that crane is approximately $1,300,000, and the aggregate orderly

liquidation value is approximately $1,000,000.  The Equitable Note is guaranteed by the Ashly

Cashman 2012 Irrevocable Trust and the Casey Cashman 2012 Irrevocable Trust, and by James

Cashman.

60.        As of the Petition Date, none of the Debtors' accounts receivable that were aged

less than 120 days and were net of uncollectible receivables were subject to a lien asserted by

Equitable.

D.        **The Debtors' Assets.**

61.        The Debtors respective assets are generally described as follows:

a.        **CEC.**  CEC tangible assets include, without limitation, (a) 124 barges ocean
going and inland/coastal barges, including deck barges, spud barges and hopper
barges, (b) two (2) floating hotels; (c) approximately fifteen (15) cranes, primarily
consisting of crawler cranes, (d) various items of other marine and construction
equipment, including generators, anchors, pumps, welding equipment, air
compressors, and various tools; (e) an inventory of parts used to maintain the
Fleet and CEC's other equipment; and (f) office furniture and equipment.  CEC's
intangible assets consist of its equity interests in CCI and accounts receivable,
aged less than 120 days and net of uncollectible receivables, of approximately
$2,040,000, and cash on the Petition Date of approximately $3,190,000.

b.        **CSS.**  CSS' tangible assets consist of various items of equipment and tools used
to maintain the Fleet and the marine scrap and salvage operations and nominal
cash.

---

[7] The loan represented by the Equitable Note was initially made by Weymouth Bank ("Weymouth").  Equitable
succeeded to Weymouth's interests in the loan

    c.     **SMS.**  SMS' tangible assets consist of eight (8) tug/push boats and miscellaneous equipment.  SMS' intangible assets consist of its equity interests in Mystic and cash on the Petition Date of approximately $5,300.

    d.     **CCI.**  CCI's assets consist of four (4) barges, accounts receivable aged less than 120 days and net of uncollectible receivables totaling approximately $340,000, and cash of approximately $10,000.

    e.     **Mystic.**  Mystic's sole asset is the Schooner.

    E.     **The Debtors' Liabilities.**

    i.     **Secured Claims.**

62.     The secured claims asserted against the Debtors are described in the section titled "Debtors' Capital Structure", above.  The aggregate of the secured claims asserted against the Debtors is $142,500,000.

63.     Under applicable maritime law, certain charges associated with the operation and/or maintenance of a flagged vessel may constitute liens against the vessel.  As of the Petition Date, the Debtors are unaware of any such claims being asserted.

    ii.     **Priority Claims.**

64.     As of the Petition Date, CEC, SMS and CSS had unpaid, ordinary course of business, wages and benefits owed to their employees that total as follows: (a) CEC – $110,073.10; (b) SMS – $7,087.40; and (c) CSS – $6,538.12.

65.     Because they have net operating losses and other tax attributes, the Debtors do not believe that they will owe any income taxes.

### iii.    Non-Priority Unsecured Claims.

66.    The Debtors estimate that the non-priority unsecured claims against each,

excluding any inter-company debt, are approximately as follows: (a) CEC – $11,000,000;[8] (b)

SMS – $289,000; (c) CSS – $2,900; (d) CCI – all of CCI's unsecured debt is owed to CEC, who

manages CCI's operations; and (e) Mystic – $2,100.

## REQUESTED USE OF CASH COLLATERAL

### A.    Use of Cash Collateral.

67.    The Debtors require the use of Cash Collateral to pay the expenses necessary to

maintain their businesses, maintain operations and preserve the value of their assets.  The

Debtors' budgeted expenses can generally be categorized into the following groups of expenses:

(a) general and administrative expenses, (b) fleeting expenses, (c) repair and maintenance

expenses, and (d) tug and tow expenses.  Fleeting expenses are expenses associated with docking

vessels when off charter and the expenses associated with preparing the vessels for charter, and

include expenses such as pilotage, docking masters, mooring, coast guard fees, and harbor dues.

Repair expenses are the ordinary costs of repairing the Debtors' vessels when off charter in order

to keep the vessels seaworthy.  Tug and tow expenses are expenses associated with moving the

Debtors' vessels when they are off charter in order to maintain, repair and prepare the vessels for

charter.

