## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CASHMAN EQUIPMENT CORP.,[1] | Case No. 17-12205-MSH |
| Debtor. | (Jointly Administered) |

## SANTANDER BANK N.A.'S OBJECTION
## TO THE DEBTORS' FIRST AMENDED DISCLOSURE
## STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION

Santander Bank, N.A. ("**Santander**") hereby objects (this "**Objection**") to the *First Amended Disclosure Statement with Respect to Joint Plan of Reorganization of Cashman Equipment Corp., Cashman Scrap & Salvage, LLC, Servicio Marina Superior, LLC, Cashman Canada, Inc., Mystic Adventure Sales, LLC, and James M. Cashman* [Dkt. No. 912] (the "**Disclosure Statement**") filed by the Debtors.[2]   In support of this Objection,[3] Santander respectfully states as follows:

### I.   INTRODUCTION

1.     The Disclosure Statement supports a plan of reorganization (the "**Plan**") that is fatally flawed in numerous respects, rendering it incapable of confirmation.  The most glaring problem with the Plan is structural because it mimics features of a substantive consolidation of

---

[1]     The Debtor in this chapter 11 case and related cases of which joint administration has been granted, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Cashman Equipment Corp. (7969), Cashman Scrap & Salvage, LLC (6088), Servicio Marina Superior, LLC (6919), Mystic Adventure Sails, LLC (2137) and Cashman Canada, Inc. (1296).

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan (as defined herein) and the Disclosure Statement.  Docket entries refer to Case No. 17-12205-MSH, unless otherwise noted.

[3]     In addition to the grounds set forth in this Objection, Santander is joining in the objection of Rockland Trust Company to the Disclosure Statement along with other certain Lenders, and Santander reserves the right to join such other lenders' objections that may be filed as well.  For any such objection(s) that Santander joins, Santander asserts the arguments contained therein as its own in additional to the arguments set forth in this Objection.

the Debtors' estates by embracing the benefits and not the burdens of consolidation.  The Plan's consolidation mechanism handcuffs creditors, and particularly Lenders, without the Debtors making any effort to demonstrate that substantive consolidation is appropriate under these circumstances.  The Plan's improper consolidation feature alone is self-defeating.

2.       Other fatal flaws in the Plan include improper treatment of Lenders' guarantee claims against James M. Cashman ("***Jamie Cashman***"), a discriminatory "death trap" mechanism that is fundamentally unfair to non-Supporting Lenders because it improperly withholds rights they would otherwise be entitled to, and a free and clear sale mechanism purportedly under section 363 without the Debtors being able to meet any of the requirements of section 363(f).  Individually, any one of these flaws would prevent confirmation.  Collectively, they demonstrate that solicitation under these circumstances would be a futile effort, and for this reason the Disclosure Statement should not be approved.

3.       The Disclosure Statement also should not be approved because it contains inadequate information on other material Plan provisions.  Entirely missing from the Disclosure Statement and Plan is treatment of Santander's other mortgage on Jamie Cashman's property at 72 Jericho Road.  That mortgage arose separate and apart from Santander's commercial loan transactions with the Debtors and must be independently classified for Plan treatment and voting. The Disclosure Statement also does not contain an adequate discussion of the Debtors' section 1129(a)(7) analysis, which presently focuses only on an immediate liquidation using discounted forced liquidation values.  The facts and circumstances here point toward a hypothetical chapter 7 taking the form of an orderly liquidation, and those values must be discussed as well. In all likelihood, a section 1129(a)(7) analysis using orderly liquidation values would reflect that the Plan, at present, cannot satisfy the best interest of creditors test making this an omission of

tremendous significance to creditors.   The Disclosure Statement contains far too little information about Jamie Cashman's life insurance policies, totaling $90 million in face value, held by the Insurance Trust that will be made partially available to the Debtors as a loan upon maturity during the Plan's term.   It does not appear that Debtors have thought through all of the potential consequences of this arrangement, and far greater disclosure is needed for creditors to evaluate the viability of this additional form of potential Plan liquidity.

4.      For these reasons, among others set forth in objections that Santander intends to join, Santander respectfully requests that the Disclosure Statement not be approved.

## II.      BACKGROUND FACTS

5.      On June 9, 2017 (the "***Petition Date***"), each of the Debtors, along with their principal, Jaime Cashman, filed a petition for relief under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Massachusetts (this "***Court***").   The Debtors continue to operate their businesses and manage their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      On June 28, 2017, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "***Committee***") in these cases.

7.      Prior to the Petition Date, Santander had established certain commercial vessel loan arrangements (collectively, the "***Loans***") in favor of the Debtors Cashman Equipment Corp. ("***CEC***"), Servicio Marina Superior, LLC ("***SMS***"), and Mystic Adventure Sails, LLC ("***Mystic***" collectively with all Debtors other than Jamie Cashman, the "***Corporate Debtors***").   Such Loans are evidenced by a series of promissory notes, among other instruments and agreements (collectively, the "***Loan Documents***") including a certain Amended and Restated Consolidation Loan Agreement dated September 17, 2015 (the "***Credit Agreement***").   Santander has filed a

proof of claim in the amount of $27,298,717.66, which consists of principal $26,597,222.28 and

non-default interest of $272,067.88 as of the Petition Date, plus other certain fees, and is

exclusive of, *inter alios*, post-Petition Date default and non-default interest.  *See* Claim No. 66.

8.     The Loans are secured by, *inter alia*, preferred vessel mortgages (the "***Vessel***

***Mortgages***") in favor of Santander on twelve (12) vessels owned by CEC, SMS, and Mystic

(collectively, the "***Collateral Vessels***").   The Loans are all cross-collateralized by all of the

Collateral Vessels.

9.     In connection with the Loans, Santander entered into two separate guarantee

agreements dated September 17, 2015.  One guarantee agreement was with CEC, SMS, and

Mystic (the "***Corporate Guarantee***") and the other was with Jamie Cashman individually (the

"***Individual Guarantee***").  The Individual Guarantee is secured by a second mortgage against

Jamie Cashman's real property located at 72 Jericho Road, Dennis, MA (the "***Second***

***Mortgage***").[4]   Based on the Debtors financial disclosures to date and estimated value of this

property, there appears to be in upwards of $2 million dollars in equity available in the property

securing Santander's claim against Jamie Cashman on account of the Individual Guarantee.

Both of the guarantee agreements in favor of Santander state that the underlying obligations of

the respective guarantors "are primary and not contingent."   The each also state that the

underlying obligations being guaranteed are "of payment and not merely of collection."

10.    Prior to the Petition Date, Santander notified CEC, SMS, and Mystic of their

defaults under the Loans and the Corporate Guarantee and Jamie Cashman of his default under

the Individual Guarantee.   Santander demanded repayment in full of the entire outstanding

---

[4]       Jamie Cashman has claimed the 72 Jericho Road Property as exempt homestead property.  This homestead
designation was filed of record the same day as Jamie Cashman's Petition Date, and arose well after Santander's
respective mortgages against the property were filed of record.  Santander's position is that the claimed homestead
exemption is ineffective against a previously-filed mortgages.

indebtedness under the Loans and the guarantees.  When the respective Debtors failed to pay, Santander filed suit against them for breach of the Loan Documents and both guarantees.  *See* Cause No. 1:17-cv-10527, styled *Santander Bank, N.A. vs. Cashman Equiptment Corp., et al.*, in the United States District Court for the District of Massachusetts (the "***Santander Lawsuit***").  At the time of the Santander Lawsuit, the arrearage owed by the respective Debtors on account of the Loans and the guarantees was in the in the collective amount of $304,672.18 (exclusive of default interest).  The Debtors filed for bankruptcy protection shortly after Santander filed its lawsuit, and these arrearages remain unpaid.

11.     Santander also possesses another mortgage against the 72 Jericho Road property on account of a Home Equity Line of Credit Agreement ( the "***HELOC Mortgage***"), as reflected by its claim in the amount of $2,265,175.55.  *See* Claim No. 13 in Case No. 17-12205.  This HELOC Mortgage is independent of Santander's Second Mortgage against the same property, and each mortgage secures independent obligations of Jamie Cashman.  Jamie Cashman has not made any payments on account of the HELOC Mortgage since the Petition Date.

