# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (Eastern Division)

|  |  |
|---|---|
| In re: | Chapter 11 |
| CASHMAN EQUIPMENT CORP.,[1] | Case No. 17-12205-MSH |
| Debtors. | Jointly Administered |

## MODIFIED THIRD AMENDED JOINT PLAN OF REORGANIZATION OF CASHMAN EQUIPMENT CORP., CASHMAN SCRAP & SALVAGE, LLC, SERVICIO MARINA SUPERIOR, LLC, CASHMAN CANADA, INC., MYSTIC ADVENTURE SAILS, LLC, AND JAMES M. CASHMAN

MURPHY& KING, P.C.
One Beacon Street
Boston, MA  02108
Harold B. Murphy, Esq.
D. Ethan Jeffery, Esq.

Email:  EJeffery@murphyking.com
Telephone:  (617) 423-0400
Facsimile:  (617) 423-0498


Dated: November 2, 2018

JEFFREY D. STERNKLAR, LLC
225 Franklin Street, 26th Floor
Boston, MA 02110
Jeffrey D. Sternklar, Esq.


Email:  jeffrey@sternklarlaw.com
Telephone: (617) 396-4515
Facsimile:  (617) 507-6530

---

[1] The debtors in these jointly administered Chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are Cashman Equipment Corp. (7969), Cashman Scrap & Salvage, LLC (6088), Servicio Marina Superior, LLC (6919), Mystic Adventure Sails, LLC (2137) and Cashman Canada, Inc. (1296).

Cashman Equipment Corporation, Cashman Scrap & Salvage, LLC, Servicio Marina Superior, LLC, Cashman Canada, Inc., Mystic Adventure Sails, LLC, and James M. Cashman, each a debtor and debtor-in-possession in the Bankruptcy Cases (as defined below), propose the following joint plan of reorganization under Section 1121 of the United States Bankruptcy Code.

# ARTICLE I

## DEFINITIONS AND CONSTRUCTION OF TERMS

For purposes of the Plan, the following terms shall have the meanings specified in this Article I. A capitalized term used but not defined in the Plan that is also used in the Bankruptcy Code shall have the meaning ascribed to that term in the Bankruptcy Code. Wherever from the context it appears appropriate, each term stated shall include both the singular and the plural, and pronouns shall include the masculine, feminine and neuter, regardless of how stated. The words "in the Plan," "the Plan," "hereto," "herein," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular Section, sub-Section or clause contained in the Plan. The rules of construction contained in Section 102 of the Bankruptcy Code shall apply to the terms of the Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions the Plan.

**1.1** "2018 Installment" shall mean $300,000.

**1.2** "Accrued Contract Interest" shall mean the amount of accrued but unpaid Contract Interest owed to an Agreed-Claim Lender as of the Effective Date, before taking account of the distribution under Section 4.1(c)(i)(4) of the Plan.

**1.3** "Additional Plan Lien" shall mean a subordinated Lien as to payment and priority on the Mortgaged Vessels other than: (a) the Pacwest/MARAD Vessels, and (b) the Unencumbered Vessels, which Lien shall be junior to the Vessel Mortgages and Liens securing the Insurers' Claims and the Allowed Maritime Lien Claims, if any.

**1.4** "Additional Vessel Lien" shall mean a Lien on the Unencumbered Vessels which Lien shall be a first priority Lien except that it shall be junior to the Liens securing the Insurers' Claims and the Allowed Maritime Lien Claims, if any.

**1.5** "Adequate Protection Liens" shall mean, collectively, (a) the replacement liens granted under the cash collateral orders entered by the Bankruptcy Court, including any "Primary Replacement Liens" and "Secondary Replacement Liens", and (b) all Additional Adequate Protection Liens (as defined in the Eighth Cash Collateral Order) granted under the cash collateral orders entered by the Bankruptcy Court.

**1.6** "Administrative Expense Claim" shall mean a Claim that is Allowed under Section 503(b) of the Bankruptcy Code and that is entitled to priority under Section 507(a)(1) of the Bankruptcy Code, including Professional Fee Claims.

**1.7** "Affiliate" shall mean any Person that is an affiliate of the Debtors or the Reorganized Debtors under the Bankruptcy Code.

749807

**1.8** "Agreed-Claim Lender" shall mean a Lender: (a) with an Allowed Secured Claim in an amount that the Debtors and such Lender have agreed upon in writing, including, subject to Section 2.2(e) of the Plan, with respect to any Costs of Collection, and (b) who files a statement pursuant to Section 4.1(c)(i)(11) of the Plan and votes in favor of the Plan.

**1.9** "Allonge" shall mean the allonge, to be included in the Plan Supplement, which shall effect the amendment of the Loan Documents to conform to the terms of the Plan.

**1.10** "Allowed" shall mean, with reference to any Claim or Equity Interest:

  (a)  a Claim or Equity Interest that has been listed by the Debtors in their Schedules and (i) is not listed as disputed, contingent or unliquidated, and (ii) is not a Claim or Equity Interest as to which a proof of claim or interest has been filed;

  (b)  a Claim or Equity Interest as to which a timely proof of claim or interest has been filed by the Bar Date and either (i) no objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery has been interposed, the extent to which such Claim has been allowed (whether in whole or in part) by a Final Order;

  (c)  a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code and allowed in accordance with Section 502(h) of the Bankruptcy Code; or

  (d)  any Claim or Equity Interest expressly allowed under the Plan, pursuant to the Confirmation Order or pursuant to a Final Order of the Bankruptcy Court.

**1.11** "Asset(s)" shall mean any real or personal property of any Debtor, whether tangible or intangible and wherever situated, together with the proceeds thereof.

**1.12** "Bankruptcy Cases" shall mean, collectively, the Chapter 11 bankruptcy proceedings pending in the Bankruptcy Court under docket numbers 17-12204-MSH, 17-12205-MSH, 17-12206-MSH, 17-12207-MSH, 17-12208-MSH and 17-12209-MSH.

**1.13** "Bankruptcy Code" shall mean Title 11 of the United States Code in effect in the Bankruptcy Cases.

**1.14** "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Massachusetts in which the Bankruptcy Cases are pending and, to the extent of any reference under 28 U.S.C. §157, the unit of such District Court specified pursuant to 28 U.S.C. §151.

**1.15** "Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075, and any local rules of the Bankruptcy Court.

749807

**1.16**    "Bar Date" shall mean December 22, 2017, the dates fixed by order of the Bankruptcy Court as the last date by which Persons asserting certain Claims against the Debtors must file a proof of claim or interest or be forever barred from asserting a Claim against the Debtors or their property, from voting on the Plan and/or sharing in distributions under the Plan.

**1.17**    "BP" shall mean BP Exploration & Production, Inc. and all of its affiliates, successors, subsidiaries, agents, assigns and subrogees.

**1.18**    "BP Agreement" shall mean that certain that certain *Confidential Settlement Agreement and Release*, dated as of December 22, 2016, between, among others, CEC and BP.

**1.19**    "BP Stipulation" shall mean that certain *Stipulation Between Debtor and BP Exploration & Production, Inc.* [doc. no. 748-1] dated May 15, 2018, as approved by an order of the Bankruptcy Court dated June 12, 2018 [doc. no. 842].

**1.20**    "Business Day" shall mean any day other than a Saturday, Sunday or legal holiday recognized in the Commonwealth of Massachusetts.

**1.21**    "Cardi" shall mean Cardi Corporation, Cardi Materials, LLC and all of their affiliates, successors, subsidiaries, agents, assigns and subrogees.

**1.22**    "Cash" shall mean lawful currency of the United States of America (including wire transfers, cashier's checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks and money orders).

**1.23**    "Causes of Action" shall mean, without limitation, any and all actions, causes of action, choses in action, defenses, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims or proceedings to recover money or property and demands of any nature whatsoever, whether known or unknown, in law, equity or otherwise including, without limitation, those Avoidance Actions that the Debtors and the Reorganized Debtors have not expressly covenanted in this Plan that they shall not commence or pursue.

**1.24**    "CCI" shall mean Cashman Canada, Inc., one of the Debtors and a debtor-in-possession.

**1.25**    "CEC" shall mean Cashman Equipment Corporation, one of the Debtors and a debtor-in-possession.

**1.26**    "CSS" shall mean Cashman Scrap & Salvage, LLC, one of the Debtors and a debtor-in-possession

**1.27**    "Claim" shall mean a claim against a Person or its property as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, (a) any right to payment, whether or not such right is reduced to judgment, and whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is

749807

reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

     **1.28**    "<u>Class</u>" shall mean those classes designated in Article III of the Plan.

     **1.29**    "<u>Collateral</u>" shall mean any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

     **1.30**    "<u>Collateral Agent</u>" shall have the meaning ascribed to such term in the Eighth Cash Collateral Order.

     **1.31**    "<u>Collateral Expenses</u>" shall mean (a) as to any Lender, any out of pocket expenses for recording fees and like costs reasonably incurred by such Lender on or after the Effective Date that are necessary to maintain the effectiveness and perfection of its Liens, including in respect of Retained Lien Documents, (b) as to the Lenders' Collateral Agent, the fees and costs set forth in Section 5.5(a) of the Plan, plus any reasonable fees and costs provided for in the Plan Lien Documents applicable to the Lenders' Collateral Agent, and (c) as to the GUC Collateral Agent, the fees and costs set forth in Section 5.6(a) of the Plan, plus any reasonable fees and costs provided for in the Plan Lien Documents applicable to the GUC Collateral Agent. Recording fees, taxes and like costs shall not be deemed unreasonably incurred and paid by reason of being within the scope of Section 12.2 of the Plan.

     **1.32**    "<u>Confirmation Date</u>" shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in these Bankruptcy Cases.

     **1.33**    "<u>Confirmation Order</u>" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code, and any supplementary orders of the Bankruptcy Court issued in furtherance of the Plan, in form and substance reasonably acceptable to the Debtors, the Committee and the Lenders.

     **1.34**    "<u>Contested-Claim Lender</u>" shall mean a Lender other than an Agreed-Claim Lender.

     **1.35**    "<u>Contingent or Unliquidated Claim</u>" shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court but which was not filed in a sum certain, or for which the event that would give rise to such a liability or debt has not occurred and is dependent upon a future event that has not occurred or may never occur, and which has not been Allowed.

     **1.36**    "<u>Contract Interest</u>" shall mean the right to recover or retain the interest due to a Lender calculated using the non-default rate of interest provided for under such Lender's Loan Documents.

     **1.37**    "<u>Convenience Class Claim</u>" shall mean all Allowed General Unsecured Claims that elect the treatment set forth in the respective Classes 27 of the Plan.

**1.38**    "Conventional Terms" shall mean usual and customary commercial lending terms regularly available from a bank, savings and loan association, savings institution, trust company or national banking association that provides term and working capital financing to entities that own and operate maritime vessels, including as such terms relate to personal guaranties of and by owners and managers of such entities.

**1.39**    "Corporate Debtors" shall mean, collectively, CCI, CEC, CSS, Mystic and SMS, including (from and after the Effective Date) in their capacity as Reorganized Debtors.

**1.40**    "Costs of Collection" of a Lender shall mean all professional fees and costs, and other costs of collection, reasonably incurred by such Lender (a) before the Petition Date, in connection with the Debtors' obligations to such Lender, (b) from the Petition Date through the Effective Date that are allowable under Section 506(b) of the Bankruptcy Code, in each case to the extent Allowed either by an agreement in writing between the Debtors (after consultation with the Committee) and such Lender, or by a Final Order of the Bankruptcy Court, and (c) in obtaining the allowance of such Costs of Collection.

**1.41**    "Covenants" shall mean the covenants attached as Exhibit 1.

**1.42**    "Cure Claim" shall mean the amount necessary to cure any defaults in an executory contract or unexpired lease so that such contract or lease may be assumed pursuant to Section 365(b)(1) of the Bankruptcy Code.

**1.43**    "Debtors" shall mean, collectively, CCI, CEC, CSS, Mystic, SMS and JMC, including, from and after the Effective Date, in their capacity as Reorganized Debtors.

**1.44**    "Debt Service Amount" shall mean, as of the date Net Proceeds from the sale of a Mortgaged Vessel are distributed to the Lender with the first priority Lien on such vessel, an amount equal to the lesser of (a) twenty percent (20%) of such Net Proceeds, or (b) the next four (4) of the monthly payments due, or to become due, under Section 4.1(c)(i)(2) of the Plan to such Lender, provided that, from and after a Default, the Debt Service Amount shall be zero.

**1.45**    "Default" shall mean the occurrence after the Effective Date, and lapse of any applicable grace or cure period under the Plan, of an Event of Default.  No change in the rights of any parties under the Plan triggered by "Default" shall occur unless notice has been given in accordance with the Plan and any applicable grace or cure period has elapsed without the Event of Default being cured.

**1.46**    "Default Obligation" shall mean the right to recover or retain (a) the interest, charges and fees (other than Costs of Collection) due to a Lender as of the Petition Date that are in excess of the Contract Interest for such period, plus, to the extent allowable under Section 506(b) of the Bankruptcy Code, (b) the interest, charges and fees (other than Costs of Collection) due to a Lender from the Petition Date to the Effective Date that are in excess of the Contract Interest for such period.

**1.47**    "Designated Vessel Proceeds" shall mean the Net Proceeds of the sale or refinance of the Pacwest/MARAD Vessels, after the amounts due to MARAD or Pacwest, as applicable with respect to the Vessel(s) to be sold or refinanced, have been paid in full, to be

749807

paid, within thirty (30) days of their receipt, Pro Rata to the holders of Allowed Claims in Classes 23A, 24A and 26A – F to the extent and in the manner specified in Section 5.6(b) of the Plan.

**1.48** "Disclosure Statement" shall mean the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, in the form approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

**1.49** "Disputed Claim" shall mean:

      (a)     if no proof of claim relating to a Claim has been filed, a claim that is listed in the Schedules as unliquidated, disputed or contingent; or

      (b)     if a proof of claim relating to a Claim has been filed, a Claim as to which a timely objection or request for estimation, or request to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy Rules, has been made, or which is otherwise disputed by one or more of the Debtors in accordance with applicable law, which objection, request for estimation, action to limit recovery or dispute has not been withdrawn or determined by Final Order; or

      (c)     a Claim that is a Contingent or Unliquidated Claim.

**1.50** "Distribution Record Date" shall mean fifteen (15) days prior to the first scheduled hearing on the approval of the Disclosure Statement or such other date established by the Bankruptcy Court.

**1.51** "EBITDA" shall mean, for the purposes of Section 4.1(c)(i)(14) of the Plan, for any applicable measurement period, the Corporate Debtors' earnings before interest, taxes, depreciation and amortization, provided that the earnings shall not include: (a) any proceeds from the sales of Vessels, and (b) any revenue from the charter and/or rental of Vessels that are fitted with, and chartered and/or rented primarily for use as, living quarters (so-called "Floatels").

**1.52** "Effective Date" shall mean the first Business Day after the later to occur of (a) the fifteenth (15th) day following the Confirmation Date, provided that no stay pending appeal of the Confirmation Order has been granted, or (b) the date that all conditions precedent to the effectiveness of the Plan have been satisfied or waived by the Debtors pursuant to Section 10.2 of the Plan.

**1.53** "Equipment" shall have the meaning ascribed to that term under section 9-102(33) of the Massachusetts Uniform Commercial Code, M.G.L. c. 106 § 9-102(33).

**1.54** "Equity Interest" shall mean the interest of any holder of any general or limited partnership interest in or voting or non-voting shares of any of the Debtors, and all options and/or rights, contractual or otherwise, to acquire at any time any general or limited partnership interest in or voting or non-voting shares of any of the Debtors, as such interests exist immediately prior to the Effective Date.

749807

**1.55** "Eighth Cash Collateral Order" shall mean the *Eighth Interim Order Granting (1) Use of Cash Collateral, (2) Replacement Liens, (3) Additional Adequate Protection, And (4) Other Relief* [doc. no. 546], entered by the Bankruptcy Court on October 24, 2017.

**1.56** "Equalization Payment" shall mean, with respect to a Disputed Claim in Classes 23A, 24A and 26A – F that becomes an Allowed Claim after the Effective Date, an amount equal to the Pro Rata distributions which the holder of such a Claim would have received under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date.

**1.57** "Estate(s)" shall mean in the singular, with reference to a specific Debtor, the estate created in such Debtor's Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code, and in the plural all of the Debtors' bankruptcy estates created pursuant to Section 541 of the Bankruptcy Code.

**1.58** "Event of Default" shall mean, as to the Lenders and subject to any applicable grace periods, one or more of the following events: (a) the failure to make when due any payment to any Lender under the Plan; (b) the breach of any Covenant or obligation to Lenders or the Lenders' Collateral Agent under the Plan; or (c) the breach of any obligation under the Plan Lien Documents.

**1.59** "Excess Cash" shall mean the amount by which the book value of the Corporate Debtors' aggregate cash on hand and cash equivalents (such as currency, coins, checks received but not yet deposited, deposit accounts, certificates of deposit, government securities, commercial paper, money market accounts, and mutual funds that primarily hold any of the foregoing) as of an Excess Cash Measurement Date, less the Designated Vessel Proceeds, deposits and other amounts held, in the ordinary course of business, in escrow or in a separate account and subject to a restriction on the Debtors use of such funds (to the extent included in the Debtors cash or cash equivalents), and due but unpaid payments under the Plan, is greater than $10,000,000.

**1.60** "Excess Cash Measurement Date" shall mean, September 30, 2019, and March 31 and September 30 for each calendar year thereafter until the Lenders' Allowed Secured Claims are paid in full.

**1.61** "Excess Cash Payment" shall mean a payment of Excess Cash commencing on November 30, 2019 and continuing semi-annually sixty-one (61) days following each Excess Cash Measurement Date until the Lenders' Allowed Secured Claims are paid in full; provided that the Reorganized Debtors shall not accelerate the payment of expenses for the purpose of reducing the Excess Cash Payment.

**1.62** "Final Order" shall mean an order or judgment which has not been reversed, stayed, modified or amended and, as to which (a) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending, or (b) if appeal, review, re-argument or certiorari of the order has been sought, the order has been affirmed or the request for review, re-argument or certiorari has been denied and the time to seek a further appeal, review, re-argument or certiorari has expired, and as a result of which such order shall have become final and non-appealable in accordance with applicable law; provided,

749807

_however_, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

**1.63**    "Financial Statements" shall mean an income statement, balance sheet and statement of cash flows for each of the Corporate Debtors, substantially in the same form prepared by the Corporate Debtors prior to the Petition Date.

**1.64**    "General Unsecured Claim" shall mean a Claim that is: (a) not a Secured Claim, (b) not entitled to priority of payment under Section 507 of the Bankruptcy Code, and (c) not a Claim for an Equity Interest.

**1.65**    "GUC Collateral Agent" shall mean the collateral agent that shall hold and administer the GUC Lien, pursuant to the terms of the Plan, for the benefit of the holders of Allowed Claims in Classes 23A, 24A, 25A and 26A – F.

**1.66**    "GUC Lien" shall mean a lien provided for the benefit of the holders of Allowed Claims in Classes 23A, 24A, 25A and 26A – F, on the Pacwest/MARAD Vessels, which lien shall held and administered by the GUC Collateral Agent and be junior to the Vessel Mortgages and Liens securing Pacwest's Allowed Secured Claim, MARAD's Allowed Secured Claim, the Insurers' Claims and the Allowed Maritime Lien Claims, if any.

**1.67**    "GUC Plan Intercreditor Agreement" shall mean an agreement, substantially in the form of the "Intercreditor Agreement" as defined in the Eighth Cash Collateral Order, to govern the relative priorities established by the Plan as between and among Pacwest, MARAD and the GUC Collateral Agent.

**1.68**    "Initial Payment" shall mean $3,000,000 to be distributed to the Agreed-Claim Lenders on a Pro Rata basis.

**1.69**    "Installment Payments" shall mean: (a) $233,750, to be paid, as soon as practicable following the Effective Date, Pro Rata to the holders of Allowed Claims in Classes 23A, 24A and 26A – F; and (b) $233,750, to be paid, on or about the first day of the first full calendar quarter following the Effective Date and quarterly thereafter, Pro Rata to the holders of Allowed Claims in Classes 23A, 24A and 26A – F until the earlier to occur of (i) the tenth (10th) anniversary of the Effective Date, or (ii) the payment in full of all Allowed Claims in Classes 23A, 24A and 26A – F.

**1.70**    "Internal Revenue Code" shall mean Title 26 of the United States Code, as amended from time to time.

**1.71**    "Insider" shall have the meaning set forth in Section 101(31) of the Bankruptcy Code, provided that it shall not include any Debtor.