68.    Attached Exhibit B is a budget for the Debtors' operations (the "Budget") for the

period between June 12, 2017 and September 17, 2017 (the "Budget Period").   The Budget sets

forth estimated receipts and disbursements for the Budget Period.  The Budget shows that during

---

[8]  In addition, there are disputed claims and counterclaims in lawsuits by and against CEC that total approximately
$18,800,000.  CEC reserves all of its rights, claims and defenses with respect to such litigation.

the Budget Period, the Debtors' aggregate Cash Collateral increases from approximately $5,783,000 (consisting of cash of approximately $3,190,000 and receivables of approximately $2,593,000) to $6,746,000 at the end of the Budget Period (consisting of cash of approximately $2,858,000 and receivables of approximately $3,888,000).

69.     The Debtors request the authority, under Section 363 of the Bankruptcy Code, to use Cash Collateral to fund their operations during the Budget Period.  The use of Cash Collateral will enable the Debtors to pay the obligations necessary to maintain their operations while they pursue a reorganization, and to preserve the value of their operations and assets, including accounts receivable.  Absent the use of Cash Collateral, the Debtors would be required to cease operations, resulting in, among other things, the forced liquidation of their assets at a reduced return, the material diminution in the value of their accounts receivable, and the termination of the Debtors' employees.  Permitting the Debtors to use Cash Collateral is therefore in the best interests of the Debtors, their bankruptcy estates and creditors.

### B.     <u>Adequate Protection</u>.

70.     Section 363(e) of the Code provides that a party with an interest in property proposed to be used, sold or leased by a debtor must receive adequate protection for such interest before the debtor may use, sell or lease such property.  *See* 11 U.S.C. § 363(e).

71.     Section 361 of the Code provides that when adequate protection is required under Section 363 of the Code, such adequate protection may be provided by, *inter alia*, "providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property."  11 U.S.C. § 361(2).

72.     The entitlement to and measure of the protection required is always determined by the extent of the anticipated or actual decrease, if any, in the value of the secured creditor's

collateral during course of the bankruptcy case.  *See In re First South Savings Assoc.*, 820 F.2d

700, 710 (5th Cir.1987).  Adequate protection requires only that the value of the creditor's

interest in the cash collateral be protected from diminution while the debtor is using the cash

collateral.  *See United Savings Association of Texas v. Timbers of Inwood Forest Assoc.*, *Ltd.*,

484 U.S. 365 (1988).

73.    Courts uniformly recognize the existence of an equity cushion as adequate

protection for the use of cash collateral.  *See Baybank-Middlesex v. Ralar Distributors*, 69 F.3d

1200, 1203 (1st Cir. 1995)("A sufficient equity cushion is itself a recognized form of adequate

protection, thus collateral valuation is a logical step in making an adequate protection

determination [in a cash collateral context].") *citing First Agricultural Bank v. Jug End in the*

*Berkshires*, 46 BR 892, 899 (Bankr. D. Mass. 1985); *see also In re SW Boston Hotel Venture*

*LLC*, 449 B.R. 156, 176 (Bankr. D. Mass. 2011)("If collateral securing a claim has value greater

than the interest of the secured claim holder, the excess value, referred to as an equity cushion,

constitutes adequate protection for the secured party's interest.").

74.    The Debtors will provide adequate protection for the use of Cash Collateral in

multiple ways, including by continuing to preserve the value of the Fleet by chartering, selling,

insuring, repairing and maintaining the vessels in the Fleet, by the replacement liens described

below, and by the equity cushion in the Debtors' assets.  The vessels in the Fleet are located

around the world, and without the Debtors' continued operations to maintain the vessels, their

value will decline dramatically.  At the same time that the Debtor is insuring, repairing and

maintaining the vessels in the Fleet, the Debtor will also be preserving their value and creating

cash collateral by chartering and selling the vessels.  This continued preservation of the value of

the vessels in the Fleet provides the Lenders with adequate protection for the use of Cash

Collateral. *See Ralar Distributors*, 69 F.3d at 1203.