### III.    OBJECTION

12.     Santander objects to the adequacy of information included in the Disclosure Statement for the following reasons:

**A.     The Disclosure Statement is in Support of a Fatally Flawed Plan that Cannot be Confirmed.**

13.     Section 1125(b) provides that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title . . . , unless, at the time of or before such solicitation, . . . a written disclosure statement [is] approved, . . . by the court as containing adequate information."  11 U.S.C. § 1125(b).  Part of analyzing whether a disclosure statement contains inadequate information requires consideration whether it supports a plan that cannot be

confirmed on its face. *See In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989)

("Allowing a facially nonconfirmable plan to accompany a disclosure statement is both

inadequate disclosure and a misrepresentation."); *In re Pecht (Pecht II)*, 57 B.R. 137, 139

(Bankr. E.D. Va. 1986) ("Not only would allowing a nonconfirmable plan to accompany a

disclosure statement, and be summarized therein, constitute inadequate information, it would be

misleading and it would be a needless expense to the estate.").

14.    Where a disclosure statement supports a plan that is so fatally flawed as to render

it unconfirmable on its face, courts across the country, including this one, have denied the debtor

the opportunity to proceed with soliciting a plan doomed for failure. *See, e.g.*, *In re Mahoney

Hawkes, LLP*, 289 B.R. 285, 304 (Bankr. D. Mass. 2002) (declining to approve disclosure

statement because it supported plan that could not be confirmed); *In re Bjolmes Realty Tr.*, 134

B.R. 1000, 1002 (Bankr. D. Mass. 1991) ("It is permissible, . . . for the court to pass upon

confirmation issues where, as here, it is contended that the plan is so fatally and obviously

flawed that confirmation is impossible.") (citations omitted); *accord. In re 3333 Main, LLC*, No.

13-51533, 2014 WL 2338273, at *1 (Bankr. D. Conn. May 29, 2014) (recognizing "case law

supports the termination of the plan confirmation process at the disclosure statement stage" when

"the corresponding Plan is unconfirmable as a matter of law") (citation omitted); *In re Am.

Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (collecting cases and holding that "a

bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure

statement stage that a later confirmation hearing would be futile because the plan described by

the disclosure statement is patently unconfirmable"); *In re R & G Props., Inc.*, No. 08-10876,

2009 WL 2043873, at *5 (Bankr. D. Vt. July 6, 2009) (finding disclosure statement failed "to

satisfy the adequate information standard of § 1125, because it accompanies a Plan that cannot

be confirmed pursuant to 11 U.S.C. § 1129"); *In re Quigley Co., Inc.*, 377 B.R. 110, 115–16

(Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to

approve the disclosure statement must be denied, as solicitation of the vote would be futile."); *In*

*re E. Maine Elec. Co-op., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991) ("If the disclosure

statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court

should exercise its discretion to refuse to consider the adequacy of disclosures.") (citations

omitted); *In re Dakota Rail, Inc.*, 104 B.R. at 145 ("[T]his is a proposed plan which cannot

succeed . . . . A clearer case of a facially defective disclosure statement could hardly be found");

*In re Unichem Corp.*, 72 B.R. 95, 100 (Bankr. N.D. Ill.), *aff'd*, 80 B.R. 448 (N.D. Ill. 1987)

("Since this plan, . . . is unconfirmable as a matter of law, the court is unable to approve

[debtor's] disclosure statement."); *In re Pecht (Pecht I)*, 53 B.R. 768, 772 (Bankr. E.D. Va.

1985) (holding "because the disclosure describes a plan which cannot be confirmed, the

disclosure statement should not be approved").

15.    Based on the forgoing authorities, all parties in interest would be best served by

addressing the Plan's fatal flaws (set forth below) at the Disclosure Statement stage of these

proceedings as opposed to at the Plan confirmation stage.

    **(i)**    **<u>The Plan contains an improper consolidation mechanism that is prejudicial
to creditors and is being sought without the proper foundation for approval
of substantive consolidation.</u>**

16.    The Plan structure mimics a quasi-substantive consolidation of all the Corporate

Debtors' estates along with Jamie Cashman's estate.  All while expressly disclaiming any

intention to substantively consolidate.  *See* Dkt. No. 912 at p. 4 ("Nothing in the Plan is intended

to effectuate a substantive consolidation of the Debtors or their Estates.").  That the Debtors seek

the benefits of substantive consolidation without the associated burdens is a fundamental flaw in

the Plan that renders it unconfirmable.  So too is the fact that the Debtors have not attempted to

carry their burden of demonstrating that this proposed consolidation is justified under the facts of these cases as an equitable remedy.

> **(a).    Overview of substantive consolidation doctrine and when the drastic equitable remedy may be authorized.**

17.    "Substantive consolidation usually results in, *inter alia*, pooling the assets of, and claims against, the two entities; satisfying liabilities from the resultant common fund; eliminating inter-company claims; and combining the creditors of the two companies for purposes of voting on reorganization plans."  *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988) (citing 5 COLLIER ON BANKRUPTCY § 1100.06, at 1100–32 n. 1 (L. King ed. 15th ed. 1988)). Courts have cautioned that "[s]ubstantive consolidation should not be confused with either the corporate law concept of piercing the corporate veil or the bankruptcy law concept of joint administration."  *In re Cameron Constr. & Roofing Co., Inc.*, 565 B.R. 1, 8 (Bankr. D. Mass. 2016) (quoting *In Helena Chem. Co. v. Circle Land and Cattle Corp. (In re Circle Land and Cattle Corp.)*, 213 B.R. 870, 874 (Bankr. D. Kan. 1997)). "Whereas joint administration is designed in large part to promote procedural convenience and cost efficiencies which do not affect the substantive rights of claimants or the respective debtor estates, substantive consolidation merges the assets and liabilities of the debtor entities into a unitary debtor estate, to which all holders of allowed claims are required to look for distribution."  *In re Hemingway Transp., Inc.*, 954 F.2d 1, 11–12 (1st Cir. 1992) (citations omitted).

18.    Courts have also cautioned the sparing use of substantive consolidation because it "is no mere instrument of procedural convenience . . . but a measure vitally affecting substantive rights."  *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d at 518 (quoting *Flora Mir Candy Corp. v. R.S. Dickson & Co.*, 432 F.2d 1060, 1062 (2d Cir. 1970); *accord. In re Snider Bros., Inc.*, 18 B.R. 230, 234 (Bankr. D. Mass. 1982) ("[C]onsolidation in bankruptcy is no mere instrument of

procedural convenience, but a measure vitally affecting substantive rights."); *In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 423 (3d Cir. 2005) ("Because its effect radically rearranges legal boundaries, assets and liabilities, substantive consolidation is typically a sparingly used remedy for debtors' conduct. . . ."). The result of substantive consolidation "is that claims of creditors against separate debtors morph to claims against the consolidated survivor." *In re Owens Corning*, 419 F.3d 195, 206 (3d Cir. 2005) (quoting *In re Genesis Health Ventures, Inc.*, 402 F.3d at 423). "The bad news for certain creditors is that, instead of looking to assets of the subsidiary with whom they dealt, they now must share those assets with all creditors of all consolidated entities, raising the specter for some of a significant distribution diminution." *Id.*

19.     "Substantive consolidation has no express statutory basis but is a product of judicial gloss." *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d at 518. "A bankruptcy court's authority to consolidate is not provided for in the Bankruptcy Code, but it has been deemed to derive from the bankruptcy court's general equitable powers as expressed in section 105 of the Code." *In re Logistics Info. Sys., Inc.*, 432 B.R. 1, 10 (D. Mass. 2010). Both the U.S. Court of Appeals for the First Circuit and decisions from within this Court have embraced the ability to apply the substantive consolidation doctrine in the bankruptcy context. *E.g.*, *In re Hemingway Transp., Inc.*, 954 F.2d at 11–12; *In re Cameron Constr. & Roofing Co., Inc.*, 565 B.R. at 10; *In re Logistics Info. Sys., Inc.*, 432 B.R. at 13. It is worth noting that in each of these instances where substantive consolidation has been authorized, the proponent affirmatively sought substantive consolidation and carried the burden of demonstrating that the remedy was equitable under the circumstances. *E.g.*, *In re Cameron Constr. & Roofing Co., Inc.*, 565 B.R. at 10.