**1.72**    "Insurance Trust" shall mean the James M. Cashman Insurance Trust.

**1.73**    "Insurers" shall mean, collectively, Great American Insurance Company and Starr Indemnity and Liability Company, and their respective successors and assigns.

749807

**1.74**   "<u>JMC</u>" shall mean James M. Cashman, one of the Debtors and a debtor-in-possession.

**1.75**   "<u>JMC Secured Claims</u>" shall mean Secured Claims against JMC arising from loans made to JMC, and shall not include any guarantees of loans by JMC.

**1.76**   "<u>Lender</u>" shall mean each of Banc of America Leasing and Capital, LLC, Citizens Asset Finance, Inc., Fifth Third Bank, Key Equipment Finance, a division of KeyBank, National Association, Pacwest, Radius Bank, RTC, Santander Bank, N.A., Wells Fargo Equipment Finance, Inc., Equitable Bank, U.S. Bank, National Association, acting through its division, U.S. Bank Equipment Finance, and MARAD, provided that, if any Lender gives notice to the Reorganized Debtors that its Claim(s) has been transferred to a different entity, then as to such Lender the term "Lender" shall thereafter mean such transferee.

**1.77**   "<u>Lenders' Collateral Agent</u>" shall mean the collateral agent that shall hold and administer the Additional Plan Lien and the Additional Vessel Lien, pursuant to the terms of the Plan, for the benefit of the Lenders.

**1.78**   "<u>Lender Maturity Date</u>" shall mean the earlier of (a) the sixth (6th) anniversary of the Effective Date, and (b) the date of any Default.

**1.79**   "<u>Lender Plan Intercreditor Agreement</u>" shall mean an agreement, substantially in the form of the "Intercreditor Agreement" as defined in the Eighth Cash Collateral Order, to govern the relative priorities established by the Plan as between and among the Lenders and the Lenders' Collateral Agent.

**1.80**   "<u>Lender Rate</u>" shall mean a floating per annum interest rate (calculated on the basis of a 365-day year for the actual number of days elapsed) equal to LIBOR plus five (5) percentage points, provided, that: (a) from and after a Default with respect to any Lender, Lender Rate shall mean a floating per annum interest rate (calculated on the basis of a 365-day year for the actual number of days elapsed) equal to LIBOR plus seven (7) percentage points, and (b) in no event shall the Lender Rate be less than the Pay Rate.

**1.81**   "<u>LIBOR</u>" shall mean the per annum rate of interest (rounded up to the nearest 1/8th of 1%) determined by the Lenders' Collateral Agent at or about 11:00 a.m. (London time) on each day equal to the London interbank offered rate (or LIBOR Successor Rate selected in accordance with the terms of this provision) for an interest period of 3 months/90 days, all in accordance with the further provisions of this definition as set forth below), as published on the applicable Reuters screen page (or other commercially available source designated by the Lenders' Collateral Agent from time to time); <u>provided</u>, that in no event shall LIBOR be less than zero.  Notwithstanding anything to the contrary in this Plan, if the Lenders' Collateral Agent determines or the Lenders holding 75% of the then-outstanding Principal Obligation (as of any date of determination, for purposes of this definition, the "<u>Required Lenders</u>") notify the Lenders' Collateral Agent that Required Lenders have determined (in any such case, a "<u>Determination</u>"), and have provided written notice of the Determination to the Corporate Debtors, that (i) adequate and reasonable means do not exist for ascertaining LIBOR because the LIBOR quote on the applicable screen page (or other source) used by the Lenders' Collateral

- 10 -

Agent to determine LIBOR (the "LIBOR Screen Rate") is not available or published on a current basis and such circumstances are unlikely to be temporary, or (ii) the administrator of the LIBOR Screen Rate or a governmental authority having jurisdiction over United States national banks has made a public statement identifying a specific date (the "Scheduled Unavailability Date") after which LIBOR or the LIBOR Screen Rate shall no longer be made available, or used for determining the interest rate of loans, or (iii) it has become common in the commercial syndicated loan market for new loans in that market being documented to (and/or for existing loans in that market to be amended in order to) incorporate or adopt a new benchmark interest rate to replace LIBOR, then, reasonably promptly after such determination by the Lenders' Collateral Agent or receipt by the Lenders' Collateral Agent of written notice of the Determination, LIBOR shall be replaced with an alternate benchmark rate (including any mathematical or other adjustments to the benchmark (if any) incorporated therein) selected (a "Selection") by the Lenders' Collateral Agent in its commercially reasonable judgment after consultation with the Corporate Debtors and approved in writing by the Required Lenders, giving due consideration to any evolving or then existing convention in the market for U.S. Dollar-denominated syndicated credit facilities for such alternative benchmarks (provided further, that in no event shall the LIBOR Successor Rate be less than zero) (the "LIBOR Successor Rate"), and such LIBOR Successor Rate shall be effective at 5:00 p.m. on the fifth Business Day after approval thereof by the Required Lenders  unless contested by the Corporate Debtors.  The Lenders' Collateral Agent shall give written notice to the Corporate Debtors within three (3) Business Days following any approval by the Required Lenders of a LIBOR Successor Rate.  If no LIBOR Successor Rate has been determined, and the circumstances under clause (i) above exist or the Scheduled Unavailability Date has occurred, the Lenders' Collateral Agent will promptly notify the Corporate Debtors and the Lenders, and thereafter, the LIBOR Successor Rate shall mean, on any date,  a per annum rate of interest equal to the "prime rate," as published in the "Money Rates" column of *The Wall Street Journal* on such date, minus 100 basis points (provided further, that in no event shall LIBOR as determined under this sentence be less than zero).  Notwithstanding the foregoing, the Corporate Debtors may dispute a Determination, a Selection, or the LIBOR Successor Rate, by, within fifteen (15) Business Days after receiving notice thereof, providing the Lenders' Collateral Agent and each of the Lenders with a Notice of Dispute with respect to the LIBOR Successor Rate.  If a written agreement specifying the rate that shall replace LIBOR for purposes of the Plan has not been executed by the Corporate Debtors, the Lenders' Collateral Agent, and each of the Lenders with an outstanding Secured Claim within twenty (20) Business Days after such Notice of Dispute, the Corporate Debtors shall file an appropriate pleading seeking determination by the Bankruptcy Court, or if the Bankruptcy Cases have been closed, shall submit the dispute to binding arbitration by the Plan Arbitrator.

     **1.82**     "Lien" shall have the meanings set forth in Sections 101(36) and (37) of the Bankruptcy Code; provided that (a) a lien that has been avoided in accordance with Sections 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall not constitute a Lien, (b) no lien shall be valid unless approved by a Final Order of the Bankruptcy Court or by agreement of the Debtor against whom the lien is asserted, and (c) the liens of Lenders shall be governed by the Eighth Cash Collateral Order and the Plan, including, without limitation, the waiver of the Retained Challenges pursuant to the Plan.

**1.83** "Life Insurance Agreement" shall mean an agreement between the Debtors and the Insurance Trust as provided for in Section 5.3 of the Plan.

**1.84** "Loan Documents" shall mean all documents evidencing a Secured Claim and/or the Lien securing such Claim, executed by the Debtors prior to the Petition Date, including, without limitation, notes, loan agreements, mortgages (including ship and fleet mortgages), security agreements, financing statements, guarantees, swap agreements, and such other documents executed in connection with such Secured Claim and/or Lien.

**1.85** "MARAD" shall mean the U.S. Maritime Administration and its successors and assigns.

**1.86** "Maritime Lien Claim(s)" shall mean the Secured Claims held by (a) Bollinger Amelie Repair, LLC, Bollinger Morgan City, LLC, Kim Marine Documentation, Inc., Portland Tugboat, LLC, Poseidon International, Ltd., and Starboard Yacht Group, LLC, and (b) any other entity with a lien, under applicable maritime law, which is asserted as of the Effective Date and either agreed to or contested by the Debtors within the later to occur of (i) thirty (30) days from the Effective Date, or (ii) thirty (30) days from the date of the notice or filing of the lien, the taking of action, or the making of process by the maritime lien claimant.

**1.87** "MDP" shall mean the minimum disposition prices for the Mortgaged Vessels and the Unencumbered Vessels listed on Exhibit 2 to the Plan, or such other minimum disposition prices agreed to between the Debtors and (a) the holder of the Vessel Mortgage on a particular Mortgaged Vessel, or (b) as to an Unencumbered Vessel, the Lenders' Collateral Agent.

**1.88** "Mortgaged Vessels" shall mean the vessels and certain items of equipment denoted as "Mortgaged Vessels" on Exhibit 3 to the Plan.

**1.89** "Mystic" shall mean Mystic Adventure Sales, LLC, one of the Debtors and a debtor-in-possession.

**1.90** "Net Proceeds" shall mean: (a) for the Vessels and the Equipment listed on Exhibit 2 to the Plan, the gross proceeds of any sale, transfer or liquidation of such Vessels or Equipment less the Vessel Closing Costs for such Vessel or Equipment; and (b) for all other Assets of the Debtors, the gross proceeds of any sale, transfer or other liquidation of any of the Assets, including the prosecution of Causes of Action, less the aggregate of: (i) the costs and expenses of selling, transferring, prosecuting and/or liquidating the Assets, including, without limitation, professional fees and expenses related to the recovery and disposition of the Assets; (ii) taxes (including capital gains taxes); (iii) accrued and unpaid Real Estate Taxes and municipal liens; and (iv) closing costs and other usual and ordinary recording and/or settlement charges.

**1.91** "Norton" shall mean Norton Rose Fulbright LLP and/or its successors and assigns.

749807

**1.92** "Notice Parties" shall mean, with respect to any Vessel(s) to be sold pursuant to the Plan, the parties who have Liens on such Vessel, including, without limitation, the GUC Collateral Agent and the Lenders' Collateral Agent.

**1.93** "Organization Documents" shall mean, as applicable, the Debtors' respective operating agreements, trust agreements, articles of incorporation, bylaws, corporate minute books and such other documents evidencing the Debtors' formation and/or operation in such jurisdictions in which the Debtors are authorized to conduct business.

**1.94** "Pacwest" shall mean Pacific Western Bank.

**1.95** "Pacwest/MARAD Vessels" shall mean those Vessels subject to liens in favor of Pacwest and MARAD.

**1.96** "Pay Rate" shall mean the interest rate set forth in Section 4.1(c)(i)(2)(B) of the Plan applicable to the periods specified in that Section of the Plan.

**1.97** "Permitted Commission" shall mean, with respect to the sale of a Mortgaged Vessel, a fee payable to one or more brokers, none of whom is a Debtor or an Insider, equal to or less than six percent (6%) of the gross purchase price of such Mortgaged Vessel, or such higher amount as may be agreed to by the Reorganized Debtors and the holder of the Vessel Mortgage on such vessel.

**1.98** "Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, governmental agency or political subdivision.

**1.99** "Petition Date" shall mean June 9, 2017.

**1.100** "Plan" shall mean this *Modified Third Amended Joint Plan of Reorganization of Cashman Equipment Corp., Cashman Scrap & Salvage, LLC, Servicio Marina Superior, LLC, Cashman Canada, Inc., Mystic Adventure Sails, LLC, And James M. Cashman*, including, without limitation, all exhibits, supplements, appendices and schedules to the Plan, either in their present form or as the same may be altered, amended or modified from time to time.

**1.101** "Plan Arbitrator" shall mean Robert Somma, or in the event of his resignation or unavailability, another retired bankruptcy judge from the First Circuit.

**1.102** "Plan Contribution" shall mean the funds and benefits provided by or on behalf of the holders of the Debtors' Equity Interests, including the following: (a) the Net Proceeds of the sale of the lot located on Forest Street in Milton, Massachusetts, (b) the Net Proceeds of the sale of Lots 3, 3F2 and 4, Bayou Barbary, Jonathan Davis Plantation Land, Baratria, LA, and (c) the Life Insurance Agreement.

**1.103** "Plan Lien Documents" shall mean the documents reasonably necessary to evidence, secure and administer the Additional Plan Lien, the Additional Vessel Lien and the GUC Lien, including the GUC Plan Intercreditor Agreement, the Lender Plan Intercreditor Agreement, mortgages and assignment of insurances.

749807

**1.104** "Plan Supplement" shall mean the compilation of documents, agreements, papers, instruments and forms of documents associated with the Plan, including the GUC Plan Intercreditor Agreement and the Lender Plan Intercreditor Agreement, to be filed in connection with the confirmation of the Plan.

**1.105** "Principal Obligation" shall mean:

(a)    With respect to an Agreed-Claim Lender and before the application of the amounts paid to such Agreed-Claim Lender pursuant to Section 4.1(c)(i)(8) of the Plan, if any, such Agreed-Claim Lender's Allowed Claim for: (i) the principal due to such Agreed-Claim Lender as of the Petition Date, as established by paragraph 13 of the Eighth Cash Collateral Order, (ii) Costs of Collection due to an Agreed-Claim Lender as of the Petition Date, plus, to the extent allowable under Section 506(b) of the Bankruptcy Code, (iii) the Costs of Collection due to such Agreed-Claim Lender from the Petition Date to the Effective Date, less (iv) amounts paid after the Petition Date and before the Effective Date to such Agreed-Claim Lender, other than payments of Contract Interest pursuant to any applicable cash collateral order to those Agreed-Claim Lenders entitled to receive post-petition Contract Interest under Section 506(b) of the Bankruptcy Code.

(b)    With respect to a Contested-Claim Lender and before the application of the amounts paid to such Contested-Claim Lender pursuant to Section 4.1(c)(i)(8) of the Plan, if any, such Contested-Claim Lender's Allowed Claim for: (i) the principal due to such Contested-Claim Lender as of the Petition Date, as established by paragraph 13 of the Eighth Cash Collateral Order, (ii) Contract Interest, the Default Obligation and Costs of Collection due to such Contested-Claim Lender as of the Petition Date, plus, to the extent allowable under Section 506(b) of the Bankruptcy Code, (iii) Contract Interest, the Default Obligation (other than default interest waived by such Contested-Claim Lender pursuant to an order of the Bankruptcy Court) and Costs of Collection due to such Contested-Claim Lender from the Petition Date to the Effective Date, and (iv) the other amounts claimed by a Contested-Claim Lender by the Unresolved Claim Amount Deadline, to the extent secured by Liens of such Lender, less (v) amounts paid after the Petition Date to such Lender.  If the Allowed Secured Claim of a Contested-Claim Lender has not been determined as of the Effective Date, then for purposes of computing payments to such Lender under the Plan, the Principal Obligation shall be calculated as though the Claim had been Allowed in the full amount sought by the Lender, provided that, after entry of a Final Order determining such Claim, (y) the Debtors may offset against the amounts next due to such Lender the difference (if any) between the amounts the Lender would have received under the Plan based on the Principal Obligation as finally determined and the amounts actually paid to such Lender (including recovery of excess interest paid), and (z) the Debtors

- 14 -

shall thereafter pay such Lender monthly installments under Section 4.1(c)(i)(2) of the Plan computed in accordance with the Principal Obligation as finally determined.

**1.106** "Priority Claims" shall mean all Claims, if any, entitled to priority under Section 507(a) of the Bankruptcy Code other than Priority Tax Claims and Administrative Expense Claims.

**1.107** "Priority Maritime Lien" shall mean, with respect to a Vessel, a maritime lien on a vessel having priority, under applicable law in the vessel's location, over a first preferred ship mortgage on such Vessel, and arising on account of obligations incurred by the Debtors after the Confirmation Date.

**1.108** "Priority Tax Claims" shall mean any Claim of a governmental unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

**1.109** "Professionals" shall mean those Persons (a) employed pursuant to an order of the Bankruptcy Court in accordance with Sections 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement is allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

**1.110** "Professional Fee Claims" shall mean the fees and expenses of Professionals under Sections 330, 331, or 503 of the Bankruptcy Code approved by an Order of the Bankruptcy Court.

**1.111** "Property" shall mean collectively and with reference to a specific Debtor, all real and personal property owned by the Debtors, including the Vessels.  All references to the "Property" shall be deemed to mean all or any portion of such Property.

**1.112** "Pro Rata" shall mean: (a) when used with reference to a distribution of property under the Plan, proportionately so that with respect to a particular Allowed Claim, the ratio of (i)(1) the amount of property distributed on account of such Claim to (2) the amount of such Claim, is the same as the ratio of (ii)(1) the amount of property distributed on account of all Allowed Claims of the Class in which such Claim is included to (2) the amount of all Allowed Claims in that Class; and (b) when used with reference to a Lien, proportionately so that with respect to a particular Lien holder, to the ratio of (i)(1) the amount of property to be received from the liquidation of collateral securing such Lien to (2) the amount of the Lien holder's Allowed Secured Claim, is the same as the ratio of (ii)(1) the amount of property to be received from the liquidation of collateral securing such Lien to all holders of the Lien to (2) the amount of the Allowed Secured Claims of all holders of the Lien.  Pro Rata payments to the Lenders and Agreed-Claim Lenders shall be made based on the balance of such creditors' Allowed Secured Claims at the time the payment in question is made.

**1.113** "Purchase Option Charter" shall mean an agreement to sell Vessels and certain equipment constituting Mortgaged Vessel(s) and/or Unencumbered Vessel(s) pursuant to charter agreements that provide the lessee with an option to purchase the leased vessel and/or equipment.

- 15 -

**1.114** "Qualified Sale" shall have the meaning set forth in Section 5.2(b) of the Plan.

**1.115** "Reorganized Debtors" shall mean the Debtors, from and after the Effective Date, as recapitalized, reconstituted and reorganized pursuant to the Plan and any associated documents.

**1.116** "Retained Challenge Rights" shall have the meaning ascribed to such term in the Eighth Cash Collateral Order and in the *Notice of Retained Challenges of Official Committee of Unsecured Creditors* dated October 30, 2017, as such notice has been amended.

**1.117** "Retained Proceeds Claim(s)" shall mean Retained Proceeds Claim(s) as defined in the Sale Order.

**1.118** "Retained Lien Document" shall mean: (i) an amendment to any Vessel mortgage or security agreement that is a Loan Document and that grants a Lender a Lien that secures its Allowed Secured Claim, which amendment shall attach and reference the Allonge, and (ii) any assignment of insurances and any amendment to any existing assignment of insurances relating to any Vessel that, in each case, is the subject of a Vessel mortgage described in subparagraph (i) above.

**1.119** "RTC" shall mean Rockland Trust Company and its successors and assigns.

**1.120** "Sale Notice" shall mean a notice of a Qualified Sale of a Vessel in the form attached as Exhibit 4.

**1.121** "Sale Order" shall mean the *Order Authorizing Sales of Certain Assets Free and Clear of All Liens, Claims and Interests* [doc. no. 545] entered by the Bankruptcy Court on October 24, 2017.

**1.122** "Schedules" shall mean the schedules of assets and liabilities, the list of holders of interests and the statements of financial affairs filed by the Debtors under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements have been or may be supplemented or amended from time to time.

**1.123** "Schedule of Agreed-Claim Lenders" shall mean a schedule listing the Allowed Secured Claim of each Agreed-Claim Lender, as agreed to by the Debtors (after consultation with the Committee) and the Agreed-Claim Lenders, listing separately the agreed Principal Obligation, Contract Interest, Default Obligation and Costs of Collection (through the period for which the Agreed-Claim Lender has provided the Debtors with invoices for such Costs of Collection) for each Agreed-Claim Lender.

**1.124** "Secured Claim" shall mean:

    (a)    With respect to a Lender, such Lender's Principal Obligation as of the Effective Date, plus, (a) in the case of an Agreed-Claim Lender, its Accrued Contract Interest, and (b) after the Effective Date, such other amounts that the Lender is entitled to receive under the Plan and, to the extent applicable, such Lender's Loan Documents, Allonge, Plan Lien

Documents and Retained Lien Documents, including the Additional
Interest to the extent not waived pursuant to the Plan; and

(b)     With respect to all other entities, any Claim that is secured by a Lien on
Collateral to the extent of the value of such Collateral, as determined in
accordance with Section 506(a) of the Bankruptcy Code, or, in the event
that such Claim is a claim of setoff under Section 553 of the Bankruptcy
Code, to the extent of such setoff.

**1.125**   "Settlement Notice" shall mean a notice filed with the Bankruptcy Court
regarding the resolution of a Disputed Claim or Cause of Action that includes, among other
information, the identity of the parties to the dispute, the amount at issue at the commencement
of the dispute, and a summary of the resolution of the dispute.