75.    The Debtors also propose to grant to the Lenders replacement liens (the

"Replacement Liens") on the same types of post-petition property of the estates against which

the Lenders held liens as of the Petition Date, without prejudice to the Debtors' rights to contest

the amount, validity, priority and extent of any liens or claims asserted by the Lenders.  The

Replacement Liens shall maintain the same priority, validity and enforceability as the Lenders'

pre-petition liens.  The Replacement Liens should only be recognized to the extent of the

diminution in value of the Lenders' prepetition collateral after the Petition Date resulting from

the Debtors' use of the Cash Collateral during these cases.  Since the Debtors' aggregate value of

cash collateral will be at least maintained, if not increased, over the Budget Period, the Lenders'

interest in Cash Collateral is adequately protected by the grant of the Replacement Liens.  *See* 11

U.S.C. § 361(2).

76.    Moreover, the Lenders will be adequately protected for the Debtors use of Cash

Collateral by the substantial equity cushion in the Lenders' collateral.  *See Ralar Distributors*, 69

F.3d at 1203

**C.    Reporting.**

77.    The Debtors will provide the following reporting, monthly, to each Lender: (a) a

report on the collection of accounts receivable based on which Lender asserts liens on the

collected accounts receivable, (b) a report on which vessel generated accounts receivable during

the month in question and which Lender, if any, asserts a lien on such vessel, (c) a budget to

actual report with respect to the Budget, and (d) a copy of each Debtors' monthly operating

report submitted to the Office of the United States Trustee.  Such reporting will be provided on

the fifteenth (15th) day of each month for the preceding calendar month.

<u>**NOTICE**</u>

78.    The Debtors will serve this motion and notice of any hearing of such motion upon

the Lenders, any other individual or entity known by the Debtors to assert liens on or security

interests in any of the Debtors' assets, each Debtors' twenty largest unsecured creditors, the

Office of the United States Trustee, the Office of the Attorney General of Massachusetts,

relevant federal and state taxing authorities and upon any party requesting notice in this

proceeding.

[this space intentionally left blank]

**WHEREFORE**, the Debtors request that the Court enter an order, substantially in the form attached as <u>Exhibit C</u>: (a) granting this Motion; (b) authorizing the Debtors' use of Cash Collateral as requested; (c) granting the Replacement Liens; (d) scheduling a final hearing on the use of Cash Collateral; and (e) granting the Debtors such other and further relief as is necessary and proper under the circumstances.

Respectfully submitted,

CASHMAN EQUIPMENT CORP., CASHMAN
SCRAP & SALVAGE, LLC, SERVICIO MARINA
SUPERIOR, LLC, CASHMAN CANADA, INC.,
AND MYSTIC ADVENTURE SAILS, LLC,
By their proposed counsel,


*/s/ D. Ethan Jeffery*
Harold B. Murphy (BBO #362610)
D. Ethan Jeffery (BBO #631941)
Michael K. O'Neil (BBO #658025)
Murphy & King, Professional Corporation
One Beacon Street, 21st Floor
Boston, Massachusetts  02108-3107
Telephone:  (617) 423-0400
Facsimile:  (617) 423-0498
EJeffery@murphyking.com

Dated:  June 12, 2017
728455

IN RE: CASHMAN EQUIPMENT CORP., *ET AL.*
BANKRUPTCY NO. 17-12205
(JOINTLY ADMINISTERED)

EXHIBIT A TO

MOTION FOR AN ORDER (1) AUTHORIZING THE USE OF
CASH COLLATERAL, (2) GRANTING REPLACEMENT
LIENS, (3) SCHEDULING A HEARING ON THE FURTHER USE
OF CASH COLLATERAL, AND (4) GRANTING OTHER RELIEF