20.     The party seeking substantive consolidation bears a heavy burden. "Since consolidation can cause *disproportionate prejudice* among claimants required to *share* the

debtors' pooled assets, *the party requesting substantive consolidation must satisfy the bankruptcy court that, on balance, consolidation will foster a net benefit among all holders of unsecured claims*." *In re Hemingway Transp., Inc.*, 954 F.2d at 12 (emphasis in original and emphasis added). Courts within the this district have applied the so-called *Auto-Train* test for substantive consolidation, which "examines three factors, all of which must be met: (1) the movant must show a 'substantial identity between the entities to be consolidated;' (2) the movant must also demonstrate that 'consolidation is necessary to avoid some harm or to realize some benefit;' and (3) if a creditor will be prejudiced, the benefits of consolidation must heavily outweigh the harm." *In re Logistics Info. Sys., Inc.*, 432 B.R. at 12 (quoting *In re Auto-Train Corp., Inc.*, 810 F.2d 270, 276 (D.C. Cir. 1987)); *see also In re Cameron Constr. & Roofing Co., Inc.*, 565 B.R. at 10 (concluding that the First Circuit in *In re Hemingway Transportation, Inc.* adopted a test that mirrors the *Auto-Train* test) (citing *In re Hemingway Transp., Inc.*, 954 F.2d at 12 n.15).

21.     In considering a consolidation request, "[i]t must be recognized and affirmatively stated that substantive consolidation, in almost all instances, threatens to prejudice the rights of creditors." *In re Snider Bros., Inc.*, 18 B.R. at 234 (citation omitted). Thus, after the proponent for consolidation demonstrates the necessary prerequisites are met, "a creditor may object on the grounds that it relied on the separate credit of one of the entities and that it will be prejudiced by the consolidation," and "[i]f a creditor makes such a showing, the court may order consolidation *only* if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm." *In re Auto-Train Corp.*, *Inc.*, 810 F.2d at 276  (emphasis added) (citations omitted).

22.     An attempt at "deemed" consolidation of all or part of a plan, such as the Plan here, without first demonstrating the proper founding for substantive consolidation renders the plan "fatally flawed." *See In re Owens Corning*, 419 F.3d at 16 (finding "perhaps the flaw most

10

fatal to the Plan Proponents' proposal is that the consolidation sought was 'deemed'"); *see also In re New Century TRS Holdings, Inc.*, 407 B.R. 576, 591–92 (D. Del. 2009) (reversing plan confirmation order due to improper consolidation mechanism). In *In re Owens Corning*, the Third Circuit found the plan proponents' attempt at "deemed" consolidation for limited purposes problematic because "[i]n effect, the Plan Proponents seek to remake substantive consolidation not as a remedy, but rather a stratagem to 'deem' separate resources reallocated to [the debtors] to strip the [secured lenders] of rights under the Bankruptcy Code, favor other creditors, and yet trump possible Plan objections by the [secured lenders]." *In re Owens Corning*, 419 F.3d at 16.

23.     This Court in *In re SW Boston Hotel Venture, LLC* restated conclusion in *Owens Corning* that "the Third Circuit held that the 'deemed' consolidation of a corporate debtor and related entities that had guaranteed their borrowing was impermissible as it deprived the lender of the guarantees for which it had bargained." *In re SW Boston Hotel Venture, LLC*, 460 B.R. 38, 64 (Bankr. D. Mass. 2011), *vacated*, No. BAP 11-087, 2012 WL 4513869 (B.A.P. 1st Cir. Oct. 1, 2012), *vacated*, 748 F.3d 393 (1st Cir. 2014). In *In re SW Boston Hotel Venture, LLC*, the Court embraced one of the principles from *Owens Corning* that "[w]hile substantive consolidation may be used defensively to remedy the identifiable harms cause by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights)." *Id.* (quoting *In re Owens Corning*, 419 F.3d at 211). Accordingly, from the lesson taught by *Owens Corning* a rule has emerged in this District that "when substantive consolidation is used offensively for an improper purpose which is detrimental to creditors, ***a court should not permit its use***." *Id.* at 65 (emphasis added).

**(b).    *The Plan's deemed consolidation mechanism is a fatal flaw because it fails to comport with complete substantive consolidation and the proper foundation for the remedy has not been demonstrated.***

24.    Here, like the plan the Third Circuit found "fatally flawed" in *Owens Corning*, the Plan similarly makes an attempt at "deemed" consolidation for offensive purposes, without actually resulting in full-blown substantive consolidation, and without first demonstrating the proper foundation for the Court to authorize such a drastic equitable remedy. *See In re Owens Corning*, 419 F.3d at 216.  According to the Disclosure Statement, "[f]or the purposes of the Allowance of and distributions to Allowed Claims under the Plan, Section 6.2(a) of the Plan provides for the consolidation of the Debtors such that creditors with multiple Claims for the same obligations will receive only one Allowed Claim under the Plan." Dkt. 912 at p. 4.  Indeed, Section 6.2(a) of the Plan provides in relevant part:

> Any holder of multiple Allowed Claims against more than one Debtor that arise from the contractual, joint, joint and several, or several liability of such Debtors, the guarantee by one Debtor of another Debtor's obligation or other similar circumstances, shall be entitled to one Allowed Claim that, in the aggregate, does not exceed the amount of the underlying Claim giving rise to such multiple Claims.  Claims against more than one of the Debtors arising from the same injury, damage, cause of action or common facts shall be Allowed and paid only once as if such Claim were against a single Debtor.

Dkt. No. 911 at § 6.2(a).

25.    The Plan's consolidation of all Lenders' claims against the various Debtors into a single claim creates precisely the same result as substantive consolidation because the "claims of creditors against separate debtors morph to claims against the consolidated survivor." *In re Owens Corning*, 419 F.3d at 206 (quoting *In re Genesis Health Ventures, Inc.*, 402 F.3d at 423); *see also In re Hemingway Transp., Inc.*, 954 F.2d at 11–12 ("[S]ubstantive consolidation merges the assets and liabilities of the debtor entities into a unitary debtor estate, to which all holders of allowed claims are required to look for distribution.").  Despite this consolidated treatment under

the Plan, the Disclosure Statement attempts to disclaim that "[n]othing in the Plan is intended to effectuate a substantive consolidation of the Debtors or their Estates."  Dkt. 912 at p. 4. Relatedly, Section 6.2(a) of the Plan states that "Nothing in this Section 6.2(a) of the Plan shall, upon a default under the Plan, prevent the holder of Allowed Claims against more than one Debtor from enforcing its remedies under the Plan against such Debtors."  Dkt. No. 911 at § 6.2(a).

26.     While it may be true that nothing in Section 6.2(a) of the Plan prevents the holder of Allowed Claim from pursuing its remedies against more than one applicable Debtor upon default, *see id.*, elsewhere the Plan further limits Lenders' rights, particularly with respect to Jamie Cashman and Lenders' pre-petition guaranties.  For instance, the definition of "JMC Secured Claims" means "Secured Claims against JMC arising from loans made to JMC, and *shall not include any guarantees of loans by JMC*."  *Id.* at § 1.56 (emphasis added).  By this definition, the Debtors apparently intend to strip any Lenders' secured guaranties against Jamie Cashman, such as the one Santander possesses, into General Unsecured Claims.  The Disclosure Statement reinforces this conclusion by referencing the $62,866,000 amount of pre-petition general unsecured claims against Jamie Cashman and stating "[o]f this amount, approximately $62,840,000 consists of claims asserted by Lenders on account of Mr. Cashman's guaranties of the debts of the corporate Debtors. Net of the guaranty claims, the General Unsecured Claims asserted against Mr. Cashman total approximately $25,800."  Dkt. No. 912 at p. 23.

27.     Notwithstanding the Debtors' efforts to convert secured guarantee claims against Jamie Cashman into General Unsecured Claims, the Plan further diminishes Lenders' rights under pre-petition guarantees the following way:

> All guaranties issued by any Debtor to Lenders and Supporting Lenders: (1) shall remain in effect, provided that no payment or other obligation under such

> guaranties shall be due or deliverable from the respective Debtor unless there is a payment default under the Plan; and (2) *shall constitute secondary sources of repayment for the obligations guaranteed, such that each holder of such a guaranty must exhaust its remedies against the primary obligor before seeking a recovery against the guarantor.*

Dkt. 911 at § 4.1(h) (emphasis added).   Accordingly, Section 6.2(a) of the Plan consolidates Santander's claims against various of the Debtors into a single Allowed Claim against all Debtors' consolidated Estates; Section 1.56 of the Plan attempts to strip the secured nature of Santander's pre-petition Individual Guarantee claim against Jamie Cashman and transform it into a General Unsecured Claim; and Section 4.1(h) of the Plan further converts the now unsecured Individual Guarantee claim, in addition to Santander's pre-petition Corporate Guarantee claims against other Debtors, into secondary guarantees for collection, as opposed to their original form as primary guarantees for payment.  *See* Dkt. 911 at §§ 1.56, 4.1(h), 6.2(a).