**1.126**   "SMS" shall mean Servicio Marina Superior, LLC, one of the Debtors and a
debtor-in-possession.

**1.127**   "Unencumbered Vessels" shall mean the vessels denoted as "Unencumbered
Vessels" on Exhibit 3 to the Plan.

**1.128**   "Vessel(s)" shall mean, collectively, the Mortgaged Vessels and the
Unencumbered Vessels.

**1.129**   "Vessel Closing Costs" shall mean the aggregate of: (a) the Permitted
Commission; (b) the amount to be paid at such closing to obtain discharge of a Priority Maritime
Lien; (c) recording, discharge, and transfer fees; and (d) the Debtors' costs and expenses of
selling the Vessel, including, without limitation, (i) professional fees, and (ii) expenses and any
charges (including fees relating to the registration of the vessel under the laws of its current flag
state) that must be paid before the sale of the vessel will be permitted or recognized by such
state; but excluding sales taxes, which shall be otherwise provided for.

**1.130**   "Vessel Mortgages" shall mean the Liens designated as "Vessel Mortgages" on
Exhibit 3 to the Plan until the Allowed Claim that is secured by such Lien is paid in full pursuant
to the Plan.

**1.131**   "Vessel Sale Dispute" shall mean any dispute between the Reorganized Debtors
and the holder of a Lien on a Vessel regarding the sale of such Vessel pursuant to Section 5.2 of
the Plan, including, without limitation, whether such sale is a Qualified Sale, whether the
allocation of the Sales Proceeds is correct, and whether the commission is a Permitted
Commission.

**1.132**   "Voting Deadline" shall mean the deadline for submitting ballots with respect to
the Plan that is established by the Bankruptcy Court.

**1.133**   "Western Surety" shall mean Western Surety Company, CNA Surety and all of
their respective affiliates, successors, subsidiaries, agents, assigns and subrogees.

749807

## ARTICLE II

## TREATMENT OF ALLOWED UNCLASSIFIED CLAIMS

**2.1     Non-Classification.**

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against each Debtor are not classified for the purposes of voting on, or receiving distributions under, the Plan.  All such Claims are instead treated separately in accordance with the terms set forth in this Article II.

**2.2     Administrative Expense Claims.**

(a)     <u>General</u>.  Except for Professional Fee Claims and except as otherwise agreed to by the Debtors and the holder of an Allowed Administrative Expense Claim, each such holder shall be paid in full in Cash on the later of: (i) the date such Allowed Administrative Expense Claim becomes due in accordance with its terms; and (ii) the Effective Date.

(b)     <u>U.S. Trustee's Fees</u>.  The outstanding fees due to the United States Trustee pursuant to 11 U.S.C. § 1930 shall be paid in full on or before the Effective Date.

(c)     <u>Professional Compensation and Expense Reimbursement Claims</u>.

(i)     Within thirty (30) days after the Effective Date, each Professional shall file a final application for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.  Any such application granted by the Bankruptcy Court shall be paid: (1) within fifteen days of the entry of the order of the Bankruptcy Court approving such application, unless a stay of the order approving the application is obtained; or (2) upon such other terms as may be mutually agreed upon between the Professional and the Debtors or Reorganized Debtors.

(ii)     All fees and expenses of Professionals for services rendered after the Effective Date shall be paid by the Reorganized Debtors upon receipt of reasonably detailed invoices in such amounts and on such terms as such Professional and the Reorganized Debtors may agree.  No further order or authorization from the Bankruptcy Court shall be necessary to permit the Reorganized Debtors to pay the fees and expenses of Professionals for services rendered after the Effective Date.

(d)     <u>Unresolved Claim Bar Date</u>.  Except in the case of an Agreed-Claim Lender, any entity asserting a Claim against the Debtors under Section 506(b) of the Bankruptcy Code or pursuant to Section 1.105(b) of the Plan, shall file notice of such Claim with the Bankruptcy Court not later than the Voting Deadline, or such other date established by the Bankruptcy Court, or such Claim shall be forever disallowed and barred as a Claim against the Debtors, whether for purposes of voting, sharing in any distribution, or in any other way participating as a party in

- 18 -

interest in the Bankruptcy Cases. The notice of claim filed with the Bankruptcy Court shall list the specific amounts claimed by the Lender and may reference filed proofs of claim to support such amounts. The Debtors shall, within seven (7) days of the approval of the Disclosure Statement, notify each Lender of any dispute with respect to those Costs of Collection as to which such Lender has provided the Debtors with invoices.

(e)      *Agreed-Claim Lender's Costs of Collection.* Within fifteen (15) Business Days of the Effective Date, each Agreed-Claim Lender shall provide the Debtors with copies of invoices for their Collection Costs (redacted to preserve privileged information) for any period for which the Agreed-Claim Lender has provided the Debtors with an estimate of its Costs of Collection. Within thirty (30) Business Days of the Effective Date, the Debtors shall notify the Agreed-Claim Lender, in writing, whether they agree to such Costs of Collection, in which case such Costs of Collection shall be deemed Allowed and shall be added to the Agreed-Claim Lender's Allowed Secured Claim, or they dispute such Costs of Collection. If the Debtors notify the Agreed-Claim Lenders that they dispute the Costs of Collection covered by such invoices, then the Agreed-Claim Lender shall, within twenty (20) Business Days after receipt of such notice, file an application with the Bankruptcy Court seeking allowance of such Costs of Collection. Any Costs of Collection Allowed by the Bankruptcy Court shall be added to the Agreed-Claim Lender's Allowed Secured Claim.

**2.3      Priority Tax Claims.**

Each holder of an Allowed Priority Tax Claim against each Debtor, if any, shall be paid, at the sole election of the Debtors, either: (a) upon such terms as may be agreed to between the Debtors and the holder of an Allowed Priority Tax Claim; (b) in full in Cash on the Effective Date; or (c) in installment payments of Cash commencing on the Effective Date and (i) of a total value as of the Effective Date equal to the Allowed amount of such Claim, (ii) over a period ending not later than five (5) years from the Petition Date, and (iii) in a manner not less favorable than the most favored General Unsecured Claim under the Plan.

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The Claims against and Equity Interests in the Debtors are categorized below pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. A Claim is placed in a particular Class for the purpose of voting on the Plan, and only to the extent that such Claim is Allowed for voting purposes in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date. For the purposes of the Allowance of and distributions to Allowed Claims under the Plan, Section 6.2(a) of the Plan provides for the consolidation of the Debtors such that creditors with multiple Claims for the same obligations will receive only one Allowed Claim under the Plan. All Classes of claims and Equity Interests

with respect to each Debtor are separately classified in their own distinct sub-classes, sub-class A for CEC, sub-class B for SMS, sub-class C for CSS, sub-class D for CCI, sub-class E for Mystic, and sub-class F for JMC.  Nothing in the Plan is intended to effectuate a substantive consolidation of the Debtors or their Estates.

### 3.1    Claim and Equity Interest Categories.

Claims against and Equity Interests in the Debtors have been classified as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 A | Banc of America Leasing Secured Claims | Impaired | Yes |
| 2 A | Bollinger Ameila Repair, LLC Secured Claims | Impaired | Yes |
| 3 A | Bollinger Morgan City, LLC Secured Claims | Impaired | Yes |
| 4 F | Chase Bank Secured Claims | Unimpaired | No |
| 5 A – C | Citizens Asset Finance Secured Claims | Impaired | Yes |
| 6 A | Equitable Bank Secured Claims | Impaired | Yes |
| 7 A | Fifth Third Bank Secured Claims | Impaired | Yes |
| 8 A | Great American Ins. Company Secured Claims | Impaired | Yes |
| 9 A – C | Key Bank Secured Claims | Impaired | Yes |
| 10 A | Kim Marine Documentation, Inc. Secured Claims | Impaired | Yes |
| 11 A | MARAD Secured Claims | Impaired | Yes |
| 12 A | Norton Rose Fulbright, LLP Secured Claims | Impaired | Yes |
| 13 A | Pacific West Bank Secured Claims | Impaired | Yes |
| 14 A | Poseidon International, Ltd. Secured Claims | Impaired | Yes |
| 15 A, C | Radius Bank Secured Claims | Impaired | Yes |
| 16 A – F | Rockland Trust Company Secured Claims | Impaired | Yes |
| 17 A, B, E, F | Santander Bank Secured Claims | Impaired | Yes |
| 18 A | Starboard Yacht Group LLC Secured Claims | Impaired | Yes |

749807

| 19 A – E | Starr Indemnity & Liability Co. Secured Claims | Impaired | Yes |
|---|---|---|---|
| 20 A | US Bank N.A. Secured Claims | Impaired | Yes |
| 21 A | Wells Fargo Equipment Finance, Inc. Secured Claims | Impaired | Yes |
| 22 A – F | Priority Claims | Unimpaired | Yes |
| 23 A | Cardi Claim | Impaired | Yes |
| 24 A | Western Surety Claim | Impaired | Yes |
| 25 A | BP Claim | Impaired | Yes |
| 26 A – F | General Unsecured Claims | Impaired | Yes |
| 27 A – F | Convenience Class Claims | Impaired | Yes |
| 28 A – E | Equity Interests | Impaired | Yes |

**3.2    Elimination of Vacant Classes.**

Any Class of Claims or Equity Interests that does not contain, as of the Confirmation Date, a holder of an Allowed Claim or Equity Interest, or a holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under Section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.1    Classes 1 - 21 – Allowed Secured Claims.**

(a)    <u>Classification</u>.  Classes 1 through 21 consist of Secured Claims against the Debtors, as applicable.  The Claims of Lenders and the Insurers shall be deemed fully secured as to the Allowed amount of such Claims on the Petition Date, and shall include, to the extent allowable under Section 506(b) of the Bankruptcy Code, Claims for post-petition interest and Costs of Collection.

(b)    <u>Impairment and Voting</u>.  Except for the JMC Secured Claims, the Secured Claims are impaired under the Plan, and the holders of such Claims shall be entitled to vote to accept or reject the Plan.  The JMC Secured Claims

- 21 -

are unimpaired under the Plan and the holders of such Claims are not entitled to vote to accept or reject the Plan.

(c)    <u>Claim Treatment</u>.  In full and final satisfaction, settlement, discharge and release of the Allowed Secured Claims, the holders of Allowed Secured Claims shall receive the following treatment, as applicable:

(i)    Within five (5) days following the Voting Deadline, the Debtors shall file the Schedule of Agreed-Claim Lenders.  As soon as practicable after the determination of the Agreed-Claim Lenders estimated Costs of Collection pursuant to Section 2.2(e) of the Plan, the Debtors shall file an amended Schedule of Agreed-Claim Lenders listing the amount of each Agreed-Claim Lender's Claim as of the Effective Date.  The Secured Claim of each Agreed-Claim Lender shall be Allowed in the amount listed in the Schedule of Agreed-Claim Lenders.  Upon the Allowance of the Secured Claim of each Contested-Claim Lender by a Final Order, such Allowed Secured Claim shall be treated as Allowed as of the Effective Date for the purposes of the Plan.  A Lender's Allowed Secured Claim shall be the joint and several obligation of the Corporate Debtors, and each Lien of such Lender securing any portion of such Lender's Allowed Secured Claim shall secure the entire Allowed Claim.  A Lender's Allowed Secured Claim shall receive the following treatment:

(1)    <u>Maturity Date</u>.  The Corporate Debtors shall pay the Lender on the Lender Maturity Date the unpaid balance (if any) of its Allowed Secured Claim.  If not paid in full on the Lender Maturity Date, each Lender may add to such unpaid balance on a monthly basis (A) simple interest thereon at the Lender Rate, and (B) such Lender's reasonable costs of collecting such unpaid balance, including attorneys' fees and including in any bankruptcy case of any of the Debtors.

(2)    <u>Monthly Installments</u>.  The Corporate Debtors shall pay each Lender a monthly payment consisting of (A) principal computed on the basis of an amortization schedule of 22.5 years from and after the Effective Date applied to the Principal Obligation, which principal component of each monthly installment shall not adjust from the amortization schedule established on the Effective Date, and (B) interest in arrears on the outstanding amount of the Principal Obligation, which shall be calculated and adjust daily, as follows: (I) for the first fifty-four (54) months following the Effective Date, based on an interest rate of five and one-half percent (5.50%) per annum; (II) for the fifty- fifth (55th) through and including the sixtieth (60th) months

- 22 -

following the Effective Date, based on an interest rate of six percent (6.00%) per annum; (III) for the sixty-first (61st) through and including the sixty-sixth (66th) months following the Effective Date, based on an interest rate of six and one-quarter percent (6.25%) per annum; and (IV) for the sixtieth-seventh (67th) through and including the seventy-second (72nd) months following the Effective Date, based on an interest rate of six and one-half percent (6.50%) per annum. The first monthly payment shall be for the period between the Effective Date and the thirtieth (30th) day following the Effective Date, and shall be paid within three (3) Business Days from the Debtors' receipt of an invoice from the Lender for such monthly payment, and such payments shall continue monthly thereafter on the same day of each month. Notwithstanding Section 6.1 of the Plan, each such monthly payment shall be sent by Federal Reserve wire transfer or by check delivered by overnight mail. In the event of a dispute with respect to the amount of a monthly payment of principal and interest, the Debtors may pay the monthly payment to the Lender on account, without prejudice to any of the Debtors' or the Lenders' rights, claims and defenses with respect to such payment.

(3)    Additional Interest. In addition to interest at the Pay Rate, each Lender shall also be entitled to receive simple interest, calculated daily on the actual outstanding Principal Obligation at a rate equal to the difference between the Lender Rate and the Pay Rate (the "Additional Interest"). The Additional Interest shall accrue and be due and payable on the Lender Maturity Date; provided that, if such Lender's Allowed Secured Claim (excluding the accrued Additional Interest) is paid in full:

(A)    Prior to the last day of the fifty-fourth (54th) month following the Effective Date, then such Lender's Additional Interest shall be waived and any claim to such Lender's Additional Interest shall be discharged and released pursuant to the terms of the Plan;

(B)    From the first day of the fifty-fifth (55th) month through the last day of the sixtieth (60th) month following the Effective Date, then sixty-two and one-half percent (62.5%) of such Lender's Additional Interest shall be waived and any claim to such portion of the Additional Interest shall be

- 23 -

discharged and released pursuant to the terms of the Plan, <u>provided that</u> the balance of such Lender's Additional Interest (37.5%) is paid at the same time as the Principal Obligation of such Lender is paid in full; and

(C)     From the first day of the sixty-first (61st) month through the last day of the sixty-sixth (66th) month following the Effective Date, then forty percent (40%) of such Lender's Additional Interest shall be waived and any claim to such portion of the Additional Interest shall be discharged and released pursuant to the terms of the Plan, <u>provided that</u> the balance of such Lender's Additional Interest (60%) is paid at the same time as the Principal Obligation of such Lender is paid in full.

(4)     <u>Agreed-Claim Lenders' Contract Interest</u>.  Within three (3) Business Days of the Effective Date, (A) the Corporate Debtors shall pay each Agreed-Claim Lender, as applicable, a Pro Rata share, with the other Agreed-Claim Lenders, of the Initial Payment, to be applied in payment of its Accrued Contract Interest, and thereafter as provided in Section 4.1(c)(i)(12) of the Plan, and (B) each Agreed-Claim Lender shall be deemed to waive the Default Obligation.  To the extent that the Accrued Contract Interest of an Agreed-Claim Lender is not paid in full by the Initial Payment, (Y) such Agreed-Claim Lender shall have a priority right (over Agreed-Claim Lenders no longer owed Accrued Contract Interest and over Contested-Claim Lenders) to receive the distributions of Excess Cash, which shall be distributed Pro Rata among the Agreed-Claim Lenders still owed Accrued Contract Interest to the extent of (and to be applied to) their unpaid Accrued Contract Interest, until the Accrued Contract Interest of each Agreed-Claim Lender is paid in full, and (Z) the balance, if any, of the Accrued Contract Interest of such Agreed-Claim Lender shall be paid on or before December 31, 2020.

(5)     <u>Excess Cash Payments</u>.  The Debtors shall make each Excess Cash Payment on the date specified in Section 1.60 of the Plan, in the amount of Excess Cash as of the Excess Cash Measurement Date preceding such date.  Each Excess Cash Payment:

(A)     Shall be accompanied by a report, certified by an officer of the Corporate Debtors, showing in

- 24 -

reasonable detail the Corporate Debtors' computation of (I) Excess Cash as of the preceding Excess Cash Measurement Date, and (II) each Lender's Pro Rata share of such Excess Cash.  Any Lender shall have the right, at its own expense and upon reasonable notice to the Corporate Debtors, to review the Corporate Debtors' financial records in order to check the computation of the Excess Cash (but not the computation of each Lender's Pro Rata Share of the Excess Cash), provided that, the Corporate Debtors shall reimburse the Lender for such expense if the amount of the Excess Cash is determined to be less than ninety percent (90%) of the amount required by the Plan.  In the event of a dispute regarding the Excess Cash, the Corporate Debtors may pay the amount required by the report to the Lenders on account, without prejudice to any of the Corporate Debtors' or the Lenders' rights, claims and defenses with respect to such payment.  Any dispute regarding the Excess Cash Payment shall be determined by the Bankruptcy Court, or if the Bankruptcy Cases have been closed, by binding arbitration before the Plan Arbitrator.

(B)     Shall be paid first in accordance with Section 4.1(c)(i)(5)(A) of the Plan, and once all Accrued Contract Interest has been paid, then Pro Rata to all Lenders.

(6)     Collateral Expenses.  Within thirty (30) days of the Corporate Debtors' receipt of reasonably detailed invoices for Collateral Expenses, the Corporate Debtors shall reimburse the relevant Lender, the Lenders' Collateral Agent, or the GUC Collateral Agent, as applicable, for reasonably incurred Collateral Expenses.

(7)     Lenders' Additional Liens.  In addition to retention of Liens pursuant to Section 4.1(d) of the Plan, subject to the Lender Plan Intercreditor Agreement, each Lender shall, on the Effective Date, receive an interest, Pro Rata with the other Lenders based on their respective Allowed Secured Claims at any time outstanding, in the Additional Plan Lien and the Additional Vessel Lien to secure the payment of such Lender's Allowed Secured Claim.

(8)     Retained Proceeds Claims.  All Allowed Retained Proceeds Claim shall be paid in full on the later to occur of the

Effective Date or the date such Claim becomes Allowed by a Final Order, which payments shall be applied to the monthly payments due, or to become due under Section 4.1(c)(i)(2) of the Plan to the Lender holding the Retained Proceeds Claim, or as otherwise agreed between the Debtors and the holder of the Retained Proceeds Claim. Upon the payment in full of the Allowed Retained Proceeds Claim, all Liens securing such claim shall be discharged.

(9)    Vessel Sale Proceeds.  Each Lender shall receive, in accordance with Section 5.2(d)(iii) of the Plan, the Net Proceeds of the sale of any Mortgaged Vessels against which it holds a Vessel Mortgage.

(10)    Pro Rata Payments.  If the Debtors choose to make payments to the Lenders other than amounts required by the Plan, such payments shall be made Pro Rata to Lenders in accordance with their then-outstanding Principal Obligations at the time of payment.  If any such payment is in conjunction with a request for release of all or a portion of the Additional Vessel Lien or the Additional Plan Lien, acceptance of such request by a majority in amount of Lenders based on their then-outstanding Principal Obligations will bind all Lenders and the Lenders' Collateral Agent to effectuate such release in exchange for the Pro Rata payment promised in connection therewith.  If, after receiving a Pro Rata share of the Initial Payment and/or a payment(s) of Excess Cash, a Lender's Secured Claim is reduced, either by agreement with the Debtors or by a Final Order of the Bankruptcy Court, then: (A) at the sole option of the Debtors, (1) such Lender shall, within ten (10) Business Days, return to the Debtors the amount of the Initial Payment and Excess Cash payment(s), as applicable, by which it was overpaid, or (2) the Debtors may offset such amount pursuant to Section 1.105(b) of the Plan, and (B) within ten (10) Business Days of the receipt of such funds or such offset, the Debtors shall remit to every other Lender the amount (if any) by which such Lenders' share of Pro Rata payments to Lenders would have been greater if such Pro Rata payments had been computed in accordance with the Allowed Secured Claim of the disputed Lender as finally determined.

(11)    Deadline for Agreed-Claim Lender Election.  A Lender who elects to become an Agreed-Claim Lender must file a written statement with the Bankruptcy Court to that effect not later than the Voting Deadline.

- 26 -

(12)    Application of Payments.  Except as otherwise provided in
the Plan, a Lender may apply each payment on account of
its Allowed Secured Claim received prior to the Maturity
Date as follows: first, to Collateral Expenses, second, to
accrued interest at the Pay Rate, third, to the Principal
Obligation, and fourth, to Additional Interest (to the extent
not waived pursuant to Section 4.1(c)(i)(3) of the Plan).
After the Maturity Date, each Lender may apply any
amount received or collected on account of its Allowed
Secured Claim as such Lender determines in its sole
discretion, subject to applicable law.