| Type | Date | Bank | Borrowers | | | | Guarantors | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | CEC | SMS | CSS | Mystic | CEC | SMS | Mystic | CSS | CCI | JMC |
| Term Loan | 6/30/2010 | Rockland Trust | X | X | X | | | X | | X | X | X |
| Revolver | 6/24/2011 | Rockland Trust | X | X | | | X | X | | X | | X |
| Term Loan | 6/6/2013 | Rockland Trust | | X | | | X | | | X | X | X |
| Revolver | 6/28/2013 | Rockland Trust | X | | | | | X | | X | X | X |
| Term Loan | 8/20/2015 | Rockland Trust | X | | | | | X | X | X | X | X |
| Term Loan | 1/26/2016 | Rockland Trust | X | | | | | X | X | X | X | X |
| Term Loan | 1/26/2016 | Rockland Trust | X | | | | | X | X | X | X | X |
| | | | | | | | | | | | | |
| Consumer Loan | 11/21/2005 | Santander | X | | | | | | | | | |
| Term Loan | 6/25/2013 | Santander | X | | | | | | | | | X |
| Term Loan | 7/28/2014 | Santander | X | X | | X | | | | | | X |
| Term Loan | 10/10/2014 | Santander | X | X | | X | | | | | | X |
| Term Loan | 9/17/2015 | Santander | X | X | | X | X | X | X | | | X |
| | | | | | | | | | | | | |
| Term Loan | 12/26/2014 | Wells Fargo | X | | | | | X | | X | | X |
| Term Loan | 12/4/2015 | Wells Fargo | X | | | | | X | | X | | X |
| Term Loan | 12/4/2015 | U.S. Bank | X | | | | | X | | X | | X |
| Term Loan | 12/4/2015 | Key Bank | X | | | | | X | | X | | X |
| Term Loan | 12/9/2015 | Pacific Western Bank | X | | | | | X | | X | | X |
| Term Loan | 12/14/2015 | Fifth Third Bank | X | | | | | X | | X | | X |
| | | | | | | | | | | | | |
| Term Loan | 6/3/2011 | Citizens | X | X | X | | | | | | | X |
| Term Loan | 5/9/2014 | Citizens | X | | | | | X | | X | | X |
| Term Loan | 8/28/2015 | Citizens | X | | | | | X | | X | | X |
| | | | | | | | | | | | | |
| Term Loan | 6/26/2012 | Bank of America | X | | | | | X | | X | | X |
| Term Loan | 8/15/2014 | Bank of America | X | X | | | | | | X | | X |
| | | | | | | | | | | | | |
| Term Loan | 9/15/2015 | Equitable | X | | | | | | | | | X |
| | | | | | | | | | | | | |
| Term Loan | 12/15/2014 | Radius Bank | X | | | | | | | X | | X |
| | | | | | | | | | | | | |
| Bonds | 12/4/1997 | MARAD | X | | | | | | | | | |
| Bonds | 4/14/1999 | MARAD | X | | | | | | | | | |

IN RE: CASHMAN EQUIPMENT CORP., *ET AL.*
BANKRUPTCY NO. 17-12205
(JOINTLY ADMINISTERED)


EXHIBIT B TO


MOTION FOR AN ORDER (1) AUTHORIZING THE USE OF
CASH COLLATERAL, (2) GRANTING REPLACEMENT
LIENS, (3) SCHEDULING A HEARING ON THE FURTHER USE
OF CASH COLLATERAL, AND (4) GRANTING OTHER RELIEF