28.     The Plan further consolidates the source of Lenders' recoveries through the creation of an "Additional Plan Lien" that burdens all Lenders' collateral by imposing an additional junior lien on each Lenders' Mortgaged Vessels in favor of all other Lenders' Allowed Secured Claims.  *See* Dkt. 911 at §§ 1.2, 4.1(c)(i)(3) and (c)(ii)(2).  This feature is a hallmark of substantive consolidation because the Additional Plan Lien effectively cross-collateralizes all Debtors' Mortgaged Vessels as a consolidated source of recovery for all Lenders' allowed Secured Claims.  *See In re 431 W. Ponce De Leon, LLC*, 515 B.R. 660, 688 (Bankr. N.D. Ga. 2014) ("One of the effects of the proposed consolidation is that all creditors are effectively cross collateralized because all assets stand for all debts.").

29.     To wit, Section 1.2 of the Plan defines "Additional Plan Lien" to mean in relevant part "a lien on the Mortgaged Vessels other than . . . the Unencumbered Vessels, which lien shall be junior to the Vessel Mortgages and Liens securing the Insurers' Claims and the Allowed Maritime Lien Claims, if any, and shall be shared Pro Rata by all Lenders with Allowed Secured

Claims." Dkt. 911 at § 1.2. Section 4.1(c)(i)(3) further provides that "[i]n addition to the Liens retained under the Plan, the Supporting Lender [or Lender] shall receive the Additional Plan Lien to secure its Allowed Secured Claim." *Id.* at § 4.1(c)(i)(3), (c)(ii)(2). Similar to the Plan's treatment of the Lenders' ability to enforce guarantees, enforcement of the Additional Plan Lien is also contingent on the Debtors' default under the Plan and expiration of any applicable cure period. *See id.* at § 4.1(c)(i)(10), (c)(ii)(7).

30.     The Plan therefore contains many features indicative of substantive consolidation such as consolidating each Lenders' multiple claims against each respective Debtor into singular Allowed Claims against all Debtors, curtailing and eliminating material features of Lenders' pre-petition guarantees against the Corporate Debtors and Jamie Cashman, and pooling Lenders' sources of recoveries through the Additional Plan Lien on the entire fleet of all Lenders' Mortgaged Vessels. *E.g.*, *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d at 518 ("Substantive consolidation usually results in, *inter alia*, pooling the assets of, and claims against, the two entities; satisfying liabilities from the resultant common fund; . . ."). Each of these Plan features are prejudicial to Lenders, as they eliminate or curtail Lenders' rights that existed pre-petition.

31.     The Plan also contains certain provisions that are inconsistent with substantive consolidation in ways that are favorable to the Debtors and their non-Debtor affiliates. For instance, elimination of inter-company claims is a typical feature of substantive consolidation. *See id.* The Disclosure Statement acknowledges the existence of pre-petition inter-company loans made by various of the Debtors totaling almost $27.4 million. *See* Dkt. No. 912 at p. 23. It provides, however, that "[u]nder the Plan, these [inter-company] claims will not be discharged." *Id.* Another feature of substantive consolidation is pooling assets of various related debtors into a single asset pool. *See In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d at 518. Section 5.7 of the

15

Plan provides, however, that "[e]xcept as otherwise provided in the Plan, *each of the Reorganized Debtors, as of the Effective Date, shall be vested with all of the assets of each respective Debtor*." Dkt. 911 at § 5.7 (emphasis added).

32.    Based on these foregoing provisions, this Plan is remarkably similar to the plan the Third Circuit in *Owens Corning* found "fatally flawed" by offensively using "partial" or "deemed" consolidation to burden creditors while not imposing other unfavorable aspects of consolidation to the debtors' benefit. The court in *Owens Corning* described or quoted the similarly offensive plan features at issue there as follows:

> [T]he Plan Proponents sought a form of what is known as a "deemed consolidation," under which a consolidation is deemed to exist for purposes of valuing and satisfying creditor claims, voting for or against the Plan, and making distributions for allowed claims under it. Yet "the Plan would not result in the merger of or the transfer or commingling of any assets of any of the Debtors or Non–Debtor Subsidiaries, . . . [which] will continue to be owned by the respective Debtors or Non–Debtors." Despite this, on the Plan's effective date "all guarantees of the Debtors of the obligations of any other Debtor will be deemed eliminated, so that any claim against any such Debtor and any guarantee thereof . . . will be deemed to be one obligation of the Debtors with respect to the consolidated estate." Put another way, "the Plan eliminates the separate obligations of the Subsidiary Debtors arising from the guarant[e]es of the 1997 Credit Agreement."

*In re Owens Corning*, 419 F.3d at 202 (internal citations and footnote omitted). Here, just as in *Owens Corning*, Debtors' Plan attempts to deem a consolidation of all Lenders' claims into a single Allowed Claim for voting and Plan recovery purposes; further consolidates and communizes the source of recoveries for Lenders' claims by burdening all Lenders' Mortgaged Vessels with the Additional Plan Lien in favor of all other Lenders' Allowed Secured Claims; eliminates secured guarantees against Jamie Cashman and turns all Lenders' pre-petition primary guarantees for payment against various Debtors into secondary guarantees for collection, effectively eliminating the separate obligations of the Debtors under the original guarantee agreements; and allows each Debtor's assets to re-vest post-confirmation into each

corresponding Reorganized Debtor, hence free of any burden of consolidation. *Cf. id.* As the court in *Owens Corning* concluded, "'[c]ommunizing" assets of affiliated companies to one survivor to feed all creditors of all companies may to some be equal (and hence equitable). But it is hardly so for those creditors who have lawfully bargained prepetition for unequal treatment by obtaining guarantees of separate entities." *Id.* at 216.

33.     Finally, it is worth noting that the Debtors seek the benefits of this deemed partial consolidation without bothering to establish the pre-requisite foundation for substantive consolidation—*i.e.*, hopeless commingling, insider wrong-doing, historical disregard of corporate separateness, etc. *See In re Snider Bros., Inc.*, 18 B.R. at 239. Instead, they disingenuously seek to impose the beneficial aspects of substantive consolidation on the one hand while disclaiming any overt attempt to do so on the other. *See* Dkt. No. 912 at p. 4 ("Nothing in the Plan is intended to effectuate a substantive consolidation of the Debtors or their Estates."). In any event, Santander does not consent to the Plan's deemed partial consolidation, much less any full-blown substantive consolidation. *See In re SW Boston Hotel Venture, LLC*, 460 B.R. at 63 (recognizing, absent consent, consolidation proponent must demonstrate entitlement to the remedy); *In re Owens Corning*, 419 F.3d at 212 (same).

34.     Because the Debtors' Plan uses features of substantive consolidation offensively and to the detriment of Santander and other Lenders that bargained pre-petition for guarantee and collateral independence rights that the Plan's consolidation features diminish, the Plan is "fatally flawed" and cannot be confirmed. *See In re Owens Corning*, 419 F.3d at 216. This Disclosure Statement should not be approved for solicitation of a fatally flawed Plan.

**(ii)      The Plan fails to properly treat Santander's Individual Guarantee claims against Jamie Cashman regarding both payment and voting.**

35.      The Plan for Jamie Cashman contains numerous improper mechanisms including

17

failure to account for pre-petition defaults under the Individual Guarantee, improper stripping of the secured nature of Santander's Individual Guarantee claim, unauthorized discharge of the unsecured portion of the same without proper application of payments, and failure to provide proper voting treatment.  These deficiencies render the Plan unconfirmable.

36.     Prior to the Petition Date, Santander notified Jamie Cashman of his default under his Individual Guarantee and demanded repayment in full of the entire outstanding indebtedness he guaranteed.  When he failed to pay, Santander filed suit against him (along with the applicable Corporate Debtors) for breaching the guarantee. At the time of the lawsuit, the arrearage owed by the applicable Corporate Debtors and Jamie Cashman was in the in the collective amount of $304,672.18 (exclusive of default interest), and these arrearages presently remain unpaid.