(13)    Covenants and Loan Documents.  The Covenants shall
apply to each Lender's Allowed Secured Claim.  As of the
Effective Date, the Loan Documents shall be deemed
amended and restated, without further action, as necessary
to reflect and incorporate the terms of the Plan through the
Allonge.  Without derogating from the underlying financial
obligation arising under and evidenced by the Loan
Documents (which shall remain in full force and effect to
the extent of such Lender's Allowed Secured Claim and
shall be paid in accordance with the Plan) or from any Lien
therefor (which shall continue to secure, and shall
remain valid and enforceable as to such financial obligations as
modified by the Plan), and without limiting the exercise
after any Default of any remedy contained in the Loan
Documents, the occurrence of the Effective Date shall
render inoperative any terms, covenants, representations
and warranties, and/or remedies contained in the Loan
Documents that impose obligations upon the Debtors that
are inconsistent with or more expansive than the terms of
the Plan, and to the extent that there is any inconsistency
between the Plan and any of the Loan Documents, the
terms of the Plan shall control.

(14)    Early Refinancing.  If, at any time after the third (3rd)
anniversary of the Effective Date, the sum of all of the
Lenders' Allowed Secured Claims divided by the
Corporate Debtors' trailing twelve months' EBITDA, is
less than 7.0 for four (4) consecutive calendar quarters,
then the Debtors shall retain an investment banker to
pursue a loan, on Conventional Terms, in an amount not
less than the amount necessary to pay the balance of the
Allowed Lenders' Secured Claims in full.  In the event that
the Debtors obtain a commitment for such a loan on
Conventional Terms, the Debtors shall use their reasonable
best efforts to close on such loan.

- 27 -

(15)    <u>Investment Banker</u>.  Except as otherwise provided in
Section 4.1(c)(i)(14) of the Plan, on or before six (6)
months prior to the sixth (6th) anniversary of the Effective
Date, the Debtors shall hire an investment banker to assist
the Debtors in seeking financing to pay the outstanding
balance of the Lenders' Allowed Secured Claims on or
before the sixth (6th) anniversary of the Effective Date.

(16)    <u>Waiver of Retained Challenge Rights</u>.  Effective as of the
Effective Date, (a) the Retained Challenge Rights shall be
deemed waived and released by the Debtors, the Debtors'
Estates and the Committee, and (b) the Debtors and the
Reorganized Debtors acknowledge and agree that they have
no claims, counterclaims, rights of setoff or recoupment, or
any other basis to reduce, offset or otherwise limit their
liability to each Lender for its Allowed Secured Claim,
except to the extent of any rights, claims and defenses of
the Debtors to Claims asserted by Lenders pursuant to
Sections 2.2(d) and 2.2(e) of the Plan.

(17)    <u>Plan Supplement</u>.  All documents, agreements and
instruments in the Plan Supplement that materially affect
the treatment of the Claim or Lien of any Lender shall be
included therein only upon approval by such Lender, acting
reasonably, as being satisfactory in form and substance.

(18)    <u>Cash Collateral Orders</u>.  The Corporate Debtors shall pay
all Allowed and unpaid Agent Claims (as defined in the
Eighth Cash Collateral Order), from the Retained Proceeds
Lien (as defined therein), on the later to occur of the
Effective Date or the date such Claims become Allowed by
a Final Order; provided that, notwithstanding any other
provision of the Plan, the Allowed Agent Claims shall be
secured by the Retained Proceeds Lien until paid in full.  If
the Effective Date does not occur on the first day of a
month: (A) each Lender shall, as soon as practicable
following the Effective Date, send an invoice for the
Interim Payment (as defined in any cash collateral order in
effect on the day before the Effective Date) for the period
between the first day of the month preceding the Effective
Date and the Effective Date, (B) the Debtors shall make
each such Interim Payment within three (3) Business Days
of the receipt of the invoice for such payment, and (C) each
Lender shall waive the Default Obligation for such period.

(19)    <u>Default</u>.  Notwithstanding Section 5.12 of the Plan, which
shall not apply to Lenders or the Lenders' Collateral Agent,

- 28 -

(A) all payments to Lenders required by the Plan (including turnover of Net Proceeds to the Lenders' Collateral Agent) shall be made when due, or within a grace period of three (3) Business Days thereafter, and if not so made shall be a Default, except that not more than once per calendar year, as to each Lender (with the Lenders' Collateral Agent considered a single, separate Lender for this purpose), the Debtors' failure to make a payment (or the Collateral Agent's non-receipt of Net Proceeds) when due or within such grace period shall not be a Default unless the Debtors fail to make such payment (or, as applicable, cause such Net Proceeds to be received by the Lenders' Collateral Agent) within a cure period of three (3) Business Days after receiving a notice of default from the Lender or the Lenders' Collateral Agent; (B) upon occurrence of any other Event of Default, the Debtors shall have a cure period of fifteen (15) Business Days after receiving notice of the Event of Default within which to cure such Event of Default; and (C) if the Debtors fail to cure an Event of Default within the applicable grace and/or cure period specified in clause (A) or (B), then a Default shall exist and without further notice or action by any Lender, the outstanding amount of each Lender's Allowed Secured Claim shall become immediately due and payable, whereupon the Lenders and the Lenders' Collateral Agent shall have all of their rights and remedies under the Plan, the Loan Documents, the Retained Lien Documents, the Plan Lien Documents and other applicable documents, laws and rules.  If a Lender (with the Lenders' Collateral Agent considered a Lender for this purpose) gives a notice pursuant to this Section 4.1(c)(i)(19) of the Plan, such Lender shall send a copy of such notice to all other Lenders.  The notices under the preceding sentence are solely for informational purposes, and shall have no effect on whether a Default exists.

(ii)    JMC Secured Claims.  The Allowed JMC Secured Claims shall be reinstated such that they are unimpaired pursuant to Section 1124 of the Bankruptcy Code and the respective pre-petition loan documents of the holders of the JMC Secured Claims.  In the event that a holder of an Allowed JMC Secured Claim is entitled to compensation under this Section 4.1(c)(ii) of the Plan, the amount of such compensation shall be either (1) determined by the Bankruptcy Court, or (2) agreed to between JMC and the holder of such Claim.  The Liens securing the obligations to RTC evidenced by the "Secured Loans" (as defined in that certain Stipulation between RTC and JMC [doc. no. 656-1] are acknowledged as

provided in that Stipulation.  Following the Effective Date, holders of the JMC Secured Claims shall no longer be obligated to make any further principal advances to JMC under the respective Loan Documents and any such obligations to extend such additional advances shall be deemed cancelled.

(iii)   <u>Norton Claim</u>.  On the Effective Date, the holder of the Allowed Norton Secured Claim shall apply the retainer held by Norton in full and final satisfaction of the Allowed Norton Secured Claim. After payment of the Allowed Norton Secured Claim in full, the balance of the Allowed Claim held by Norton, if any, shall be treated as a General Unsecured Claim.  In the event that the Allowed Norton Secured Claim is less than the retainer held by Norton, Norton shall, after payment of the Allowed Norton Secured Claim in full, promptly pay the balance of such retainer to the Reorganized Debtors.

(iv)   <u>Insurers Secured Claims</u>.  The Allowed Insurers Secured Claims shall be paid in full as follows: (1) on the Effective Date, the deposit held by the Insurers shall be applied, Pro Rata, to the Insurers Secured Claims; (2) commencing thirty (30) days following the Effective Date, by monthly installments of principal and interest based on an interest rate of five and one-half percent (5.50%) per annum (commencing to accrue on the Effective Date) and an amortization term of twenty-two and one-half (22.5) years, with all accrued interest and principal due on the sixth (6th) anniversary of the Effective Date; or (3) as determined by the Bankruptcy Court to permit the holders of the Allowed Insurers Secured Claim to realize the indubitable equivalent of such claims.

(v)   <u>Maritime Lien Claims</u>.  The Allowed Maritime Lien Claims shall be paid in full either: (1) commencing thirty (30) days following the Effective Date, by monthly installments of principal and interest based on an interest rate of five and one-half percent (5.50%) per annum (commencing to accrue on the Effective Date) and an amortization term of twenty-two and one-half (22.5) years, with all accrued interest and principal due on the sixth (6th) anniversary of the Effective Date; (2) as determined by the Bankruptcy Court to permit the holder of the Allowed Secured Claim to realize the indubitable equivalent of such claim; or (3) as agreed between the holder of an Allowed Maritime Lien Claim and the Debtors.

(d)   <u>Retention of Liens</u>.  To secure the payment of Allowed Secured Claims and except as specifically modified by the Plan, the holders of such Claims shall retain their Liens as of the Petition Date, including, without limitation: (i) their respective Liens on Vessels, (ii) additionally, in the

- 30 -

case of RTC, its Liens on Corporate Debtor personal property other than Vessels, including, without limitation, all Equipment, accounts, charter hire, payment and general intangibles, and insurances, and the cash and non-cash proceeds thereof, and (iii) the accounts and proceeds of such Vessels and Equipment, to the extent and priority of such Liens as of the Petition Date.  Nothing in this Plan shall be deemed to modify the Corporate Debtors' acknowledgments of Lenders' Liens set forth in the Eighth Cash Collateral Order or the waiver of the Retained Challenge Rights under the Plan.  In respect of the RTC security interests referenced above in this Section 4.1(d)(iii) of the Plan, such security interest shall be and shall remain subordinated as specified in prepetition subordination agreements with other Lenders and as specified in any of the Plan Lien Documents.  Upon the request of any Lender, the Debtors shall execute and return to such Lender any Retained Lien Document within fifteen (15) Business Days of receiving such document; provided that, (A) if the Debtors provide the Lender with a mark-up of the Retained Lien Document containing proposed revisions, the Debtors shall not be required to execute or deliver the Retained Lien Document until the dispute is resolved by the Bankruptcy Court or the Plan Arbitrator, as applicable, and (B) if the Retained Lien Document is otherwise acceptable to the Debtors but the Debtors dispute the necessity of the Retained Lien Document, the Debtors shall execute the Retained Lien Document and deliver it to the Lender, but may dispute, and shall not be required to pay any costs (including Collateral Expenses) incurred by the Lender with respect to such Retained Lien Document unless the Bankruptcy Court or the Plan Arbitrator, as applicable, resolves the dispute in favor of the Lender.  Any dispute regarding the form or necessity of a Retained Lien Document shall be determined by the Bankruptcy Court, or if the Bankruptcy Cases have been closed, by binding arbitration before the Plan Arbitrator.

(e)     Discharge of Liens.  Upon payment in full of an Allowed Secured Claim in immediately available funds: (i) all Liens securing the Allowed Secured Claim shall be deemed canceled, discharged and released, and (ii) the holder of the Allowed Secured Claim shall be required to deliver to the Reorganized Debtors, within three (3) Business Days (or within such period agreed to by the Debtors) of the payment in full of the Allowed Secured Claim, all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of the Liens that secured the Allowed Secured Claim.  In the event an Allowed Secured Claim is paid in full in immediately available funds through the re-financing of such Claim, the holder of the Additional Plan Lien shall, within three (3) Business Days of the closing of such re-financing (or within such period agreed to by the Debtors), deliver a release and discharge of the Additional Plan Lien on the Collateral securing the Allowed Secured Claim to be paid through the re-financing.

749807

(f)      Reporting.  The Reorganized Debtors shall provide the Lenders with the following reporting:

(i)      Monthly Report.  Commencing on the twentieth (20th) after the end of the calendar month in which the Effective Date occurs, and continuing monthly until the Lenders' Allowed Secured Claims are paid in full, the Reorganized Corporate Debtors shall provide each Lender having an outstanding Allowed Secured Claim with the Debtors' Financial Statements for the preceding calendar month.

(ii)     Yearly Reports.  On or before April 30 of each calendar year following the Effective Date until the Lenders' Allowed Secured Claims are paid in full, the Reorganized Corporate Debtors shall provide each Lender having an outstanding Allowed Secured Claim with Financial Statements for the preceding calendar year (including the calendar year ending December 31, 2019 if the Effective Date occurred in 2019) that have been subject to audit by an independent accounting firm retained by the Reorganized Corporate Debtors, in their sole discretion.  The Reorganized Corporate Debtors shall provide each Lender having an unpaid Allowed Secured Claim with copies of the Reorganized Debtors' tax returns within thirty (30) days of their filing.

(iii)    JMC Reports.  On or before May 15 of each calendar year following the Effective Date until the Lenders' Allowed Secured Claims are paid in full, JMC shall supply each Lender having an outstanding Allowed Secured Claim with a signed personal financial statement in the form to be included in the Plan Supplement.  JMC shall provide each Lender having an outstanding Allowed Secured Claim with a copy of his federal tax returns within thirty (30) days of its filing.

(iv)     Confidentiality.  Notwithstanding any Massachusetts freedom of information act or similar statute, the Lenders (other than MARAD) and their representatives, agents and professionals shall keep all reports provided by the Reorganized Debtors strictly confidential and shall be permitted to disclose such reports only to those of their representatives, agents and professionals specifically involved in evaluating the Allowed Secured Claim who require such reports, and to third parties in accordance with Section 5.2(h) of the Plan.  If a Lender or any of its representatives, agents or professionals become legally compelled to disclose any of the reports, such Lender shall consult with the Reorganized Debtors, provide the Reorganized Debtors with prompt written notice before any report is disclosed, and shall disclose only that portion of the report that is legally required to be disclosed.  The Reorganized Debtors may seek a protective order or other appropriate remedy to

- 32 -

protect the confidentiality of the reports (including without limitation a narrowing of the scope of disclosure).  If the Reorganized Debtors do not obtain a protective order or other appropriate remedy or if the Reorganized Debtors agree to permit disclosure of a report, such Lender shall exercise good faith in cooperating with any efforts of the Reorganized Debtors to obtain appropriate assurances in writing that confidential treatment will be accorded the report.

(g)     Remedies.  Upon the occurrence of a Default as to an Allowed Secured Claim, the holder of such Claim shall be entitled to enforce its rights under applicable law in a court of competent jurisdiction in the County of Suffolk, Commonwealth of Massachusetts; provided that, a Lender with an Allowed Secured Claim may enforce its claims, rights and remedies in respect of the Debtors and against a Vessel *in rem* at whatever place such Vessel shall be found lying, and for the purpose of any action which the Lender may bring before the courts of such jurisdiction or other judicial authority, and for the purposes of any action which the Lender may bring against the Vessel, any writ, notice, judgment or other legal process or documents may (without prejudice to any other method of service under applicable law) be served upon the Debtors and the Master of such Vessel (or upon anyone acting as the Master, regardless of title) and such service shall be deemed good service on the Debtors for all purposes.

(h)     Guaranties.  Notwithstanding any other provision of the Plan (including Section 6.2 of the Plan), all guaranties issued by any Debtor to any Lender shall remain in effect, provided that no payment or other obligation under such guaranties shall be due or deliverable from the respective Debtor unless there is a Default.

**4.2     Class 22A – 22F – Priority Claims.**

(a)     Classification.  Classes 22A through 22F consist of the Priority Claims against the Debtors.

(b)     Impairment and Voting.  The Priority Claims are unimpaired under the Plan, and are unimpaired under the Plan and the holders of such Claims are not entitled to vote to accept or reject the Plan.

(c)     Claim Treatment.  In full and final satisfaction, settlement, discharge and release of the Allowed Priority Claims, the holders of the Allowed Priority Claims shall be paid in full either: (i) in accordance with any pre-petition agreements between the holder of the Allowed Priority Claim and the respective Debtor, (ii) on the later to occur of the Effective Date or the date the Claim becomes an Allowed claim, or (iii) in accordance with any post-Petition Date agreement between the claimant and the respective Debtor.

- 33 -

749807

(d)    <u>Treatment of Shannon Cashman's Claim</u>.  Shannon Cashman's Allowed Claim shall be treated as follows:

(i)    The Consent Judgment between JMC and Shannon Cashman dated August 23, 2007 ("<u>Consent Judgment</u>") will be modified to provide as follows:

(1)    JMC's obligation to pay Shannon Cashman $5,000 per month shall be modified to provide that JMC shall pay Shannon Cashman the sum of $6,000 per month in child support until the earlier of September 1, 2021 and the date that JMC pays Shannon Cashman the "Lump Sum Payment" (as defined below);

(2)    JMC's obligation to pay Shannon Cashman $500,000 upon each of their children attaining their eighteenth (18th) birthdays shall be modified to provide that JMC shall pay Shannon Cashman $1,000,000 (the "<u>Lump Sum Payment</u>") on or before June 30, 2022;

(3)    JMC shall market and offer for sale 90 Countryside Lane, Milton, MA, commencing no later than September 1, 2021.  Shannon Cashman shall cooperate as reasonably requested by JMC in the marketing, offering and sale of 90 Countryside Lane, Milton, MA.  Unless RTC agrees otherwise, RTC's Allowed Claim secured by a Lien on 90 Countryside Lane, Milton, MA, shall be paid and satisfied from the proceeds of any sale of such property in accordance with applicable law and the applicable loan documents;

(4)    The Lump Sum Payment shall not accrue any interest if paid to Shannon Cashman on or before September 1, 2021.  If the Lump Sum Payment is not paid prior to September 1, 2021, then it shall accrue interest from and after September 1, 2021 up to and including the earlier of the date of payment and June 30, 2022, at the rate of 12% per annum.  If the Lump Sum Payment is not paid on or before June 30, 2022, then it shall accrue interest from and after July 1, 2022 at the rate of 1.5% per month until paid in full;

(5)    JMC shall cause Bayou Villars Holding Co., LLC to execute and deliver to Shannon Cashman a guaranty, in form and substance reasonably satisfactory to JMC and Shannon Cashman, of JMC's obligations to pay the Lump

Sum Payment (and any interest) to Shannon Cashman as set forth above.; and

(6)     JMC shall pay Shannon Cashman the sum of $37,500 on the earlier of December 31, 2019 and the closing of any *bona fide* sale of 613 Bayou Road, Belle Chasse, Louisiana.

(ii)    JMC shall cause Bayou Villars Holding Co., LLC to grant CEC a mortgage on the property located on Codfish Lane, Nantucket, Massachusetts (the "Property"), to secure the $2,121,487 owed by Bayou Villars Holding Co., LLC to CEC, which shall be paid to CEC upon the sale of the Property.

(iii)   Shannon Cashman will vote to accept the Plan and will generally support confirmation of the Plan.

(iv)    Except as otherwise set forth herein, the Consent Judgment shall remain in full force and effect as modified by the Plan.  Shannon Cashman shall support and join in any filings or other documentation in Louisiana that are necessary or desirable to modify the Consent Judgment in accordance herewith.

**4.3    Class 23A – Cardi Claim.**

(a)     Classification.  Class 23A consists of the Claim of Cardi.

(b)     Impairment and Voting.  Class 23A is impaired and the holder of the Cardi Claim shall be entitled to vote to accept or reject the Plan.

(c)     Claim Treatment.  In full and final satisfaction, settlement, discharge and release of the Allowed Cardi Claim, the Allowed Cardi Claim shall be paid in full, with interest at a rate of five percent (5%) per annum or such other rate determined by the Bankruptcy Court to permit the holder of the Allowed Cardi Claim to receive property of a value, as of the Effective Date, equal to the Allowed Cardi Claim.  Payments to the holder of the Allowed Cardi Claim shall be made from the Installment Payments, the Designated Vessel Proceeds and the Equalization Payment (if applicable), with the balance, if any, paid on or before the tenth (10th) anniversary of the Effective Date.

(d)     Application of Payments.  Installment Payments shall be applied first and on a Pro Rata basis to any Equalization Payments then due, and second, in accordance with Sections 4.3(c), 4.4(c) and 4.6(c) of the Plan.  Payments of the Designated Vessel Proceeds shall be applied in accordance with Section 5.6 of the Plan.

(e)     GUC Lien.  Cardi shall receive an interest in the GUC Lien to secure the payment of its Allowed Claim, if any.

- 35 -

**4.4**  **Class 24A – Western Surety Claims.**

(a)  <u>Classification</u>.  Class 24A consists of the Claim of Western Surety.

(b)  <u>Impairment and Voting</u>.  Class 24A is impaired and the holder of Western Surety's Claim shall be entitled to vote to accept or reject the Plan.

(c)  <u>Claim Treatment</u>.  In full and final satisfaction, settlement, discharge and release of the Allowed Western Surety Claim, the Allowed Western Surety Claim shall be paid in full, with interest at a rate of five percent (5%) per annum or such other rate determined by the Bankruptcy Court to permit the holder of the Allowed Western Surety Claim to receive property of a value, as of the Effective Date, equal to the Allowed Western Surety Claim.  Payments to the holder of the Allowed Western Surety Claim shall be made from the Installment Payments, the Designated Vessel Proceeds and the Equalization Payment (if applicable), with the balance, if any, paid on or before the tenth (10th) anniversary of the Effective Date.