**Cashman Equipment Corp & Affiliates - 2017 Projected Weekly Cash Flow**

| Week ended | Wk# | Projection 6/18/2017 | Projection 6/25/2017 | Projection 7/2/2017 | Projection 7/9/2017 | Projection 7/16/2017 | Projection 7/23/2017 | Projection 7/30/2017 |
|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | |
| Accounts Receivable Collections | | 197,130 | 187,487 | 28,300 | 131,744 | 120,945 | 175,969 | 280,650 |
| **TOTAL COLLECTIONS** | | **197,130** | **187,487** | **28,300** | **131,744** | **120,945** | **175,969** | **280,650** |
| **Operating Disbursements** | | | | | | | | |
| CEC Payroll | | 58,683 | 50,734 | 55,267 | 54,534 | 58,683 | 50,734 | 54,534 |
| SMS Payroll | | 4,000 | 4,000 | 10,250 | 4,000 | 4,000 | 4,000 | 10,250 |
| CSS Payroll | | 4,318 | 4,318 | 4,318 | 4,318 | 4,318 | 4,318 | 4,318 |
| Subcontractors, Supplies and Materials | | 50,206 | 81,456 | 81,456 | 81,456 | 81,456 | 50,206 | 50,206 |
| Equipment Rental and Lease Expense | | 24,337 | 24,339 | 24,612 | 24,342 | 24,343 | 24,345 | 24,619 |
| Fleeting related | | - | 50,000 | 134,320 | 50,000 | 50,000 | - | 84,320 |
| Tug and Tow | | - | 11,000 | 46,200 | 8,250 | 16,923 | 16,923 | 16,923 |
| Corporate Insurance | | - | - | - | 31,000 | - | - | - |
| Facility (Rent/Utilities/Maintenance): | | 6,250 | 1,000 | 700 | 15,764 | 6,250 | 1,000 | 700 |
| Office and travel expense | | 13,846 | 13,846 | 25,000 | 13,846 | 13,846 | 13,846 | 13,846 |
| Sales and Foreign taxes | | 1,000 | 5,000 | 15,000 | 1,000 | 1,000 | 5,000 | 1,000 |
| Accounting, appraisals | | 4,400 | 3,400 | 3,640 | 3,400 | 4,400 | 3,640 | 3,400 |
| US Trustee | | - | - | 9,750 | - | - | - | - |
| Other Operating Disbursements | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| **TOTAL OPERATING DISBURSEMENTS** | | **172,041** | **254,093** | **415,513** | **296,910** | **270,220** | **179,012** | **269,116** |
| **NET CASH FLOW** | | **25,090** | **(66,606)** | **(387,213)** | **(165,166)** | **(149,275)** | **(3,043)** | **11,534** |
| **Consolidated Cash Balance, Beginning** | | **$ 3,190,043** | **$ 3,215,133** | **$ 3,148,527** | **$ 2,761,314** | **$ 2,596,148** | **$ 2,446,873** | **$ 2,443,830** |
| **NET CASH FLOW** | | **25,090** | **(66,606)** | **(387,213)** | **(165,166)** | **(149,275)** | **(3,043)** | **11,534** |
| **Consolidated Cash Balance, Ending** | | **$ 3,215,133** | **$ 3,148,527** | **$ 2,761,314** | **$ 2,596,148** | **$ 2,446,873** | **$ 2,443,830** | **$ 2,455,364** |
| **ACCOUNTS RECEIVABLE** | | | | | | | | |
| Beginning Balance, net 120 and deemed uncollectible | | 2,593,994 | 2,396,864 | 2,819,411 | 3,512,411 | 3,380,667 | 3,259,722 | 3,083,753 |
| + New Billing | | - | 610,034 | 721,300 | - | - | - | 683,774 |
| - Collections | | (197,130) | (187,487) | (28,300) | (131,744) | (120,945) | (175,969) | (280,650) |
| Ending balance | | 2,396,864 | 2,819,411 | 3,512,411 | 3,380,667 | 3,259,722 | 3,083,753 | 3,486,876 |