37.     The Plan does not propose to pay Santander to cure this arrearage (plus default interest) at confirmation.[5]  Although the Plan is silent as to treatment of pre-petition defaults, the Disclosure Statement provides that "[a] defaults [sic] under any pre-petition agreement, including pre-petition loan documents, will not be enforceable after the Effective Date unless such default is also a default under the Plan."  Dkt. 912 at p. 43. Otherwise, with respect to the covenant and default provisions in Santander's pre-petition Loan Documents (which the Plan defines to include Santander's guarantees, *see* Dkt. No. 911 at § 1.60), the Disclosure Statement provides that the Plan's terms replace and cancel all such inconsistent "terms, covenants, representations and warranties, and/or remedies that impose obligations upon the Debtors" from Lenders' Loan Documents.  *See* Dkt. No. 912 at p. 33.  The Plan further provides that "any obligations of the Debtors and/or Claims by the holder of an Allowed Secured Claim arising from such [Loan Documents'] terms, covenants, representations and warranties, and/or remedies

---

[5]     The Plan does provide a mechanism for *waiving* default interest of Supporting Lenders, the impropriety of which is addressed separately in this Objection.

shall be ***discharged*** upon the Effective Date." *Id.* (emphasis added). While not set forth with any level of clarity, the Plan appears to contemplate discharge Santander's pre-petition claim against Jamie Cashman for defaulting under the Individual Guarantee.

38. As noted, the Plan's definition of JMC Secured Claims specifically "shall not include any guarantees of loans by JMC." Dkt. 911 at § 1.56. Regarding Plan impairment and voting of Secured Claims, the Disclosure Statement states:

> Except for the JMC Secured Claims, the Secured Claims are impaired under the Plan, and the holders of such Claims shall be entitled to vote to accept or reject the Plan. The JMC Secured Claims are unimpaired under the Plan and the holders of such Claims are not entitled to vote to accept or reject the Plan. Chase Bank, RTC and Santander are the holders of JMC Secured Claims.[6]

Dkt. No. 912 at p. 30. These provisions collectively appear to strip away Santander's secured guarantee claims against Jamie Cashman (notwithstanding Santander's recorded Second Mortgage securing a lien in its favor on the 72 Jericho Road property on account of Jamie Cashman's Individual Guarantee), allow Santander to vote its secured claims on account of the Loans as to the Debtors *other than* Jamie Cashman, and do not allow Santander to vote on account of its HELOC Mortgage claim as to Jamie Cashman, purporting to leave that claim as unimpaired. These provisions do not describe what happens to Santander's pre-petition claims against Jamie Cashman for his default and failure to perform under the Individual Guarantee. Presumably, Santander has a General Unsecured Claim against Jamie Cashman on account of his pre-petition default under the Individual Guarantee, as the Plan does leave all guarantees in place as against any of the Debtors, albeit with severely modified terms. *See* Dkt. 911 at § 4.1(h).

39. Regarding General Unsecured Claim treatment, the Disclosure Statement reflects that the Plan will pay 85% of all such claims at 14% on the Effective Date with the remaining

---

[6] This reference to Santander holding a JMC Secured Claim concerns the HELOC Mortgage and not the Second Mortgage securing the Individual Guarantee because guarantees are excluded from the definition of JMC Secured Claims. The lack of disclosure concerning the HELOC Mortgage is addressed in this Objection below.

balance to be paid over 20 equal quarterly installments.  Dkt. No. 912 at p. 38.  The Disclosure

Statement also provides that for General Unsecured Claims against Jamie Cashman in Class 26F:

> In addition to the treatment set forth in Section 4.6(c) of the Plan and pursuant to Section 1123(a)(8) and 1129(a)(15)(A) of the Bankruptcy Code, on or before the seventh (7th ) anniversary of the Effective Date, Mr. Cashman shall pay, from his disposable income, fifteen percent (15%) of the Allowed General Unsecured Claims in Class 26F.  The Debtors believe that this treatment meets the requirements of Sections 1123(a)(8) and 1129(a)(15) of the Bankruptcy Code.

*Id.*

40.     Considering all of the provisions discussed above regarding Jamie Cashman

reveals numerous holes and deficiencies.  First of all, the Plan and Disclosure Statement must

specify payment treatment and voting rights of Santander's guarantee claims against Jamie

Cashman, beyond merely providing that they are purportedly no longer secured due to the

definition of JMC Secured Claims and consolidating all of Santander's claims for treatment as a

single Allowed Claim.

41.     Second, the Plan may not discharge and eliminate Santander's claim on account

of Jamie Cashman's matured, non-contingent, and pre-petition default under the Individual

Guarantee as described in pages 33 and 43 of the Disclosure Statement, respectively.  Dkt. 912 at

pp. 33, 43.  Especially not while providing for payment of other non-guarantee based General

Unsecured Claims under the Plan and omitting treatment of Santander's purportedly unsecured

guarantee altogether.  *See Granada Wines, Inc. v. New England Teamsters & Trucking Indus.*

*Pension Fund*, 748 F.2d 42, 46–47 (1st Cir. 1984) (prohibiting separate classification of general

unsecured claims of equal rank).   Nor can the Plan discharge Jamie Cashman's matured

guarantee obligations without separate payment on the basis of the Plan's channeling all claims

to be paid by a single source or by the Corporate Debtors' receipt of a discharge.   "The

Bankruptcy Code provides—and multiple courts have confirmed—that discharge of a borrower's

debt in bankruptcy does not affect a guarantor's liability." *In re Gentry*, 807 F.3d 1222, 1227 (10th Cir. 2015) (citing 11 U.S.C. § 524(e)). "Expressly stated in the code, that principle *preserves* creditors' claims against co-debtors and guarantors and *provides an avenue for creditors to freely prosecute those claims*." *Id.* (emphasis added) (citation omitted). Nor does the Corporate Debtors' payments to Santander reduce Santander's claims against Jamie Cashman. *See Ivanhoe Bldg. & Loan Assoc. of Newark, N.J. v. Orr*, 295 U.S. 243, 246–47 (1935); *accord. Reconstruction Fin. Corp. v. Denver & R.G.W.R. Co.*, 328 U.S. 495, 529 (1946) ("[A] creditor secured by the property of others need not deduct the value of that collateral or its proceeds in proving his debt.") (citing *Ivanhoe*).

42.     Instead, 11 U.S.C. § 1141(d)(5) dictates how an individual's debts are discharged in chapter 11 cases. One such requirement is for the individual's "completion of all payments under the plan." 11 U.S.C. § 1141(d)(5)(A). The other potentially applicable discharge provision is when each unsecured claimant receives more than it would in a chapter 7 liquidation, modification of the plan is impracticable, and section 522(q)(1) is not potentially applicable to the individual debtor. *See id.* § 1141(d)(5)(B). The Plan does not provide for payment of Santander's purported General Unsecured Claim against Jaime Cashman under either mechanism of section 1141(d)(5), which is a fatal flaw.

43.     Third, even if Jamie Cashman seeks to discharge his guarantee obligations under section 1141(d)(5), under subsection (A) or (B) he must pay *something* on account of those guarantee claims. Jamie Cashman's current Plan framework does not appear to contemplate *any* payments toward satisfaction of fixed, matured, non-contingent guarantee claims against him. Those omitted payments run afoul of sections 1123(a)(8) and 1129(a)(15), which is yet another fatal flaw.

44.     Taken together, sections 1123(a)(8) and 1129(a)(15) require an individual to pay creditors his disposable income over the five years following confirmation, to the extent necessary to pay creditors' allowed claims.  Section 1129(a)(15) states:

> In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan--
>
> **(A)** the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>
> **(B)** the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

11 U.S.C. § 1129(a)(15).  Given that guarantee claims against Jamie Cashman total $62,840,000, Dkt. No. 912 at pp. 23, and greatly exceed the value of his assets (other than the value of his equity interests), *see id.* at 14, it appears that subsection (A) cannot apply here making section section 1129(a)(15)(B) the only applicable provision.  In addition, section 1123(a)(8) provides that in a chapter 11 case involving an individual, "a plan shall . . . provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan." *Id.* § 1123(a)(8).

45.     The Plan contemplates Jamie Cashman receiving an annual salary of $1.2 million plus annual bonuses of $500,000, Dkt. No. 912 at p. 11, subject to the terms of an undisclosed management bonus program, Dkt. No. 911 at § 12.5.  The aggregate guarantee claims against Jamie Cashman total $62,840,000, but the Disclosure Statement indicates that, net of those guarantee claims, Jamie Cashman only intends to contribute his disposable income toward the paying 15% of the remaining $25,800 non-guarantee claims at some point over a 7 year term.

Dkt. No. 912 at pp. 23, 38.  That amounts to $3,870. Jamie Cashman would be receiving a windfall by not paying the guarantee claims against him with his disposable income, and keeping the remaining $11,896,130 he's eligible to receive as disposable income over the 7 year Plan term.[7]  Underscoring the impermissible nature of the Plan's non-treatment of Lenders' guarantee claims against Jamie Cashman is that the remaining $11,896,130 income amount he's intended to keep is being paid by the Corporate Debtors, depleting the funds they have available to pay Lenders as well.