(d)  <u>Application of Payments</u>.  Installment Payments shall be applied first and on a Pro Rata basis to any Equalization Payments then due, and second, in accordance with Sections 4.3(c), 4.4(c) and 4.6(c) of the Plan.  Payments of the Designated Vessel Proceeds shall be applied in accordance with Section 5.6 of the Plan.

(e)  <u>GUC Lien</u>.  Western shall receive an interest in the GUC Lien to secure the payment of its Allowed Claim, if any.

**4.5**  **Class 25A – BP Claims.**

(a)  <u>Classification</u>.  Class 25A consists of the BP Claims.

(b)  <u>Impairment and Voting</u>.  Class 25A is impaired and the holder of BP's Claims shall be entitled to vote to accept or reject the Plan.

(c)  <u>Claim Treatment</u>.  In full and final satisfaction of the BP Claims and in accordance with the BP Stipulation, CEC shall pay the 2018 Installment to BP upon the Effective Date, and the BP Agreement shall be re-instated.

(d)  <u>GUC Lien</u>.  BP shall receive the GUC Lien to secure the payment of its Allowed Claim.

**4.6**  **Class 26A – 26F – General Unsecured Claims.**

(a)  <u>Classification</u>.  Classes 26A through 26F consist of the General Unsecured Claims against the Debtors.

749807

(b)     <u>Impairment and Voting</u>.  Classes 26A through 26F are impaired under the Plan and each holder of a General Unsecured Claim shall be entitled to vote to accept or reject the Plan.

(c)     <u>Claim Treatment</u>.  In full and final satisfaction, settlement, discharge and release of the Allowed General Unsecured Claims, each holder of an Allowed General Unsecured Claim shall be paid in full, with interest at a rate of five percent (5%) per annum or such other rate determined by the Bankruptcy Court to permit the holder of the Allowed General Unsecured Claim to receive property of a value, as of the Effective Date, equal to the Allowed General Unsecured Claim.  Payments to the holders of the Allowed General Unsecured Claims shall be made from the Installment Payments, the Designated Vessel Proceeds and the Equalization Payment (if applicable), with the balance, if any, paid on or before the tenth (10th) anniversary of the Effective Date.  In addition to the GUC Dividend, the Debtors and the Reorganized Debtors expressly covenant that they shall not commence or pursue Avoidance Actions against any Creditor in any Class 26 of the Plan.

(d)     <u>Additional Class 26F Treatment</u>.  In addition to the treatment set forth in Section 4.6(c) of the Plan and pursuant to Section 1123(a)(8) and 1129(a)(15)(A) of the Bankruptcy Code, on or before the seventh (7th) anniversary of the Effective Date, JMC shall pay, from his disposable income, fifteen percent (15%) of the Allowed General Unsecured Claims in Class 26F.

(e)     <u>Application of Payments</u>.  Installment Payments shall be applied first and on a Pro Rata basis to any Equalization Payments then due, and second, in accordance with Sections 4.3(c), 4.4(c) and 4.6(c) of the Plan.  Payments of the Designated Vessel Proceeds shall be applied in accordance with Section 5.6 of the Plan.

(f)     <u>GUC Lien</u>.  The holders of the Allowed General Unsecured Claims shall receive a beneficial interest in the GUC Lien granted to the GUC Collateral Agent to secure the payment of their respective Allowed Claims.  The GUC Lien shall be (1) junior only to the Vessel Mortgages and Liens securing Pacwest's Allowed Secured Claim, MARAD's Allowed Secured Claim, the Insurers' Claims and the Allowed Maritime Lien Claims, if any, and (2) subject to the GUC Plan Intercreditor Agreement.

(g)     <u>Reporting.</u>  Simultaneously with transmittal to the Lenders, the Reorganized Debtors shall provide the GUC Collateral Agent with copies of all yearly reporting provided to the Lenders, and, if requested by the GUC Collateral Agent in writing, copies of all quarterly reporting provided to the Lenders.

749807

**4.7    Class 27A – 27F – Convenience Class Claims.**

(a)    <u>Classification</u>.  Classes 27A through 27F consist of the Allowed Convenience Class Claims.

(b)    <u>Impairment and Voting</u>.  Classes 27A through 27F are impaired under the Plan and each holder of a Convenience Class Claim shall be entitled to vote to accept or reject the Plan.

(c)    <u>Claim Treatment</u>.  In full and complete satisfaction, settlement, release and discharge, each holder of an Allowed Convenience Class Claim shall receive, upon the later to occur of the Effective Date or the date such Claim becomes an Allowed Claim, the lesser of:

(i)    Seventy-five percent (75%) of the holder's Allowed Claim; or

(ii)    $3,750.

(d)    <u>Additional Treatment</u>.  In addition to the amount paid pursuant to Section 4.7(c) of the Plan, the Debtors and the Reorganized Debtors expressly covenant that they shall not commence or pursue Avoidance Actions against any Creditor in any Class 27 of the Plan.

(e)    <u>Election</u>.  Any creditor with an Allowed Claim may elect to become a Convenience Class Claim by doing so on the ballot approved by the Bankruptcy Court not later than the deadline for voting on the Plan.

**4.8    Class 28A – 28F – Equity Interests.**

(a)    <u>Classification</u>.  Classes 28A through 28F consist of the Equity Interests in the Debtors.

(b)    <u>Impairment and Voting</u>.  Classes 28A through 28F are impaired under the Plan and each holder of an Equity Interest shall be entitled to vote to accept or reject the Plan.

(c)    <u>Treatment</u>.  The holders of Equity Interests shall retain their respective Equity Interests and JMC shall retain his interests in real and personal property.

(d)    <u>Distributions</u>.  The Debtors shall not make any distributions on account of Allowed Equity Interests until the Allowed Claims of all non-Insider creditors have been paid in accordance with the terms of the Plan, except that if a Debtor is a Subchapter S corporation or a so-called "pass-through" entity, that Debtor may make distributions to the holders of its Equity Interests in an amount equal to the state and federal income taxes of the holders of its Equity Interests attributable to the income of such Debtor.

**4.9     Reservation of Rights.**

The Debtors reserve the right to, among other things, (a) contest the right of the holder of any Claim to vote on the Plan (except in respect of any Agreed-Claim Lender), or designate the vote of the holder of any Claim, (b) contest the right of the holder of any Claim to receive distributions under the Plan, (c) seek to subordinate any Claim for inequitable conduct or otherwise, and (d) seek to estimate any claim for any purposes under the Plan.

**4.10    Claims of Insiders.**

Except as expressly provided in Section 4.8(d) of the Plan, neither JMC, nor any Insider of the Debtors, nor any holder of Equity Interests shall receive any distributions or any transfers on account of their Allowed Claims or Equity Interests, whether any such Claims are Secured Claims, Administrative Claims, Priority Claims or General Unsecured Claims, until the Allowed Claims of all non-Insider creditors have been paid in accordance with the term of the Plan.


**ARTICLE V**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

**5.1     Plan Implementation.**

The Plan will be funded from the Debtors' continued operations, including revenue from the charter and sale of Vessels.  Upon the Effective Date, the Debtors are authorized to take all action permitted by their Organization Documents (as applicable) and by the law, including, without limitation, to use their Cash and other Assets for all purposes provided for in the Plan and in their operations, to the borrow funds, to refinance their Secured obligations, to grant liens on their unencumbered Assets, to sell (subject to the terms of the Plan) their existing Assets.  Upon the entry of the Confirmation Order, the Debtors are authorized, without further court order, to perform all obligations necessary to sell Assets (other than Vessels, the sales of which are subject to Section 5.2 of the Plan, or any other Assets that are subject to a Lender's Lien) and, to the extent necessary, owned by trusts or corporate entities in which a Debtor holds a controlling interest.  The Assets shall be sold, transferred, assigned or otherwise conveyed to the buyer free and clear of all liens, claims, encumbrances and interests, with such liens, claims, encumbrances and interests to attach to the Net Proceeds of the sale to the same extent, priority and validity as is set forth in the Plan.

**5.2     Sales of Vessels.**

(a)     <u>Authorization to Sell</u>.  Upon the entry of the Confirmation Order, the Reorganized Debtors are authorized, pursuant to Section 1123(a)(5) of the Bankruptcy Code and without further court order, to perform all obligations necessary to close on the Qualified Sales of Vessels, and to execute such other documents and take such other actions as are reasonably necessary to effectuate such sales.  In the case of a Qualified Sale, The Vessels shall be sold, transferred, assigned or otherwise conveyed to the buyer free and clear of all liens, claims,

encumbrances and interests.  In the case of a Qualified Sale, the transfer of the Vessels shall (i) constitute legal, valid and effective transfers of property of the Reorganized Debtors to the buyer, and (ii) vest in the buyer all of the Reorganized Debtors' right, title and interest in the Vessel transferred free and clear of all Liens, Claims, encumbrances and interests of any entity.  The Reorganized Debtors are authorized to perform all obligations necessary to close on the sales of Vessels without the approval of the holders of Liens on Vessels provided that such sales are Qualified Sales.

(b)     Qualified Sales.  The sale of one or more Vessels shall constitute a "Qualified Sale" if the Debtors follow the procedures set forth in this Section 5.2 of the Plan, and: (i) in the case of the sale of a single Vessel, the gross purchase price is equal to or greater than the Vessel's MDP; (ii) in the case of the sale of multiple Vessels, the gross purchase price is more than the aggregate amount of the MDPs for all such Vessels; (iii) in the case of a sale pursuant to a Purchase Option Charter for a Vessel, the purchase price payable upon exercise of the sale option, over and above any credit for any lease payment(s) paid to the Debtors under the Purchase Option Charter prior to the sale closing, is not less than the MDP for the vessel sold, or, in the case of multiple Vessels, the aggregate MDP for all of the Vessels sold; (iv) the holder(s) of the Vessel Mortgage(s) on the Vessel(s) to be sold (including, in the case of an Unencumbered Vessel, the Lenders' Collateral Agent) consent in writing to the sale, provided, however, notwithstanding anything to the contrary herein, if a Vessel is proposed to be sold for less than MDP, only the consent of the Lender with a first priority Lien on the Vessel shall be required.

(c)     Allocation of Sales of Multiple Assets.  In the case of any sale (including any sale pursuant to any Purchase Option Charter) of two or more Vessels, the Sale Notice provided by the Debtors shall set forth an allocation of the aggregate gross purchase price and Net Proceeds payable upon the closing of such sale among all Vessels to be sold in proportion to their respective MDPs (or such lesser price to which the holders of Vessel Mortgages on the Mortgaged Vessels included in such sale have consented), provided that (1) amounts above the aggregate MDP for all Vessels sold shall be allocated reflecting the value of any material charters and leases to the extent ascertainable, and (2) the amount allocated to each Vessel shall be not less than the MDP for such Vessel, except in the event of a sale for less than MDP that is expressly consented to by the Lender with the first priority Lien on such Vessel in accordance with Section 5.2(b)(iv) of the Plan.

(d)     Release of Liens for Vessel Sales.  The Liens on Vessels to be sold pursuant to the Plan shall be discharged and released as follows:

(i)     Sale Notice.  At least five (5) Business Days prior to the scheduled closing of a Qualified Sale, the Reorganized Debtors shall send: (1) to the Notice Parties, a Sale Notice with respect to such sale, and (2) to the holder(s) of Lien(s) on the Vessel to be sold, a discharge of such Lien(s).

(ii)    Delivery of Discharge.  At least two (2) Business Day prior to the scheduled closing of a Qualified Sale, the holder(s) of the Lien(s) on the Vessel to be sold, including without limitation the GUC Collateral Agent and the Lenders' Collateral Agent, shall deliver a discharge and release of its Lien(s) on the Vessel

to be sold to the Reorganized Debtors' closing attorney for the sale (the "Closing Attorney") to be held in escrow subject to clause (iii) and Sections 5.5 and 5.6 of the Plan.

(iii)   Payment of Net Proceeds of Mortgaged Vessels Other Than the Pacwest/MARAD Vessels.  Within four (4) Business Days after the closing of a Qualified Sale of a Mortgaged Vessel other than the Pacwest/MARAD Vessels, the Closing Attorney shall distribute the Net Proceeds of the sale in accordance with the terms of the Plan.  All of the Net Proceeds of each such Mortgaged Vessel sale: (1) shall be paid to the holder(s) of Lien(s) on the Vessel (other than, prior to Default, the holder of the Additional Plan Lien) in the order of the seniority of such liens, and (2) when the claims of all holder(s) of Lien(s) on the Vessel (other than, prior to Default, the holder of the Additional Plan Lien) are paid in full, the balance of the Net Proceeds shall be retained by the Debtors.  All Net Proceeds of each such Mortgaged Vessel sale paid to the holder(s) of Lien(s) on the Mortgaged Vessel shall be applied as follows: (A) for any sales closing up to and including the second (2nd) anniversary of the Effective Date, (i) the Debt Service Amount shall be applied to the monthly payments due, or to become due, to such holder under the Plan, and (ii) the balance shall be applied in accordance with Section 4.1(c)(i)(12) of the Plan; and (B) for any sales closing after the second (2nd) anniversary of the Effective Date all Net Proceeds shall be applied in accordance with Section 4.1(c)(i)(12) .  The Net Proceeds of the sale of a Vessel subject to the Additional Vessel Lien or the GUC Lien shall be paid as set forth in Sections 5.5 or 5.6 of the Plan, respectively.

(e)   Notices of Sale.  Notices of Qualified Sales in the form of the Sale Notice, and may be sent by electronic mail, first class mail and/or overnight mail.

(f)   Vessel Sale Dispute.  In the event a Vessel Sale Dispute occurs after the Bankruptcy Cases are closed, the parties to the dispute shall confer to try and resolve the dispute and, if they are unable to resolve the dispute, shall submit the dispute to binding arbitration before the Plan Arbitrator within three (3) business days.  The appointment of the Plan Arbitrator shall be effectuated through the final decree closing the Bankruptcy Cases, and shall terminate upon the payment in full of the Lenders' Allowed Secured Claims.  The Plan Arbitrator shall receive payment, at the Plan Arbitrator's customary hourly rate, for the time spent resolving the Vessel Sale Disputes.  The Plan Arbitrator's hourly charges incurred in resolving the Vessel Sale Disputes shall be paid by the non-prevailing party in the Vessel Sale Dispute, or as otherwise determined by the Plan Arbitrator.

(g)   Collateral Surrender. Following the Effective Date, at any time any Lender possesses an outstanding Allowed Secured Claim, the Corporate Debtors and such Lender, in each party's sole discretion, may agree in writing for the Corporate Debtors to surrender to such Lender's Collateral subject to such Lender's senior Lien(s) free and clear of all other claims, liens, encumbrances, and interests (including, for the avoidance of doubt, the Additional Plan Lien); provided that the Corporate Debtors shall not agree to the surrender of any of the Pacwest/MARAD Vessels without the written consent of the GUC Collateral Agent.  Notices

- 41 -

with respect to such surrender of Collateral, and release of Liens in connection thereto, shall be subject to the same treatment set forth in Sections 5.2(d)(i)-(ii) and (e)-(f) of the Plan.  Unless otherwise agreed in writing between the Corporate Debtors and the Lender receiving the surrender of Collateral, the Allowed Secured Claim of such Lender shall be reduced by the MDP of such Collateral being surrendered, with the credit being applied in accordance with Section 4.1(c)(i)(12) of the Plan.  Following such surrender of Collateral and the reduction of the Lender's Allowed Secured Claim, the Lender receiving such Collateral shall be entitled to sell or otherwise dispose of the Collateral in any manner whatsoever, without restriction, and without further modification or adjustment to the Lender's Allowed Secured Claim.

(h)    _Confidentiality_.  At any time any Lender's Allowed Secured Claim remains outstanding, such Lender is entitled to share otherwise confidential MDP values for Collateral subject to that Lender's senior Lien(s), and other confidential information, including the reports provided pursuant to Section 4.1(f) of the Plan, concerning the Debtors' assets, liabilities and operations with third parties interested in participating in or acquiring that Lender's loans with the Debtors; provided, however, that such third parties shall be required to enter into a non-disclosure agreement, in a form to be included in the Plan Supplement, that requires the third parties to keep the such information confidential.

## 5.3    Life Insurance Agreement.

Upon entry of the Confirmation Order, the Debtors shall enter into and effectuate the Life Insurance Agreement, in a form to be provided in the Plan Supplement, that, subject to the Debtors' payments of the premiums for the insurance policies owned by the Insurance Trust, provides that the Insurance Trust: (a) will be obligated to repay all premiums paid by the Debtors, which repaid premiums the Debtors shall promptly remit Pro Rata to the Lenders, with such payments to be applied in accordance with Section 4.1(c)(i)(12) of the Plan, (b) will be obligated to loan seventy-five percent (75%) of the death benefits obtained by the Insurance Trust to the Corporate Debtors, provided that the Corporate Debtors' obligations to repay such loan shall be subordinate in all respects to the Corporate Debtors' obligations to the holders of Allowed Claims under the Plan, and (c) shall not, after receipt of the death benefits, pay dividends or make loans or other transfers to Insiders.

## 5.4    Execution of Necessary Documents; Amendment of Documents.

(a)    Confirmation of the Plan shall constitute authorization by the Bankruptcy Court for the Debtors and/or the Reorganized Debtors to enter into all documents, instruments and agreements necessary to effectuate the terms of the Plan.  The form and/or content of the documents, instruments and agreements necessary to effectuate the terms of the Plan shall be subject to the approval of the Debtors and/or the Reorganized Debtors, in their sole discretion.

(b)    As of the Effective Date, all pre-Confirmation Date documents and agreements (whether written or oral) between the Debtors and any party shall be deemed to be amended as necessary to effectuate and conform to the terms of this Plan.  To the extent that there is any inconsistency between the Plan and any such documents and agreements, the terms of the Plan shall control.

749807

(c)     All matters provided for in the Plan involving any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan shall be deemed to have occurred, and shall be in effect, without any requirement of further action by the Reorganized Debtors, their agents, representatives, members, managers, officers, directors or Affiliates.

**5.5     Provisions Regarding Additional Plan Lien and Additional Vessel Lien.**

(a)     <u>Plan Lien Documents; Collateral Agent</u>.  The Lenders' Collateral Agent, who will hold the Additional Plan Lien and the Additional Vessel Lien for the benefit of all of the Lenders, shall be an unrelated, financial institution experienced at handling engagements of this type, and shall be selected before the Confirmation Date by a majority of the Lenders in amount (based on their respective Allowed Secured Claims pursuant to the Eighth Cash Collateral Order) with the consent of the Debtors, which shall be limited to determining that the fees and expense reimbursements are reasonable in the marketplace of national financial institutions experienced at handling engagements of this type.  Any dispute concerning the appointment of the Lenders' Collateral Agent shall be resolved by the Bankruptcy Court.  The Lenders' Collateral Agent shall be entitled to a reasonable fee, reasonable attorneys' fees and costs, plus any recording costs, for the purpose of establishing and perfecting the Additional Plan Lien and the Additional Vessel Lien, and, if all Lenders' Allowed Secured Claims are not paid in full on the Lender Maturity Date, for the purpose of enforcing the Additional Plan Lien and/or the Additional Vessel Lien.  The Plan Supplement shall include, among other things, the Plan Lien Documents.  The Lenders and all other Persons may rely upon the provisions of all recorded Retained Lien Documents and Plan Lien Documents.

(b)     <u>Payments on Account of Additional Plan Lien</u>.  No payments shall be due on account of the Additional Plan Lien, nor shall any rights account with the Additional Plan Lien be exercised, unless a Default has occurred.  For each Qualified Sale of a Vessel subject to the Additional Plan Lien, the Lenders' Collateral Agent shall be required to deliver an applicable partial discharge of the Additional Lien, without any payment, in accordance with Section 5.2 of the Plan, except that after a Default, the Closing Attorney shall remit to the Lenders' Collateral Agent on account of the Additional Plan Lien the entire amount of Net Proceeds remaining after payment of the Vessel Mortgage on the sold Vessel.