Cashman Equipment Corp & Affiliates -  2017 Pro

| Week ended | Projection 8/6/2017 | Projection 8/13/2017 | Projection 8/20/2017 | Projection 8/27/2017 | Projection 9/3/2017 | Projection 9/10/2017 | Projection 9/17/2017 | Projection Totals |
|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | |
| Accounts Receivable Collections | 358,539 | 392,952 | 249,298 | 233,831 | 233,831 | 233,831 | 233,831 | 3,058,339 |
| **TOTAL COLLECTIONS** | **358,539** | **392,952** | **249,298** | **233,831** | **233,831** | **233,831** | **233,831** | **3,058,339** |
| **Operating Disbursements** | | | | | | | | |
| CEC Payroll | 58,683 | 50,734 | 55,267 | 57,667 | 57,667 | 57,667 | 57,667 | 778,521 |
| SMS Payroll | 4,000 | 4,000 | 4,000 | 4,000 | 10,250 | 4,000 | 4,000 | 74,750 |
| CSS Payroll | 4,318 | 4,318 | 4,318 | 4,318 | 4,318 | 4,318 | 4,318 | 60,452 |
| Subcontractors, Supplies and Materials | 50,206 | 50,206 | 50,206 | 50,206 | 50,206 | 50,206 | 50,206 | 827,886 |
| Equipment Rental and Lease Expense | 24,348 | 24,350 | 24,351 | 24,625 | 24,354 | 24,356 | 24,357 | 341,678 |
| Fleeting related | - | - | - | 84,320 | - | - | - | 452,960 |
| Tug and Tow | 16,923 | 16,923 | 16,923 | 16,923 | 16,923 | 16,923 | 16,923 | 234,681 |
| Corporate Insurance | - | 31,000 | - | - | - | 31,000 | - | 93,000 |
| Facility (Rent/Utilities/Maintenance): | 15,764 | 6,250 | 1,000 | 700 | 15,764 | 6,250 | 1,000 | 78,392 |
| Office and travel expense | 25,000 | 13,846 | 13,846 | 13,846 | 25,000 | 13,846 | 13,846 | 227,308 |
| Sales and Foreign taxes | 15,000 | 1,000 | 5,000 | 1,000 | 15,000 | 1,000 | 1,000 | 68,000 |
| Accounting, appraisals | 3,640 | 4,400 | 3,640 | 3,400 | 3,400 | 4,400 | 3,640 | 52,800 |
| US Trustee | 9,750 | - | - | - | 9,750 | - | - | 29,250 |
| Other Operating Disbursements | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 70,000 |
| **TOTAL OPERATING DISBURSEMENTS** | **232,632** | **212,027** | **183,552** | **266,005** | **237,633** | **218,966** | **181,958** | **3,389,677** |
| **NET CASH FLOW** | **125,907** | **180,925** | **65,746** | **(32,174)** | **(3,801)** | **14,865** | **51,874** | **(331,338)** |
| **Consolidated Cash Balance, Beginning** | **$ 2,455,364** | **$ 2,581,271** | **$ 2,762,196** | **$ 2,827,942** | **$ 2,795,768** | **$ 2,791,967** | **$ 2,806,832** | **$ 3,190,043** |
| **NET CASH FLOW** | **125,907** | **180,925** | **65,746** | **(32,174)** | **(3,801)** | **14,865** | **51,874** | **(331,338)** |
| **Consolidated Cash Balance, Ending** | **$ 2,581,271** | **$ 2,762,196** | **$ 2,827,942** | **$ 2,795,768** | **$ 2,791,967** | **$ 2,806,832** | **$ 2,858,706** | **$ 2,858,706** |
| **ACCOUNTS RECEIVABLE** | | | | | | | | |
| Beginning Balance, net 120 and deemed uncolle | 3,486,876 | 3,944,488 | 3,551,536 | 3,302,238 | 3,782,270 | 3,548,439 | 4,122,621 | 2,593,994 |
| + New Billing | 816,151 | - | - | 713,863 | - | 808,014 | - | 4,353,135 |
| - Collections | (358,539) | (392,952) | (249,298) | (233,831) | (233,831) | (233,831) | (233,831) | (3,058,339) |
| Ending balance | 3,944,488 | 3,551,536 | 3,302,238 | 3,782,270 | 3,548,439 | 4,122,621 | 3,888,790 | 3,888,790 |

IN RE: CASHMAN EQUIPMENT CORP., *ET AL.*
BANKRUPTCY NO. 17-12205
(JOINTLY ADMINISTERED)

EXHIBIT C TO

MOTION FOR AN ORDER (1) AUTHORIZING THE USE OF
CASH COLLATERAL, (2) GRANTING REPLACEMENT
LIENS, (3) SCHEDULING A HEARING ON THE FURTHER USE
OF CASH COLLATERAL, AND (4) GRANTING OTHER RELIEF

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(Eastern Division)**

| | |
|---|---|
| In re<br><br>**CASHMAN EQUIPMENT CORP.,**[9]<br><br>Debtor | **Chapter 11**<br><br>**Case No. 17-12205** |

**INTERIM ORDER GRANTING**
**MOTION FOR AN ORDER (1) AUTHORIZING THE USE OF**
**CASH COLLATERAL, (2) GRANTING REPLACEMENT**
**LIENS, (3) SCHEDULING A HEARING ON THE FURTHER USE**
**OF CASH COLLATERAL, AND (4) GRANTING OTHER RELIEF**