46.    Instead, to be entitled to a discharge of fixed, matured, non-contingent unsecured Lender guarantee claims under section 1141(d)(5)(A), the Plan must provide for payment of these claims in accordance with sections 1123(a)(8) and 1129(a)(15) over the 7 year term.  And the proposed 15% payment of Jamie Cashman's disposable income one time over the 7 year term is insufficient.  Instead, this amount Lenders are entitled to be paid on their guarantee claims against Jamie Cashman cannot be less than his disposable income over the Plan's 7 year term. *See* 11 U.S.C. § 1129(a)(15)(B).

47.    And if the Plan is to cure Jamie Cashman's default of Lenders' guarantee claims against him, such as Santander's, to render such claims as no longer matured, then section 1123(d) provides that "[n]otwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default *the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law*."  11 U.S.C. § 1123(d) (emphasis added).  In the case of Santander, curing the pre-petition default of his Individual Guarantee requires Jamie Cashman to pay at minimum the $304,672.18 owed to Santander as of February 28, 2017, plus all default

---

[7]    This figure is calculated by taking the $1.7 million in income Jamie Cashman is eligible to receive each year under the Plan and multiplying it by 7 years for a total of $11.9 million and then subtracting that figure by the $3,870 he intends to contribute to the non-guarantee General Unsecured Claims against him.

interest provided under the guarantee agreement.  *See id.*  Requiring Santander to be a "Supporting Lender" under the Plan to be entitled to satisfaction of the Default Obligation necessary to cure its matured pre-petition guarantee claim against Jamie Cashman (or any of the other Debtors for that matter) is inconsistent with the plain language of section 1123(d).

48.     Finally, the Disclosure Statement and Plan must provide for Lenders to vote their guarantee claims as to Jamie Cashman's Plan on a secured and unsecured basis.  *See* 11 U.S.C. § 1126(a); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 336 (Bankr. E.D. Pa. 1987) ("If a class is impaired, then its members have the absolute right to vote.").  Santander also must be entitled to vote the full amount of its pre-petition guarantee claim against Jamie Cashman consisting of the entire Loan balance, as split into both secured and unsecured classes pursuant to section 506(a). *See* FED. R. BANKR. P. 3018(d) ("A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim shall be entitled to accept or reject a plan in *both* capacities.") (emphasis added).  Santander must be entitled to vote the entire amount of its Individual Guarantee claim because it matured pre-petition by Santander making formal demand, asserting its right to immediate payment *in full satisfaction of the outstanding indebtedness*, and declaring default and filing the Santander Lawsuit for the same.  Santander's guarantee claim is therefore *not* contingent.

49.     Because the Plan fails to provide for proper payment and voting treatment of Lender claims against Jamie Cashman, it is fatally flawed and should not be solicited for voting.

**(iii)     The Plan contains an improper "death trap" regarding the Supporting Lender provision, which is discriminatory as to otherwise similarly situated Lenders and violates 11 U.S.C. § 1123(a)(4).**

50.     The Plan structure creates two categories of Lenders, diving them into Supporting Lenders and non-Supporting Lenders, but it does so on an impermissible basis.  In exchange for becoming a Supporting Lender, such Lenders are to receive an extra distribution of $3 million in

cash on the Effective Date, Dkt. No. 911 at §§ 1.50 and 4.1(c)(i)(2)(A), together with, potentially, an extra off-the-top share of the annual payment of any Excess Cash.[8]  Supporting Lenders also waive entitlement to recover any default interest on their Loans.  Non-Supporting Lenders are not entitled to payment of *any* interest, charges, or fees due to them from the Initial Payment.  Non-Supporting Lenders only receive Excess Cash payments after Supporting Lenders' Contract Interest is paid in full.  Finally, the PIK Interest owed to non-Supporting Lenders is to be capitalized and deemed part of the principal amount of a non-Supporting Lender's claim on the Effective Date's sixth anniversary while PIK Interest owed to Supporting Lenders will be paid on the Effective Date's seventh anniversary (provided such Supporting Lenders are not paid in full prior to the Effective Date's sixth anniversary).  *Id.*

51.     Section 1123(a)(4) states that "a plan shall provide the *same treatment* for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a *less favorable treatment* of such particular claim or interest."  11 U.S.C. § 1123(a)(4) (emphasis added).  The Debtors may not end-run around this rule by separately classifying all Lenders, but nonetheless subjecting them to the same treatment of being either a Supporting or non-Supporting Lender.  Despite being classified separately, all Lenders remain in the same priority class, and section 1123(a)(4) is not intended to elevate form over substance.  *See In re FINOVA Grp., Inc.*, 304 B.R. 630, 637 (D. Del. 2004) (holding "[t]o treat [similarly situated lenders] differently would be to ignore the economic realities of their Credit Agreements, elevate form elevate form over substance and violate the equal treatment mandate of Section 1123(a)(4)").

---

[8] The extra distribution is payable, solely to Supporting Lenders, to the extent of any unpaid Contract Interest (interest at the non-default rate) left unpaid after the $3 million Initial Payment.  Dkt. No. 911 at §§ 1.30 and 4.1(c)(i)(2)(B).

52.     In any event and in addition to being subject to section 1123(a)(4), this cram-down Plan also may not discriminate unfairly and must be fair and equitable.  *See* 11 U.S.C. § 1129(b)(1).  It violates both requirements.  "The Bankruptcy Code does not define unfair discrimination, but it is designed to protect against horizontal discrimination in the same way that the absolute priority rule prevents against nonconsensual vertical discrimination."  *In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018) (quoting *In re SunEdison, Inc.*, 575 B.R. 220, 226 (Bankr. S.D.N.Y. 2017)).  In other words, "the unfair discrimination test assures fair treatment among classes of *the same priority level*" such as all Lenders share here under the Plan.  *Id.* (quoting *In re SunEdison, Inc.*, 575 B.R. 220, 226) (emphasis added).  Moreover, "[t]here is no authority in the Bankruptcy Code for discriminating against classes who vote against a plan of reorganization." *In re MCorp Fin., Inc.*, 137 B.R. 219, 236 (Bankr. S.D. Tex.), *appeal dismissed and remanded*, 139 B.R. 820 (S.D. Tex. 1992)).  In such a situation, where a plan subjects a particular class to unfavorable and unequal treatment upon casting rejecting vote, a potential "deathtrap" arises subjecting the plan to running afoul of rules prohibiting unfair and inequitable treatment and unfair discrimination.  *See id.*

53.     Though arising with relative irregularity, courts analyzing potential "deathtrap" or "carrot and stick" provisions have upheld them *only* if "the inducement is to give a stakeholder more than it would be entitled to, rather than to threaten to take an existing right away."  *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 275–76 (Bankr. S.D.N.Y. 2007).  As the D.C. Court of Appeals recognized in, *AOV Industries, Inc.*,

> the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members.  The other side of the coin of unequal payment, however, has to be *unequal consideration tendered for equal payment*.  It is disparate treatment when members of a common class are required to tender more valuable consideration—be it their claim against specific property

of the debtor or some other cognizable chose in action—in exchange for the same percentage of recovery.

*In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986) (emphasis added).

54.     Applied here, the above decisions reflect that the Plan treats similarly situated Lenders unfairly by requiring them to forgo an existing right—default interest—in exchange for payment of Excess Cash and a share of the Initial Payment, which, although pays them faster, the Lenders would all otherwise be entitled to recover as the Plan purports to pay all Lenders' Allowed Claims in full.  In electing to become a non-Supporting Lender, each Lender forgoes something else—the right to be paid from their own cash collateral as funds necessarily including such cash collateral will be expended to the collective Supporting Lender group through the Initial Payment and early Excess Cash distributions.  This is unfairly discriminatory to non-Supporting Lenders as it diminishes the cash collateral they bargained for because that cash is being paid for the benefit of the Supporting Lenders.  *Cf. In re LDN Corp.*, 191 B.R. 320, 324 (Bankr. E.D. Va. 1996) (concluding in the context of adequate protection, that "[t]he debtor wants to use the cash collateral to make adequate protection payments and to fund operating expenses. . . . This subjects the secured creditor to an impermissible form of double jeopardy. The bank's secured loan balance can only be reduced by the diminution of its [cash] collateral.").

55.     The only way for such a Supporting Lender mechanism to avoid being a deathtrap would be for the Initial Payment and Excess Cash funds to be unencumbered, and to be paid without the condition of requiring a waiver of default interest.  Because the Plan contains neither saving feature, it cannot be confirmed and is fatally flawed.