(c)     <u>Payments on Account of Additional Vessel Lien</u>.  Within three (3) Business Days after the closing of a Qualified Sale of an Unencumbered Vessel, the Closing Attorney shall distribute the Net Proceeds of the sale as follows: (i) first, to the holder(s) of Lien(s) on the Vessel that are senior in priority to the Lien held by the Lenders' Collateral Agent, (ii) second, to the Lenders' Collateral Agent to be applied to the Lenders' Collateral Agent's outstanding Collateral Expenses, if any, and (iii) third, to the Lenders' Collateral Agent and the Debtor that owned the Vessel sold as follows: (1) of the first $1,000,000 of such Net Proceeds, the Debtors shall retain eighty percent (80%) and twenty percent (20%) shall be paid to the Lenders' Collateral Agent for the Pro Rata benefit of the Lenders; (2) of the second $1,000,000 of such Net Proceeds, the Debtors shall retain seventy percent (70%) and thirty percent (30%) shall be paid to the Lenders' Collateral Agent for the Pro Rata benefit of the Lenders; (3) of the third $1,000,000 of such Net Proceeds, the Debtors shall retain forty percent (40%) and sixty percent (60%) shall be paid to the  Lenders' Collateral Agent for the Pro Rata benefit of the Lenders; and (4) of any subsequent Net Proceeds, the Debtors shall retain fifty percent (50%) and fifty percent

- 43 -

(50%) shall be paid to the Lenders' Collateral Agent for the Pro Rata benefit of the Lenders.  All Net Proceeds of the sales of Unencumbered Vessels that are received by a Lender shall be applied by such Lender to its Allowed Secured Claim in accordance with Section 4.1(c)(i)(12) of the Plan.

(d)     Discharge of Additional Vessel Lien.  In addition to the discharge provided for in Section 4.1(e) of the Plan, the Additional Vessel Lien shall be discharged upon the written consent of two-thirds (2/3) of the Lenders, measured based on the principal balance of the Lenders' respective Allowed Secured Claims at the time of such consent.  Any payments to the Lenders on account of such discharge of the Additional Vessel Lien shall be paid to the Lenders on a Pro Rata basis.

## 5.6     Provisions Regarding GUC Lien.

(a)     Plan Lien Documents; Collateral Agent.  The GUC Collateral Agent, who will hold the GUC Lien for the benefit of the holders of Allowed Claims in Classes 23A, 24A, 25A and 26A – F, shall be selected by the Committee, or, in the event of an objection to such collateral agent by the holder of an Allowed Claim in one of the foregoing classes that is not a Lender, shall be appointed by the Bankruptcy Court.  The GUC Collateral Agent shall be entitled to reasonable attorneys' fees and costs, not to exceed $7,500 plus any recording costs, for the purpose of establishing and perfecting the GUC Lien.  The GUC Collateral Agent shall be entitled to a fee of $2,500 per quarter, plus, after a default under the Plan that is not cured in accordance with the Plan and involves the GUC Lien, reasonable attorneys' fees and costs to enforce such Lien.  The Plan Supplement shall include, among other things, the Plan Lien Documents, including the GUC Plan Intercreditor Agreement respecting the first priority liens of Pacwest and MARAD.  The GUC Collateral Agent and all other Persons may rely upon the provisions of all recorded Plan Lien Documents.

(b)     Payments of Designated Vessel Proceeds.  Within four (4) Business Days after the closing of a Qualified Sale of a Vessel subject to the GUC Lien, the Reorganized Debtors shall distribute the Net Proceeds of such sale as follows: (i) first, to the holder(s) of Lien(s) on the Vessel that are senior in priority to the Lien held by the GUC Collateral Agent, including any Lien held by Pacwest or MARAD, as applicable, (ii) second, to the GUC Collateral Agent as provided in the following sentence, and (iii) third, the remaining balance to the Debtor that owned the Vessel sold.  The Net Proceeds of the sale of a Vessel that are distributed to the GUC Collateral Agent shall be applied: (1) first, and on a Pro Rata basis to any Equalization Payments then due, (2) second, to the next scheduled Installment Payment, and (3) third, and on a Pro Rata basis to the balance due to the holders of the Allowed Claims in Classes 23A, 24A and 26A – F.

## 5.7     Organization Documents and Good Standing.

As of the Effective Date, the Debtors' respective Organization Documents shall be amended as necessary to effectuate the terms of the Plan and shall become the Organization Documents of the Reorganized Debtors.  To the extent that there is any inconsistency between the Plan and any of the Organization Documents, the terms of the Plan shall control.  To the extent any of the Debtors is not in compliance as of the Effective Date with any state or local law requirements necessary to remain as an organized legal entity in good standing and/or remain

- 44 -

authorized as an organized legal entity to conduct business in any jurisdiction, the Debtors and/or the Reorganized Debtors, as the case may be, shall be deemed to be in compliance with any such laws if they comply with such laws within six months after the Effective Date.  To the extent necessary, each of the Debtors' respective Organization Documents shall be deemed amended to prohibit the issuance of nonvoting equity securities, and to provide, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.

### 5.8     Revesting of Property.

Except as otherwise provided in the Plan, each of the Reorganized Debtors, as of the Effective Date, shall be vested with all of the assets of each respective Debtor.

### 5.9     Preservation and Resolution of Causes of Action.

Except as provided in, and unless expressly waived, relinquished, exculpated, released, compromised or settled in the Plan (including, without limitation, the express waiver of Retained Challenge Rights set forth in Section 4(c)(i)(14) of the Plan), the Confirmation Order, the Eighth Cash Collateral Order, any Final Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, the Reorganized Debtors will exclusively retain and may enforce, and the Debtors and the Reorganized Debtors expressly reserve and preserve for these purposes, in accordance with sections 1123(a)(5)(A) of the Bankruptcy Code, any Claims, demands, rights and Causes of Action that the Debtors or their respective Estates may hold against any person or entity.  No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to them by virtue of or in connection with the confirmation or consummation of the Plan.  After the Effective Date and except as otherwise provided in the Plan, the Reorganized Debtors are authorized, without further Bankruptcy Court order, to compromise, settle and/or otherwise dispose of any Causes of Action; provided that, until the Bankruptcy Cases are closed, the Reorganized Debtors shall file a Settlement Notice with respect to any settlement of a Cause of Action.

### 5.10     Trustee Powers.

Upon the Effective Date, the Reorganized Debtors shall each be vested with the standing of and with all rights, powers and benefits afforded to a "trustee" under the Bankruptcy Code.

### 5.11     Dissolution of the Committee.

The Committee shall dissolve automatically on the Effective Date.  Upon such dissolution, its members, professionals, and agents shall be released from any further duties and responsibilities in the Bankruptcy Case and under the Bankruptcy Code, except with respect to applications for Professional Fee Claims or reimbursement of expenses incurred as a member of the Committee.

- 45 -

### 5.12    Default.

No event of default under the Plan shall occur unless, in the event of a breach of the Debtors' or the Reorganized Debtors' obligations under the Plan, the holder of the Allowed Claim asserting the default shall provide written notice of such breach to the Reorganized Debtors and such breach is not cured: (a) in the event of a breach that can be cured by the payment of a sum of money, within ten (10) days of the Reorganized Debtors' receipt of such notice; and (b) for any other breach, within thirty (30) days of the Reorganized Debtors' receipt of such notice, provided that, if such non-monetary breach cannot reasonably be cured within such 30-day period and the Reorganized Debtors have commenced curing such breach and continue to cure such breach, the thirty (30) day period shall be extended for such time as is reasonably necessary to cure such breach.

## ARTICLE VI

## DISTRIBUTIONS ON CLAIMS AND RESOLUTION OF DISPUTED CLAIMS

### 6.1    Method of Distributions Under the Plan.

(a)    In General.  Subject to Bankruptcy Rule 9010, and except as otherwise provided in the Plan, all distributions under the Plan to be made by, or on behalf of, the Reorganized Debtors to the holder of each Allowed Claim shall be mailed by first class mail, postage prepaid, to the address of such holder as listed on the Schedules unless the Reorganized Debtors have been notified in writing of a change of address as of the Distribution Record Date, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules.  The Reorganized Debtors shall have no obligation to locate such holders whose distributions or notices are properly mailed but nevertheless returned.

(b)    Form of Distributions.  Except as otherwise provided in the Plan, any payment of Cash made by, or on behalf of, the Reorganized Debtors pursuant to the Plan shall be made by check or, upon agreement of the parties, by wire transfer.

(c)    Distributions to be on Business Days.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(d)    Fractional Dollars.  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (rounding down in the case of $0.50 or less, and rounding up in the case of more than $0.50).

(e)    Distributions to Holders as of the Distribution Record Date.  As of the close of business on the Distribution Record Date, the claims register shall be closed.  The Reorganized Debtors shall have no obligation to recognize any transfer of any Claims occurring after the close of business on the Distribution Record Date, and shall instead be entitled to recognize and deal

for all purposes under the Plan with only those holders of record as of the close of business on the Distribution Record Date.  This Section 6.1(e) of the Plan shall not be deemed to bar or restrict the assignment of any Claim.

### 6.2    Allowance of and Objections to Claims.

(a)    Any holder of multiple Allowed Claims against more than one Debtor that arise from the contractual, joint, joint and several, or several liability of such Debtors, the guarantee by one Debtor of another Debtor's obligation or other similar circumstances, shall be entitled to one Allowed Claim that, in the aggregate, does not exceed the amount of the underlying Claim giving rise to such multiple Claims.  Claims against more than one of the Debtors arising from the same injury, damage, cause of action or common facts shall be Allowed and paid only once as if such Claim were against a single Debtor.  Nothing in this Section 6.2(a) of the Plan shall, upon a default under the Plan, prevent the holder of Allowed Claims against more than one Debtor from enforcing its remedies under the Plan against such Debtors.

(b)    Except as otherwise specifically provided in the Plan or in an order of the Bankruptcy Court pursuant to Section 506(b) of the Bankruptcy Code, no interest shall accrue on or be paid on account of an Allowed Claim.

(c)    Prior to the Effective Date, any objections to Claims against the Debtors shall be prosecuted by the Debtors.  On and after the Effective Date and unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Reorganized Debtors shall have the right to the exclusion of all others (except as to the Professionals' applications for allowances of compensation and reimbursement of expenses under Section 327 of the Bankruptcy Code and Rule 2014(a) of the Bankruptcy Rules) to make, file, prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court, objections to Claims.  Notwithstanding any other provision of the Plan, the Reorganized Debtors shall not make any distribution on account of any Disputed Claim unless and until such Claim becomes Allowed.

(d)    After the Effective Date and except as otherwise provided in the Plan, the Reorganized Debtors are authorized, without further Bankruptcy Court order, to compromise, settle and/or otherwise dispose of any dispute regarding a Claim; provided that, until the Bankruptcy Cases are closed, the Reorganized Debtors shall file a Settlement Notice with respect to any settlement of a disputed Claim.

### 6.3    Deadline for Objecting to Claims.

Except as otherwise provided by order of the Bankruptcy Court, the Debtors, or the Reorganized Debtors as the case may be, may file an objection to a Claim against the Debtors until the later of: (a) the date that such Claim becomes due and payable in accordance with its terms, or (b) ninety (90) days after the Effective Date.

### 6.4    Estimation of Claims.

The Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such

- 47 -

Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall have jurisdiction to estimate a Disputed Claim at any time and for any purpose, including, without limitation, for plan voting, feasibility, allowance and distribution purposes. If the Bankruptcy Court estimates a Disputed Claim, such estimation shall not preclude the Debtors or the Reorganized Debtors from pursuing any supplemental proceedings to object to any payment of such Claim. All of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not exclusive remedies. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court or by agreement between the Debtors or the Reorganized Debtors and the holder of such Disputed Claim.

### 6.5     Reversion of Unclaimed Checks.

The amounts of any checks issued for distributions under the Plan that remain uncashed for a period of 180 days after the date of such distribution shall revert and be vested in the Reorganized Debtors free and clear of any claim or interest of any holder of a Claim under the Plan.

### 6.6     Obligation to Provide Tax Documents.

No Person entitled to a payment or distribution under the Plan shall receive such distribution or payment until the Person provides the Reorganized Debtors with: (a) a W-9 or similar federal or state tax form, and (b) such other tax forms as are reasonably requested by the Reorganized Debtors (collectively the "Tax Forms"). If any Person holding an Allowed Claim fails to provide a Tax Form to the Reorganized Debtors after two written requests for a Tax Form, such Person's Allowed Claim shall be disallowed and expunged without further order of the Bankruptcy Court.

# ARTICLE VII

# VOTING ON THE PLAN AND CRAMDOWN

### 7.1     Voting of Claims.

Each holder of an Allowed Claim in an impaired Class that retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan. Each holder of the foregoing Allowed Claims electing to vote shall do so on a duly executed and delivered ballot and in accordance with procedures set forth in the applicable order of the Bankruptcy Court establishing Plan voting procedures.

### 7.2     Acceptance by Impaired Classes.

An impaired class of Claims or Equity Interests shall have accepted the Plan if (a) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims or Allowed Equity Interests actually voting in such Class have voted to accept the Plan and (b) the holders (other than any holder designated

under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims or Allowed Equity Interests actually voting in such Class have voted to accept the Plan. If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

**7.3    Nonconsensual Confirmation.**

If any impaired Class entitled to vote does not accept the Plan by the requisite majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected the Plan, the Debtors reserve the right (a) to seek confirmation of the Plan under Section 1129(b) of the Bankruptcy Code; and/or (b) to amend the Plan in accordance with Section 12.3 of the Plan.

## ARTICLE VIII

### EXECUTORY CONTRACTS, UNEXPIRED LEASES, POST-PETITION CONTRACTS AND RETIREE AND COMPENSATION BENEFITS

**8.1    Assumption of Executory Contracts and Unexpired Leases.**

Pursuant to Sections 1123(b)(2) and 365(a) of the Bankruptcy Code, any executory contract or unexpired lease (excluding insurance policies) that (i) has not expired by its own terms on or prior to the Confirmation Date, (ii) has not been assumed, assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, (iii) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date, or (iv) is not designated by the Debtors as being an executory contract or unexpired lease to be rejected at the time of confirmation of this Plan, shall be deemed assumed on the Effective Date.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumption pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

**8.2    Payments Related to The Assumption of Executory Contracts And Unexpired Leases.**

(a)    Payment of Claims Arising From Assumed Contracts And Leases.  Any Allowed Claims arising from the assumption of an executory contract or unexpired lease will receive, in full and complete satisfaction, settlement, release and discharge of such Claims, payment in the ordinary course of business as and when such Allowed Claims become due pursuant to such executory contract or unexpired lease.

(b)    Disputed Claims and Bar Date.  If there is a dispute regarding (i) the amount of any claim arising from the assumption or rejection of an executory contract or unexpired lease, (ii) the ability of the applicable Debtor or any assignee to provide "adequate assurance of future performance," within the meaning of Section 365 of the Bankruptcy Code, under a contract or lease to be assumed, or (iii) any other matter pertaining to the assumption or assumption and

assignment of any contract or lease, the payment of any Claim related to the foregoing will be made following entry of a Final Order resolving the dispute and approving the assumption.

### 8.3    Rejection Damage Claims.

If the rejection of an executory contract or unexpired lease by the Debtors results in a Claim by the other party or parties to such contract or lease, any claim for damages, if not previously evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estates, the Reorganized Debtors and their respective properties, agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors on or before thirty (30) days following the later to occur of: (a) the rejection of such executory contract or unexpired lease, and (b) the Confirmation Date.  Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim are timely filed will be treated as General Unsecured Claims subject to the provisions of the Plan.  The Debtors or the Reorganized Debtors, as the case may be, shall have the right to object to any such Claim for rejection damages in accordance with the Plan.

## ARTICLE IX

## RELEASE AND DISCHARGE OF CLAIMS

### 9.1    Discharge.

Except as otherwise expressly provided in Section 1141 of the Bankruptcy Code or the Plan, the distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final discharge as against the Debtors and the Reorganized Debtors of any debt or obligation of the Debtors that arose before the Effective Date, and any debt of the Debtors of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims against the Debtors or their Estates of any nature, including, without limitation, any setoff claims and/or any interest accrued on any Claim from and after the Petition Date, whether or not: (a) a proof of claim based on such debt, obligation or Equity Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (b) such Claim is Allowed under Section 502 of the Bankruptcy Code, or (c) the holder of such Claim has accepted the Plan; provided that, JMC's discharge is subject to the limitations set forth in Section 1141(d)(5) of the Bankruptcy Code.

### 9.2    Injunction Relating to the Plan.

As of the Effective Date, all Persons are hereby permanently enjoined from commencing, continuing or enforcing in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtors, their Estates or the Reorganized Debtors, on account of, or respecting any Claims, debts, rights, obligations, Causes of Action or liabilities discharged pursuant to the Plan, except to the extent expressly permitted under the Plan.

- 50 -

### 9.3     Releases.

Except as otherwise set forth in the Plan, as of the Effective Date, in consideration for, among other things, the obligations of the Debtors under the Plan and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, (a) each holder of a Claim or Interest that votes in favor of the Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each Person that has held, holds or may hold a Claim or Equity Interest or at any time was a creditor or equity holder of any of the Debtors and that does not vote on the Plan or votes against the Plan, in each case will be deemed to forever release, waive and discharge all claims (including any derivative claims), obligations, suits, judgments, damages, demands, rights, causes of action and liabilities (other than the right to enforce the Reorganized Debtors' obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered, or that remain in effect, under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to a Debtor, the Bankruptcy Cases or the Plan that such entity has, had or may have against any Debtor, the Estates, the Estate's Assets, the Reorganized Debtors and/or the Reorganized Debtors' Assets.  Nothing in this Section 9.3 of the Plan shall be deemed to provide a release to a non-Debtor third party.

### 9.4     Cancellation of Existing Indebtedness and Liens.

Except as is otherwise provided in the Plan, on the Effective Date: (a) all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements and any other documents or instruments evidencing Claims against the Debtors, together with any and all Liens securing same, including without limitation any rights of setoff, any of the foregoing held by the Collateral Agent, securing the Retained Proceeds Claims and Agent Claims, and/or securing a Claim that is not an Allowed Claim, shall be canceled, discharged and released without further act or action by any Person under any applicable agreement, law, regulation, order or rule, (b) the obligations of the Debtors thereunder shall be deemed cancelled, discharged and released, and (c) all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the Reorganized Debtors.  To the extent deemed necessary or advisable by the Reorganized Debtors, any holder of a Claim shall promptly provide the Reorganized Debtors with an appropriate instrument of cancellation, discharge or release, as the case may be, in suitable form for recording wherever necessary to evidence such cancellation, discharge or release, including the cancellation, discharge or release of any Lien securing such Claim. Notwithstanding the foregoing, this Section 9.4 of the Plan shall not apply to the Loan Documents of any Lender with an Allowed Secured Claim, the effectiveness of which is governed by Section 4.1(c) of the Plan, until such Allowed Secured Claim has been paid in full. The homestead exemption claimed by JMC on real property located at 72 Jericho Road, Dennis, Massachusetts, shall not apply to any voluntary mortgages, security agreements, deeds of trust, liens or other security interests filed of record or recorded against that property prior to JMC's filing of a homestead declaration with respect to that property.

749807

**9.5     Exculpation.**

Except as otherwise set forth in the Plan, neither the Debtors, the Reorganized Debtors, the Committee nor any of their respective present or former members, managers, officers, directors, employees, general or limited partners, advisors, attorneys, agents, successors or assigns, shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the administration of these Bankruptcy Cases, the pursuit of confirmation of the Plan, the Disclosure Statement, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan occurring prior to the Effective Date, provided that the terms of this Section 9.5 of the Plan shall not apply to any liability for willful misconduct or ultra vires acts.

**9.6     Setoffs.**

Except as otherwise provided in the Plan, nothing contained in the Plan shall constitute a waiver or release by the Debtors, the Estates and/or the Reorganized Debtors of any rights of setoff each may have against any Person.

**ARTICLE X**

**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE OF THE PLAN**

**10.1     Conditions Precedent to Effectiveness.**

Subject to Section 10.2 of the Plan, the following are conditions precedent to the occurrence of the Effective Date:

(a)     The Confirmation Order, in form and substance reasonably acceptable to the Debtors shall have been entered by the Bankruptcy Court and shall not be subject to any stay;

(b)     The Confirmation Order shall have become a Final Order;

(c)     The Plan Lien Documents and the Retained Lien Documents shall have been executed and delivered as provided in the Plan.

**10.2     Waiver of Conditions.**

Except for the condition set forth in Sections 10.1(a) of the Plan, the Debtors (a) in their sole discretion, waive the condition precedent to the effectiveness of the Plan set forth in Section 10.1(b) by filing a notice of waiver with the Bankruptcy Court, and (b) waive the condition precedent to the effectiveness of the Plan set forth in Section 10.1(c) of the Plan, provided that such waiver shall not be made without the approval of the Committee and the Lenders, such approvals not to be unreasonably withheld, solely as to Plan Lien Documents that affect the Allowed Claims and/or Liens of such Lender or the Liens of the GUC Collateral Agent.  The failure to satisfy or waive any condition precedent to the occurrence of the Effective Date may be

749807

asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied.

**10.3    Effect of Non-occurrence of Conditions to the Effective Date.**

If the Effective Date has not occurred within six (6) months after the Confirmation Date, then except as extended by agreement among the Debtors, the Committee and a majority of the Lenders in amount (based on their respective Allowed Secured Claims pursuant to the Eighth Cash Collateral Order), the Plan shall terminate.  Upon termination, the Plan shall be null and void in all respects and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors, or (b) prejudice in any manner the rights of the Debtors or any other Person or constitute an admission, acknowledgement, offer or undertaking by the Debtors or any other Person.