This matter having come before the Court on the *Motion For an Order (1) Authorizing the Use of Cash Collateral, (2) Granting Replacement Liens, (3) Scheduling a Hearing on the Further Use of Cash Collateral, and (4) Granting Other Relief* (the "Cash Collateral Motion") filed on June 12, 2017, by Cashman Equipment Corp. ("CEC"), Cashman Scrap & Salvage, LLC ("CSS"), Servicio Marina Superior, LLC ("SMS"), Cashman Canada, Inc. ("CCI"), and Mystic Adventure Sails, LLC ("Mystic", and together with CEC, CSS, SMS and CCI the "Debtors"), the debtors and debtors-in-possession in the above captioned cases. The Court having considered the Motion, the *Affidavit of James Cashman in Support of First Day Motions*, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on _____, 2017 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and MBLR 4001-2(b); and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested

---

[9] Joint administration requested.  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Cashman Equipment Corp. (7969), Cashman Scrap & Salvage, LLC (6088), Servicio Marina Superior, LLC (6919), Mystic Adventure Sails, LLC (2137) and Cashman Canada, Inc. (1296).

in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the

Court that granting the interim relief requested is necessary to avoid immediate and irreparable

harm to the Debtors and their estate pending the Final Hearing, and otherwise is fair and

reasonable, in the best interests of the Debtors, their estates, and their creditors, and equity holders,

and essential for the maximization of the assets of the Debtors' business; and after due deliberation

and consideration, and for good and sufficient cause appearing therefor;

## THE COURT HEREBY MAKES THE FOLLOWING PRELIMINARY FINDINGS

A.    On June 9, 2017 (the "Petition Date"), the Debtors filed voluntary petitions with

this Court for relief under chapter 11 of the Bankruptcy Code.  The chapter 11 cases filed by the

Debtors are referred to herein as the "Cases."

B.    The Debtors continue to operate their businesses and manage their properties as

debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee

or examiner has been appointed in the Cases.

C.    This Court has jurisdiction over these proceedings, and the persons and properties

affected hereby, pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C.

§§ 1408 and 1409 and the standing order of reference codified in LR D, Mass. 201.  The Motion

is a core proceeding pursuant to 28 U.S.C. § 157(b).

D.    As of the date hereof, the United States Trustee for the District of Massachusetts

(the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors in the

Cases pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

E.    The Debtors requested entry of this Interim Order pursuant to Bankruptcy Rule

4001(b)(2).  The Debtors have an immediate need to use the Cash Collateral to, among other

things, preserve and maximize the value of the Debtors' assets, absent which immediate and

2

irreparable harm will result to the Debtors, their estates, and their creditors. The preservation

and maintenance of the Debtors' assets and business is necessary to maximize values available

for distribution to creditors. Absent the Debtors' ability to use Cash Collateral, the Debtors

would not have sufficient available sources of working capital or financing and would be unable

to pay their operating expenses (including, without limitation, fuel, port fees, insurance cost,

crew and repairs) or maintain their assets (including, without limitation, their fleet of vessels), to

the severe detriment of the Debtors' estates and creditors. Accordingly, the relief requested in

the Motion and the terms herein are (i) critical to the Debtors' ability to maximize the value of

their chapter 11 estates, (ii) in the best interests of the Debtors and their estates, and (iii)

necessary, essential, and appropriate to avoid immediate and irreparable harm to the Debtors and

their assets. This Order and all of its terms meet the standard for interim relief set forth in

MBLR 4001-2(e)(2).

   F.  The following entities (collectively the "<u>Lenders</u>") may assert liens on the

Debtors' property and may have an interest in the Debtors' Cash Collateral: (i) U.S. Secretary of

Transportation acting through the U.S. Maritime Administration; (ii) Rockland Trust Company;

(iii) Santander Bank, N.A.; (iv) Wells Fargo, N.A.; (v) Citizens Asset Finance, Inc.; (vi) Bank of

America Leasing and Capital, LLC; (vii) U.S. Bank Equipment Finance; (viii) KeyBank N. A.;

(ix) Fifth Third Bank; (x) Radius Bank; (xi) Pacific Western Bank; and (xii) Equitable Bank.

   G.  Attached to the Cash Collateral Motion is a budget (the "<u>Budget</u>") for the use of

Cash Collateral.