**(iv)     <u>The Plan is fatally flawed because it contains a free and clear sale mechanism that does not comply with any of the standards of section 363(f) with respect to non-Supporting Lenders' Mortgage Vessels.</u>**

56.     The Disclosure Statement and Plan describe a faulty post-confirmation program

allowing the Debtor to sell Mortgaged Vessels free and clear of Lenders' liens and interests "pursuant to Bankruptcy Code Sections 105(a) and 363 and without further court order."  Dkt. No. 911 at § 5.2(a); Dkt. No. 912 at pp. 39–40.  The problem is that, as Santander has objected at every opportunity, *see* Dkt. No. 186 at 8–12; No. 651 at 10–17; and No. 756 at 11–18, the Debtors *cannot sell Santander's Mortgaged Vessels without Santander's consent* because the Debtors are unable to satisfy ***any*** of the other section 363(f) prongs with respect to Santander (or any other Lender).

57.    "Property of an estate may not be sold free and clear of any interest under § 363(f) unless one of the five conditions is met."  *See In re Colarusso*, 295 B.R. 166, 175 (B.A.P. 1st Cir. 2003), *aff'd*, 382 F.3d 51 (1st Cir. 2004).  For the reasons set forth in Santander's three prior objections to the Debtors' motions for authority to sell Mortgage Vessels, the Debtors cannot satisfy ***any*** of the section 363(f) prongs other than the consensual sale prong of 11 U.S.C. § 363(f)(2).  *See* Dkt. No. 186 at 8–12; No. 651 at 10–17; and No. 756 at 11–18 (incorporated herein by reference).  Thus, because Lenders will not consent to the sale of their Mortgaged Vessels free and clear of their liens under the terms proposed in the Plan, the Plan fails because a critical piece of its post-confirmation funding is through vessel sales.  And because the Plan fails to satisfy section 363(f) with respect to post-confirmation vessel sales, it similarly fails to comply with section 1129(a)(1) and cannot be confirmed.  *See In re Patriot Place, Ltd.*, 486 B.R. 773, 819 (Bankr. W.D. Tex. 2013) (denying plan confirmation because proposed sale failed to comply with section 363(f) and, in turn, section 1129(a)(1)).  This is yet another fatal flaw that prevents the Plan from proceeding to solicitation.

**B.    The Disclosure Statement Lacks Adequate Information in Many Other Material Respects that Prohibit Approval for Plan Solicitation.**

58.    The Disclosure Statement should also not be approved because it does not contain

the "adequate information" required under section 1125(b) of the Bankruptcy Code. "Adequate

information" is specifically defined in section 1125(a) to mean:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in
> light of the nature and history of the debtor and the condition of the debtor's
> books and records, including a discussion of the potential material Federal tax
> consequences of the plan to the debtor, any successor to the debtor, and a
> hypothetical investor typical of the holders of claims or interests in the case, that
> would enable such a hypothetical investor of the relevant class to make an
> informed judgment about the plan, but adequate information need not include
> such information about any other possible or proposed plan and in determining
> whether a disclosure statement provides adequate information, the court shall
> consider the complexity of the case, the benefit of additional information to
> creditors and other parties in interest, and the cost of providing additional
> information[.]

11 U.S.C. § 1125(a).

59.    "To satisfy the requirements of adequate information under § 1125, a disclosure

statement must contain the necessary financial information, data, and projections relevant to the

creditors' decision to accept or reject the Chapter 11 plan." *In re Ferguson*, 474 B.R. 466, 476

(Bankr. D.S.C. 2012). "Generally, a disclosure statement must contain all pertinent information

bearing on the success or failure of the proposals in the plan of reorganization." *In re Cardinal

Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990) (citation omitted). "[T]he purpose of

a disclosure statement is to inform equity holders and claimants, as fully as possible, about the

probable financial results of acceptance or rejection of a particular plan" and "the information to

be provided should be comprised of all those factors presently known to the plan proponent that

bear upon the success or failure of the [plan's] proposals." *In re Stanley Hotel, Inc.*, 13 B.R.

926, 929 (Bankr. D. Colo. 1981).

60.    Here, the Disclosure Statement fails to satisfy the "adequate information"

standard required under section 1125(b) in a variety of significant ways.

**(i)    The Disclosure Statement contains inadequate information about Santander's two mortgages against Jamie Cashman's property located at 72 Jericho Road.**

61.    Santander possesses two mortgages, the HELOC Mortgage and the Second Mortgage, in its favor regarding Jamie Cashman's property at 72 Jericho Road.  *See* attachments to Claim No. 13 in Case No. 17-12204; Claim No. 23 in Case No. 17-12205.   The Disclosure Statement only appears to recognize the HELOC Mortgage, which secures an obligation independent of Santander's Individual Guarantee claim, but places it in Class 17F listing the amount of $26,869,190.16.  Santander's claim under the HELOC Mortgage is not part of this $26,869,190.16 figure, however, as reflected by its claim in the amount of $2,265,175.55 on account of the HELOC Mortgage.  *See* Claim No. 23 in Case No. 17-12205.  This HELOC Mortgage claim must be accounted for in the Plan's structure, and separately classified in Jamie Cashman's case for voting and distribution purposes.  Santander's Second Mortgage securing its Individual Guarantee claim should also be included under the definition of JMC Secured Claim and treated under the Plan, given Jamie Cashman's matured pre-petition default that remains uncured.

62.    Moreover, Jamie Cashman has not paid any amounts on account of the HELOC Mortgage since the Petition Date.  Although the Plan states that HELOC Mortgage will be reinstated to render it unimpaired, it leaves the amount owed either (a) to be determined by the Court, or (b) agreed upon by Jamie Cashman and the holder of the JMC Secured Claim.  *See* Dkt. 912 at § 4.1(c)(iii).  It also fails to mention anything about JMC Claim Holder's entitlement to interest (whether contract-based or default interest) in reinstating any such claim.  *See* 11 U.S.C. § 1124(2)(A).  This unspecified and to-be-determined treatment leaves Santander exposed to a situation where, following the close of voting, it turns out its HELOC Mortgage

claim is impaired after all, effectively prohibiting from voting that claim. Because these details about Santander's two mortgages against the 72 Jericho Road property are missing from the Disclosure Statement, it is inadequate.

      **(ii)**    **The Disclosure Statement contains inadequate information regarding a hypothetical chapter 7 liquidation scenario for parties to evaluate section 1129(a)(7) because it does not include an orderly liquidation analysis.**

63.     The Disclosure Statement's best interests of creditors discussion is relegated to a discussion of a chapter 7 liquidation solely using forced liquidation values and applying an additional discount of 15% to 20%. *See* Dkt. No. 912 at p. 50. The Disclosure Statement is inadequate because it (a) fails to discuss a hypothetical chapter 7 liquidation involving orderly liquidation values, and (b) fails to explain the rationale and methodology as to why the Debtors arrived at the 15% to 20% discount figures.

64.     Given the Debtors' asset base, current operations, and debt structure, an orderly liquidation scenario is more appropriate here in the context of a section 1129(a)(7) analysis. Many of the Debtors' vessels are presently on charters, some lasting longer than the next six months. Any chapter 7 trustee would therefore encounter a situation requiring quasi-operational status as ongoing charters wind-down and charter parties exercise their extension options for charters presently in effect. It would also take time for a chapter 7 trustee to withdrawal the Debtors' entire fleet from its present global operations to prepare for vessels sales. Taking such situations into account, the Bankruptcy Code provides for chapter 7 trustees to operate businesses under section 721, which provides that "[t]he court may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the ***orderly liquidation*** of the estate." 11 U.S.C. § 721 (emphasis added). By its very terms, section 721 recognizes that a chapter 7 trustee faced with a quasi-operational enterprise will necessarily have to liquidate the estate in an orderly, as opposed to

forced, manner.  *See id.*; *see also In re Heissinger Res. Ltd.*, 67 B.R. 378, 384 (C.D. Ill. 1986) (finding that immediate liquidation not required when trustee authorized to operate business under section 721 to maximize value).  That the present section 1129(a)(7) analysis estimates no distributions to General Unsecured Creditors until at least two years, *see* Dkt. No. 912 at p. 50, gives further credence to the inherent likelihood that orderly, as opposed to immediate, liquidation of these Debtors is the appropriate measure.