**10.4    Notice of Occurrence of Effective Date.**

As soon as practicable following the Effective Date, the Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date, that specifies, among other things, the date on which the Effective Date occurred.


**ARTICLE XI**

**RETENTION OF JURISDICTION**

**11.1**    From and after the occurrence of the Effective Date, the Bankruptcy Court shall have jurisdiction over the matters arising out of, and related to, the Bankruptcy Cases and the Plan, as legally permissible, pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code including, without limitation:

(a)    To hear and determine any and all objections to the allowance, disallowance, determination, liquidation, classification or estimation of any Claims or Equity Interests or any controversies as to the priority and classification of any Claims (or any security with respect thereto) or Equity Interests or to estimate any Disputed Claim;

(b)    To hear and determine any and all applications by Professionals for compensation and reimbursement of expenses, authorized pursuant to the Plan or the Bankruptcy Code;

(c)    To hear and determine any and all applications (whether or not pending at or on the Confirmation Date) related to the rejection, assumption or assumption and assignment of executory contracts and unexpired leases to which any Debtor is a party, and to hear, determine and allow any Claims resulting therefrom;

(d)    To enforce and adjudicate the provisions of the Plan subject to the terms of the Plan;

749807

(e)     To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan;

(f)     To determine any Claim or liability to a governmental unit which may be asserted as a result of the transactions contemplated in the Plan;

(g)     To hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

(h)     To determine such other matters as may be necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(i)     To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, enforcement or vacatur of the Plan or any Person's obligations incurred in connection with the Plan;

(j)     To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan, except as otherwise provided herein;

(k)     To determine any other matters that may arise in connection with the Plan, the Disclosure Statement, the Confirmation Order or any other contract, instrument, release, indenture or other agreement or document created in connection with the foregoing;

(l)     To resolve any cases, controversies, suits or disputes with respect to releases, injunctions and other provisions contained in Article IX hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions or other provisions;

(m)     To hear and determine any Claims, rights, demands and Causes of Action arising prior to the Effective Date preserved pursuant to the Plan; and

(n)     To enter an order and/or final decree concluding the Bankruptcy Cases.


## ARTICLE XII

## MISCELLANEOUS

### 12.1   Continuation of Injunctions or Stays Until Effective Date.

All injunctions or stays provided for in the Bankruptcy Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date, except as otherwise ordered by the Bankruptcy Court upon appropriate motion and with appropriate notice.

749807

**12.2    Exemption from Transfer Taxes.**

In accordance with Section 1146(c) of the Bankruptcy Code: (a) the issuance, transfer or exchange of any security under the Plan or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, or the re-vesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated by the Plan, (b) the making, delivery, creation, assignment, amendment or recording of any note or other obligation for the payment of money or any mortgage, deed of trust or other security interest under, in furtherance of, or in connection with the Plan, and the issuance, renewal, modification or securing of indebtedness by such means, and (c) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.  Each recorder of deeds or similar official for any county, city or governmental unit in which any instrument under the Plan is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, transfer tax, intangible tax or similar tax.

**12.3    Amendment or Modification of the Plan.**

Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors jointly at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of Sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with Section 1125 of the Bankruptcy Code.  The Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under Section 1129 of the Bankruptcy Code.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.  The Debtors or the Reorganized Debtors may, without notice to holders of Claims (other than the Lenders) insofar as it does not materially and adversely affect the interests of any such holders, correct any defect or omission in the Plan and any exhibit to the Plan or in any Plan Document.  Notwithstanding this Section 12.3 of the Plan, the Debtors shall not alter, amend or modify the Plan so as to materially affect the Lenders without their prior written consent.

**12.4    Severability.**

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, upon the request of the Debtors (and subject to reasonable notice to the Lenders and an opportunity to object to the extent that the applicable term or provision of the Plan affects the Lenders), alter

749807

and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alternation or interpretation. The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable according to its terms.

### 12.5    JMC Compensation.

JMC's compensation after the Effective Date shall be in accordance with the amount agreed to at the mediation between the Debtors and the Lenders, as will be further set forth in the Plan Supplement, subject to any request to impound that may be filed by JMC.

### 12.6    Revocation or Withdrawal of the Plan.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void.

### 12.7    Binding Effect.

The rights, duties and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

### 12.8    Notices.

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors shall only be effective if in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and confirmed, addressed as follows:

Cashman Equipment Corp., et al.
41 Brooks Drive
Suite 1005
Braintree, MA  02184
Telephone: (781) 535-6222

Attention:    Mr. James M. Cashman
        Mr. Raymond W. Riddle

- 56 -

749807

With copies to:

> Murphy & King, Professional Corporation
> One Beacon Street
> Boston, MA 02108
> Harold B. Murphy, Esq.
> D. Ethan Jeffery, Esq.
> Telephone: (617) 423-0400
> E-mail: HMurphy@murphyking.com
> E-mail: EJeffery@murphyking.com

and

> Jeffrey D. Sternklar, LLC
> 225 Franklin Street, 26th Floor
> Boston, MA 02110
> Jeffrey D. Sternklar, Esq.
> Telephone: (617) 396-4515
> Email: jeffrey@sternklarlaw.com

### 12.9    Governing Law.

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflicts of law of such jurisdiction.

### 12.10   Withholding and Reporting Requirements.

In connection with the consummation of the Plan, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

### 12.11   Post-Confirmation Fees, Final Decree.

Each Reorganized Debtor will be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6).  After confirmation, each Reorganized Debtor will serve the United States Trustee and each Lender with an unpaid Allowed Secured Claim with a monthly financial report for each month (or portion thereof) these bankruptcy cases remain open.  The Reorganized Debtors may request that these bankruptcy cases be closed notwithstanding that there may be proceedings relating to Disputed Claims still pending.  The monthly financial report shall include the following:

> (a)    A statement of all disbursements made during the course of the quarter, whether or not pursuant to the Plan;

749807

(b)      A summary, by class, of amounts distributed or property transferred to each recipient under the plan, and an explanation of the failure to make any distributions or transfers of property under the Plan;

(c)      The Reorganized Debtors' projections as to their continuing ability to comply with the terms of the Plan;

(d)      A description of any other factors which may materially affect the Reorganized Debtors' ability to consummate the Plan; and

(e)      An estimated date when an application for final decree will be filed with the court (in the case of the final monthly report, the date the decree was filed).

**12.12  Headings.**

Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

[this space intentionally left blank]

749807

**12.13  Inconsistency.**

In the event of any inconsistency between the Plan and the Disclosure Statement or any other instrument or document created or executed pursuant to the Plan, the terms of the Plan shall govern.

Cashman Equipment Corporation,                Cashman Scrap & Salvage, LLC,

/s/ *James M. Cashman*                          /s/ *James M. Cashman*
By: James M. Cashman                           By: James M. Cashman
Its: President                                 Its: Manager

Servicio Marina Superior, LLC,                 Cashman Canada, Inc.,

/s/ *James M. Cashman*                          /s/ *James M. Cashman*
By: James M. Cashman                           By: James M. Cashman
Its: General Manager                           Its: President

Mystic Adventure Sails, LLC,                   James M. Cashman,

/s/ *James M. Cashman*                          /s/ *James M. Cashman*
By: Servicio Marina Superior, LLC
By: James M. Cashman
Its: General Manager

Counsel for Corporate Debtors,                 Counsel for James M. Cashman,

/s/ *D. Ethan Jeffery*                          /s/ *Jeffrey D. Sternklar*
Harold B. Murphy, Esq. (BBO #362610)           Jeffrey D. Sternklar, Esq. (BBO# 549561)
D. Ethan Jeffery, Esq. (BBO #631941)           JEFFREY D. STERNKLAR, LLC
MURPHY& KING, P.C.                             225 Franklin Street, 26th Floor
One Beacon Street                              Boston, MA 02110
Boston, MA  02108                              Telephone: (617) 396-4515
Telephone:  (617) 423-0400                     Facsimile:  (617) 507-6530
Facsimile:  (617) 423-0498                     Email:  jeffrey@sternklarlaw.com
Email:  EJeffery@murphyking.com

Dated:  November 2, 2018

IN RE: CASHMAN EQUIPMENT CORP., *ET AL.*
BANKRUPTCY NO. 17-12205
(JOINTLY ADMINISTERED)

EXHIBIT 1 TO

MODIFIED THIRD AMENDED JOINT PLAN OF REORGANIZATION OF
CASHMAN EQUIPMENT CORP., CASHMAN SCRAP & SALVAGE, LLC,
SERVICIO MARINA SUPERIOR, LLC, CASHMAN CANADA, INC.,
MYSTIC ADVENTURE SAILS, LLC, AND JAMES M. CASHMAN

### Plan Exhibit 1 -- Covenants

The following covenants shall apply as stated herein on and after the Effective Date. Capitalized terms not otherwise defined in the Plan shall have the meanings ascribed to them at the end of this Exhibit 1.

### A.    Negative Covenants.

So long as any amounts remain due under the Plan on account of an Allowed Secured Claim and as long as the GUC Lien remains in place, the Debtors shall not, without the prior approval of the Bankruptcy Court or another court of competent jurisdiction:

1.    after the Effective Date, guaranty or become liable in respect of any new indebtedness, obligation or liability of any non-Debtor Insider;

2.    abandon or destroy any Vessel, nor permit charterers of a Vessel to abandon or destroy any chartered Vessel;

3.    expend, in any calendar year, an aggregate amount in excess of $500,000 on account of Capital Expenditures;

4.    purchase any new or used vessel unless the Lenders' Allowed Secured Claims have been paid in full;

5.    be a party to any merger, reorganization or consolidation other than among the Corporate Debtors;  and

6.    purchase or acquire the business, assets or capital stock of any other organization other than in the ordinary course of business.

### B.    Affirmative Covenants.

So long as any amounts remain due under the Plan on account of an Allowed Secured Claim and as long as the GUC Lien remains in place, the Debtors shall:

7.    measured on a cumulative basis, (a) for the first two (2) calendar years following the Effective Date, reduce the Lenders' Principal by not less than eighty-five percent (85%) of the Principal Reduction Amount for each Measurement Period, and (b) for the third to the sixth calendar years following the Effective Date, reduce, as measured on a cumulative basis, the Lenders' Principal by not less than ninety percent (90%) of the Principal Reduction Amount for each Measurement Period, such that, on a cumulative basis, the Lenders' Principal is reduced by not less than $8.2 million by December 31, 2019, $16.5 million by December 31, 2020, $27.2 million by December 31, 2021, $36 million by December 31, 2022, $43.4 million by December 31, 2023, and $48.9 million by December 31, 2024; provided that, for all Measurement Periods: (i) the reduction of the Lenders Principal may come from any source, including, without limitation, the monthly payments made to the Lenders under the Plan, the sales of Vessels and the Excess Cash

Payment, (ii) any principal reduction payments from gross Vessel sales in excess of $10,000,000 during calendar year 2018 shall be used to determine the Debtors' compliance with this paragraph 7, regardless of whether such principal reduction payments occurred prior to the Effective Date, and (iii) if, during any Measurement Period, the Debtors reduce the Lenders Principal by more than the Principal Reduction Amount, such excess amount shall be applied to future Measurement Periods to determine the Debtors' compliance with this paragraph 7; **SUBJECT TO ADJUSTMENT BASED ON THE NUMBER OF AGREED-CLAIM LENDERS**

8.      use, operate, protect and maintain their respective Property: (a) in good operating order, repair and seaworthy condition, ordinary wear and tear excepted, (b) consistent with ordinary industry practice, (c) in compliance with applicable insurance policies, and (d) in accordance with the applicable laws, treaties, conventions, rules, regulations and ordinances of the sovereign jurisdiction where such Property may be located;

9.      keep and to cause each Vessel to be kept free and clear of all Liens other than (a) Liens on the Vessel as of the Effective Date, (b) Permitted Maritime Liens, and (c) those Liens the validity of which is being contested in good faith;

10.      maintain, or cause to be maintained, in all material respects, all records, logs and other materials with respect to the Vessels required by applicable law, customarily maintained by vessel operating companies or required by any Governmental Authority having jurisdiction over the Vessels;

11.      procure all repairs to or replacement of any damaged, worn or lost parts or equipment on a Vessel in such manner (both as regards workmanship and quality of materials) as not to diminish the value of such Vessel;

12.      (a) with respect to any Vessel that is currently documented under the laws and flag of the United States of America as of the date hereof, the Debtors shall keep such Vessel duly and validly documented under the laws and flag of the United States of America, including, if required by requirements of law, to maintain a current Certificate of Documentation (with a coastwise endorsement if the Vessel has a coastwise endorsement as of the date hereof) and a current Certificate of Inspection for such Vessel; and

(b) with respect to any Vessel that is not currently documented under the laws and flag of the United States of America as of the date hereof, the Debtors shall keep such Vessel duly and validly documented under the laws and flag of such jurisdiction, including, as necessary, maintaining current certificates, certifications, endorsements, qualifications and other similar documentation;

13.      as necessary, (a) with respect to all Debtors, remain eligible to own and document vessels under the laws of the sovereign jurisdiction where each such Debtor may own any Vessel, and (b) with respect to each of CEC, SMS and Mystic, remain (i) eligible to act as an owner in respect of a United States flagged vessel pursuant to 46 U.S.C. § 12103(b) and the regulations promulgated thereunder, and (ii) a citizen of the United States within the meaning of 46 U.S.C. 50501(a), (b), and (d) and the regulations issued thereunder, qualified to own and

2

operate vessels in the coastwise trade of the United States;

14.     pay and discharge or cause to be paid and discharged when due and payable, from time to time, all post-petition taxes, assessments, governmental charges, fines and penalties lawfully levied, assessed or imposed on any Vessel, other than those the amount or validity of which is being contested in good faith;

15.     take all commercially reasonable steps to defend the title and possession of each of the Vessels and of every part thereof against the claims and demands of all persons whomsoever;

16.     upon the reasonable request of the holder of a Lien on a Vessel, provide to such holder: (a) the current location of such Vessel, (b) a copy of any current charter agreements for such Vessel, and (c) copies of documents evidencing the Vessel's current flag, certifications and registrations;

17.     upon the reasonable request of the holder of a Lien on a Vessel, permit such holder to: (a) make periodic inspections or surveys of such Vessel to determine its condition, repair and maintenance status, and (b) make periodic inspections of the logs of such Vessel, provided that the log inspections shall only be conducted during normal business hours and upon reasonable notice to and in a manner that will not disrupt or interfere with the Debtors' business or operations;

18.     file all post-Effective Date tax returns required to be filed and pay all post-Effective Date taxes, promptly when due, except to the extent that any such tax shall be currently contested in good faith by appropriate proceedings and the Debtors shall have set aside on its books appropriate reserves with respect thereto;

19.     operate their respective businesses in the ordinary course consistent with past practice and, to the best of their respective knowledge, in compliance with all applicable laws, and obtain and maintain in full force and effect all permits, certificates, licenses, agreements and other rights that are or may at any time be necessary or appropriate to the operation of its business as at such time conducted;

20.     maintain and preserve their corporate or other legal existence and all their rights, franchises and qualifications adequate for the conduct of their businesses;

21.     notify the holders of unpaid Allowed Secured Claims of any uninsured litigation, claim or cause of action pending, commenced or threatened by, against or in any way involving one or more of the Debtors with an amount at issue greater than $500,000;

22.     maintain their books and records relating to its financial affairs in accordance with their respective pre-Effective Date practices;

23.     not transfer or permit to be transferred or changed, the flag or hailing port of any Vessel absent the prior written consent of either (a) the Lender with a first Lien on the Vessel in question, or (b) if no Lender exclusively holds a senior Lien on the Vessel, the Lenders'

3

750007

Collateral Agent or the GUC Collateral Agent, as applicable;

24.      obtain and maintain, or cause to be maintained, at the Debtors' cost, insurance with one or more financially sound insurance companies, underwriters, funds, mutual insurance associations, for each of the Vessels and each Debtors' respective other Property, providing coverage substantially similar to the coverage in place prior to the Effective Date; provided that, all such insurances shall name the Vessel's owner and the respective Lien holder(s) as named insured or loss payee, and the policies or certificates of the insurances shall provide that there shall be no recourse against the Lien holder for the payment amounts due under such insurances;

25.      endeavor to cause each insurance company, underwriter, fund, mutual insurance association and/or club that provides insurance for a Vessel to agree in writing that the policy or policies issued will not be cancelled for any reason whatsoever without at least thirty (30) days' prior written notice to the Debtors and to the holders of valid Liens (including the Lender as to each Mortgaged Vessel and the Lenders' Collateral Agent as to each Unencumbered Vessel) on such Vessel;

26.      provide Certificates of insurance and/or other written evidence of insurance on a Vessel to the holders of Liens on such Vessel (including the Lender as to each Mortgaged Vessel and the Lenders' Collateral Agent as to each Unencumbered Vessel) upon the reasonable request of the Lien holder;

27.      take all commercially reasonable steps necessary to make all proofs of loss under any insurance policy and to effect collections from underwriters for any loss under any insurance policy;

28.      in the event of a casualty, damage or injury to a Debtor's Property (a) use the proceeds of any insurance covering the damaged property to restore the Property, or (b) if restoration is not possible, distribute the proceeds of any insurance covering the damaged Property in accordance with the Plan, including, if applicable, in the same way as would be required for Net Proceeds of such Property;

29.      in the event of the condemnation of all or any part of a Debtor's Property, distribute the proceeds of any condemnation award in accordance with the Plan, including, if applicable, in the same way as would be required for Net Proceeds of such Property, unless such award is used to restore the functionality of the affected Property;

30.      in the event of a casualty, damage or injury to a Vessel in excess of $190,000, notify the holders of Liens on such Vessel of such event within ten (10) Business Days;

31.      provide, promptly upon the occurrence of any of the following events, to the holders of Liens on a Vessel, notice of: (a) the occurrence of an Environmental Claim with respect to such Vessel, (b) the receipt by the Debtors or any of its permitted charterers (where the Debtors have knowledge of such receipt) of any Environmental Claim with respect to such Vessel, and/or (c) the assertion of a post-Effective Date Lien against such Vessel;

4

32.    provide to the holders of Liens on a Vessel, upon request, copies of the documents associated with any of the events listed in paragraph 31 with respect to such Vessel; and

33.    with respect to any Vessel that is currently documented under the laws and flag of the United States of America, place and maintain on board each Vessel subject to a mortgage evidencing a valid Lien as of the Effective Date, a copy of the mortgage, and cause such copy and such Vessel's marine documents to be exhibited to any and all persons having business therewith that could reasonably give rise to any Lien on such Vessel, and place and maintain on display on such Vessel a framed printed notice reading substantially as follows:

### NOTICE OF MORTGAGE

THIS VESSEL IS OWNED BY [NAME OF DEBTOR] (THE "OWNER") AND IS COVERED BY A MORTGAGE, DATED AS OF [DATE OF MORTGAGE] (THE "MORTGAGE"), GIVEN BY THE OWNER IN FAVOR OF [NAME OF MORTGAGEE] (THE "MORTGAGEE").  UNDER THE TERMS OF THE MORTGAGE, NEITHER THE OWNER, ANY CHARTERER, THE MASTER OF THIS VESSEL NOR ANY OTHER PERSON HAS ANY RIGHT, POWER OR AUTHORITY TO CREATE, INCUR OR PERMIT TO BE PLACED OR IMPOSED UPON THIS VESSEL ANY LIEN WHATSOEVER OTHER THAN THE LIEN OF THE MORTGAGE, CERTAIN LIENS PERMITTED UNDER THE MORTGAGE, AND THE FOLLOWING LIENS:  (A) (I) LIENS FOR CREW'S WAGES (INCLUDING THE WAGES OF THE MASTER OF THIS VESSEL), (II) LIENS FOR SALVAGE (INCLUDING CONTRACT SALVAGE) AND GENERAL AVERAGE, AND (III) LIENS FOR WAGES OF A STEVEDORE WHEN EMPLOYED DIRECTLY BY A PERSON LISTED IN 46 U.S.C. § 31341, PROVIDED THAT ANY LIENS PERMITTED BY THIS CLAUSE (B) SHALL HAVE ACCRUED FOR NOT MORE THAN THIRTY (30) DAYS; (B) LIENS FOR DAMAGES ARISING FROM MARITIME TORTS WHICH ARE COVERED BY INSURANCE AND ANY DEDUCTIBLE APPLICABLE THERETO, OR IN RESPECT OF WHICH A BOND OR OTHER SECURITY HAS BEEN POSTED ON BEHALF OF THE OWNER WITH THE APPROPRIATE COURT OR OTHER TRIBUNAL TO PREVENT THE ARREST OR SECURE THE RELEASE OF THIS VESSEL FROM ARREST; AND (C) ANY OTHER LIENS THAT ARE SUBORDINATE TO THE LIEN OF THE MORTGAGE.