   H.  The Debtors have caused notice of the Motion, the relief requested therein, and

the Interim Hearing to be served by facsimile, email, overnight courier, or hand delivery on the

following parties (collectively, the "<u>Notice Parties</u>"): (i) the U.S. Trustee; (ii) holders of the

twenty (20) largest unsecured claims on a consolidated basis against the Debtors; (iii) the

Lenders; (iv) the Internal Revenue Service; (v) any other taxing authority with a claim against

any Debtor; (vi) all parties who have filed a notice of appearance and request for service of

papers pursuant to Bankruptcy Rule 2002.  Under the circumstances, the notice given by the

Debtors of the Motion, the relief requested therein, and of the Interim Hearing complies with

Bankruptcy Rules 2002, 4001(b), (c), and (d) and MBLR 4001-2(b).

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      Capitalized terms not otherwise defined herein shall have the meanings ascribed

to them in the Cash Collateral Motion.

2.      The Cash Collateral Motion is GRANTED on an interim basis as set forth in this

order. Any objections to the Cash Collateral Motion to the extent not withdrawn or resolved are

hereby overruled.

3.      The Debtors are authorized to use Cash Collateral substantially in accordance

with the Budget through and including _____, 2017 (the "Interim Period").

4.      For the purposes of Sections 361, 363(e) and 507(b) of the Bankruptcy Code, and

as adequate protection to the Lenders for the Debtors' use of Cash Collateral, the Lenders are

granted replacement liens (the "Replacement Liens") on the same types of post-petition property

of the Debtors' estates against which the Lenders held liens as of the Petition Date.  The

Replacement Liens shall maintain the same priority, validity and enforceability as the Lenders'

respective pre-petition liens.  The Replacement Liens shall be recognized only to the extent of

the post-petition diminution in value of the Lenders' pre-petition collateral resulting from the

Debtors' use of the Cash Collateral.

4

5. The Replacement Liens shall not attach to any avoidance powers held by any of the Debtors or any trustee for the Debtors, including those avoidance powers set forth in Sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, or to the proceeds of any claims under or actions commenced pursuant to such powers.

6. Commencing on July 15, 2017, and continuing thereafter on the fifteenth (15th) day of each successive month, the Debtors shall provide the following reporting to each Lender: (a) a report on the collection of accounts receivable based on which Lender asserts liens on the collected accounts receivable, (b) a report on which vessel generated accounts receivable during the month in question and which Lender, if any, asserts a lien on such vessel, (c) a budget to actual report with respect to the Budget, and (d) a copy of each Debtors' monthly operating report submitted to the Office of the United States Trustee.

7. Nothing in this order shall constitute a waiver by or restrict the right of any Debtor to seek the further use of Cash Collateral.

8. This Court has not been asked to find, and it does not find, that any asserted security interest or lien is valid or perfected. Nothing contained in this order is intended, or shall be deemed, to be a ruling on the extent or validation of any creditor's asserted security interest.

9. A continued hearing on the Debtors' request for entry of the Final Order is scheduled for _____, 2017, at __:___ _.m. (prevailing Eastern Time) before this Court. Within three (3) business days after entry of this Interim Order, the Debtors shall serve, or cause to be served, by first class mail or other appropriate method of service, a copy of this Interim Order on the Notice Parties. Any responses or objections to the Motion shall be made in writing, conform to the applicable Bankruptcy Rules and the local rules of this Court, be filed with the Bankruptcy Court, set forth the name of the objecting party, the basis for the objection,

5

and the specific grounds therefor, and be served so as to be actually received no later than

_____, 2017, at 4:00 p.m. (prevailing Eastern time) by the following parties: (a)

counsel for the Debtors, Harold B. Murphy, Esquire  and D. Ethan Jeffrey, Esquire, Murphy &

King Professional Corporation, 1 Beacon Street , Boston, Massachusetts; (b) U.S. Trustee and (c)

those Parties requesting Notice

       10.    Notwithstanding any applicability of any Bankruptcy Rules, the terms and

conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

       11.    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction and power to

enforce this Interim Order in accordance with its terms and to adjudicate any and all matters

arising from or related to the interpretation or implementation of this Interim Order.


BY THE COURT


_____

United States Bankruptcy Judge

Dated: June    , 2017

728473