65.    Moreover, given that the majority of the Debtors' fleet is encumbered, they must explain their belief as to why a chapter 7 trustee would immediately sell fully encumbered collateral that has no benefit to unsecured creditors.  As a general rule, chapter 7 trustees do not sell fully encumbered collateral.  *E.g.*, *In re Williamson*, 94 B.R. 958, 962–63 (Bankr. S.D. Ohio 1988) ("A trustee may sell a debtor's property . . . , but generally only to benefit the unsecured creditors, i.e. when 'the sale proceeds *will fully compensate secured lienholders and produce some equity for the benefit of the bankrupt's estate.*'") (quoting *In re Riverside Investment P'ship*, 674 F.2d 634, 640 (7th Cir. 1982)).  Instead, with regard to fully encumbered assets, as a default rule "[t]he Bankruptcy Code provides for the abandonment of those assets in which there is no significant equity for the estate. The trustee need not administer such assets." *In re Landreneau*, 74 B.R. 12, 13 (Bankr. W.D. La. 1987); *see also* U.S. DEPARTMENT OF JUSTICE EXECUTIVE OFFICE OF U.S. TRUSTEES, *Handbook for Chapter 7 Trustees*, at p. 4-14, available at https://www.justice.gov/ust/file/handbook_for_chapter_7_trustees.pdf/download (last accessed July 26, 2018) ("A trustee may sell assets only if the sale will result in a meaningful distribution to creditors. . . . If the sale will not result in a meaningful distribution to creditors, the trustee must abandon the asset.").

66.    The Disclosure Statement's section 1129(a)(7) does not take the likelihood of a

chapter 7 trustee abandoning or surrendering fully secured assets for the benefit of the Lenders into account.  Nor does it assign values to such fully encumbered abandoned and surrendered assets in its section 1129(a)(7) analysis.  It is materially deficient for these reasons as well.

67.    Moreover, the Disclosure Statement must explain the rationale behind applying a 15% to 20% discount.  "As a representative of the creditors of a bankruptcy estate, a trustee is under a duty to liquidate property of the estate expeditiously *but at the highest price that can be obtained*."  *In re Terrell*, 27 B.R. 130, 132 (Bankr. W.D. La. 1983).  The Disclosure Statement contains inadequate information regarding this discount methodology as well.

68.    The Disclosure Statement's failure to include an orderly liquidation analysis, account for the full values of fully encumbered collateral that a chapter 7 trustee would abandon or surrender, and explain the discount interest methodology are not minor details.  Instead, the omission of this information conceals the very real possibility that, if orderly liquidation value is in fact the appropriate measure for a section 1129(a)(7) analysis in this situation, the Debtors' Plan at present cannot satisfy the best interest of creditors test.  The Plan does not propose to pay all creditors' claims in full, but using orderly liquidation values would likely reveal that all creditors would be entitled to full recoveries in a hypothetical chapter 7 over time.  Accordingly, the Debtors' must provide a section 1129(a)(7) analysis using orderly liquidation values to adequately inform the creditor body about their Plan.

**(iii)    The Disclosure Statement contains inadequate information regarding the proposed loan from the Insurance Trust relating to Jamie Cashman's life insurance policies held by the Insurance Trust.**

69.    Critical details are missing from the disclosures about the proposed loan from the Insurance Trust in the event that Jamie Cashman's life insurance policies held by the Insurance Trust mature during the Plan's term. It discloses that annual premiums owed on these policies are in the amount of $273,000.  Dkt. 912 at p. 41.  It does not disclose who is currently responsible

33

for paying these premiums, but indicates that the Debtors' are assuming responsibility for paying these premiums going forward. *Id.* The Disclosure Statement does also does not state what law governs the underlying policies, who the original beneficiaries under the policies were, who originally procured the policies, and whether the present trust ownership and loan assignment runs afoul of potential prohibitions against stranger-originated life insurance ("***STOLI***") policies. The possible application of STOLI laws to the proposed transaction under the Plan is significant because violation of STOLI prohibitions can void the underlying policies. *E.g.*, *First Penn-Pac. Life Ins. Co. v. Evans*, 313 F. App'x 633, 636 (4th Cir. 2009) ("[A]n individual without 'any reasonable expectation of pecuniary benefit or advantage from the continued life' of an unrelated person may not insure that life; this constitutes a pure 'wager policy' and is void as a contract against public policy.") (quoting *Conn. Mut. Life Ins. Co. v. Schaefer*, 94 U.S. 457, 460 (1876)).

70.     Moreover, the Disclosure Statement does not describe the immediately available cash surrender value of these policies. Nor does it provide information as to whether the cash surrender value of these policies may be immediately realizable by Jamie Cashman's creditors in satisfaction of their claims against him. *See, e.g.*, *In re Monahan*, 171 B.R. 710, 717 (Bankr. D.N.H. 1994) (applying New Hampshire law and concluding that "debtors were owners of the [life insurance] policies and had the power, as of the date of bankruptcy, to change beneficiaries or to cancel the policy and receive the cash surrender value. Those rights and powers became property of the estate on the filing date."); *see also In re CRS Steam, Inc.*, 217 B.R. 365, 368 (Bankr. D. Mass. 1998) (applying Massachusetts law and observing it "is open to the interpretation that it applies only after the death of the insured and does not permit the insured to protect the [life insurance] policy's cash surrender value from his creditors during [debtor's] lifetime"). These missing, and indeed material, details about the new insurance loan proposal

34

and the underlying policies must be included in the Disclosure Statement as well.

## IV.     RESERVATION OF RIGHTS

71.     Nothing in this Objection is intended to be, or should be construed as, a waiver by Santander of any of its rights under any of the Loan Documents, the Bankruptcy Code, or applicable law.  Santander hereby reserves the right to further amend, modify, or supplement this Objection at any time.  Santander reserves the right to seek additional adequate protection or to seek conversion or dismissal of the bankruptcy cases at any time.  Santander further reserves the right to withdraw its consent to the continuation of the sale of its vessels due to unsatisfactory sale performance or for any other reason or purpose.  Finally, Santander also reserves all its rights as a creditor in these bankruptcy cases, including in connection with any proof of claim or administrative claim it may file in these bankruptcy cases.

## V.     CONCLUSION

WHEREFORE, Santander respectfully requests that this Court enter an order, (i) sustaining this Objection; (ii) denying approval of the Disclosure Statement, and (iii) granting Santander such other and further relief as this Court deems just and appropriate under the circumstances.

**DATED** July 27, 2018

Respectfully Submitted,

*/s/ Jonathan W. Young*
Jonathan W. Young (BBO No. 569081)
Scott R. Magee (BBO No. 664067)
Locke Lord LLP
111 Huntington Ave.
Boston, MA 02199
(617) 239-0367 (Telephone)
(855) 595-1190 (Facsimile)
jonathan.young@lockelord.com
scott.magee@lockelord.com

– and –

Stephen J. Humeniuk (*admitted pro hac vice*)
Locke Lord LLP
600 Congress Ave., Suite 2200
Austin, TX 78701
(512) 305-4838 (Telephone)
(512) 305-4800 (Facsimile)
stephen.humeniuk@lockelord.com

**ATTORNEYS FOR SANTANDER BANK, N.A.**

## CERTIFICATION OF COMPLIANCE WITH
## MASSACHUSETTS LOCAL BANKRUPTCY RULE 3017-1

The undersigned counsel to Santander certifies that prior to filing this Objection, Santander (a) on July 6, 2018, provided written comments to the Disclosure Statement to the Corporate Debtors' and Jamie Cashman's respective counsel in an attempt to narrow the issues of disagreement, and (b) on July 25, 2018, the parties conducted a telephone conference in accordance with Massachusetts Local Bankruptcy Rule 3017-1(b). The following individuals participated in the conference call: Jonathan W. Young and Stephen J. Humeniuk of Locke Lord LLP on behalf of Santander; and Harold B. Murphy and D. Ethan Jeffery of Murphy & King, P.C., on behalf of the Debtors. The parties were able to narrow (and perhaps eliminate) some of their disputes concerning adequacy of information in the Disclosure Statement. The parties continue to dispute whether the approval of the Disclosure Statement should be denied because the Plan is patently not confirmable, among other issues. The parties are engaged in an ongoing effort to reach agreement on treatment of Santander's guarantee claims under the Plan, among other items.

*/s/ Jonathan W. Young* _____
Jonathan W. Young

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 27, 2018, true and correct copies of the foregoing were forwarded to all parties receiving electronic notification in this case from the Court's electronic case filing (ECF) system.

*/s/ Stephen J. Humeniuk* _____
Stephen J. Humeniuk