Certain Defined Terms

The term "Capital Expenditures" shall mean an amount expended for the construction or acquisition of capital assets, and shall not include amounts expended for the capital maintenance of any asset.

The term "Environmental Claim" shall mean any claim, notice, demand, order, suit or proceeding alleging liability for or obligation with respect to any liability for (a) the presence, release or threatened release of materials regulated by an Environmental Law, or (b) any violation or alleged violation of any Environmental Law.

The term "Environmental Law" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Resource Conservation and

750007

Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251, et seq.), the Clean Air Act (42 U.S.C. § 7401, et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601, et seq.), the Occupational Safety and Health Act (29 U.S.C. § 651, et seq.), the Pipeline Safety Act (49 U.S.C. § 601, et seq.), the Oil Pollution Act of 1990 (33 U.S.C. § 2701, et seq.), and any similar state or local laws.

The term "Lenders' Principal" shall mean the aggregate of the Lenders' Principal Obligation as of the Effective Date.

The term "Measurement Period" shall mean, respectively, the following: (a) First Measurement Period – December 31, 2018, to December 31, 2019; (c) Second Measurement Period – December 31, 2019, to December 31, 2020; (d) Third Measurement Period – December 31, 2020, to December 31, 2021; (e) Fourth Measurement Period – December 31, 2021, to December 31, 2022; (f) Fifth Measurement Period – December 31, 2022 to December 31, 2023; and (g) Sixth Measurement Period – December 31, 2023, to December 31, 2024.

The term "Permitted Maritime Liens" shall mean with respect to a Vessel, one or more (i) Liens for crew's wages, (ii) one or more Liens for salvage (including contract salvage) and general average, (iii) shipyard Liens or any other Lien arising by operation of law in the ordinary course of business in operating, maintaining or repairing a Vessel, (iv) Liens related to the supply of necessaries (within the meaning of 46 U.S.C. § 31301, or the equivalent under non-U.S. law) to any Vessel; (v) Liens for damages arising from maritime torts which are covered by insurance and any deductible applicable thereto, or in respect of which a bond or other security has been posted with the appropriate court or other tribunal to prevent the arrest or secure the release of the Vessel from arrest, and (vi) Liens for charters or subcharters, or leases or subleases.

The term "Principal Reduction Amount" shall mean: (a) for the First Measurement Period – $9.7 million; (b) for the Second Measurement Period – $9.7 million; (c) for the Third Measurement Period – $10.9 million; (d) for the Fourth Measurement Period – $9.8 million; (e) for the Fifth Measurement Period – $8.3 million; and (f) for the Sixth Measurement Period – $6.1 million.[1] **SUBJECT TO ADJUSTMENT BASED ON THE NUMBER OF AGREED-CLAIM LENDERS**

---

[1] The Principal Reduction Amount for the Sixth Measurement Period is based on the assumption that the Lenders' Allowed Secured Claims are not paid in full until the seventy-second (72nd) month following the Effective Date, which differs from the projections attached to the Disclosure Statement, which assume that the Lenders' Allowed Secured Claims are paid in full prior to the sixtieth (60th) month following the Effective Date.

6

IN RE: CASHMAN EQUIPMENT CORP., *ET AL.*
BANKRUPTCY NO. 17-12205
(JOINTLY ADMINISTERED)

EXHIBIT 2 TO

MODIFIED THIRD AMENDED JOINT PLAN OF REORGANIZATION OF
CASHMAN EQUIPMENT CORP., CASHMAN SCRAP & SALVAGE, LLC,
SERVICIO MARINA SUPERIOR, LLC, CASHMAN CANADA, INC.,
MYSTIC ADVENTURE SAILS, LLC, AND JAMES M. CASHMAN

This Exhibit is subject to impoundment pursuant to an order of the Bankruptcy Court.

IN RE: CASHMAN EQUIPMENT CORP., *ET AL.*
BANKRUPTCY NO. 17-12205
(JOINTLY ADMINISTERED)

EXHIBIT 3 TO

MODIFIED THIRD AMENDED JOINT PLAN OF REORGANIZATION OF
CASHMAN EQUIPMENT CORP., CASHMAN SCRAP & SALVAGE, LLC,
SERVICIO MARINA SUPERIOR, LLC, CASHMAN CANADA, INC.,
MYSTIC ADVENTURE SAILS, LLC, AND JAMES M. CASHMAN

Cashman Equipment Corp. - 4
Exh. 3 to 3rd Amended Plan of Reorganization

| Marine Vessels and Certain Equipment | Description | Vessel Mortgage Holder |
|---|---|---|
| **Mortgaged Vessels** | | |
| JMC 3005 / No. 1231566 | ABS Deck - Non Coastwise | 5th 3rd |
| JMC 3006 / No. 1231564 | ABS Deck - Non Coastwise | 5th 3rd |
| JMC 2600 / No. 1239411 | ABS Deck - Non Coastwise | Banc of America |
| JMC 2601 / No. 1239412 | ABS Deck - Non Coastwise | Banc of America |
| JMC 3010 / No. 1239413 | ABS Deck - Non Coastwise | Banc of America |
| JMC 3011 / No. 1239414 | ABS Deck - Non Coastwise | Banc of America |
| Miss Nora (JMC 4003) / Vanuatu No. 2332 | ABS Self Ballastable Deck Barge | Banc of America |
| JMC 121 / No. 1161280 | Inland Spud Barge | Citizens |
| JMC 148 / No. 1233601 | ABS Deck Barge | Citizens |
| JMC 151 / No. 1137944 | ABS Spud Barge | Citizens |
| JMC 152 / No. 1149337 | Inland Spud Barge | Citizens |
| JMC 163 / No. 1232364 | ABS Spud Barge | Citizens |
| JMC 182 / No. 1200354 | ABS Deck Barge | Citizens |
| JMC 188 / No. 1218746 | ABS Deck Barge | Citizens |
| JMC 191 / No. 1220851 | ABS Deck Barge | Citizens |
| JMC 252 / No. 1239099 | ABS Deck Barge 3500 PSF | Citizens |
| JMC 257 / No. 1225117 | ABS Deck Barge 4000 PSF | Citizens |
| JMC 3334 / No. 1233624 | ABS Deck - Non Coastwise | Citizens |
| JMC 58 / Serial No. 2251127 Manitowoc | Manitowoc 2250 Crane - Cummings | Equitable |
| JMC 56/Serial No. 2251131 Manitowoc | Manitowoc 2250 Maxer Prepped self erect | Key |
| JMC 57 / Serial No. 2251112 Manitowoc | Manitowoc 2250 Maxer Prepped self erect | Key |
| JMC 3330 / No. 1198348 | ABS Deck - Non Coastwise | Key |
| JMC 3331 / No. 1203928 | ABS Deck - Non Coastwise | Key |
| JMC 46 / No. 1064243 | ABS Deck Barge | MARAD |
| JMC 51 / No. 1072075 | ABS Deck Barge | MARAD |
| JMC 180 / No. 1124599 | ABS Deck Barge | MARAD |
| JMC 251 / No. 1078176 | ABS Deck Barge | MARAD |
| JMC 254 / No. 1078866 | ABS Deck Barge | MARAD |
| JMC 2820 / No. Vanuatu 2059 | ABS Deck - Non Coastwise | Pacific West |
| JMC 2821 / No. Vanuatu 2060 | ABS Deck - Non Coastwise | Pacific West |
| JMC 12 / No. 985369 | Inland Deck Barge | Radius |
| JMC 75 / No. 1241274 | Inland Deck Barge | Radius |
| JMC 76 / No. 1241275 | Inland Deck Barge | Radius |
| JMC 124 / No. 1210287 | Inland Deck Barge | Radius |
| JMC 144 / No. 1192756 | ABS Deck Barge | Radius |
| JMC 145 / No. 1192758 | ABS Deck Barge | Radius |
| JMC 190 / No. 1214662 | ABS Deck Barge | Radius |
| JMC 23 / Serial No. 40290 | Manitowoc 4000W Vicon Crawler Crane | RTC |
| JMC 24 (Ex-YFNB-8)/ Vanuatu No. 1938 | RMS Floatel Barge | RTC |
| JMC 35 / Serial No. 41780 | Manitowoc 4100 Crane S2 | RTC |
| JMC 37 / Serial No. 395020 | Manitowoc 3900 Crane | RTC |
| JMC 40 / Serial No. 355293 | Broderson IC80-2f CarryDeck Crane | RTC |
| JMC 42 / Serial No. 413002 | Manitowac 4100 Ser II 230T Crane | RTC |
| JMC 44 Vanuatu No. 1939 | RMS Floatel Barge | RTC |
| JMC 47 / No. Canada 839918 | ABS Deck Barge | RTC |
| JMC 48 / No. Canada 839919 | ABS Deck Barge | RTC |
| JMC 52 / Serial No. 41484 | Manitowac 4100S2 Crawler crane | RTC |
| JMC 54 / Serial No. 41302 | Manitowac 4100 Series II Crawler crane | RTC |
| JMC 55 / Serial No.40049 Manitowoc | Manitowac 4000W 1965 Crane | RTC |
| JMC 59 / Serial No. 9991114 Manitowoc | Manitowoc 999 Crawler Crane On JMC 00153 | RTC |
| JMC 60 / Serical No. 99991072 Manitowoc | Manitowoc 999 Crawler Crane On JMC 00154 | RTC |
| JMC 73 / No. 1180710 | Converted to Inland Deck Barge 2015 | RTC |
| JMC 74 / No. 1180709 | Converted to Inland Deck Barge 2015 | RTC |
| JMC 92 (Preeminent I) | Inland Quarters | RTC |
| JMC 140 / No. 1137943 | ABS Spud Barge | RTC |
| JMC 154 / No. 1266804 | Inland Spud Barge | RTC |
| JMC 184 (Lisa Michelle) / No. 1103489 | ABS Spud Barge | RTC |
| JMC 185 / No. Canada 838024 | ABS Deck Barge | RTC |
| JMC 231 / No. 1267468 | Inland Deck Barge | RTC |
| JMC 232 / No. 1267469 | Inland Deck Barge | RTC |
| JMC 244 / Vanuatu No. 1936 | RMS Deck Barge | RTC |
| JMC 245 / Vanuatu No. 1937 | RMS Deck Barge | RTC |
| JMC 250 / No. 1074918 | ABS Deck Barge | RTC |
| JMC 258 / No. 1226873 | ABS Deck Barge 4000 PSF | RTC |
| JMC 617 | Sectional Barge | RTC |
| JMC 2508 / No. Mexico 025/16 | ABS Deck - Non Coastwise | RTC |

Cashman Equipment Corp. - #1
Exh. 3 to 3rd Amended Plan of Reorganization

| Marine Vessels and Certain Equipment | Description | Vessel Mortgage Holder |
|---|---|---|
| JMC 2509 / No. Mexico 022/12 | ABS Deck - Non Coastwise | RTC |
| JMC 2510 / No.1203929 | ABS Deck - Non Coastwise | RTC |
| JMC 2515 / No. Mexico 024/16 | ABS Deck - Non Coastwise | RTC |
| JMC 2516 / No. Mexico 021/16 | ABS Deck - Non Coastwise | RTC |
| JMC 2602 / No. 1264966 | ABS Deck - Non Coastwise | RTC |
| JMC 2823 / No. Vanuatu 2046 | ABS Deck - Non Coastwise | RTC |
| JMC 2824 / No. Vanuatu 2406 | ABS Deck - Non Coastwise | RTC |
| JMC 2825 / No. Vanuatu 2407 | ABS Deck - Non Coastwise | RTC |
| JMC 3007 / No. 1210087 | ABS Deck - Non Coastwise | RTC |
| JMC 3008 / No. 1210089 | ABS Deck - Non Coastwise | RTC |
| JMC 3080 / No. Vanuatu 2400 | Rina Deck Barge -Non Coastwise | RTC |
| Atlas / No.1097588 | ABS Classed Tug | RTC |
| Marina Orion / No. 1209095 | BV Classed Tug | RTC |
| Marina Polaris / No. 1209096 | BV Classed Tug | RTC |
| Miss Hannah (JMC 4002) No. 1237602 | ABS Self Ballastable Deck Barge | RTC |
| Miss Mary (JMC 4001) / No. Vanuatu 2249 | ABS Self Ballastable Deck Barge | RTC |
| Reed Danos Tug / No. 588434 | ABS Classed Tug | RTC |
| Todd Danos Tug / No. 637906 | ABS Classed Tug | RTC |
| JMC 253 / No. 1236914 | ABS Deck Barge 4000 PSF | Santander |
| JMC 2514 / No. 1206774 | ABS Deck - Non Coastwise | Santander |
| JMC 300 / No. 1094810 | ABS Deck Barge | Santander |
| JMC 3003 / No. Mexico 031/16 | ABS Deck - Non Coastwise | Santander |
| JMC 3004 / No. 1183281 | ABS Deck - Non Coastwise | Santander |
| JMC 3009 / No. Mexico 030/16 | ABS Deck - Non Coastwise | Santander |
| JMC 3012 / No. 1243362 | ABS Deck - Non Coastwise | Santander |
| JMC 3013 / No. 1243363 | ABS Deck - Non Coastwise | Santander |
| JMC 3014 / No. 1246365 | ABS Deck - Non Coastwise | Santander |
| JMC 3015 / No. 1246573 | ABS Deck - Non Coastwise | Santander |
| Miss Molly Tug / No. 9598000 Vanuau No. 2340 | BV Classed Tug | Santander |
| Mystic Schooner Sail Boat / No. 1185949 | Three Masted Schooner | Santander |
| JMC 85 / No. 1095096 | ABS Spud Barge | US Bank |
| JMC 146 / No. 1214459 | ABS Deck Barge | US Bank |
| JMC 159 / No. 1122407 (Deer Isle Granite) | ABS Spud Barge | US Bank |
| JMC 41 / Serial No. CW-4076 | Amclyde Crane - CBW-8800 Gantry Crane | Wells Fargo |
| JMC 49 / Serial No. 2251071 | Manitowac 2250 Crawler Crane | Wells Fargo |
| JMC 120 / No. 1144582 | Inland Spud Barge | Wells Fargo |
| JMC 130 / No. 1138024 | Inland Spud Barge | Wells Fargo |
| JMC 141 / No. 1137948 | ABS Spud Barge | Wells Fargo |
| JMC 150 / No. 1136586 | ABS Spud Barge | Wells Fargo |
| JMC 164 / No. 1235150 | ABS Spud Barge | Wells Fargo |
| JMC 171 / No. 1137281 | Hooper Barge | Wells Fargo |
| JMC 186 / No. 1208748 | ABS Deck Barge | Wells Fargo |
| JMC 187 / No. 1208552 | ABS Deck Barge | Wells Fargo |
| JMC 192 / No. 1114610 | Inland Spud Barge | Wells Fargo |
| JMC 256 / No. 1217297 | ABS Deck Barge 4000 PSF | Wells Fargo |
| JMC 259 / No. 1230994 | ABS Deck Barge 4000 PSF | Wells Fargo |
| JMC 263 / No. 1230780 | ABS Deck Barge | Wells Fargo |
| JMC 264 / No. 1243694 | ABS Deck Barge | Wells Fargo |
| JMC 304 / No. 1105091 | ABS Deck Barge | Wells Fargo |

**Unencumbered Vessels**

| | | |
|---|---|---|
| JMC 50 / No. 1069223 | ABS Deck Barge | Unencumbered |
| JMC 137 / No. 979637 | Inland Sand Scow | Unencumbered |
| JMC 2511 / No.1198346 | ABS Deck - Non Coastwise | Unencumbered |
| JMC 3332 / No. 1216553 | ABS Deck - Non Coastwise | Unencumbered |
| JMC 3333 / No. 1216560 | ABS Deck - Non Coastwise | Unencumbered |
| JMC 3335 / No. 1233625 | ABS Deck - Non Coastwise | Unencumbered |
| JMC 3337 / No. 1243364 | ABS Deck - Non Coastwise | Unencumbered |
| JMC 3339 / No. | Flat Top Ballastable Barge | Unencumbered |
| JMC 3340 / No. | Flat Top Ballastable Barge | Unencumbered |
| JMC 3341 / No. | Flat Top Ballastable Barge | Unencumbered |
| Carloyn Anne JMC 926 / No. 956128 | Inland Pushboat | Unencumbered |

749753

IN RE: CASHMAN EQUIPMENT CORP., *ET AL.*
BANKRUPTCY NO. 17-12205
(JOINTLY ADMINISTERED)

EXHIBIT 4 TO

MODIFIED THIRD AMENDED JOINT PLAN OF REORGANIZATION OF
CASHMAN EQUIPMENT CORP., CASHMAN SCRAP & SALVAGE, LLC,
SERVICIO MARINA SUPERIOR, LLC, CASHMAN CANADA, INC.,
MYSTIC ADVENTURE SAILS, LLC, AND JAMES M. CASHMAN

**Cashman Equipment Corp., et al.**
**Sale Notice**

Asset to be sold:_____

Name of Buyer:_____

Offer:_____

Creditors asserting liens on or in respect of the asset to be sold:_____
_____

1.    List any other offers (offeror, price, & terms) made for the asset within the last ninety (90) days:_____

2.    With respect to the asset to be sold:

   a.  Is the asset on charter or under lease, other than to the buyer: Yes/No_____;
   b.  Is the asset being sold subject to a pending, but not yet commenced charter/lease: Yes/No_____;
   c.  If the answer to either 2(a) or 2(b) is yes, attach a copy of the charter/lease;
   d.  Is any other Mortgaged Vessel (*i.e,* a "JMC" nominated piece of equipment that is not a registered vessel) attached to the sale asset.  If so, is that other Vessel included in the sale transaction.  Further, if so, include a proposed allocation of the sale price between the sale assets.

3.    Is the buyer an insider or affiliate (as those terms are defined by the Bankruptcy Code) of the Debtors: Yes/No_____.

4.    Is the buyer a creditor of one of the Debtors: Yes/No_____.

5.    If a vessel;

   a.  Is the buyer required to satisfy any pre-conditions, such as citizenship in order to purchase of the vessel:  Yes/No_____.  If yes, identify the conditions and how they will be satisfied.
   b.  Is the sale of the vessel subject to any government approvals:  Yes/No ____. If yes, identify the government approval and how it will be obtained.
   c.  Is the vessel subject to any maritime lien(s) that have/has priority, under applicable maritime law, in the vessel's location, over the preferred mortgage, if any, on the vessel, or has first priority over other liens or claims on the vessel:  Yes/No ____.  If yes, identify the priority maritime lien(s) and specify the amount of the underlying claim(s) secured by the priority maritime lien(s).

1

743961

Case 17-12205    Doc 1158    Filed 11/02/18    Entered 11/02/18 15:51:36    Desc Main
Document      Page 74 of 76

        d.       Is the broker (if applicable) an insider or affiliate of the Debtors: Yes/No_____.

        e.       Attach the following documents:

           a.  A copy of the purchase agreement;
           b.  A list of the estimated closing costs, including any brokers' commissions and fees payable to a governmental unit with respect to any required approval to transfer the asset, the filing and recording of the transfer of title to the asset, and the discharge of any recorded liens in or on the asset.
           c.  A list of any credits against the purchase price due to the buyer and the basis for such credits;
           d.  A calculation of the estimated net proceeds of the sale substantially in the form attached as Schedule 1;
           e.  The most recent appraisal for the asset to be sold.

I certify that the foregoing is true and correct to the best of my knowledge, information and belief.

                             [NAME OF ENTITY SELLING ASSET]


                             _____

                             By: James M. Cashman

Dated:_____              Its: President

2

743961

# Schedule 1

733325

# Cashman Equipment Corp. *et al.*

## Pro Forma Closing Report Concerning Vessel Sale

Vessel:  JMC[          ]

Sale Price Payable at Closing
Minimum Disposition Price (MDP)
Lender Consent Required for this Price?                    No

|                                              | Net Proceeds | Other Items |
|----------------------------------------------|--------------|-------------|
| GROSS SALE PROCEEDS                          | $      -     |             |
| Commission                                   | $      -     |             |
| Recording, Discharge, Transfer Fees          | $      -     |             |
| Other Payment to Flag State                  | $      -     |             |
| Amounts Paid Pre-Closing (note 1)            | $      -     |             |
| Priority Maritime Liens                      | $      -     |             |
| Misc. Closing Costs                          | $      -     |             |
| NET PROCEEDS                                 | $      -     |             |

Note 1:  E.g. lease/charter payments to be received by Debtors before sale closing
          in the case of a Purchase Option Charter.