**THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE PLAN. ACCEPTANCE MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT UNDER SECTION 1125 OF THE BANKRUPTCY CODE. THIS FORM OF DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT, BUT HAS NOT BEEN APPROVED.**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (Eastern Division)

| | |
|---|---|
| In re: | Chapter 11 |
| **CASHMAN EQUIPMENT CORP.,**[1] | Case No. 17-12205-MSH |
| Debtors. | Jointly Administered |

### [PROPOSED]
### MODIFIED THIRD AMENDED DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF CASHMAN EQUIPMENT CORP., CASHMAN SCRAP & SALVAGE, LLC, SERVICIO MARINA SUPERIOR, LLC, CASHMAN CANADA, INC., MYSTIC ADVENTURE SAILS, LLC, AND JAMES M. CASHMAN

MURPHY& KING, P.C.
One Beacon Street
Boston, MA  02108
Harold B. Murphy, Esq.
D. Ethan Jeffery, Esq.

Email:  EJeffery@murphyking.com
Telephone:  (617) 423-0400
Facsimile:   (617) 423-0498


JEFFREY D. STERNKLAR, LLC
225 Franklin Street, 26th Floor
Boston, MA 02110
Jeffrey D. Sternklar, Esq.

Email:  jeffrey@sternklarlaw.com
Telephone: (617) 396-4515
Facsimile:  (617) 507-6530

Dated: November 2, 2018

---

[1] The debtors in these jointly administered Chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are Cashman Equipment Corp. (7969), Cashman Scrap & Salvage, LLC (6088), Servicio Marina Superior, LLC (6919), Mystic Adventure Sails, LLC (2137) and Cashman Canada, Inc. (1296).

# I.    INTRODUCTION

Pursuant to Section 1125 of the Bankruptcy Code,[2] Cashman Equipment Corporation, Cashman Scrap & Salvage, LLC, Servicio Marina Superior, LLC, Cashman Canada, Inc., Mystic Adventure Sails, LLC, and James M. Cashman (collectively the "Debtors"), each a debtor and debtor-in-possession in the Bankruptcy Cases, provide this disclosure statement (the "Disclosure Statement") to all of the Debtors' known creditors and parties in interest.  The purpose of this Disclosure Statement is to provide the information deemed necessary for creditors to make an informed decision in exercising their rights to vote on the *Modified Third Amended Joint Plan of Reorganization of Cashman Equipment Corp., Cashman Scrap & Salvage, LLC, Servicio Marina Superior, LLC, Cashman Canada, Inc., Mystic Adventure Sails, LLC, And James M. Cashman* (the "Plan") dated as of the date of this Disclosure Statement, a copy of which is attached as Exhibit A.  A summary of the Plan, the estimated claims against the Debtors and the estimated dividend is set forth below.

**The Debtors recommend that you vote to accept the Plan**.  Each creditor should, however, review the Plan and this Disclosure Statement carefully in order to determine whether or not to accept or reject the Plan based upon the creditor's independent judgment and evaluation.  The description of the Plan in this Disclosure Statement is in summary form and is qualified by reference to the actual terms and conditions of the Plan, which should be reviewed carefully before making a decision to accept or reject the Plan.

The information contained in this Disclosure Statement has been provided by the Debtors based upon the knowledge of their records, business and affairs.  Except as otherwise expressly indicated, such information has not been subject to audit or independent review.  Although great effort has been made to be accurate, neither the Debtors nor their respective professional advisors warrant the accuracy of the information contained in this Disclosure Statement.

No representations concerning the Debtors, including the value of their assets or the aggregate dollar amount of claims which may be allowed, are authorized other than as set forth in this Disclosure Statement.  Any representations, warranties or agreements made to secure acceptance or rejection of the Plan that differ from those contained in this Disclosure Statement should not be relied upon in voting on the Plan.

Any descriptions of legal principles contained in this Disclosure Statement do not constitute a legal opinion and may not be relied upon by any creditor or party in interest.  Each creditor or party in interest should consult with their own legal advisors with respect to any legal principles described in this Disclosure Statement.

This Disclosure Statement has been prepared by the Debtors to provide creditors with adequate information so that they can make an informed judgment about the Plan.  Each creditor should read this Disclosure Statement and the Plan in their entirety before voting on the Plan. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement,

---

[2] Capitalized terms not otherwise defined in this disclosure statement shall have the meanings ascribed to them in the Plan (as defined below).

and no person has been authorized to utilize any information concerning the Debtors' businesses or assets other than the information contained in this Disclosure Statement.

## II.      SUMMARY OF THE PLAN

The Allowed, non-Insider Claims will be paid primarily from the income generated by the Debtors' operations and the sale of certain of the Debtors' Vessels, and the Debtors' secured debt will be paid in full, with interest. The Plan provides for the extension and re-profiling of the Lenders' Claims while providing credit enhancement to the Lenders, in the form of an interest in the Additional Plan Lien on collateral that has equity, based on orderly liquidation values set forth in the Debtors' August, 2017 appraisals, of approximately $65 million, and an interest in the Additional Vessel Lien on the Debtors' unencumbered vessels. The Plan provides for the continued sales of Vessels, in the ordinary course of business, and the Excess Cash Payment to reduce the Debtors' leverage and accelerate the reduction of Lenders' principal balances. The Plan provides for the Debtors to retain sufficient working capital to operate their businesses and meet their Plan obligations.

In accordance with the Court's order dated August 22, 2018 [doc. no. 1020], the Debtors, the Committee and the Lenders participated in a mediation (the "Mediation") for the purposes of developing a consensual plan of reorganization. The Plan reflects the terms that the Debtors believe would result in the Committee and the Lenders supporting the Plan. The significant changes between the *First Amended Joint Plan of Reorganization of Cashman Equipment Corp., Cashman Scrap & Salvage, LLC, Servicio Marina Superior, LLC, Cashman Canada, Inc., Mystic Adventure Sails, LLC, And James M. Cashman* (filed on July 13, 2018) and the Plan (which is the Modified Third Amended Plan) are as follows:

- The interest rate for Lenders is changed to the ninety-day LIBOR rate plus five percent (5.0%) per annum.

- The cash pay interest rate is five and one-half percent (5.5%) for the first fifty-four (54) months following the Effective Date, increasing to six percent (6.0%) at month fifty-four (54), to six and one-quarter (6.25%) at month sixty (60), and to six and one-half (6.5%) at month 66.

- Interest equal to the difference between the cash pay rate and LIBOR plus five percent (5%) per annum will accrue (the "Additional Interest") and be paid on the sixth (6th) anniversary of the Effective Date, provided that, (a) 100% of the Additional Interest will be waived if the Lenders' Allowed Secured Claims are paid in full prior to fifty-four (54) months after the Effective Date, (b) sixty-two and one-half percent (62.5%) of the Additional Interest will be waived if the Lenders' Allowed Secured Claims are paid in full between fifty-four (54) and sixty months (60) after the Effective Date, and (c) forty percent (40%) of the Additional Interest will be waived if the Lenders' Allowed Secured Claims are paid in full between sixty (60) and sixty-six (66) months after the Effective Date.

- The term for the payment of the Lenders' Allowed Secured Claims is reduced from seven (7) years to six (6) years.

- If, after three (3) years following the Effective Date, the Debtors' operations meet a certain secured debt to EBITDA ratio for four (4) consecutive quarters, then the Debtors will retain an investment banker to determine whether the Debtors' obligations to the Lenders can be refinanced. Solely for the purposes of this test, EBITDA shall not include vessel sale proceeds and Floatel revenue. The Debtors shall use their reasonable best efforts to close loan refinancing on Conventional Terms.

- The covenant in the Plan relating to the minimum principal reduction of Lenders' Allowed Secured Claims is modified so that for the first two (2) years following the Effective Date, the Debtors must achieve eighty-five percent (85%) of the projected principal reduction, and for the third (3rd) to sixth (6th) year following the Effective Date, the Debtors must achieve ninety percent (90%) of the projected principal reduction.

- The Excess Cash definition is modified to reduce the measuring amount for cash from $11 million to $10 million.

- The sweep of Excess Cash is modified to occur twice a year, as opposed to once a year.

- The application of the Net Proceeds of the sale of Mortgaged Vessels is modified to provide that: (a) for the first two (2) years following the Effective Date, eighty percent (80%) of such Net Proceeds will be applied to the principal balance of the Lender's Allowed Secured Claim, and twenty percent (20%) will be applied to the monthly payments due or to become to such Lender (not to exceed four (4) months' payments); and (b) for the third (3rd) to the sixth (6th) years following the Effective Date, 100% of such Net Proceeds will be applied to the principal balance of the Lender's Allowed Secured Claim.

- Lenders will receive an interest in the Additional Vessel Lien on the Unencumbered Vessels.

- The Net Proceeds of the sale of any Unencumbered Vessels will be distributed as described in Section 6.15, below.

- The Additional Vessel Lien will be released upon the consent of two-thirds (2/3) of the Lenders (based on the principal balance of the Lenders' Allowed Claims)

- All General Unsecured Creditors will receive an interest in a Lien on the Pacwest/MARAD Vessels, which lien will be junior to existing Liens.

- The Debtors and the Committee will release the Retained Challenges against Agreed-Claim Lenders and will reach agreement with the Agreed-Claim Lenders on the amounts of their Allowed Secured Claims, including any amounts for professional fees and post-petition non-default interest.

- The Debtors and the Committee will have the right to review invoices and documentation relating to each Agreed-Claim Lenders' asserted professional fees and costs, and if the Debtors and the Committee are not satisfied with such fees and costs, the Agreed-Claim Lender must file a fee application with the Bankruptcy Court, but, in such a case, such Lender (a) will not be obligated to  be a Agreed-Claim Lender (and will reserve any rights that it may have to default interest), and (b) will not be entitled to a Pro Rata share of the $3 million Initial Payment, but will otherwise support the Conformed Plan.  Notwithstanding the foregoing, unless each Lender's claim has been fixed in an amount satisfactory to such Lender, the Lenders will not be required to support the Conformed Plan.

- The limit on the Debtors' capital expenditures is reduced from $2,000,000 to $500,000 per year, and the Debtors have covenanted not to purchase any new or used vessels until the Lenders' Allowed Secured Claims are paid in full.

- Mr. Cashman's compensation will be adjusted.

- The Lenders will have the ability to review and comment on the mechanics of the Plan and there will be one allonge that incorporates the terms of the Plan into the Loan Documents.

The Plan provides for the payment in full of all other Allowed Secured Claims, Administrative Claims, Priority Claims, Priority Tax Claims and General Unsecured Claims.

**THE DEBTORS URGE ALL CREDITORS TO VOTE TO ACCEPT THE PLAN BECAUSE IT PROVIDES A HIGHER AND MORE CERTAIN RETURN TO CREDITORS THAN THE ALTERNATIVE.**

A summary of the types of Claims and the recovery for each type of Claim follows.  All Classes of claims and Equity Interests with respect to each Debtor are separately classified in their own distinct sub-classes, sub-class A for CEC, sub-class B for SMS, sub-class C for CSS, sub-class D for CCI, sub-class E for Mystic, and sub-class F for JMC.  Each sub-class shall constitute a separate class within the meaning of Section 1122 of the Bankruptcy Code.  A Claim is placed in a particular Class for the purpose of voting on the Plan, and only to the extent that such Claim is Allowed for voting purposes in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.  For the purposes of the Allowance of and distributions to Allowed Claims under the Plan, Section 6.2(a) of the Plan provides for the consolidation of the Debtors such that creditors with multiple Claims for the same obligations will receive only one Allowed Claim under the Plan.  Each impaired sub-class of claims is entitled to vote on the Plan.  Nothing in the Plan is intended to effectuate a substantive consolidation of the Debtors or their Estates.

| Type of Claim | Estimated Amount of Claim as of Petition Date | Plan Recovery | Voting Status |
|---|---|---|---|
| Administrative Claims | N/A | Paid in the ordinary course of business | N/A |
| Professional Fee Claims | N/A | Paid in full | N/A |
| Priority Tax Claims | $190,000.00 | Paid in full | N/A |
| Class 1 A Banc of America Leasing Secured Claims | $12,210,607.57 | Paid in full | Impaired |
| Class 2 A Bollinger Ameila Repair, LLC Secured Claims | $15,500.00 | Paid in full | Impaired |
| Class 3 A Bollinger Morgan City, LLC Secured Claims | $500.00 | Paid in full | Impaired |
| Class 4 F Chase Bank Secured Claims | $222,000.00 | Reinstated and paid in full | Unimpaired |
| Class 5 A – C Citizens Asset Finance Secured Claims | $13,952,207.65 | Paid in full | Impaired |
| Class 6 A Equitable Bank Secured Claims | $1,149,911.34 | Paid in full | Impaired |
| Class 7 A Fifth Third Bank Secured Claims | $4,069,697.36 | Paid in full | Impaired |
| Class 8 A Great American Ins. Company Secured Claims | $158,000.00 | Paid in full | Impaired |
| Class 9 A – C Key Bank Secured Claims | $6,440,126.15 | Paid in full | Impaired |
| Class 10 A Kim Marine Documentation, Inc. Secured Claims | $3,130.00 | Paid in full | Impaired |
| Class 11 A MARAD Secured Claims | $1,745,000.00 | Paid in full | Impaired |
| Class 12 A Norton Rose Fulbright, LLP Secured Claims | $319,000.00 | Paid in full | Impaired |
| Class 13 A Pacific West Bank Secured Claims | $688,362.70 | Paid in full | Impaired |

| | | | |
|---|---|---|---|
| Class 14 A Poseidon International, Ltd. Secured Claims | $33,000.00 | Paid in full | Impaired |
| Class 15 A, C Radius Bank Secured Claims | $4,187,905.83 | Paid in full | Impaired |
| Class 16 A – F Rockland Trust Company Secured Claims | $47,671,782.13 | Paid in full | Impaired |
| Class 17 A, B, E, F Santander Bank Secured Claims | $26,869,190.16 | Paid in full | Impaired |
| Class 18 A Starboard Yacht Group LLC Secured Claims | $4,110.00 | Paid in full | Impaired |
| Class 19 A – E Starr Indemnity & Liability Secured Claims | $560,000.00 | Paid in full | Impaired |
| Class 20 A US Bank N.A. Secured Claims | $2,384,457.01 | Paid in full | Impaired |
| Class 21 A Wells Fargo Equipment Finance, Inc. Secured Claims | $22,473,173.93 | Paid in full | Impaired |
| Class 22 A – F Priority Claims | $500,000.00 | Paid in full | Unimpaired |
| Class 23 A Cardi Claims | Unknown | Paid in full with interest at a rate of five percent (5.00%) per annum over ten years | Impaired |
| Class 24 A Western Surety Claims | Unknown | Paid in full with interest at a rate of five percent (5.00%) per annum over ten years | Impaired |
| Class 25 A BP Claims | $7,200,000.00 | Paid in full | Impaired |
| Class 26 A – F General Unsecured Claims | $5,500,000.00[3] | Paid in full with interest at a rate of five percent (5.00%) per annum over ten years | Impaired |

---

[3] This figure is net of guaranty claims and disputed litigation claims, which are described in detail in Section 4.3(F) below.

| Class 27 A – F Convenience Class Claims | $246,000.00<br><br>(subject to election by creditors) | Lesser of 75% of Allowed Claim or $3,750 | Impaired |
|---|---|---|---|
| Class 28 A – E Equity Interests | N/A | Retention of Equity Interests | Impaired |

Because the Lenders are classified and treated as fully secured creditors and will receive the payment in full of their Allowed Secured Claims, the Lenders will be entitled to vote as secured creditors and not as unsecured creditors.  The description of the Claims and estimation of the recoveries set forth above does not constitute an admission that the claims are Allowed Claims.  The balances set forth above for Lenders are based on the amounts acknowledged to be owed to the Lenders as of the Petition Date, and do not include claims by the Lenders for default interest, attorneys' fees and costs.  The Plan recovery is a projection and the Debtors reserve all of their rights, claims and defenses with respect to any and all Claims.

## III.      INFORMATION ABOUT THE REORGANIZATION PROCESS

### 3.1      Purpose Of Disclosure Statement

This Disclosure Statement includes background information about the Debtors and also identifies the classes into which creditors have been placed by the Plan.  The Disclosure Statement describes the proposed treatment of each of those classes if the Plan is confirmed.  In addition, this Disclosure Statement contains information concerning the prospects for creditors in the event of confirmation or, in the alternative, the prospects if confirmation is denied or the proposed Plan does not become effective.

Upon approval by the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code, this Disclosure Statement and any exhibits will have been found to contain adequate information of a kind and in sufficient detail that would enable reasonable, hypothetical investor typical of a holder of impaired claims or interests to make an informed judgment about the Plan.  Approval of this Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

### 3.2      Voting Procedure

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating, signing and causing the Ballot Form accompanying this Disclosure Statement to be returned to the following address in the enclosed envelope:

Ethan Jeffery<br>
Murphy & King, Professional Corporation<br>
One Beacon Street<br>
Boston, MA  02108

Ballots must be received **on or before 5:00 P.M. (Eastern Daylight Savings Time) on
_____, 2018** to be counted in the voting.  Ballots received after this time will not be
counted in the voting unless the Bankruptcy Court so orders.

### 3.3    Ballots

Accompanying this Disclosure Statement is a ballot for acceptance or rejection of the
Plan (a "Ballot").  Each party in interest entitled to vote on the Plan will receive a Ballot.  All
Classes except Class 4F (Chase Bank Secured Claim) and Classes 29 A – E (Equity Interests) are
impaired and may vote on the Plan.  Each member of a voting Class will be asked to vote for
acceptance or rejection of the Plan.  A party who holds claims in more than one Class should
complete a Ballot for each Class with respect to the applicable portion of its claim included in
each Class.

### 3.4    The Confirmation Hearing

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan to commence
on _____, 2018 at __:__ _.m., or as soon thereafter as the parties can be heard.
The Confirmation Hearing will be held before the Honorable Melvin S. Hoffman, United States
Bankruptcy Judge, Courtroom 2, 12th Floor, 5 Post Office Square, Boston, Massachusetts,
02109.  At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the various
requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the
best interests of holders of claims and interests.  The Bankruptcy Court will also receive and
consider a report of plan voting prepared by the Debtors and summarizing the votes for
acceptance or rejection of the Plan by the parties entitled to vote.

### 3.5    Acceptances Necessary to Confirm Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things,
whether each impaired Class has accepted the Plan.  Under Section 1126 of the Bankruptcy
Code, an impaired Class is deemed to have accepted the Plan if at least 2/3 in amount and more
than 1/2 in number of the Allowed Claims of Class members who have voted to accept or reject
the Plan have voted for acceptance of the Plan.  Unless there is acceptance of the Plan by all
members of an impaired Class, the Bankruptcy Court must also determine that Class members
will receive under the Plan property of a value, as of the Effective Date, that is not less than the
amount that such Class members would receive or retain if the Debtors were liquidated under
Chapter 7 of the Bankruptcy Code on the Effective Date.

Section 7.2 of the Plan provides, in part: "If a Class contains Claims or Interests eligible
to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject
the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted
the Plan."  Such "deemed acceptance" by an impaired class in which no class members submit
ballots satisfies section 1129(a)(10) of the Bankruptcy Code.  *See In re Ruti-Sweetwater, Inc.,*
836 F.2d 1263 (10th Cir. 1988); *In re Adelphia Communications Corp.,* 368 B.R. 140, 260-262
(Bankr. S.D.N.Y. 2007).  Certain of the Lenders dispute that such deemed acceptance satisfies
section 1129(a)(10) of the Bankruptcy Code.

**3.6     Confirmation of The Plan Without The Necessary Acceptances.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

**A.     No Unfair Discrimination.**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of creditors differently without unfairly discriminating against either class.

**B.     Fair and Equitable Test.**

The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes may reject the Plan.  There is no Class receiving more than a 100 percent recovery.

(1)     Secured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to

another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

      (2)    <u>Unsecured Claims</u>.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property unless the junior class provides "new value" or other consideration to the Debtors.  If the class of unsecured claims accepts the Plan, then there is no prohibition on a junior claim or junior receiving or retaining property under the Plan.  Creditors with Secured Claims do not have standing to assert that a plan's treatment is not fair and equitable to unsecured creditors.

      (3)    <u>Interests</u>.

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; (ii) the value of such interest; or (iii) if the class does not receive the amount as required under (i) no class of interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors may, at their option, choose to rely on Section 1129(b) to seek confirmation of the Plan if it is not accepted by all impaired Classes of Creditors.

## IV.   GENERAL INFORMATION

### 4.1   Description of the Debtors

### A.   The Debtors' Businesses

The Debtors specialize in the charter and sale of ocean going and inland barges and tugboats servicing the marine construction, oil and gas, scrap and salvage and marine remediation industries worldwide.  The Debtors' operations also include heavy marine construction, dredging, pile driving, concrete work, pier and dock construction, bridge construction, shore protection, demolition, oil spill and other marine remediation work, and marine salvage work.

Beginning with CEC, which was formed in 1995 with a fleet of only ten (10) barges servicing the New England construction industry, the Debtors expanded their fleet of equipment to include over 150 vessels. The Debtors' fleet (the "Fleet") currently consists of 120 vessels, consisting of thirty (30) inland/coastal barges, seventy-nine (79) ocean going barges, seven (7) tug/push boats, two (2) floating hotels (the "Floatels"), one (1) sectional construction barge, one (1) three-masted schooner, and various items of general and specialized construction equipment, including cranes and related construction equipment and marine pollution and clean-up equipment. The Fleet's barges include inland and ocean going barges ranging in size from 120 to 400 feet in length, of which fifty-four (54) are documented under the Jones Act. Nearly seventy-five (75%) of the Fleet barges are less than fourteen (14) years old, and can be retrofitted to accommodate the unique project needs of customers across the public and private sectors and a variety of industries. For example, following hurricane Maria, the Debtors retro-fitted a barge with modular living units to create a temporary Floatel to address the demand for living quarters in Puerto Rico. CEC is one of the largest owner/operators of offshore barges in the world.

The Debtors provide services in and maintain, or have maintained, vessels on the U.S. East Coast and Gulf of Mexico, Mexico, Singapore, Australia, the Persian Gulf, West Africa, the Caspian Sea and South and Central America. Due to the size and versatility of the Fleet, the Debtors are able to deploy vessels and service customers across the world. CEC currently has barges based in Africa, Indonesia, Korea, the Middle East, Mexico, Singapore and the states of Louisiana, New Jersey, South Carolina, Virginia, Florida, Massachusetts and New York. CCI's barges are based in Canada.

The Debtors' primary source of revenue is the charter of the vessels and equipment in the Fleet, with secondary revenue sources consisting of vessel and equipment sales and its construction contracting business. The Debtors' operations are integrated, with CEC providing administrative functions for each of the Debtors, CSS providing repair and maintenance services for the Fleet, SMS providing tug and tow services and CCI and Mystic owning discrete assets. The tugs and the three-masted schooner were laid-up prior to the Petition Date, and the Debtors do not currently have plans to utilize those vessels.

The length of CEC's barge charters runs from daily, to monthly, to, in some instances, more than a year, with daily charter rates between $300 and $3,000 per day, excluding the Floatels. Once a barge is on charter, the party chartering the barge covers the costs of operating the barge, including crew costs, dock and harbor fees, pilotage and insurance. The charter and sale of vessels is accomplished by utilizing Mr. Cashman's extensive industry network.

## B.    The Debtors

CEC, a Massachusetts corporation, was formed in 1995 and currently employs nineteen (19) people, all of whom are based in the United States. CEC is headquartered in Braintree, Massachusetts, and owns 109 of the vessels in the Fleet, as well as other equipment utilized in its operations. In addition to chartering and managing the Fleet, CEC has provided marine and general (heavy civil) construction services. CSS, a Louisiana limited liability company, was formed in 2003 and currently employs five (5) people, all of whom are based in the United States. CSS operations are located in Louisiana and consist of managing the repair and

maintenance yard utilized by CEC to maintain the Fleet.  CSS also provides the Debtors with scrapping and salvaging services for vessels and equipment, and provides waterfront facilities for logistical support.

SMS, a Louisiana limited liability company, was formed in 2006 and currently employs two (2) people based in the United States.  SMS owns seven (7) tug/push boats in the Fleet. SMS historically provided towing and heavy haul services, primarily to the off shore drilling industry in the Gulf of Mexico and in Southeast Asia.  CCI is a Canadian corporation that owns and operates three (3) of the barges in the Fleet.  Mystic is a Massachusetts limited liability company whose sole asset is an ocean-going three-masted sailing schooner called the *Mystic* (the "Schooner").

James M. Cashman ("Mr. Cashman") is the president, treasurer and secretary of CEC, and the manager of the other Debtors.  Other members of the senior management team include Raymond Riddle, senior vice president of Administration and Finance, Daniel Schwall, senior vice president, and Daniel Hudnall, senior vice president.  The Debtors will retain their senior management.  Following the Effective Date, the salaries for senior management will be set in accordance with the Debtors' customary pre-petition levels, including the payment of bonuses, as will be more fully described in the Plan Supplement.  Following the Petition Date, Mr. Cashman's salary will be $1,200,000 per year, with a bonus of $250,000 if the Debtors exceed the projected reduction in the principal balance of the Allowed Agreed-Claim Lenders' Secured Claims, and a bonus based on a percentage of Vessel sales.  In the event of Mr. Cashman's death or incapacity, an executive committee consisting of Raymond Riddle, Daniel Schwall and Daniel Hudnall will manage the Debtors' operations until they can select a new chief executive officer for the Debtors.

The holders of the equity interests in CEC are Mr. Cashman (64%), the Ashly Cashman 2012 Irrevocable Trust (18%) and the Casey Cashman 2012 Irrevocable Trust (18%).  Mr. Cashman is the sole holder of the equity interests in CSS.  The James M. Cashman Insurance Trust is the sole equity holder of SMS.  CEC is the sole holder of the equity interests in CCI, and SMS is the sole holder of the equity interests in Mystic.

## C.      The Prepetition Financing

As of the Petition Date, CEC and SMS had borrowed money from twelve financial institutions as follows (collectively the "Lenders"): (i) Rockland Trust Company ("RTC"); (ii) Santander Bank, N.A. ("Santander"); (iii) Wells Fargo Equipment Finance, Inc. ("Wells"); (iv) Citizens Asset Finance, Inc. ("Citizens"); (v) U.S. Bank, National Association, acting through its division, U.S. Bank Equipment Finance ("U.S. Bank"); (vi) Key Equipment Finance, a division of KeyBank National Association ("Key"); (vii) Fifth Third Bank ("Fifth Third"); (viii) Radius Bank ("Radius"); (ix) Pacific Western Bank ("PacWest"); (x) Equitable Bank ("Equitable"); (xi) Banc of America Leasing and Capital, LLC ("B of A"); and (xii) the U.S. Secretary of Transportation acting through the U.S. Maritime Administration ("MARAD").

The loans from the Lenders were used to finance the acquisition and construction of new Fleet vessels, to refinance prior debt, and to support general working capital needs.  The

aggregate amount owed by the Lenders as of the Petition Date was approximately $143,845,000. All of the Debtors have guaranteed some or all of the Lenders' indebtedness.[4] The Debtors granted liens on certain of their vessels and other assets to secure the amounts borrowed from the Lenders and/or their guarantees of the amounts borrowed. Mr. Cashman executed guaranties of CEC's and SMS' obligations to all of the Lenders except for MARAD. A more detailed description of the Lenders' claims and liens is set forth in Section 4.3(A), below.

### D.    Events Precipitating The Bankruptcy Cases

The Debtors' current financial issues are due to the unprecedented and prolonged downturn in the oil and gas industry. Between the beginning of 2015 and October 31, 2017, a total of 134 North American oil and gas producers filed bankruptcy proceedings involving approximately $80 billion in debt. Companies, such as the Debtors, who supply services to the oil and gas industry, were not immune to the financial distress in the oil and gas industry. *See, e.g.*, Chapter 11 bankruptcy filings by Seadrill Limited, Ocean Rig UDW Inc., CGG Holding, Vantage Drilling Co., Paragon Offshore plc, Tidewater, Inc., and Montco Offshore, Inc. While material drops in the price of oil do occur, historically the price of oil has rebounded in a period of eight (8) to (9) months. The drop in the price of oil that started in 2015 was unusual both because of the long time it took to rebound – approximately two and one-half (2.5) years – and the extent of the drop in prices, which had not occurred for approximately twenty (20) years.

In recent years, a substantial portion of the Debtors' revenue was derived from the sale and charter of vessels to companies involved in the exploration for and development of oil and gas assets, as well as oil clean up and related petroleum projects. In 2014 and 2015, the Debtors generated revenue from the charter and sale of vessels of approximately $75.2 and $75.3 million, respectively. In 2016 and 2017, as a result of the downturn in the oil and gas industry, the Debtors' revenue from the charter and sale of vessels was approximately $44.1 million and $32.5 million, respectively.

Prior to the Petition Date, the Debtors engaged in extensive discussions with the Lenders in an attempt to reach an out-of-court restructuring. While some progress was made, the Lenders and the Debtors were not able to finalize an out-of-court arrangement and, when one of the Lenders filed suit against the Debtors and requested an attachment of the Debtors' assets, including its bank accounts, the Debtors filed these Chapter 11 cases to preserve their assets and their ability to restructure their indebtedness.

### 4.2    The Debtors' Assets[5]

CEC's tangible assets include, without limitation, (a) 106 ocean going and inland/coastal barges, including deck barges, spud barges and hopper barges, (b) two Floatels; (c) one (1) sectional barge, (d) approximately fifteen (15) cranes, primarily consisting of crawler cranes, (e)

---

[4] The following non-debtor affiliates have also guaranteed some of the obligations to the Lenders: (a) Cashman Consulting, Singapore, Pte Ltd., (b) CHM Maritime, SAPI de CV, and (c) Cashman Caspian, LLP (collectively the "Non-Debtor Guarantors").

[5] The Debtors have not included inter-Debtor claims in the description of their assets. These claims are discussed in Section 4.3(F), below.

various items of other marine and construction equipment, including generators, anchors, pumps, welding equipment, air compressors, and various tools; (f) an inventory of parts used to maintain the Fleet and CEC's other equipment; and (g) office furniture and equipment. CEC's intangible assets consist of accounts receivable, amounts due from Affiliates, cash and its equity interests in CCI.

CSS's tangible assets consist of various items of equipment and tools used to maintain the Fleet and the marine scrap and salvage operations, and nominal cash. SMS's tangible assets consist of seven (7) tug/push boats and miscellaneous equipment. SMS's intangible assets consist of its equity interests in Mystic and nominal cash. CCI's assets consist of three (3) barges, accounts receivable and cash. Mystic's sole asset is the Schooner.

As of the Petition Date there were liens on some, but not all, of the Debtors' vessels. In order to obtain a lien on a flagged vessel, a lender must record a vessel mortgage in the jurisdiction in which the vessel is flagged.[6] The Debtors and certain of the Lenders disagree as to the extent, priority and validity of the Lenders' liens on charter revenue. As of the Petition Date, the Debtor owned seventeen (17) vessels that were unencumbered by vessel mortgage liens (collectively the "Unencumbered Vessels"), and the Debtors may own other assets that are unencumbered.

In August of 2017, the Debtors obtained appraisals (collectively the "Appraisals") for the vessels in the Fleet and certain equipment. The Appraisals were filed with the Court.[7] Based on the Appraisals, the aggregate fair market value of the vessels and certain equipment is approximately $307,788,000, and the orderly liquidation value of those assets, including the Unencumbered Vessels, is approximately $237,661,000. Based on the Appraisals, the aggregate fair market value of the Unencumbered Vessels is approximately $28,340,000, and the orderly liquidation value of those assets is approximately $22,120,000. The Debtors do not believe that the value of the Fleet has declined since August of 2017. The Debtors have not commissioned new appraisals of the Fleet.

Mr. Cashman's principal assets consist of: (a) a single family home in Dennis, Massachusetts, (b) a single family home in Milton, Massachusetts, (c) undeveloped lots in Milton Massachusetts and Barataria, Louisiana, (d) a 1938 Packard, (e) cash, (f) an individual retirement account, (g) equity interests in various of the Debtors and in non-debtor entities, and (h) various other items of personal property detailed in Mr. Cashman's Schedules. According to Mr. Cashman's Schedules and based on his opinion, his interest in real estate had an aggregate value of approximately $6,814,000 on the Petition Date, subject to various mortgages securing both direct loans to Mr. Cashman and Mr. Cashman's guaranties of the Lenders' Claims against the Debtors, which in the aggregate exceed the value of such real estate.

---

[6] In order to obtain a lien on the charter revenue generated by a flagged vessel, a lender must have a separate grant of the charter revenue – a mortgage on the vessel is not, by itself, sufficient to create a lien on the vessels' charter revenue. Not all of the Lenders have liens on charter revenue from the vessels against which they assert vessel mortgages.

[7] Redacted versions of the Appraisals that do not include the values for the Fleet were filed of record, and un-redacted versions were filed with the Court under seal and provided to the Office of the United States Trustee, the Lenders and counsel for the Committee.

Over a period of years, CEC and SMS made loans to affiliates.  RTC asserts a lien on the amounts due from the affiliates.  The amounts due from the affiliates are as follows:

| Affiliate | CEC | SMS |
|---|---|---|
| CEC VI-STTCondos | $    677,580.00 | |
| Insurance Trust | $    951,040.00 | $   1,025,610.00 |
| Bayou Villa Holdings | $   2,121,487.00 | |
| Cashley Trust Dartmouth | $    106,347.00 | |
| The Ashly Cashman Trust | $    248,685.00 | |
| The Casey Cashman Trust | $    248,686.00 | |
| Cashman B Cabot LLC | $   1,255,621.00 | |
| Totals | $   5,609,447.00 | $   1,025,610.00 |

In the Projections, the Debtors estimate that they will recover approximately $4.0 million on account of the loans to the affiliates, approximately $1.0 million per year following the Effective Date from the sales of real estate and other assets owned by the affiliates.  The amounts owed by the Insurance Trust will be paid in full if and when the trust receives death benefits arising from its insurance policies.

### 4.3    The Debtors' Liabilities[8]

Upon a motion by the Debtors, the Court entered an order establishing December 22, 2017 (the "Bar Date"), as the date by which all parties must file proofs of claim against the Debtors.  The description of the Claims in this Disclosure Statement is based on the Debtors' respective Schedules and the proofs of claim filed by creditors on or before the Bar Date.  The Plan provides that any claims asserted by Insiders will not receive payment until all non-Insider Allowed Claims have been paid in accordance with the Plan.

### A.    Lenders' Claims

The Debtors' financing for the acquisition of vessels, the refinance of existing obligations, and for general working capital purposes, was provided by the Lenders through a series of separate loans over a period of many years.  In conjunction with the entry of the *Eighth Interim Order Granting (1) Use of Cash Collateral, (2) Replacement Liens, (3) Additional Adequate Protection, And (4) Other Relief* (the "Eighth Cash Collateral Order") [doc. no. 546], the Debtors acknowledged the amount of principal and non-default interest owed to certain of the Lenders as of the Petition Date.  MARAD's Claims have not been acknowledged by the Debtors.  The amounts acknowledged are as follows:

---

[8] The Debtors' description of the claims set forth in this section of the Disclosure Statement does not constitute an admission that the claims are Allowed Claims.  The Debtors reserve all of their rights, claims and defenses with respect to any and all claims and/or any liens asserted to secure such claims.

| Lender | Principal as of 6/9/17 | Accrued Contract Int. as of 6/9/17 | Total P+I as of 6/9/17 |
|---|---|---|---|
| Fifth Third Bank | $ 4,010,000.00 | $ 59,697.36 | $ 4,069,697.36 |
| Banc of America Leasing | $ 12,125,000.36 | $ 85,607.21 | $ 12,210,607.57 |
| Citizens Asset Finance | $ 13,813,408.93 | $ 138,798.72 | $ 13,952,207.65 |
| Key Bank | $ 6,348,082.20 | $ 92,043.95 | $ 6,440,126.15 |
| Pacific West Bank | $ 684,999.96 | $ 3,362.74 | $ 688,362.70 |
| Radius Bank | $ 4,170,451.63 | $ 17,454.20 | $ 4,187,905.83 |
| Rockland Trust Company | $ 47,235,463.97 | $ 436,318.16 | $ 47,671,782.13 |
| Santander Bank | $ 26,597,122.28 | $ 272,067.88 | $ 26,869,190.16 |
| US Bank | $ 2,292,000.00 | $ 92,457.01 | $ 2,384,457.01 |
| Wells Fargo | $ 22,190,836.27 | $ 282,337.66 | $ 22,473,173.93 |
| Equitable Bank | $ 1,137,708.25 | $ 12,203.09 | $ 1,149,911.34 |
| Totals | $ 140,605,073.85 | $ 1,492,347.98 | $ 142,097,421.83 |

The Lenders have reserved the right to assert claims for higher amounts than those acknowledged by the Debtors to be due as of the Petition Date.  As of the date of this Disclosure Statement, the following Lenders have filed proofs of claim asserting the following amounts:

| Lender | Amount Asserted in Filed Proof of Claim |
|---|---|
| Fifth Third Bank | $4,277,021.15 |
| Banc of America Leasing | $12,635,900.50 |
| Citizens Asset Finance | $14,035,175.45 |
| Key Bank | $6,823,076.01 |
| Pacific West Bank | $972,802.02 |
| Radius Bank | $4,161,415.91 |
| Rockland Trust Company | $47,235,463.97 |
| Santander Bank | $27,298,717.66 |
| US Bank | $2,882,842.29 |
| Wells Fargo | $24,057,180.11 |
| Equitable Bank | $1,161,280.09 |
| MARAD | $1,744,557.39 |
| Total | $147,285,432.55 |

Attached to the Plan as Exhibit 3 is a schedule of which Lenders have liens on which vessels and certain items of equipment, as well as which vessels are unencumbered.  Pursuant to the Eighth Cash Collateral Order, the Debtors acknowledged the validity of the liens listed on Exhibit 3 to the Plan (other than MARAD's Liens).  Based on the Appraisals, Key Bank, US Bank and Equitable may not be entitled to post-petition interest, charges and attorneys' fees pursuant to Section 506(b) of the Bankruptcy Code.  The Debtors reserve all of their rights, claims and defenses in this respect.

Certain of the Lenders have asserted, pursuant to Section 506(b) of the Bankruptcy Code, the right to recover post-petition interest, at their respective default rates, charges and attorneys' fees and costs.  Pursuant to the cash collateral order entered by the Bankruptcy Court on January 17, 2018 [doc. no. 680], the Debtor paid all of the Lenders except Santander their contract interest for the period between December 1, 2017 and April 30, 2018, in exchange for which those Lenders waived their claims to default interest for that period of time.  Pursuant to the cash collateral order entered by the Bankruptcy Court on August 21, 2018 [doc. no. 1021], the Debtors are authorized to continue, through October 31, 2018, payments of contract interest to any Lender who agrees to waive its claim for default interest for the period covered by the payments.  The Debtors expect that, as a result of these orders, all of the Lenders' claims for default interest (other than MARAD's Claim) for the period between December 1, 2017 and the Confirmation Date will be waived.  For the period between the Petition Date and November 30, 2017, the Debtors estimate that the amount of default interest, exclusive of contract interest, for each Lender who may be entitled to receive post-petition interest is as follows:

| Lender | Default Interest |
|---|---|
| RTC | $ 1,573,967.90 |
| Radius | $ 65,075.98 |
| Santander | $ 633,961.26 |
| Citizens | $ 922,244.85 |
| Equitable | $ - |
| BofA | $ 751,614.47 |
| MARAD | $ - |
| Wells Fargo | $ 1,358,896.44 |
| Pac West | $ 42,234.78 |
| 5th3rd | $ 240,042.77 |
| Total | $ 5,588,038.46 |

The Bankruptcy Court will establish a bar date for the assertion of claims under Section 506(b) of the Bankruptcy Code.  The Lenders have provided the Debtors with invoices for their professional fees and costs incurred through August 31, 2018 (and in some instances through September 30, 2018), as well as estimates for their professional fees and costs between August 31, 2018 and the Effective Date, for which they intend to seek recovery under Section 506(b) of the Bankruptcy Code.  The Debtors are currently reviewing the Lenders' invoices and reserve all of their rights, claims and defenses with respect to the Lenders' Claims for the recovery of professional fees and costs.  A summary of the Lenders' professional fees and costs follows:

| Lender | Professional Fees to 8/31/18 | Estimate to 12/31/18 | Total |
|---|---|---|---|
| RTC | $ 4,649,979 | $ 550,000 | $5,199,979 |
| Santander | $ 564,440 | $ 152,500 | $ 716,940 |
| Wells | $ 159,500 | $ 46,500 | $ 206,000 |
| Citizens | $ 352,126 | $ 40,000 | $ 392,126 |
| US Bank | $ 89,736 | $ 20,000 | $ 109,736 |
| Key | $ 211,007 | $ 18,000 | $ 229,007 |
| Fifth Third | $ 233,181 | $ 25,000 | $ 258,181 |
| Radius | $ 136,000 | $ 20,000 | $ 156,000 |
| PacWest | $ 56,144 | $ 24,000 | $ 80,144 |
| Equitable | $ 53,157 | $ 45,000 | $ 98,157 |
| B of A | $ 445,000 | $ 125,000 | $ 570,000 |
| MARAD | $ 50,799 | $ - | $ 50,799 |
| Totals | $ 7,001,069 | $ 1,066,000 | $8,067,069 |

From the entry of the Sale Order (as defined below), the Debtors have sold twenty-seven (27) Vessels with purchase prices aggregating approximately $7.670 million, and have paid not less than eighty-five percent (85%) of the net proceeds of those sales to Lenders with Liens on the Vessels.

Subject to the Retained Challenges (as defined below), the Debtors have acknowledged that the Lenders (other than MARAD) have valid Liens on the Mortgaged Vessels and certain Equipment (as detailed in Exhibit 3 to the Plan). RTC asserts liens on all personal property owned by the Debtors (other than Mr. Cashman), subject to certain subordination agreements. As of the Petition Date, the Lenders had liens, in the aggregate, on cash of approximately $3,551,000 and on approximately $2,445,000 of accounts receivable, aged less than 120 days and net of uncollectible receivables. Pursuant to the cash collateral orders entered by the Bankruptcy Court, the Lenders were granted replacement liens on post-petition cash and accounts receivable to secure any diminution in a Lender's interest in cash collateral. A chart detailing the Debtors' estimates of the Lenders' respective interests in Cash Collateral as of the Petition Date follows.

| Lender | Approx. Interest in Cash | Approx. Interest in A/R | Total Approx. Interest in Cash Collateral |
|---|---|---|---|
| Fifth Third Bank | $          9,000.00 | $          58,000.00 | $          67,000.00 |
| BofA | $        50,000.00 | $        398,000.00 | $        448,000.00 |
| Citizens | $      139,000.00 | $        376,000.00 | $        515,000.00 |
| Key Bank | $                  - | $                  - | $                  - |
| MARAD | $        83,000.00 | $        108,000.00 | $        191,000.00 |
| Pacific West Bank | $        21,000.00 | $        114,000.00 | $        135,000.00 |
| Radius Bank | $        83,000.00 | $        266,000.00 | $        349,000.00 |
| RTC | $    1,971,000.00 | $        355,000.00 | $    2,326,000.00 |
| Santander | $    1,139,000.00 | $        179,000.00 | $    1,318,000.00 |
| US Bank | $                  - | $        173,000.00 | $        173,000.00 |
| Wells Fargo | $        56,000.00 | $        361,000.00 | $        417,000.00 |
| Equitable Bank | $                  - | $          57,000.00 | $          57,000.00 |
| Totals | $    3,551,000.00 | $    2,445,000.00 | $    5,996,000.00 |

The Debtors' acknowledgment of the Lenders' Claims and Liens was subject to certain retained challenges to those Claims and Liens (collectively the "Retained Challenges") asserted by both the Debtors and the Committee. The Retained Challenges are set forth on Exhibit B to this Disclosure Statement, provided that the Committee has waived its right to challenge RTC's lien on the vessels owned by CCI. The Lenders dispute the Retained Challenges and have indicated that they would object to the Committee being granted standing to assert the Retained Challenges. In conjunction with the Mediation, the Debtors and the Committee have agreed to waive any Retained Challenges against Agreed-Claim Lenders as of the Effective Date. The Debtors have not quantified the value of the Retained Challenges.

RTC and Santander have asserted liens on funds (the "Micoperi Funds") recovered pre-petition on account of an arbitration award against Micoperi SRL. Assuming that both RTC and Santander had valid and perfected liens on the Micoperi Funds, those funds constitute cash collateral and the Debtors intend to utilize such funds under the Plan. RTC and/or Santander may contend otherwise.

CEC and Wilmington Trust Company, not in its individual capacity, but solely in its capacity as indenture trustee (the "Indenture Trustee") were parties to certain trust indentures dated as of December 4, 1997 (the "1997 Indenture") and April 14, 1999 (the "1999 Indenture", and together with the 1997 Indenture, the "Indentures"). As provided in the Indentures and related governing documents, MARAD guaranteed CEC's obligations under the Indentures. The Indenture Trustee alleges that CEC defaulted on the Indentures by failing to make the May 15, 2017 payment due on the 1997 Indenture and failing to pay the 1999 Indenture following the bankruptcy filings. The Indenture Trustee has stated that MARAD, by letter dated July 10, 2017 authorized payment from the Credit Reform Financing Account to the Indenture Trustee for all unpaid interest and outstanding principal balance of the 1999 Indenture and previously authorized payment of the 1997 Indenture and thereafter paid the outstanding principal balance plus unpaid interest due on both Indentures. The Indenture Trustee has asserted a claim for unpaid fees and expenses, including attorneys' fees and expenses alleged due under the

Indentures and asserts that the Indentures have not been satisfied and discharged in compliance with the provisions of the Indentures.  The Debtors reserve all of their rights, claims and defenses with respect to any claim asserted pursuant to the Indentures and their related agreements.  Pursuant to Article IX of the Plan and specifically section 9.4 (Cancellation of Existing Indebtedness and Liens) of the Plan, on the Effective Date, the Indentures shall be deemed satisfied and discharged, without further action of the parties, including without limitation, compliance with Article 12 of the Indentures requiring the parties to execute certain instruments and documents, including delivery of an Officer's Certificate and Opinion of Counsel.

Mr. Cashman executed guaranties of CEC's and SMS' obligations to all of the Lenders except for MARAD.  Santander asserts a second mortgage on certain of Mr. Cashman's real properties to secure Mr. Cashman's respective guaranties of the corporate Debtors' obligations to Santander.  Mr. Cashman guarantied the obligations of Bayou Villars Holdings, LLC, an affiliate of the Debtors, to RTC.  Mr. Cashman acknowledged the validity of certain of his guaranties to RTC in the Eighth Cash Collateral Order.

## B.    Other Secured Claims

Various creditors have asserted maritime liens, against specific vessels, to secure their claims against the Debtors.  The creditors asserting maritime liens are as follows:

| Creditor | Claim Amount | Vessel |
|---|---|---|
| Bollinger Ameila Repair, LLC | $ 15,447.00 | Atlas, JMC 261 & 266 |
| Bollinger Morgan City, LLC | $ 470.00 | Miss Molly & Atlas |
| Kim Marine Documentation, Inc. | $ 3,136.00 | JMC 3339, 3340 & 3341 |
| Portland Tugboat, LLC | See below | See below |
| Poseidon International, Ltd. | $ 33,000.00 | JMC 3011, 3012 & 3013 |
| Starboard Yacht Group LLC | $ 4,110.79 | Mystic |
| Starr Indemnity & Liability/Great American Insurance | See below | See below |

CEC sold the JMC 157 prior to the Petition Date, and Portland Tug, LLC, which asserts a maritime lien only on the JMC 157, does not have a maritime lien on any vessel owned by the Debtors, and any claim held by Portland Tug, LLC will therefore be treated as a General Unsecured Claim.  Poseidon International's claim of $33,000 consists of three $11,000 claims against each of the JMC 3011, the JMC 3012 and the JMC 3013, and is for tackle and other goods supplied to those barges.

Starr Indemnity & Liability ("Starr") and Great American Insurance ("GAI", and together with Starr the "Insurers") provided the Debtors with insurance for their vessels and equipment prior to the Petition Date through December 31, 2017.  On September 27, 2017, the Debtors and the Insurers entered into a stipulation (the "Insurers Stipulation") [doc. no. 463-1] pursuant to which the Debtors agreed that the Insurers were owed, in the aggregate, $856,491.77 for calendar year 2016.  The Insurers are holding a deposit in the amount of $225,000.00 that secured these claims.  The Insurers Stipulation also provided that the Insurers hold maritime liens against all of the Debtors' vessels in the specific amounts set forth on schedules attached to the Insurers

Stipulation. A chart showing the amount of the Insurers' Claims that are secured by each Vessel is attached as Exhibit C. The Insurers Stipulation reserves the question of whether the Insurers' maritime liens are senior or junior to the Lenders' existing mortgages. Accordingly, a portion of the Insurers claim may be under-secured, and therefore treated as a General Unsecured Claim.

Norton Rose Fulbright, LLP ("Norton Rose"), a law firm, provided services to the Debtors prior to the Petition Date. Norton Rose filed a proof of claim asserting that it was owed $407,584.79 as of the Petition Date, and that it held a security retainer in the amount of $318,717.11 against that debt. To the extent Norton Rose has an Allowed Secured Claim, that secured claim will not exceed the amount of its security retainer.

Prior to the Petition Date, Mr. Cashman personally borrowed money from Chase Bank, N.A. ("Chase"), RTC and Santander, and owes approximately $560,000 to Chase, $2,390,000 to RTC, and $2,250,000 to Santander on account of those borrowings. These loans are secured by the following properties:

| Property | First Mortgage | Second Mortgage |
|---|---|---|
|  |  |  |
| 90 Countryside Lane, Milton, MA | Chase | RTC |
| 55 Parkwood Drive, Milton, MA | RTC | N/A |
| 72 Jericho Road, East Dennis, MA | Chase | Santander |

Santander's and RTC's secured claims based on money personally borrowed by Mr. Cashman are included in the JMC Secured Claims, and each is separately classified in its own class of Secured Claims under the Plan. All Liens securing the Allowed JMC Secured Claims are preserved under the Plan. All Liens against Mr. Cashman's real estate that secure Mr. Cashman's personal guaranties of the other Debtors' obligations to the Lenders are likewise preserved under the Plan.

Prior to the Petition Date, CEC borrowed money from General Electric Capital Corporation ("GECC"), and that loan was secured by, among other things, mortgages on certain of the Unencumbered Vessels. Prior to the Petition Date GECC was paid in full, but it appears that certain of GECC's mortgages on the Unencumbered Vessels were not discharged. Any lien held by GECC on any of the Debtors' assets will be discharged pursuant to the Plan.

### D.   Administrative Claims

Since the Petition Date, the Debtors have been paying their obligations in the ordinary course of business. The Debtors' and the Committee's professionals, whose claims constitute administrative claims, have been authorized to be paid ninety percent (90%) of their fees and 100% of their expenses on a monthly basis in accordance with the Bankruptcy Court's order dated September 29, 2018 (the "Interim Compensation Order")[docket no. 484]. The Bankruptcy Court has entered various orders approving interim fee applications filed by the Debtors' and the Committee's professionals, and authorized the Debtors to pay the amount held back from those professionals under the Interim Compensation Order. The Debtors intend to continue to pay the fees and expenses of the Debtors' and the Committee's professionals in

accordance with the Interim Compensation Order and any other orders of the Court. The Debtors estimate that the accrued and unpaid professional fees, for Debtors' and the Committee's professionals, will be approximately $500,000 on the Effective Date. The Plan provides that claims by Insiders will not receive any distribution until all Allowed non-Insider Claims receive all payments they are entitled to receive under the Plan. This subordination applies to any administrative claims asserted by any Debtor.

Under the Sale Order, the Debtors have retained a portion of each post-petition vessel sale as unencumbered cash, and as a result certain Lenders received Retained Proceeds Claims. Unless paid sooner pursuant to the Sale Order, the Retained Proceeds Claims will be paid in full within thirty (30) days of the Effective Date and applied against payments due or to become due under the Plan. As of the date of this Disclosure Statement, the Retained Proceeds Claims total approximately $1,100,000.

### E.     Priority And Priority Tax Claims

On June 14, 2018, the Bankruptcy Court entered an order [doc. no. 54] authorizing the Debtors to pay their unpaid pre-petition wages, salaries, expenses and benefits owed to their employees, and the Debtors have done so. That order also authorized the Debtors to honor their employees earned but unused pre-petition vacation and sick time, which the Debtors have done in the ordinary course of business. The Debtors therefore do not believe that they owe any wages, salaries, expenses or benefits that may constitute priority claims under Section 507, and no proofs of claim asserting such claims, other than a claim in an undetermined amount filed by Mr. Cashman, have been filed. Because the Debtors have accrued net operating losses and other tax attributes, the Debtors do not believe they have any current material tax liability, and they intend to utilize all of their available tax attributes before and after the Effective Date.

The creditors asserting priority tax claims are as follows. The Internal Revenue Service (the "IRS") filed a proof of claim asserting a priority tax claim against CEC in the approximate amount of $46,000, as well as proofs of claim asserting priority tax claims in nominal amounts against the remaining corporate Debtors. The IRS filed a proof of claim asserting a priority tax claim against Mr. Cashman in the approximate amount of $24,000. The Louisiana Department of Revenue filed a proof of claim asserting a priority tax claim against CEC only in the approximate amount of $142,500. The Massachusetts Department of Revenue filed a proof of claim asserting a priority tax claim against Mr. Cashman only in the approximate amount of $151,100.

Shannon Cashman, Mr. Cashman's ex-wife, has a claim against Mr. Cashman that constitutes a domestic support obligation, as that term is defined in the Bankruptcy Code, entitled to priority under Section 507(a)(1) of the Bankruptcy Code. Shannon Cashman asserts that this claim is approximately $1,000,000, plus other amounts under a consent judgment entered in Mr. Cashman and Shannon Cashman's pre-petition divorce proceeding.

#### F.       General Unsecured Claims

As of the Petition Date, the asserted General Unsecured Claims against the corporate
Debtors totaled approximately $51,680,000.[9]  Of this amount, approximately $46,246,000
consists of disputed litigation claims (collectively the "Disputed Unsecured Claims"), including
claims by Cardi Corporation ("Cardi") in the approximate amount of $27,376,000, Jose Salvador
in the amount of $10,000,000, and LAD Services of Louisiana, LLC ("LAD") in the amount of
$1,500,000, all of which the Debtors dispute in their entirety.  For the reasons stated below, the
Debtors do not believe that Cardi, Mr. Salvador or LAD will have Allowed Claims.

CEC disputes the entirety of Cardi's claims and has filed an objection to the proof of
claim filed by Cardi.  CEC asserts that Cardi owes CEC approximately $4,490,000 for retainage
and work performed by CEC and owes interest on that amount totaling approximately
$3,771,000, for a total claim by CEC against Cardi of approximately $8,261,000.

The Cardi claim is premised upon a subcontract between Cardi and CEC (the
"Subcontract") relating to construction of the Sakonnet River Bridge in Tiverton, Rhode Island
(the "Bridge Project").  As a result of Cardi's breach of the Subcontract for, among other things,
Cardi's failure to pay CEC amounts it is due under the Subcontract, CEC brought suit against
Cardi in Rhode Island state court in May of 2011.  Cardi filed counterclaims asserting that CEC
breached the Subcontract by reason of defective workmanship and failure to take appropriate
remedial steps.  Cardi asserts a claim in the net aggregate amount of $24,690,188, consisting of a
claim of approximately $1,724,733 for the improper placement in the Pier Piles Type F claim
(the "Type F Claim"), approximately $8,668,621 for defective construction of the Cofferdam
(the "Cofferdam Claim"), and the balance for consequential costs, including, among other costs,
lost profits of $1,559,000, liquidated damages of $1,815,250 and prejudgment interest of
$11,958.489.  Cardi's counterclaim does acknowledge a credit due to CEC of $2,682,488.  CEC
denies that its work was defective or that it is liable to Cardi for any cost.  CEC states that to the
extent that Cardi has a claim, Cardi owes CEC an amount in excess of any Cardi claim for work
performed by CEC and for which Cardi has refused to pay CEC.

The Type F Claim is based on allegedly defective work performed by CEC in pouring
concrete on certain portions of the Bridge Project.  During the pouring of the concrete, however,
CEC notified Cardi that the concrete, which was supplied by Cardi Materials, an affiliate of
Cardi, did not meet the required standards.  At the time, Cardi acknowledged the deficiencies in
the concrete and hired a consultant to recommend modifications, which were made.  Despite
acknowledging the deficiencies in the concrete, Cardi is now claiming that CEC's negligence
caused a defect in the concrete that was poured before Cardi modified the concrete to fix the
deficiencies in the concrete.  This claim is without any basis.  Moreover, Cardi's damages are
based on the removal and replacement of the deficient concrete, a remedy that was not required
by the owner of the Bridge Project.  Accordingly, CEC has no liability for the Type F Claim.

Cofferdams are floating form systems used in the forming of the Piers upon which the
superstructure of the bridge would be constructed.  Each Cofferdam is 75' 10" long, 41' 10" wide

---

[9]  This amount does not include inter-company claims among the Debtors and Affiliates.

and 10′ deep.  Each was designed as a structure resembling a rectangular boat with the bottom extending underwater and surrounding the ten (10) Piles.  Once constructed, rebars would be installed in each Cofferdam which would in turn be covered with concrete.  According to the specifications, the concrete was to be placed in the Cofferdam in one continuous pour.  Cardi was responsible for the installation of the rebars and the placement of the concrete in the Cofferdam.  All aspects of the Cofferdams were designed by RT Group ("RTG"), pursuant to RTG's contract with Cardi to provide the engineering services for the Bridge Project.  CEC was not responsible for any of the engineering of the Cofferdams.

RTG's design of the Cofferdams was defective, and, as a result, if the Cofferdams had been built as designed and filled with concrete as intended in a single pour of concrete, there would have been a catastrophic failure of the Cofferdams, most likely resulting in fatalities.  Before the pouring of the concrete in the Cofferdams began, RTG itself expressed reservations about the design of the Cofferdams and stopped the pouring of the concrete.  An independent consultant was retained, who confirmed that the design of the Cofferdams was defective.  The Cofferdam Claim is based on the amount Cardi allegedly spent to fix the Cofferdams, plus consequential costs and lost profits, as a result of RTG's defective design.  Notwithstanding that RTG was Cardi's engineer, Cardi is attempting to shift the responsibility for RTG's defective work to CEC, for the simple reason that the contract between Cardi and RTG limits RTG's liability to the amount of RTG's insurance coverage.  Cardi disputes the foregoing.

Prior to the Petition Date, CEC filed suit against Cardi in Rhode Island Superior Court for monies due under the Subcontract (the "Cardi Litigation").  Cardi filed an answer and counterclaims.  On May 10, 2018, Cardi filed a motion seeking relief from the automatic stay to continue the Card Litigation in Rhode Island Superior Court.  On June 4, 2018, the Bankruptcy Court granted relief from the automatic stay to permit the Cardi Litigation to continue.  At present, there is still outstanding discovery and pending motions in the Cardi Litigation that must be completed and resolved before a trial can occur.  Cardi believes that the trial in the Cardi Litigation will be bi-furcated, meaning that there will need to be two separate jury trials, each taking approximately four (4) to six (6) weeks.  CEC, therefore, does not believe that the first trial in the Cardi Litigation will start before mid-2019, at the earliest, and is more likely to start in late 2019.  Cardi believes that trial in the Cardi Litigation will be scheduled to start between November of 2018 and May of 2019.  On October 24, 2018, the Bankruptcy Court estimated Cardi's non-priority unsecured claim against the Debtors, for voting and feasibility purposes only, at approximately $9,632,000.  *See* doc. no. 1127.

Western Surety issued two bonds, a payment bond and a performance bond (collectively the "Bonds"), in favor of Cardi on the Bridge Project.  CEC, SMS, CSS and JMC each executed agreements (collectively the "Indemnification Agreements") whereby they agreed to indemnify Western Surety for any amounts Western Surety paid on account of the Bonds.  Western Surety will not have a Claim under the Indemnification Agreements unless it pays some amount to Cardi on account of the Bonds, which has not yet occurred.

Jose Salvador's Claim arises from a pre-Petition Date slip and fall accident on the tugboat MV Polaris, which is covered by insurance.  In any event, the Debtors have multiple defenses to

750028

Mr. Salvador's Claim, including a lack of standing, contributory negligence and that Mr. Salvador's injuries were not caused by the accident.

CEC and LAD were parties to a joint venture that provided services to BP Exploration & Production, Inc. ("BP") in conjunction with the Deepwater Horizon oil spill. A dispute among BP, CEC and LAD led to pre-Petition Date litigation. That litigation was settled among BP, CEC and LAD (see Section 5.3(E), below), which settlement provided for CEC to make payments to BP. The settlement did not include a release between CEC and LAD, and CEC has multiple claims against LAD, including a claim for contribution for payments made by CEC to BP.

Net of disputed litigation claims, the Debtors estimate that the aggregate General Unsecured Claims against the corporate Debtors is approximately $5,750,000. Assuming all General Unsecured Creditors whose claims are below $5,000 elect to be treated as Convenience Class Claims, the Convenience Class Claims will be approximately $250,000, resulting in Class 26 Claims totaling approximately $5,500,000.

As of the Petition Date and net of claims asserted by Lenders on account of Mr. Cashman's guaranties of the debts of the corporate Debtors, the General Unsecured Claims asserted against Mr. Cashman total approximately $50,200.

Over a period of years, the Debtors made inter-company loans among each other, and certain of the Debtors have claims against other Debtors. CEC is owed approximately $3.4 million by CSS, $21 million by SMS, $13,000 by CCI, $286,000 by Mystic and $1.1 million by Mr. Cashman. SMS is owed approximately $1.6 million by Mystic. Under the Plan, these claims will not be discharged. The Plan, however, provides that no payments or distributions will be made on account of the inter-Debtor claims until Allowed Claims have been paid in accordance with the Plan. RTC asserts a lien on the inter-company claims owed to the Debtors.

## V.    SIGNIFICANT POST PETITION EVENTS

### 5.1    General Information

The Debtors' voluntary Chapter 11 petitions were filed on June 9, 2017. By an order of the Bankruptcy Court dated June 12, 2017 [doc. no. 20], the Bankruptcy Cases are being jointly administered. The Debtors continue to operate as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

### 5.2    Appointment of Creditors' Committee

On June 28, 2017, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") consisting of the following creditors: (a) United Tugs, Inc.; (b) A&M Dockside Repair, Inc.; and (c) T&D Towing, LLC. The Committee retained Casner & Edwards as its counsel.

### 5.3     Chapter 11 Activity

### A.     First Day Motions

Shortly after filing their Chapter 11 petitions, the Debtors filed various so-called "first day" motions, including the (i) *Motion For an Order (1) Authorizing the Use of Cash Collateral, (2) Granting Replacement Liens, (3) Scheduling a Hearing on The Further Use of Cash Collateral, And (4) Granting Other Relief* (the "Cash Collateral Motion") [doc. no. 13], (ii) the *Motion by Debtors And Debtors-In-Possession to (A) Pay Prepetition Wages, Salaries, Expenses, And Benefits And (B) Use Existing Payroll Accounts And Business Forms* (the "Wage Motion") [doc. no. 17]; and (iii) the *Debtors' Motion Pursuant to 11 U.S.C. §§ 363(B) And 105(A) For Entry of Interim And Final Orders Authorizing, But Not Directing, Debtors to Pay Prepetition Obligations Owed to Certain Foreign Vendor*s (the "Foreign Vendor Motion") [doc. no. 15].

The Cash Collateral Motion requested authority to continue to use cash collateral (as defined in the Bankruptcy Code) to fund the Debtors' ongoing operations, including the costs of chartering and maintaining the Fleet.  Certain of the Lenders objected to the Cash Collateral Motion arguing, among other things, that their interests were not adequately protected.  The Debtors and the Lenders were able to reach an agreement that permitted for the consensual use of cash collateral on a temporary basis.

The Wage Motion sought permission to pay pre-petition wages and benefits that would otherwise constitute priority unsecured claims pursuant to Section 507(a)(4) of the Bankruptcy Code.  The Bankruptcy Court granted the Wage Motion by order dated June 14, 2017 [docket no. 54].

The Foreign Vendor Motion sought the authority to pay the pre-petition claims of certain of the Debtors' foreign based vendors on the basis that these vendors were necessary to the Debtors' continue operations.  The foreign vendors in question were selected using various criteria, including: (i) the vendor was a sole-source or limited-source supplier or service provider; (ii) the vendor had the ability to exercise remedies against CEC's assets or disrupt CEC's operations, including the charter and/or sale of vessels; (iii) the vendor had the ability to assert a maritime or other statutory lien against CEC's assets; (iv) the vendor provided services that are so vital to CEC's businesses that even brief disruption would harm CEC's operations; (v) CEC would not be able to cost-effectively obtain comparable products or services from alternative sources within a reasonable timeframe; and/or (vi) the vendor was able or likely to refuse providing essential supplies or services to CEC if prepetition balances are not paid.  The Bankruptcy Court granted the Foreign Vendor Motion by order dated June 16, 2017 [doc. no. 66].

### B.     Continued Use of Cash Collateral

Following the first day hearings, the Debtors, the Lenders and the Committee engaged in discussions regarding the continued use of cash collateral on a consensual basis.  These discussions included, among other things, the sale of vessels, the value of the Fleet, the Lenders'

claims and liens and the Debtors' and the Committee's challenges to those claims and liens. During the period of these discussions, the Debtors, the Lenders and the Committee agreed to a series of six (6) cash collateral orders that permitted the use of cash collateral on a consensual basis through October 31, 2017, and ultimately led to the entry of the Eighth Cash Collateral Order and the Sale Order (as defined below).

### C.    The Eighth Cash Collateral Order and the Sale Order

In August of 2017, the Debtors obtained the Appraisals that showed that, among other things, the aggregate fair market value of the vessels and certain equipment in the Fleet was approximately $307,788,000, and the orderly liquidation value of those assets was approximately $237,661,000, including the Unencumbered Vessels.  Based on the Appraisals, the aggregate fair market value of the Unencumbered Vessels was approximately $28,340,000, and the orderly liquidation value of the Unencumbered Vessels was approximately $22,120,000.  The Debtors and the Committee undertook an analysis of the liens asserted by the Lenders and identified various challenges to those liens as well as the Lenders' claims.  The Debtors' and the Committee's investigations revealed that most of the Lenders' Vessel liens were valid.  After discussions with each Lender, the Debtors were able to agree on the principal balance and non-default interest due to each Lender as of the Petition Date.  These efforts resulted in a comprehensive agreement for the consensual use of cash collateral, the acknowledgement of most of the Lenders' liens, the identification and reservation of the Retained Challenges, the acknowledgement that the Unencumbered Vessels were in fact unencumbered, and various reporting requirements with respect to the Debtors' operations.  The agreement was first described in a term sheet filed with the Bankruptcy Court, and then set forth in the Eighth Cash Collateral Order, which was entered by the Bankruptcy Court on October 24, 2017, which authorized the use of cash collateral through January 31, 2018.  The Debtors, the Lenders and the Committee agreed to the further consensual use of cash collateral, on substantially the same terms as the Eighth Cash Collateral Order, and the Bankruptcy Court has entered four (4) additional orders authorizing such use through November 2, 2018.

The discussions between the Debtors, the Lenders and the Committee also involved the sales of vessels and certain equipment in the Fleet.  Since vessel sales in the Debtors' industry occur in a short period of time, the Debtors required a streamlined mechanism in order to effectively sell vessels.  The comprehensive agreement between the Debtors, the Lenders and the Committee established such a sale mechanism, along with streamlined notice procedures and the form of notice, and permitted the Debtors to retain a portion of the proceeds of each vessel sale by the Debtors, free and clear of liens claims and interests.  In exchange, the Lenders with liens on the vessels sold received proportionate Retained Proceeds Claims, which claims are secured by the Retained Proceeds Liens on the Unencumbered Vessels.  The agreement regarding the sale of vessels was included in the term sheet filed with the Bankruptcy Court, and was then memorialized in the *Order Authorizing Sales of Certain Assets Free and Clear of All Liens, Claims and Interests* [doc. no. 545] entered by the Bankruptcy Court on October 24, 2017, which authorized the sale of vessels through January 15, 2018.  The Debtors, the Lenders and the Committee agreed to the consensual extension of the Sale Order, and the Bankruptcy Court has entered four additional orders authorizing the extension through November 2, 2018.

### D.    Sales of Vessels

Since the entry of the Sale Order, the Debtors have sold twenty-six (26) vessels with purchase prices aggregating $7,668,000 and paid the Lenders with liens on those vessels in accordance with the Sale Order.  The Debtors continue to market the Vessels for sale.  Pursuant to the Sale Order, the Debtors have retained approximately $750,000 of the proceeds of such sales.  As of the date of this Disclosure Statement, the Debtors were parties to four (4) Vessel charters that provide the charterer with an option to purchase the chartered Vessels and, in three of charters, cranes that were also part of the charter.  If all four (4) of those purchase options are exercised, the Debtors will realize approximately $5,599,000 of Vessel and crane sales.

### E.    The BP Settlement

Prior to the Petition Date, CEC and LAD were parties to a joint venture that provided services to BP Exploration & Production, Inc. ("BP") in conjunction with the Deepwater Horizon oil spill.  Litigation arose (the "Litigation") among CEC, LAD and BP with respect to the contract and the services provided under the contract.

Prior to the Petition Date, CEC, LAD and BP entered into that certain Confidential Settlement Agreement and Release, dated as of December 22, 2016 (the "Agreement") that resolved BP's claims against CEC and LAD, and CEC's and LAD's claims against BP.  The Agreement did not include a settlement of the claims between CEC and LAD.  The Agreement provides, among other things, that CEC will make payments to BP totaling $7.5 million on the following schedule: (i) $300,000 on January 10, 2017 and January 10, 2018; (ii) $400,000 on January 10, 2019 and January 10, 2020; (iii) $500,000 on January 10, 2021 and January 10, 2022; and (iv) $5,100,000 on January 10, 2023.  The Agreement also provided that, in the event an installment was not timely paid, a penalty of fifteen percent (15%) of the past due payment would be due, interest would accrue on the past due payment at a rate of one and one-half percent (1.5%) per month, and that payment of the entire amount due under the Agreement would be accelerated.

CEC paid BP the $300,000 installment due January 10, 2017, but, as a result of its Chapter 11 filing, was stayed from paying BP the $300,000 installment due January 10, 2018 (the "2018 Installment").

After discussions regarding the Agreement, on May 15, 2018, CEC and BP entered into a stipulation (the "BP Stipulation") [doc. no. 748-1] that provides, among other things: (i) that the Agreement shall be deemed reinstated in full, except as expressly amended and restated in the Stipulation; (ii) CEC shall pay the 2018 Installment in full and in cash on the Effective Date; (iii) any interest or penalties due to BP under the Agreement on account of the failure to pay the 2018 Installment by January 10, 2018, shall be waived and released as of the Effective Date; and (iv) BP agrees that following the Effective Date it will not accelerate any amounts due under the Agreement on account of the failure to pay the 2018 Installment by January 10, 2018.  The BP Stipulation also provides that, subject to the receipt of a disclosure statement approved by the Bankruptcy Court, BP will vote in favor of a plan that provides it with the treatment set forth in the BP Stipulation.

The Court approved the BP Stipulation by order dated June 12, 2018 [doc. no. 842].

### F.    Extension of The Exclusivity Periods

On September 15, 2017, the Debtors filed the *Motion by Debtors Pursuant to 11 U.S.C. §§ 1121(D) And 362(D)(3) to Extend The Deadlines to File a Plan Of Reorganization And Solicit Acceptances of Plan* (the "First Exclusivity Motion") [doc. no. 424] requesting an extension of the exclusive deadlines for the Debtors to file and solicit a plan of reorganization (collectively the "Exclusivity Deadlines").  RTC, Santander and Key objected to the extension of the Exclusivity Deadlines.  The Debtors were able to negotiate a consensual extension of the Exclusivity Deadlines to January 31, 2018.

On December 26, 2017, the Debtors filed the *Motion by Debtors Pursuant to 11 U.S.C. § 1121(D) to Extend The Deadlines to File a Plan of Reorganization And Solicit Acceptances* (the "Second Exclusivity Motion") [doc. no. 630] requesting a second extension of the Exclusivity Deadlines.  The Debtors were again able to negotiate a consensual extension of the Exclusivity Deadlines with the deadline to file a plan extended to May 31, 2018, and the deadline to solicit acceptances of a plan extended to July 31, 2018.  The exclusive period to solicit acceptances of the Plan set forth in Section 1123(c) of the Bankruptcy Code was subsequently extended to November 2, 2018, without prejudice to the Debtors' right to seek a further extension of that period.  The Lenders reserve all of their rights with respect to any further extension of that period.

### G.    Prior Plans and Disclosure Statements

The Debtors first filed a plan of reorganization (the "Original Plan") [doc. no. 798] and accompanying disclosure statement (the "Original Disclosure Statement") [doc. no. 799] on May 31, 2018.  The Debtors subsequently engaged in discussions with the Lenders, the Committee and various other creditors regarding the terms of the Original Plan and the information contained in the Original Disclosure Statement.  On July 13, 2018, the Debtors filed the *First Amended Joint Plan of Reorganization of Cashman Equipment Corp., Cashman Scrap & Salvage, LLC, Servicio Marina Superior, LLC, Cashman Canada, Inc., Mystic Adventure Sails, LLC, and James M. Cashman* (the "Amended Plan") [doc. no. 911] and an accompanying first amended disclosure statement (the "Amended Disclosure Statement") [doc. no. 912].  Among the primary amendments to the Original Plan and the Original Disclosure Statement are the following:

- The treatment of the Lenders' Allowed Secured Claims was modified to include the following:

    a.    The interest rate was increased from five percent (5%) per annum to six percent (6%) per annum, with five and one-half percent (5.5%) paid in monthly installments and one-half percent (.5%) paid as PIK interest.

    b.    The payment term for non-Agreed-Claim Lenders was reduced from ten (10) years to seven (7) years, consistent with the payment term for Agreed-Claim Lenders.

c.     The Excess Cash sweep provision was enhanced by reducing the Excess Cash measurement amount from $12,000,000 to $11,000,000.

d.     The Initial Payment to the Agreed-Claim Lenders is enhanced by increasing it from $2,000,000 to $3,000,000.

e.     The Original Plan provides that 100% of the Net Proceeds of Vessels would be paid to the Lender with a Lien on the Vessel sold, with fifty percent (50%) of the Net Proceeds applied to payments due or to become due to such Lender under the Original Plan, and fifty percent (50%) applied to the principal balance of such Lender's Allowed Secured Claim. The Amended Plan provides that the lesser of twenty percent (20%) or four (4) months' debt service payments to such Lender will be applied to debt service, and the balance, not less eighty percent, will be applied to the principal balance of such Lender's Allowed Secured Claim.

f.     An early maturity date provision was added that would accelerate the maturity date for all Lenders' Allowed Secured Claims if certain debt level and EBITDA benchmarks are reached prior to the existing seven (7) year maturity date.

g.     An additional covenant was added that requires the Debtors' to achieve yearly benchmarks in the reduction of the aggregate principal balance of all Lenders' Allowed Secured Claims.

h.     The capital expenditures covenant was amended to: (a) prohibit capital expenditures if the Debtors are not in compliance with the new debt reduction covenant, and (b) reduce the amount of permitted capital expenditures to $2,000,000 per year.

i.     A provision was added to permit a party who elects to become a Agreed-Claim Lenders to opt-out of the Agreed-Claim Lender treatment if the Debtors subsequently provide more favorable treatment to another Lender.

j.     A provision was added requiring the Debtors, within nine (9) months of the seven (7) year maturity of the Lenders' Allowed Secured Claims, to hire an investment banker to assist in obtaining re-financing.

•     A provision was added to clarify that any obligations under guaranties would remain in enforceable, provided that no action can be taken under the guaranties unless the Debtors are in default of the Amended Plan and the guaranties represent a secondary source of payment for the Allowed guarantied claims.

•     The treatment of General Unsecured Creditors (other than Convenience Class Claims) was modified to provide for the eighty-five percent (85%) dividend to be

paid quarterly, as opposed to yearly, with fourteen (14%) paid initially, and the balance of the payments made to General Unsecured Creditors paid over the next twenty (20) calendar quarters.

- The treatment of General Unsecured Creditors and Convenience Class Claims was enhanced to provide a covenant by the Debtors not to bring any Avoidance Actions against such creditors.

- A provision was added that obligates James M. Cashman to pay the General Unsecured Creditors against him, from his disposable income, fifteen percent of their Allowed Claims within seven (7) years of the Effective Date.

- The Convenience Class was modified to provide that only those creditors who elect to participate in the Convenience Class will receive the treatment in that Class, instead of automatically placing all Allowed General Unsecured Claims that are less than $5,000 in that Class.

- The Plan Contribution was enhanced to provide that the Insurance Trust, which is the beneficiary of the key man life insurance policies for James M. Cashman, to loan, in exchange for the Debtors' paying the premiums on such policies, seventy-five percent (75%) of the death benefits of such policies to the Debtors, with such loan being subordinate in payment to the payments required under the Original Plan.  The Debtors estimate that this loan would be approximately $70 million.

## VI.     DESCRIPTION OF THE PLAN

The following is a summary of the significant provisions of the Plan and is qualified in its entirety by the provisions of the Plan, a copy of which accompanies this Disclosure Statement. In the event and to the extent that the description of the Plan contained in this Disclosure Statement is inconsistent with any provisions of the Plan, the provisions of the Plan shall control and take precedence.  All creditors are urged to carefully read the Plan.

### 6.1     Unclassified Claims.

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified for the purposes of voting on, or receiving distributions under, the Plan.  All such Claims are instead treated separately in accordance with the terms set forth in Article II of the Plan.

### A.     Administrative Expense Claims.

(1)     <u>General</u>.  Except for Professional Fee Claims and except as otherwise agreed to by the Debtors and the holder of an Allowed Administrative Expense Claim, each such holder shall be paid in full in Cash on the later of: (i) the date such Allowed Administrative Expense Claim becomes due in accordance with its terms; and (ii) the Effective Date.

(2)    <u>U.S. Trustee's Fees</u>.  The outstanding fees due to the United States Trustee pursuant to 11 U.S.C. § 1930 shall be paid in full on or before the Effective Date.

(3)    <u>Professional Compensation and Expense Reimbursement Claims</u>.

(i)    Within thirty (30) days after the Effective Date, each Professional shall file a final application for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.  Any such application granted by the Bankruptcy Court shall be paid: (1) within fifteen days of the entry of the order of the Bankruptcy Court approving such application, unless a stay of the order approving the application is obtained; or (2) upon such other terms as may be mutually agreed upon between the Professional and the Debtors or Reorganized Debtors.

(ii)    All fees and expenses of Professionals for services rendered after the Effective Date shall be paid by the Reorganized Debtors upon receipt of reasonably detailed invoices in such amounts and on such terms as such Professional and the Reorganized Debtors may agree.  No further order or authorization from the Bankruptcy Court shall be necessary to permit the Reorganized Debtors to pay the fees and expenses of Professionals for services rendered after the Effective Date.

(4)    Unresolved Claim Bar Date.  Except in the case of an Agreed-Claim Lender, any entity asserting a Claim against the Debtors under Section 506(b) of the Bankruptcy Code or pursuant to Section 1.105(b) of the Plan, shall file notice of such Claim with the Bankruptcy Court not later than the Voting Deadline, or such other date established by the Bankruptcy Court, or such Claim shall be forever disallowed and barred as a Claim against the Debtors, whether for purposes of voting, sharing in any distribution, or in any other way participating as a party in interest in the Bankruptcy Cases.  The notice of claim filed with the Bankruptcy Court shall list the specific amounts claimed by the Lender and may reference filed proofs of claim to support such amounts.  The Debtors shall, within seven (7) days of the approval of the Disclosure Statement, notify each Lender of any dispute with respect to those Costs of Collection as to which such Lender has provided the Debtors with invoices.

(5)    Agreed-Claim Lender's Costs of Collection.  Within fifteen (15) Business Days of the Effective Date, each Agreed-Claim Lender shall provide the Debtors with copies of invoices for their Collection Costs (redacted to preserve privileged information) for any period for which the Agreed-Claim Lender has provided the Debtors with an estimate of its Costs of Collection.  Within thirty (30) Business Days of the Effective Date, the Debtors shall notify the Agreed-Claim Lender, in writing, whether they agree to such Costs of Collection, in which case such Costs of Collection shall be deemed Allowed and shall be added to the Agreed-Claim Lender's Allowed Secured Claim, or they dispute such Costs of Collection.  If the Debtors notify the Agreed-Claim Lenders that they dispute the Costs of Collection covered by such invoices, then the Agreed-Claim Lender shall, within twenty (20) Business Days after receipt of such notice, file an application with the Bankruptcy Court seeking allowance of such Costs of Collection.

Any Costs of Collection Allowed by the Bankruptcy Court shall be added to the Agreed-Claim Lender's Allowed Secured Claim.

**B.      Priority Tax Claims.**

Each holder of an Allowed Priority Tax Claim against each Debtor, if any, shall be paid, at the sole election of the Debtors, either: (a) upon such terms as may be agreed to between the Debtors and the holder of an Allowed Priority Tax Claim; (b) in full in Cash on the Effective Date; or (c) in installment payments of Cash commencing on the Effective Date and (i) of a total value as of the Effective Date equal to the Allowed amount of such Claim, (ii) over a period ending not later than five (5) years from the Petition Date, and (iii) in a manner not less favorable than the most favored General Unsecured Claim under the Plan.

**6.2      Classification.**

The Claims against and Equity Interests in the Debtors are categorized below pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  A Claim is placed in a particular Class for the purpose of voting on the Plan, and only to the extent that such Claim is Allowed for voting purposes in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.  For the purposes of the Allowance of and distributions to Allowed Claims under the Plan, Section 6.2(a) of the Plan provides for the consolidation of the Debtors such that creditors with multiple Claims for the same obligations will receive only one Allowed Claim under the Plan.  All Classes of claims and Equity Interests with respect to each Debtor are separately classified in their own distinct sub-classes, sub-class A for CEC, sub-class B for SMS, sub-class C for CSS, sub-class D for CCI, sub-class E for Mystic, and sub-class F for JMC.  Nothing in the Plan is intended to effectuate a substantive consolidation of the Debtors or their Estates.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 A | Banc of America Leasing Secured Claims | Impaired | Yes |
| 2 A | Bollinger Ameila Repair, LLC Secured Claims | Impaired | Yes |
| 3 A | Bollinger Morgan City, LLC Secured Claims | Impaired | Yes |
| 4 F | Chase Bank Secured Claims | Unimpaired | No |
| 5 A – C | Citizens Asset Finance Secured Claims | Impaired | Yes |

750028

| 6 A | Equitable Bank Secured Claims | Impaired | Yes |
|---|---|---|---|
| 7 A | Fifth Third Bank Secured Claims | Impaired | Yes |
| 8 A | Great American Ins. Company Secured Claims | Impaired | Yes |
| 9 A – C | Key Bank Secured Claims | Impaired | Yes |
| 10 A | Kim Marine Documentation, Inc. Secured Claims | Impaired | Yes |
| 11 A | MARAD Secured Claims | Impaired | Yes |
| 12 A | Norton Rose Fulbright, LLP Secured Claims | Impaired | Yes |
| 13 A | Pacific West Bank Secured Claims | Impaired | Yes |
| 14 A | Poseidon International, Ltd. Secured Claims | Impaired | Yes |
| 15 A, C | Radius Bank Secured Claims | Impaired | Yes |
| 16 A – F | Rockland Trust Company Secured Claims | Impaired | Yes |
| 17 A, B, E, F | Santander Bank Secured Claims | Impaired | Yes |
| 18 A | Starboard Yacht Group LLC Secured Claims | Impaired | Yes |
| 19 A – E | Starr Indemnity & Liability Co. Secured Claims | Impaired | Yes |
| 20 A | US Bank N.A. Secured Claims | Impaired | Yes |
| 21 A | Wells Fargo Equipment Finance, Inc. Secured Claims | Impaired | Yes |
| 22 A – F | Priority Claims | Unimpaired | Yes |
| 23 A | Cardi Claims | Impaired | Yes |
| 24 A | Western Surety Claims | Impaired | Yes |
| 25 A | BP Claims | Impaired | Yes |
| 26 A – F | General Unsecured Claims | Impaired | Yes |
| 27 A – F | Convenience Class Claims | Impaired | Yes |
| 28 A - E | Equity Interests | Impaired | Yes |

750028

The Plan provides for the consolidation of Claims for allowance and distribution purposes, such that creditors, like the Lenders, with Allowed Claims against multiple Debtors will receive only one payment of their Claim, but their Allowed Claims will be paid in full. The proposed consolidation is entirely appropriate inasmuch as it recognizes that the Lenders and other creditors considered and treated the Debtors as one economic and legal entity when extending credit to them. Among other things:

- The substantial majority of the Fleet is owned by CEC;

- SMS, CSS, CCI and Mystic are special purpose entities with a specific and limited role in the Debtors' overall operations;

- The Debtors' operations are integrated, with CEC providing administrative functions for each of the Debtors, CSS providing repair and maintenance services for the Fleet, SMS providing tug and tow services and CCI and Mystic owning discrete assets

- Eleven (11) of the twelve (12) Lenders (all except MARAD) made loans that were to or were guaranteed by multiple Debtors;

- Ninety percent (90%) of the General Unsecured Creditors assert claims against CEC;

- There are substantial inter-company claims, as detailed in Section 4.3(F), above.

Courts that have found plan consolidation objectionable did so because the consolidation materially altered creditors' recoveries. In other words, the consolidation resulted in a clear harm to creditors. Here, no harm is being visited upon any creditor class by the consolidation. Creditors' Allowed Claims are neither enhanced nor diminished by the consolidation proposed in the Amended Plan. The consolidation provided for in the Plan is, instead, for the purpose of streamlining the Claim allowance and distribution process.

The ability to consolidate arises under Section 1123(a)(5)(C) and the bankruptcy court's inherent general equitable powers, codified as Section 105(a). A court has full discretion to tailor its consolidation order to fit the circumstances of the case before it. For example, consolidation can merge the estates of several debtors for certain purposes, but does not always result in the elimination of the separate corporate entities.

### 6.3    Classes 1 - 21 – Allowed Secured Claims.

**A.    Classification.** Classes 1 through 21 consist of Secured Claims against the Debtors, as applicable. The Claims of Lenders and the Insurers shall be deemed fully secured as to the Allowed amount of such Claims on the Petition Date, and shall include, to the extent allowable under Section 506(b) of the Bankruptcy Code, Claims for post-petition interest, costs and attorneys' fees.

**B.     Impairment and Voting.**  Except for the JMC Secured Claims, the Secured Claims are impaired under the Plan, and the holders of such Claims shall be entitled to vote to accept or reject the Plan.  The JMC Secured Claims are unimpaired under the Plan and the holders of such Claims are not entitled to vote to accept or reject the Plan.  Chase Bank, RTC and Santander are the holders of JMC Secured Claims.

**C.     Claim Treatment.**  The Bankruptcy Code, including Sections 1123(b)(3) through (6), permits a debtor-in-possession, through a plan to modify the rights, Claims and Liens of creditors, including creditors holding Secured Claims.  Among other things, a debtor-in-possession may modify the rights and liens of secured creditors and provide for the sales of assets subject to Liens.  The Bankruptcy Code permits a debtor-in-possession to separately classify Secured Claims, and to provide different treatment to different classes of creditors in a plan.  For example, the Plan provides different treatment to Agreed-Claim Lenders than to other Lenders.  Since each Lender's secured claim is in its own separate class of claims, this is permitted by the Bankruptcy Code, subject to Section 1129 of the Bankruptcy Code.  Even if this were not the case, the treatment provided to Agreed-Claim Lenders may be chosen by any Lender, in their own discretion, and all Lenders' Allowed Secured Claims will be paid in full regardless of whether a Lender choses to become an Agreed-Claim Lender.  The Plan provides an interest rate to Lenders of LIBOR plus five percent (5.0%), with interest paid at an initial rate of five and one-half percent (5.5%) (the "<u>Pay Rate</u>") and the balance of the interest accruing (the "<u>Additional Interest</u>").  Assuming that the Debtors will need to exercise their "cram down" rights under Section 1129(b) of the Bankruptcy Code with respect to the claims of one or more Lenders, the interest rate applied to the Lenders' claims is determined by reference to *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), and its progeny, including *Prudential Insurance Company of America v. SW Boston Hotel Venture, LLC*, 748 F.3d 393 (1st Cir. 2014).  Under *Till*, the Debtors believe that it must first be determined whether there is an "efficient market" that would set an interest rate for the Plan.  For a variety of reasons, including the recent prolonged downturn in the oil and gas industry, the Debtors do not believe that the "efficient market" test applies in these cases.  If there is no efficient market, *Till* provides that the cram down rate of interest should be determined using the prime rate of interest plus a risk factor.  Given the value of the Lenders' collateral, the credit enhancement provided by the Additional Plan Lien coverage and the Debtors' historical and projected financial performance, the Debtors believe that the interest rate provided to Lenders under the Plan is appropriate.  For these reasons, the Debtors believe that the treatment of Lenders' Claims set forth below complies with the Bankruptcy Code.  Certain Lenders have informed the Debtors that they contend otherwise.

In full and final satisfaction, settlement, discharge and release of the Allowed Secured Claims, the holders of Allowed Secured Claims shall receive the following treatment, as applicable:

(i)     Within five (5) days following the Voting Deadline, the Debtors shall file the Schedule of Agreed-Claim Lenders.  As soon as practicable after the determination of the Agreed-Claim Lenders estimated Costs of Collection pursuant to Section 2.2(e) of the Plan, the Debtors shall file an amended Schedule of Agreed-Claim Lenders listing the amount of each Agreed-Claim Lender's

Claim as of the Effective Date.  The Secured Claim of each Agreed-Claim Lender shall be Allowed in the amount listed in the Schedule of Agreed-Claim Lenders. Upon the Allowance of the Secured Claim of each Contested-Claim Lender by a Final Order, such Allowed Secured Claim shall be treated as Allowed as of the Effective Date for the purposes of the Plan.  A Lender's Allowed Secured Claim shall be the joint and several obligation of the Corporate Debtors, and each Lien of such Lender securing any portion of such Lender's Allowed Secured Claim shall secure the entire Allowed Claim.  A Lender's Allowed Secured Claim shall receive the following treatment:

(1)     Maturity Date.  The Corporate Debtors shall pay the Lender on the Lender Maturity Date the unpaid balance (if any) of its Allowed Secured Claim. If not paid in full on the Lender Maturity Date, each Lender may add to such unpaid balance on a monthly basis (A) simple interest thereon at the Lender Rate, and (B) such Lender's reasonable costs of collecting such unpaid balance, including attorneys' fees and including in any bankruptcy case of any of the Debtors.

(2)     Monthly Installments.  The Corporate Debtors shall pay each Lender a monthly payment consisting of (A) principal computed on the basis of an amortization schedule of 22.5 years from and after the Effective Date applied to the Principal Obligation, which principal component of each monthly installment shall not adjust from the amortization schedule established on the Effective Date, and (B) interest in arrears on the outstanding amount of the Principal Obligation, which shall be calculated and adjust daily, as follows: (I) for the first fifty-four (54) months following the Effective Date, based on an interest rate of five and one- half percent (5.50%) per annum; (II) for the fifty- fifth (55th) through and including the sixtieth (60th) months following the Effective Date, based on an interest rate of six percent (6.00%) per annum; (III) for the sixty-first (61st) through and including the sixty-sixth (66th) months following the Effective Date, based on an interest rate of six and one-quarter percent (6.25%) per annum; and (IV) for the sixtieth-seventh (67th) through and including the seventy-second (72nd) months following the Effective Date, based on an interest rate of six and one-half percent (6.50%) per annum. The first monthly payment shall be for the period between the Effective Date and the thirtieth (30th) day following the Effective Date, and shall be paid within three (3) Business Days from the Debtors' receipt of an invoice from the Lender for such monthly payment, and such payments shall continue monthly thereafter on the same day of each month. Notwithstanding Section 6.1 of the Plan, each such monthly payment shall be sent by Federal Reserve wire transfer or by check delivered by overnight mail.  In the event of a dispute with respect to the amount of a monthly payment of principal and interest, the Debtors may pay the monthly payment to the Lender on account, without prejudice to any of the Debtors' or the Lenders' rights, claims and defenses with respect to such payment.

750028

(3)     <u>Additional Interest</u>.  In addition to interest at the Pay Rate, each Lender shall also be entitled to receive simple interest, calculated daily on the actual outstanding Principal Obligation at a rate equal to the difference between the Lender Rate and the Pay Rate (the "<u>Additional Interest</u>"). The Additional Interest shall accrue and be due and payable on the Lender Maturity Date; <u>provided that</u>, if such Lender's Allowed Secured Claim (excluding the accrued Additional Interest) is paid in full:

(A)     Prior to the last day of the fifty-fourth (54th) month following the Effective Date, then such Lender's Additional Interest shall be waived and any claim to such Lender's Additional Interest shall be discharged and released pursuant to the terms of the Plan;

(B)     From the first day of the fifty-fifth (55th) month through the last day of the sixtieth (60th) month following the Effective Date, then sixty-two and one-half percent (62.5%) of such Lender's Additional Interest shall be waived and any claim to such portion of the Additional Interest shall be discharged and released pursuant to the terms of the Plan, <u>provided that</u> the balance of such Lender's Additional Interest (37.5%) is paid at the same time as the Principal Obligation of such Lender is paid in full; and

(C)     From the first day of the sixty-first (61st) month through the last day of the sixty-sixth (66th) month following the Effective Date, then forty percent (40%) of such Lender's Additional Interest shall be waived and any claim to such portion of the Additional Interest shall be discharged and released pursuant to the terms of the Plan, <u>provided that</u> the balance of such Lender's Additional Interest (60%) is paid at the same time as the Principal Obligation of such Lender is paid in full.

(4)     <u>Agreed-Claim Lenders' Contract Interest</u>.  Within three (3) Business Days of the Effective Date, (A) the Corporate Debtors shall pay each Agreed-Claim Lender, as applicable, a Pro Rata share, with the other Agreed-Claim Lenders, of the Initial Payment, to be applied in payment of its Accrued Contract Interest, and thereafter as provided in Section 4.1(c)(i)(12) of the Plan, and (B) each Agreed-Claim Lender shall be deemed to waive the Default Obligation.  To the extent that the Accrued Contract Interest of an Agreed-Claim Lender is not paid in full by the Initial Payment, (Y) such Agreed-Claim Lender shall have a priority right (over Agreed-Claim Lenders no longer owed Accrued Contract Interest and over Contested-Claim Lenders) to receive the distributions of Excess Cash, which shall be distributed Pro Rata among the Agreed-Claim Lenders still owed Accrued Contract Interest to the extent of (and to be applied to) their unpaid Accrued Contract Interest, until the Accrued Contract Interest of each Agreed-Claim Lender is paid in full, and (Z) the

balance, if any, of the Accrued Contract Interest of such Agreed-Claim Lender shall be paid on or before December 31, 2020.

(5) <u>Excess Cash Payments</u>. The Debtors shall make each Excess Cash Payment on the date specified in Section 1.60 of the Plan, in the amount of Excess Cash as of the Excess Cash Measurement Date preceding such date. Each Excess Cash Payment:

(A) Shall be accompanied by a report, certified by an officer of the Corporate Debtors, showing in reasonable detail the Corporate Debtors' computation of (I) Excess Cash as of the preceding Excess Cash Measurement Date, and (II) each Lender's Pro Rata share of such Excess Cash. Any Lender shall have the right, at its own expense and upon reasonable notice to the Corporate Debtors, to review the Corporate Debtors' financial records in order to check the computation of the Excess Cash (but not the computation of each Lender's Pro Rata Share of the Excess Cash), provided that, the Corporate Debtors shall reimburse the Lender for such expense if the amount of the Excess Cash is determined to be less than ninety percent (90%) of the amount required by the Plan. In the event of a dispute regarding the Excess Cash, the Corporate Debtors may pay the amount required by the report to the Lenders on account, without prejudice to any of the Corporate Debtors' or the Lenders' rights, claims and defenses with respect to such payment. Any dispute regarding the Excess Cash Payment shall be determined by the Bankruptcy Court, or if the Bankruptcy Cases have been closed, by binding arbitration before the Plan Arbitrator.

(B) Shall be paid first in accordance with Section 4.1(c)(i)(5)(A) of the Plan, and once all Accrued Contract Interest has been paid, then Pro Rata to all Lenders.

(6) <u>Collateral Expenses</u>. Within thirty (30) days of the Corporate Debtors' receipt of reasonably detailed invoices for Collateral Expenses, the Corporate Debtors shall reimburse the relevant Lender, the Lenders' Collateral Agent, or the GUC Collateral Agent, as applicable, for reasonably incurred Collateral Expenses.

(7) <u>Lenders' Additional Liens</u>. In addition to retention of Liens pursuant to Section 4.1(d) of the Plan, subject to the Lender Plan Intercreditor Agreement, each Lender shall, on the Effective Date, receive an interest, Pro Rata with the other Lenders based on their respective Allowed Secured Claims at any time outstanding, in the Additional Plan Lien and the Additional Vessel Lien to secure the payment of such Lender's Allowed Secured Claim.

(8)     Retained Proceeds Claims.  All Allowed Retained Proceeds Claim shall be paid in full on the later to occur of the Effective Date or the date such Claim becomes Allowed by a Final Order, which payments shall be applied to the monthly payments due, or to become due under Section 4.1(c)(i)(2) of the Plan to the Lender holding the Retained Proceeds Claim, or as otherwise agreed between the Debtors and the holder of the Retained Proceeds Claim.  Upon the payment in full of the Allowed Retained Proceeds Claim, all Liens securing such claim shall be discharged.

(9)     Vessel Sale Proceeds.  Each Lender shall receive, in accordance with Section 5.2(d)(iii) of the Plan, the Net Proceeds of the sale of any Mortgaged Vessels against which it holds a Vessel Mortgage.

(10)    Pro Rata Payments.  If the Debtors choose to make payments to the Lenders other than amounts required by the Plan, such payments shall be made Pro Rata to Lenders in accordance with their then-outstanding Principal Obligations at the time of payment.  If any such payment is in conjunction with a request for release of all or a portion of the Additional Vessel Lien or the Additional Plan Lien, acceptance of such request by a majority in amount of Lenders based on their then-outstanding Principal Obligations will bind all Lenders and the Lenders' Collateral Agent to effectuate such release in exchange for the Pro Rata payment promised in connection therewith.  If, after receiving a Pro Rata share of the Initial Payment and/or a payment(s) of Excess Cash, a Lender's Secured Claim is reduced, either by agreement with the Debtors or by a Final Order of the Bankruptcy Court, then: (A) at the sole option of the Debtors, (1) such Lender shall, within ten (10) Business Days, return to the Debtors the amount of the Initial Payment and Excess Cash payment(s), as applicable, by which it was overpaid, or (2) the Debtors may offset such amount pursuant to Section 1.105(b) of the Plan, and (B) within ten (10) Business Days of the receipt of such funds or such offset, the Debtors shall remit to every other Lender the amount (if any) by which such Lenders' share of Pro Rata payments to Lenders would have been greater if such Pro Rata payments had been computed in accordance with the Allowed Secured Claim of the disputed Lender as finally determined.

(11)    Deadline for Agreed-Claim Lender Election.  A Lender who elects to become an Agreed-Claim Lender must file a written statement with the Bankruptcy Court to that effect not later than the Voting Deadline.

(12)    Application of Payments.  Except as otherwise provided in the Plan, a Lender may apply each payment on account of its Allowed Secured Claim received prior to the Maturity Date as follows: first, to Collateral Expenses, second, to accrued interest at the Pay Rate, third, to the Principal Obligation, and fourth, to Additional Interest (to the extent not waived pursuant to Section 4.1(c)(i)(3) of the Plan).  After the Maturity

Date, each Lender may apply any amount received or collected on account of its Allowed Secured Claim as such Lender determines in its sole discretion, subject to applicable law.

(13)    Covenants and Loan Documents.  The Covenants shall apply to each Lender's Allowed Secured Claim.  As of the Effective Date, the Loan Documents shall be deemed amended and restated, without further action, as necessary to reflect and incorporate the terms of the Plan through the Allonge.  Without derogating from the underlying financial obligation arising under and evidenced by the Loan Documents (which shall remain in full force and effect to the extent of such Lender's Allowed Secured Claim and shall be paid in accordance with the Plan) or from any Lien therefor (which shall continue to secure, and shall remain valid and enforceable as to such financial obligations as modified by the Plan), and without limiting the exercise after any Default of any remedy contained in the Loan Documents, the occurrence of the Effective Date shall render inoperative any terms, covenants, representations and warranties, and/or remedies contained in the Loan Documents that impose obligations upon the Debtors that are inconsistent with or more expansive than the terms of the Plan, and to the extent that there is any inconsistency between the Plan and any of the Loan Documents, the terms of the Plan shall control.

(14)    Early Refinancing.  If, at any time after the third (3rd) anniversary of the Effective Date, the sum of all of the Lenders' Allowed Secured Claims divided by the Corporate Debtors' trailing twelve months' EBITDA, is less than 7.0 for four (4) consecutive calendar quarters, then the Debtors shall retain an investment banker to pursue a loan, on Conventional Terms, in an amount not less than the amount necessary to pay the balance of the Allowed Lenders' Secured Claims in full.  In the event that the Debtors obtain a commitment for such a loan on Conventional Terms, the Debtors shall use their reasonable best efforts to close on such loan.

(15)    Investment Banker.  Except as otherwise provided in Section 4.1(c)(i)(14) of the Plan, on or before six (6) months prior to the sixth (6th) anniversary of the Effective Date, the Debtors shall hire an investment banker to assist the Debtors in seeking financing to pay the outstanding balance of the Lenders' Allowed Secured Claims on or before the sixth (6th) anniversary of the Effective Date.

(16)    Waiver of Retained Challenge Rights.  Effective as of the Effective Date, (a) the Retained Challenge Rights shall be deemed waived and released by the Debtors, the Debtors' Estates and the Committee, and (b) the Debtors and the Reorganized Debtors acknowledge and agree that they have no claims, counterclaims, rights of setoff or recoupment, or any other basis to reduce, offset or otherwise limit their liability to each Lender for its Allowed Secured Claim, except to the extent of any rights, claims and

defenses of the Debtors to Claims asserted by Lenders pursuant to Sections 2.2(d) and 2.2(e) of the Plan.

(17)   <u>Plan Supplement</u>.  All documents, agreements and instruments in the Plan Supplement that materially affect the treatment of the Claim or Lien of any Lender shall be included therein only upon approval by such Lender, acting reasonably, as being satisfactory in form and substance.

(18)   <u>Cash Collateral Orders</u>.  The Corporate Debtors shall pay all Allowed and unpaid Agent Claims (as defined in the Eighth Cash Collateral Order), from the Retained Proceeds Lien (as defined therein), on the later to occur of the Effective Date or the date such Claims become Allowed by a Final Order; provided that, notwithstanding any other provision of the Plan, the Allowed Agent Claims shall be secured by the Retained Proceeds Lien until paid in full.  If the Effective Date does not occur on the first day of a month: (A) each Lender shall, as soon as practicable following the Effective Date, send an invoice for the Interim Payment (as defined in any cash collateral order in effect on the day before the Effective Date) for the period between the first day of the month preceding the Effective Date and the Effective Date, (B) the Debtors shall make each such Interim Payment within three (3) Business Days of the receipt of the invoice for such payment, and (C) each Lender shall waive the Default Obligation for such period.

(19)   <u>Default</u>.  Notwithstanding Section 5.12 of the Plan, which shall not apply to Lenders or the Lenders' Collateral Agent, (A) all payments to Lenders required by the Plan (including turnover of Net Proceeds to the Lenders' Collateral Agent) shall be made when due, or within a grace period of three (3) Business Days thereafter, and if not so made shall be a Default, except that not more than once per calendar year, as to each Lender (with the Lenders' Collateral Agent considered a single, separate Lender for this purpose), the Debtors' failure to make a payment (or the Collateral Agent's non-receipt of Net Proceeds) when due or within such grace period shall not be a Default unless the Debtors fail to make such payment (or, as applicable, cause such Net Proceeds to be received by the Lenders' Collateral Agent) within a cure period of three (3) Business Days after receiving a notice of default from the Lender or the Lenders' Collateral Agent; (B) upon occurrence of any other Event of Default, the Debtors shall have a cure period of fifteen (15) Business Days after receiving notice of the Event of Default within which to cure such Event of Default; and (C) if the Debtors fail to cure an Event of Default within the applicable grace and/or cure period specified in clause (A) or (B), then a Default shall exist and without further notice or action by any Lender, the outstanding amount of each Lender's Allowed Secured Claim shall become immediately due and payable, whereupon the Lenders and the Lenders' Collateral Agent shall have all of their rights and remedies under the Plan, the Loan Documents, the Retained Lien Documents, the Plan

Lien Documents and other applicable documents, laws and rules. If a Lender (with the Lenders' Collateral Agent considered a Lender for this purpose) gives a notice pursuant to this Section 4.1(c)(i)(19) of the Plan, such Lender shall send a copy of such notice to all other Lenders. The notices under the preceding sentence are solely for informational purposes, and shall have no effect on whether a Default exists.

(ii)   <u>JMC Secured Claims</u> – The Allowed JMC Secured Claims shall be reinstated such that they are unimpaired pursuant to Section 1124 of the Bankruptcy Code and the respective pre-petition loan documents of the holders of the JMC Secured Claims. In the event that a holder of an Allowed JMC Secured Claim is entitled to compensation under this Section 4.1(c)(ii) of the Plan, the amount of such compensation shall be either (1) determined by the Bankruptcy Court, or (2) agreed to between JMC and the holder of such Claim. The Liens securing the obligations to RTC evidenced by the "Secured Loans" (as defined in that certain Stipulation between RTC and JMC [doc. no. 656-1] are acknowledged as provided in that Stipulation. Following the Effective Date, holders of the JMC Secured Claims shall no longer be obligated to make any further principal advances to JMC under the respective Loan Documents and any such obligations to extend such additional advances shall be deemed cancelled. Mr. Cashman is in the process of retaining a broker to sell the undeveloped lot he owns on Forest Street in Milton, Massachusetts. This lot is unencumbered, and Mr. Cashman expects to receive between $750,000 and $1,000,000 in sale proceeds, which will be the source of funds to pay the amounts necessary to reinstate the JMC Secured Claims.

(iii)   <u>Norton Claim</u> – On the Effective Date, the holder of the Allowed Norton Secured Claim shall apply the retainer held by Norton in full and final satisfaction of the Allowed Norton Secured Claim. After payment of the Allowed Norton Secured Claim in full, the balance of the Allowed Claim held by Norton, if any, shall be treated as a General Unsecured Claim. In the event that the Allowed Norton Secured Claim is less than the retainer held by Norton, Norton shall, after payment of the Allowed Norton Secured Claim in full, promptly pay the balance of such retainer to the Reorganized Debtors.

(iv)   <u>Insurers Secured Claims</u>. The Allowed Insurers Secured Claims shall be paid in full as follows: (1) on the Effective Date, the deposit held by the Insurers shall be applied, Pro Rata, to the Insurers Secured Claims; (2) commencing thirty (30) days following the Effective Date, by monthly installments of principal and interest based on an interest rate of five and one-half percent (5.50%) per annum (commencing to accrue on the Effective Date) and an amortization term of twenty-two and one-half (22.5) years, with all accrued interest and principal due on the sixth (6th) anniversary of the Effective Date; or (3) as determined by the Bankruptcy Court to permit the holders of the Allowed Insurers Secured Claim to realize the indubitable equivalent of such claims.

(v)    Maritime Lien Claims.  The Allowed Maritime Lien Claims shall be paid in full either: (1) commencing thirty (30) days following the Effective Date, by monthly installments of principal and interest based on an interest rate of five and one-half percent (5.50%) per annum (commencing to accrue on the Effective Date) and an amortization term of twenty-two and one-half (22.5) years, with all accrued interest and principal due on the sixth (6th) anniversary of the Effective Date; (2) as determined by the Bankruptcy Court to permit the holder of the Allowed Secured Claim to realize the indubitable equivalent of such claim; or (3) as agreed between the holder of an Allowed Maritime Lien Claim and the Debtors.

(vi)    Retention of Liens.  To secure the payment of Allowed Secured Claims, the holders of such Claims shall retain their pre-petition Liens as set forth in the Plan.

(vii)    Guaranties.  Notwithstanding any other provision of the Plan (including Section 6.2 of the Plan), all guaranties issued by any Debtor to any Lender shall remain in effect, provided that no payment or other obligation under such guaranties shall be due or deliverable from the respective Debtor unless there is a Default..

**6.4    Class 22A – 22F – Priority Claims.**

Claim Treatment.  In full and final satisfaction, settlement, discharge and release of the Allowed Priority Claims, the holders of the Allowed Priority Claims shall be paid in full either: (i) in accordance with any pre-petition agreements between the holder of the Allowed Priority Claim and the respective Debtor, (i) on the later to occur of the Effective Date or the date the Claim becomes an Allowed claim, or (iii) in accordance with any post-Petition Date agreement between the claimant and the respective Debtor.

Treatment of Shannon Cashman's Claim.  Shannon Cashman's Allowed Claim shall be treated as follows:

(i)    The Consent Judgment between JMC and Shannon Cashman dated August 23, 2007 ("Consent Judgment") will be modified to provide as follows:

(1)    JMC's obligation to pay Shannon Cashman $5,000 per month shall be modified to provide that JMC shall pay Shannon Cashman the sum of $6,000 per month in child support until the earlier of September 1, 2021 and the date that JMC pays Shannon Cashman the "Lump Sum Payment" (as defined below);

(2)    JMC's obligation to pay Shannon Cashman $500,000 upon each of their children attaining their eighteenth (18th) birthdays shall be modified to provide that JMC shall pay Shannon Cashman $1,000,000 (the "Lump Sum Payment") on or before June 30, 2022;

(3)    JMC shall market and offer for sale 90 Countryside Lane, Milton, MA, commencing no later than September 1, 2021.  Shannon Cashman shall cooperate as reasonably requested by JMC in the marketing, offering and

sale of 90 Countryside Lane, Milton, MA.  Unless RTC agrees otherwise, RTC's Allowed Claim secured by a Lien on 90 Countryside Lane, Milton, MA, shall be paid and satisfied from the proceeds of any sale of such property in accordance with applicable law and the applicable loan documents;

(4)     The Lump Sum Payment shall not accrue any interest if paid to Shannon Cashman on or before September 1, 2021.  If the Lump Sum Payment is not paid prior to September 1, 2021, then it shall accrue interest from and after September 1, 2021 up to and including the earlier of the date of payment and June 30, 2022, at the rate of 12% per annum.  If the Lump Sum Payment is not paid on or before June 30, 2022, then it shall accrue interest from and after July 1, 2022 at the rate of 1.5% per month until paid in full;

(5)     JMC shall cause Bayou Villars Holding Co., LLC to execute and deliver to Shannon Cashman a guaranty, in form and substance reasonably satisfactory to JMC and Shannon Cashman, of JMC's obligations to pay the Lump Sum Payment (and any interest) to Shannon Cashman as set forth above.; and

(6)     JMC shall pay Shannon Cashman the sum of $37,500 on the earlier of December 31, 2019 and the closing of any *bona fide* sale of 613 Bayou Road, Belle Chasse, Louisiana.

(ii)     JMC shall cause Bayou Villars Holding Co., LLC to grant CEC a mortgage on the property located on Codfish Lane, Nantucket, Massachusetts (the "Property"), to secure the $2,121,487 owed by Bayou Villars Holding Co., LLC to CEC, which shall be paid to CEC upon the sale of the Property.

(iii)     Shannon Cashman will vote to accept the Plan and will generally support confirmation of the Plan.

(iv)     Except as otherwise set forth herein, the Consent Judgment shall remain in full force and effect as modified by the Plan.  Shannon Cashman shall support and join in any filings or other documentation in Louisiana that are necessary or desirable to modify the Consent Judgment in accordance herewith.

**6.5     Class 23A – Cardi Claim.**

Claim Treatment.  In full and final satisfaction, settlement, discharge and release of the Allowed Cardi Claim, the Allowed Cardi Claim shall be paid in full, with interest at a rate of five percent (5%) per annum or such other rate determined by the Bankruptcy Court to permit the holder of the Allowed Cardi Claim to receive property of a value, as of the Effective Date, equal to the Allowed Cardi Claim.  Payments to the holder of the Allowed Cardi Claim shall be made from the Installment Payments, the Proceeds Payments and the Equalization Payment (if applicable), with the balance, if any, paid on or before the tenth (10th) anniversary of the

Effective Date.  As is described above, the Debtor disputes Cardi's claims in their entirety and the Bankruptcy Court has estimated Cardi's non-priority unsecured claim against the Debtors, for voting and feasibility purposes only, at approximately $9,632,000.

Application of Payments.  Installment Payments shall be applied first and on a Pro Rata basis to any Equalization Payments then due, and second, in accordance with Sections 4.3(c), 4.4(c) and 4.6(c) of the Plan.  Payments of the Designated Vessel Proceeds shall be applied in accordance with Section 5.6 of the Plan.

GUC Lien.  Cardi shall receive an interest in the GUC Lien to secure the payment of its Allowed Claim, if any.

### 6.6     Class 24A – Western Surety Claim.

Claim Treatment.  In full and final satisfaction, settlement, discharge and release of the Allowed Western Surety Claim, the Allowed Western Surety Claim shall be paid in full, with interest at a rate of five percent (5%) per annum or such other rate determined by the Bankruptcy Court to permit the holder of the Allowed Western Surety Claim to receive property of a value, as of the Effective Date, equal to the Allowed Western Surety Claim.  Payments to the holder of the Allowed Western Surety Claim shall be made from the Installment Payments, the Proceeds Payments and the Equalization Payment (if applicable), with the balance, if any, paid on or before the tenth (10th) anniversary of the Effective Date.

Application of Payments.  Installment Payments shall be applied first and on a Pro Rata basis to any Equalization Payments then due, and second, in accordance with Sections 4.3(c), 4.4(c) and 4.6(c) of the Plan.  Payments of the Designated Vessel Proceeds shall be applied in accordance with Section 5.6 of the Plan.

GUC Lien.  Western Surety shall receive an interest in the GUC Lien to secure the payment of its Allowed Claim, if any.

Western Surety's claims are derivative of Cardi's claims, and the Debtors therefore dispute Western Surety's claims in their entirety.

### 6.7     Class 25A – BP Claims.

Claim Treatment.  In full and final satisfaction of the BP Claims and in accordance with the BP Stipulation, CEC shall pay the 2018 Installment to BP upon the Effective Date, and the BP Agreement shall be re-instated.

GUC Lien.  BP shall receive an interest in the GUC Lien to secure the payment of its Allowed Claim.

**6.8      Class 26A – 26F – General Unsecured Claims.**

Claim Treatment.  In full and final satisfaction, settlement, discharge and release of the Allowed General Unsecured Claims, each holder of an Allowed General Unsecured Claim shall be paid in full, with interest at a rate of five percent (5%) per annum or such other rate determined by the Bankruptcy Court to permit the holder of the Allowed General Unsecured Claim to receive property of a value, as of the Effective Date, equal to the Allowed General Unsecured Claim.  Payments to the holders of the Allowed General Unsecured Claims shall be made from the Installment Payments, the Proceeds Payments and the Equalization Payment (if applicable), with the balance, if any, paid on or before the tenth (10th) anniversary of the Effective Date.  In addition to the GUC Dividend, the Debtors and the Reorganized Debtors expressly covenant that they shall not commence or pursue Avoidance Actions against any Creditor in any Class 26 of the Plan.

Additional Class 26F Treatment.  In addition to the treatment set forth in Section 4.6(c) of the Plan and pursuant to Section 1123(a)(8) and 1129(a)(15)(A) of the Bankruptcy Code, on or before the seventh (7th) anniversary of the Effective Date, Mr. Cashman shall pay, from his disposable income, fifteen percent (15%) of the Allowed General Unsecured Claims in Class 26F.  The Debtors believe that this treatment meets the requirements of Sections 1123(a)(8) and 1129(a)(15) of the Bankruptcy Code.

Application of Payments.  Installment Payments shall be applied first and on a Pro Rata basis to any Equalization Payments then due, and second, in accordance with Sections 4.3(c), 4.4(c) and 4.6(c) of the Plan.  Payments of the Designated Vessel Proceeds shall be applied in accordance with Section 5.6 of the Plan.

GUC Lien.  The holders of the Allowed General Unsecured Claims shall receive a beneficial interest in the GUC Lien granted to the GUC Collateral Agent to secure the payment of their respective Allowed Claims.  The GUC Lien shall be (1) junior only to the Vessel Mortgages and Liens securing Pacwest's Allowed Secured Claim, MARAD's Allowed Secured Claim, the Insurers' Claims and the Allowed Maritime Lien Claims, if any, and (2) subject to the GUC Plan Intercreditor Agreement.

The Bankruptcy Code permits a debtor-in-possession to separately classify a non-priority unsecured claim where the claim has a different legal character, rank or status, or where there is a good business reason to do so.  *See In re Hermanos Torres Perez, Inc.*, 2011 Bankr. LEXIS 4527 (Bankr. D.P.R. 2011); *In re River Valley Fitness One, L.P.*, 2003 Bankr. LEXIS 1252 (Bankr. D.N.H. 2003); *In re Mahoney Hawkes, LLP*, 289 B.R. 285 (Bankr. D. Mass. 2002).  Given the substantive differences in the legal character, rank and status of the Cardi, Western Surety and BP Claims, the Debtors assert that there is ample justification for their separate classification under the Plan.

**6.9      Class 27A – 27F – Convenience Class Claims.**

Claim Treatment.  In full and complete satisfaction, settlement, release and discharge, each holder of an Allowed Convenience Class Claim shall receive, upon the later to occur of the Effective Date or the date such Claim becomes an Allowed Claim, the lesser of:

(a)    Seventy-five percent (75%) of the holder's Allowed Claim; or

(b)    $3,750.

<u>Additional Treatment</u>.  In addition to the amount paid above, the Debtors and the Reorganized Debtors expressly covenant that they shall not commence or pursue Avoidance Actions against any Creditor in any Class 27 of the Plan.

<u>Election</u>.  Any creditor with an Allowed Claim may elect to become a Convenience Class Claim by doing so on the ballot approved by the Bankruptcy Court not later than the deadline for voting on the Plan.

### 6.10    Class 28A – 28F – Equity Interests.

<u>Treatment</u>.  The holders of Equity Interests shall retain their respective Equity Interests and JMC shall retain his interests in real and personal property.  The Debtors have not obtained a valuation of the Equity Interests in the corporate Debtors.

<u>Distributions</u>.  The Debtors shall not make any distributions on account of Allowed Equity Interests until the Allowed Claims of all non-Insider creditors have been paid in accordance with the term of the Plan, except that if a Debtor is a Subchapter S corporation or a so-called "pass-through" entity, that Debtor may make distributions to the holders of its Equity Interests in an amount equal to the state and federal income taxes of the holders of its Equity Interests attributable to the income of such Debtor.

### 6.11    Reservation of Rights With Respect to Claims.

The Debtors reserve the right to, among other things, (a) contest the right of the holder of any Claim to vote on the Plan (except in respect of any Agreed-Claim Lender), or designate the vote of the holder of any Claim, (b) contest the right of the holder of any Claim to receive distributions under the Plan, (c) seek to subordinate any Claim for inequitable conduct or otherwise, and (d) seek to estimate any claim for any purposes under the Plan.

### 6.12    Claims of Insiders.

Except as expressly provided in Section 4.8(d) of the Plan, neither JMC, nor any Insider of the Debtors, nor any holder of Equity Interests shall receive any distributions or any transfers on account of their Allowed Claims or Equity Interests, whether any such Claims are Secured Claims, Administrative Claims, Priority Claims or General Unsecured Claims, until the Allowed Claims of all non-Insider creditors have been paid in accordance with the term of the Plan.

### 6.13    Plan Implementation.

The Plan will be funded from the Debtors' continued operations, including revenue from the charter and sale of Vessels.  Upon the Effective Date, the Debtors are authorized to take all action permitted by their Organization Documents (as applicable) and by the law, including,

without limitation, to use their Cash and other Assets for all purposes provided for in the Plan and in their operations, to the borrow funds, to refinance their Secured obligations, to grant liens on their unencumbered Assets, to sell (subject to the terms of the Plan) their existing Assets. Upon the entry of the Confirmation Order, the Debtors are authorized, without further court order, to perform all obligations necessary to sell Assets (other than Vessels, the sales of which are subject to Section 5.2 of the Plan, or any other Assets that are subject to a Lender's Lien), and, to the extent necessary, owned by trusts or corporate entities in which a Debtor holds a controlling interest.  The Assets shall be sold, transferred, assigned or otherwise conveyed to the buyer free and clear of all liens, claims, encumbrances and interests, with such liens, claims, encumbrances and interests to attach to the Net Proceeds of the sale to the same extent, priority and validity as is set forth in the Plan.

**6.14   Sales of Vessels.**

(a)   <u>Authorization to Sell</u>.  Upon the entry of the Confirmation Order, the Reorganized Debtors are authorized, pursuant to Section 1123(a)(5) of the Bankruptcy Code and without further court order, to perform all obligations necessary to close on the Qualified Sales of Vessels, and to execute such other documents and take such other actions as are reasonably necessary to effectuate such sales.  In the case of a Qualified Sale, The Vessels shall be sold, transferred, assigned or otherwise conveyed to the buyer free and clear of all liens, claims, encumbrances and interests.  In the case of a Qualified Sale, the transfer of the Vessels shall (i) constitute legal, valid and effective transfers of property of the Reorganized Debtors to the buyer, and (ii) vest in the buyer all of the Reorganized Debtors' right, title and interest in the Vessel transferred free and clear of all Liens, Claims, encumbrances and interests of any entity.  The Reorganized Debtors are authorized to perform all obligations necessary to close on the sales of Vessels without the approval of the holders of Liens on Vessels provided that such sales are Qualified Sales.

(b)   <u>Qualified Sales</u>.  The sale of one or more Vessels shall constitute a "Qualified Sale" if the Debtors follow the procedures set forth in this Section 5.2 of the Plan, and: (i) in the case of the sale of a single Vessel, the gross purchase price is equal to or greater than the Vessel's MDP; (ii) in the case of the sale of multiple Vessels, the gross purchase price is more than the aggregate amount of the MDPs for all such Vessels; (iii) in the case of a sale pursuant to a Purchase Option Charter for a Vessel, the purchase price payable upon exercise of the sale option, over and above any credit for any lease payment(s) paid to the Debtors under the Purchase Option Charter prior to the sale closing, is not less than the MDP for the vessel sold, or, in the case of multiple Vessels, the aggregate MDP for all of the Vessels sold; (iv) the holder(s) of the Vessel Mortgage(s) on the Vessel(s) to be sold (including, in the case of an Unencumbered Vessel, the Lenders' Collateral Agent) consent in writing to the sale, provided, however, notwithstanding anything to the contrary herein, if a Vessel is proposed to be sold for less than MDP, only the consent of the Lender with a first priority Lien on the Vessel shall be required.

(c)   <u>Allocation of Sales of Multiple Assets</u>.  In the case of any sale (including any sale pursuant to any Purchase Option Charter) of two or more Vessels, the Sale Notice provided by the Debtors shall set forth an allocation of the aggregate gross purchase price and Net Proceeds payable upon the closing of such sale among all Vessels to be sold in proportion to their

respective MDPs (or such lesser price to which the holders of Vessel Mortgages on the Mortgaged Vessels included in such sale have consented), provided that (1) amounts above the aggregate MDP for all Vessels sold shall be allocated reflecting the value of any material charters and leases to the extent ascertainable, and (2) the amount allocated to each Vessel shall be not less than the MDP for such Vessel, except in the event of a sale for less than MDP that is expressly consented to by the Lender with the first priority Lien on such Vessel in accordance with Section 5.2(b)(iv) of the Plan.

(d)      Release of Liens for Vessel Sales.  The Liens on Vessels to be sold pursuant to the Plan shall be discharged and released as follows:

(i)      Sale Notice.  At least five (5) Business Days prior to the scheduled closing of a Qualified Sale, the Reorganized Debtors shall send: (1) to the Notice Parties, a Sale Notice with respect to such sale, and (2) to the holder(s) of Lien(s) on the Vessel to be sold, a discharge of such Lien(s).

(ii)      Delivery of Discharge.  At least two (2) Business Day prior to the scheduled closing of a Qualified Sale, the holder(s) of the Lien(s) on the Vessel to be sold, including without limitation the GUC Collateral Agent and the Lenders' Collateral Agent, shall deliver a discharge and release of its Lien(s) on the Vessel to be sold to the Reorganized Debtors' closing attorney for the sale (the "Closing Attorney") to be held in escrow subject to clause (iii) and Sections 5.5 and 5.6 of the Plan.

(iii)      Payment of Net Proceeds of Mortgaged Vessels Other Than the Pacwest/MARAD Vessels.  Within four (4) Business Days after the closing of a Qualified Sale of a Mortgaged Vessel other than the Pacwest/MARAD Vessels, the Closing Attorney shall distribute the Net Proceeds of the sale in accordance with the terms of the Plan.  All of the Net Proceeds of each such Mortgaged Vessel sale: (1) shall be paid to the holder(s) of Lien(s) on the Vessel (other than, prior to Default, the holder of the Additional Plan Lien) in the order of the seniority of such liens, and (2) when the claims of all holder(s) of Lien(s) on the Vessel (other than, prior to Default, the holder of the Additional Plan Lien) are paid in full, the balance of the Net Proceeds shall be retained by the Debtors.  All Net Proceeds of each such Mortgaged Vessel sale paid to the holder(s) of Lien(s) on the Mortgaged Vessel shall be applied as follows: (A) for any sales closing up to and including the second (2nd) anniversary of the Effective Date, (i) the Debt Service Amount shall be applied to the monthly payments due, or to become due, to such holder under the Plan, and (ii) the balance shall be applied in accordance with Section 4.1(c)(i)(12) of the Plan; and (B) for any sales closing after the second (2nd) anniversary of the Effective Date all Net Proceeds shall be applied in accordance with Section 4.1(c)(i)(12) .  The Net Proceeds of the sale of a Vessel subject to the Additional Vessel Lien or the GUC Lien shall be paid as set forth in Sections 5.5 or 5.6 of the Plan, respectively.

(e)  <u>Notices of Sale</u>.  Notices of Qualified Sales in the form of the Sale Notice, and may be sent by electronic mail, first class mail and/or overnight mail.

(f)  <u>Vessel Sale Dispute</u>.  In the event a Vessel Sale Dispute occurs after the Bankruptcy Cases are closed, the parties to the dispute shall confer to try and resolve the dispute and, if they are unable to resolve the dispute, shall submit the dispute to binding arbitration before the Plan Arbitrator within three (3) business days.  The appointment of the Plan Arbitrator shall be effectuated through the final decree closing the Bankruptcy Cases, and shall terminate upon the payment in full of the Lenders' Allowed Secured Claims.  The Plan Arbitrator shall receive payment, at the Plan Arbitrator's customary hourly rate, for the time spent resolving the Vessel Sale Disputes.  The Plan Arbitrator's hourly charges incurred in resolving the Vessel Sale Disputes shall be paid by the non-prevailing party in the Vessel Sale Dispute, or as otherwise determined by the Plan Arbitrator.  RTC has not agreed to binding arbitration of Vessel Sale Disputes.

(g)  <u>Collateral Surrender</u>. Following the Effective Date, at any time any Lender possesses an outstanding Allowed Secured Claim, the Corporate Debtors and such Lender, in each party's sole discretion, may agree in writing for the Corporate Debtors to surrender to such Lender's Collateral subject to such Lender's senior Lien(s) free and clear of all other claims, liens, encumbrances, and interests (including, for the avoidance of doubt, the Additional Plan Lien); provided that the Corporate Debtors shall not agree to the surrender of any of the Pacwest/MARAD Vessels without the written consent of the GUC Collateral Agent.  Notices with respect to such surrender of Collateral, and release of Liens in connection thereto, shall be subject to the same treatment set forth in Sections 5.2(d)(i)-(ii) and (e)-(f) of the Plan.  Unless otherwise agreed in writing between the Corporate Debtors and the Lender receiving the surrender of Collateral, the Allowed Secured Claim of such Lender shall be reduced by the MDP of such Collateral being surrendered, with the credit being applied in accordance with Section 4.1(c)(i)(12) of the Plan.  Following such surrender of Collateral and the reduction of the Lender's Allowed Secured Claim, the Lender receiving such Collateral shall be entitled to sell or otherwise dispose of the Collateral in any manner whatsoever, without restriction, and without further modification or adjustment to the Lender's Allowed Secured Claim.

(h)  <u>Confidentiality</u>.  At any time any Lender's Allowed Secured Claim remains outstanding, such Lender is entitled to share otherwise confidential MDP values for Collateral subject to that Lender's senior Lien(s), and other confidential information, including the reports provided pursuant to Section 4.1(f) of the Plan, concerning the Debtors' assets, liabilities and operations with third parties interested in participating in or acquiring that Lender's loans with the Debtors; provided, however, that such third parties shall be required to enter into a non-disclosure agreement, in a form to be included in the Plan Supplement, that requires the third parties to keep the such information confidential.

**6.15  Provisions Regarding Additional Plan Lien and Additional Vessel Lien.**

(a)  <u>Plan Lien Documents; Collateral Agent</u>.  The Lenders' Collateral Agent, who will hold the Additional Plan Lien and the Additional Vessel Lien for the benefit of all of the

Lenders, shall be an unrelated, financial institution experienced at handling engagements of this type, and shall be selected before the Confirmation Date by a majority of the Lenders in amount (based on their respective Allowed Secured Claims pursuant to the Eighth Cash Collateral Order) with the consent of the Debtors, which shall be limited to determining that the fees and expense reimbursements are reasonable in the marketplace of national financial institutions experienced at handling engagements of this type.  Any dispute concerning the appointment of the Lenders' Collateral Agent shall be resolved by the Bankruptcy Court.  The Lenders' Collateral Agent shall be entitled to a reasonable fee, reasonable attorneys' fees and costs, plus any recording costs, for the purpose of establishing and perfecting the Additional Plan Lien and the Additional Vessel Lien, and, if all Lenders' Allowed Secured Claims are not paid in full on the Lender Maturity Date, for the purpose of enforcing the Additional Plan Lien and/or the Additional Vessel Lien.  The Plan Supplement shall include, among other things, the Plan Lien Documents.  The Lenders and all other Persons may rely upon the provisions of all recorded Retained Lien Documents and Plan Lien Documents.

(b)     Payments on Account of Additional Plan Lien.  No payments shall be due on account of the Additional Plan Lien, nor shall any rights associated with the Additional Plan Lien be exercised, unless a Default has occurred.  For each Qualified Sale of a Vessel subject to the Additional Plan Lien, the Lenders' Collateral Agent shall be required to deliver an applicable partial discharge of the Additional Lien, without any payment, in accordance with Section 5.2 of the Plan, except that after a Default, the Closing Attorney shall remit to the Lenders' Collateral Agent on account of the Additional Plan Lien the entire amount of Net Proceeds remaining after payment of the Vessel Mortgage on the sold Vessel.

(c)     Payments on Account of Additional Vessel Lien.  Within three (3) Business Days after the closing of a Qualified Sale of an Unencumbered Vessel, the Closing Attorney shall distribute the Net Proceeds of the sale as follows: (i) first, to the holder(s) of Lien(s) on the Vessel that are senior in priority to the Lien held by the Lenders' Collateral Agent, (ii) second, to the Lenders' Collateral Agent to be applied to the Lenders' Collateral Agent's outstanding Collateral Expenses, if any, and (iii) third, to the Lenders' Collateral Agent and the Debtor that owned the Vessel sold as follows: (1) of the first $1,000,000 of such Net Proceeds, the Debtors shall retain eighty percent (80%) and twenty percent (20%) shall be paid to the Lenders' Collateral Agent for the Pro Rata benefit of the Lenders; (2) of the second $1,000,000 of such Net Proceeds, the Debtors shall retain seventy percent (70%) and thirty percent (30%) shall be paid to the Lenders' Collateral Agent for the Pro Rata benefit of the Lenders; (3) of the third $1,000,000 of such Net Proceeds, the Debtors shall retain forty percent (40%) and sixty percent (60%) shall be paid to the  Lenders' Collateral Agent for the Pro Rata benefit of the Lenders; and (4) of any subsequent Net Proceeds, the Debtors shall retain fifty percent (50%) and fifty percent (50%) shall be paid to the Lenders' Collateral Agent for the Pro Rata benefit of the Lenders.  All Net Proceeds of the sales of Unencumbered Vessels that are received by a Lender shall be applied by such Lender to its Allowed Secured Claim in accordance with Section 4.1(c)(i)(12) of the Plan.

(d)     Discharge of Additional Vessel Lien.  In addition to the discharge provided for in Section 4.1(e) of the Plan, the Additional Vessel Lien shall be discharged upon the written consent of two-thirds (2/3) of the Lenders, measured based on the principal balance of the Lenders' respective Allowed Secured Claims at the time of such consent.  Any payments to the

Lenders on account of such discharge of the Additional Vessel Lien shall be paid to the Lenders on a Pro Rata basis.

### 6.16    Provisions Regarding GUC Lien.

(a)      Plan Lien Documents; Collateral Agent.  The GUC Collateral Agent, who will hold the GUC Lien for the benefit of the holders of Allowed Claims in Classes 23A, 24A, 25A and 26A – F, shall be selected by the Committee, or, in the event of an objection to such collateral agent by the holder of an Allowed Claim in one of the foregoing classes that is not a Lender, shall be appointed by the Bankruptcy Court.  The GUC Collateral Agent shall be entitled to reasonable attorneys' fees and costs, not to exceed $7,500 plus any recording costs, for the purpose of establishing and perfecting the GUC Lien.  The GUC Collateral Agent shall be entitled to a fee of $2,500 per quarter, plus, after a default under the Plan that is not cured in accordance with the Plan and involves the GUC Lien, reasonable attorneys' fees and costs to enforce such Lien.  The Plan Supplement shall include, among other things, the Plan Lien Documents, including the GUC Plan Intercreditor Agreement respecting the first priority liens of Pacwest and MARAD.  The GUC Collateral Agent and all other Persons may rely upon the provisions of all recorded Plan Lien Documents.

(b)      Payments of Designated Vessel Proceeds.  Within four (4) Business Days after the closing of a Qualified Sale of a Vessel subject to the GUC Lien, the Reorganized Debtors shall distribute the Net Proceeds of such sale as follows: (i) first, to the holder(s) of Lien(s) on the Vessel that are senior in priority to the Lien held by the GUC Collateral Agent, including any Lien held by Pacwest or MARAD, as applicable, (ii) second, to the GUC Collateral Agent as provided in the following sentence, and (iii) third, the remaining balance to the Debtor that owned the Vessel sold.  The Net Proceeds of the sale of a Vessel that are distributed to the GUC Collateral Agent shall be applied: (1) first, and on a Pro Rata basis to any Equalization Payments then due, (2) second, to the next scheduled Installment Payment, and (3) third, and on a Pro Rata basis to the balance due to the holders of the Allowed Claims in Classes 23A, 24A and 26A – F.

### 6.17    Life Insurance Agreement.

Upon entry of the Confirmation Order, the Debtors shall enter into and effectuate the Life Insurance Agreement, in a form to be provided in the Plan Supplement, that, subject to the Debtors' payments of the premiums for the insurance policies owned by the Insurance Trust, provides that the Insurance Trust: (a) will be obligated to repay all premiums paid by the Debtors, which repaid premiums the Debtors shall promptly remit Pro Rata to the Lenders, with such payments to be applied in accordance with Section 4.1(c)(i)(12) of the Plan, (b) will be obligated to loan seventy-five percent (75%) of the death benefits obtained by the Insurance Trust to the Corporate Debtors, provided that the Corporate Debtors' obligations to repay such loan shall be subordinate in all respects to the Corporate Debtors' obligations to the holders of Allowed Claims under the Plan, and (c) shall not, after receipt of the death benefits, pay dividends or make loans or other transfers to Insiders.

**6.18    Revesting of Property.**

Except as otherwise provided in the Plan, each of the Reorganized Debtors, as of the Effective Date, shall be vested with all of the assets of each respective Debtor.

**6.19    Preservation and Resolution of Causes of Action.**

Except as provided in, and unless expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, the Confirmation Order, the Eighth Cash Collateral Order, any Non-Appealable Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, the Reorganized Debtors will exclusively retain and may enforce, and the Debtors and the Reorganized Debtors expressly reserve and preserve for these purposes, in accordance with sections 1123(a)(5)(A) of the Bankruptcy Code, any Claims, demands, rights and Causes of Action that the Debtors or their respective Estates may hold against any person or entity. No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to them by virtue of or in connection with the confirmation or consummation of the Plan. After the Effective Date and except as otherwise provided in the Plan, the Reorganized Debtors are authorized, without further Bankruptcy Court order, to compromise, settle and/or otherwise dispose of any Causes of Action; provided that, until the Bankruptcy Cases are closed, the Reorganized Debtors shall file a Settlement Notice with respect to any settlement of a Cause of Action.

**6.20    Dissolution of the Committee.**

The Committee shall dissolve automatically on the Effective Date. Upon such dissolution, its members, professionals, and agents shall be released from any further duties and responsibilities in the Bankruptcy Case and under the Bankruptcy Code, except with respect to applications for Professional Fee Claims or reimbursement of expenses incurred as a member of the Committee.

**6.21    Default.**

No event of default under the Plan shall occur unless, in the event of a breach of the Debtors' or the Reorganized Debtors' obligations under the Plan, the holder of the Allowed Claim asserting the default shall provide written notice of such breach to the Reorganized Debtors and such breach is not cured: (a) in the event of a breach that can be cured by the payment of a sum of money, within ten (10) days of the Reorganized Debtors' receipt of such notice; and (b) for any other breach, within thirty (30) days of the Reorganized Debtors' receipt of such notice, provided that, if such non-monetary breach cannot reasonably be cured within such 30-day period and the Reorganized Debtors have commenced curing such breach and continue to cure such breach, the thirty (30) day period shall be extended for such time as is reasonably necessary to cure such breach.

**6.22     Allowance of Claims.**

Under Section 6.2(a) of the Plan, any holder of multiple Allowed Claims against more than one Debtor that arise from the contractual, joint, joint and several, or several liability of such Debtors, the guarantee by one Debtor of another Debtor's obligation or other similar circumstances, shall be entitled to one Allowed Claim that, in the aggregate, does not exceed the amount of the underlying Claim giving rise to such multiple Claims.  Claims against more than one of the Debtors arising from the same injury, damage, cause of action or common facts shall be Allowed and paid only once as if such Claim were against a single Debtor.  Nothing in Section 6.2(a) of the Plan shall, upon a default under the Plan, prevent the holder of Allowed Claims against more than one Debtor from enforcing its remedies under the Plan against such Debtors.  Section 6.2(a) of the Plan recognizes that the Plan is a joint plan, and prevents creditors from being paid twice by two or more Debtors for the same underlying Claim.  Certain of the Lenders may contend otherwise.

**6.23     Assumption of Executory Contracts and Unexpired Leases.**

Pursuant to Sections 1123(b)(2) and 365(a) of the Bankruptcy Code, any executory contract or unexpired lease (excluding insurance policies) that (i) has not expired by its own terms on or prior to the Confirmation Date, (ii) has not been assumed, assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, (iii) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date, or (iv) is not designated by the Debtors as being an executory contract or unexpired lease to be rejected at the time of confirmation of this Plan, shall be deemed assumed on the Effective Date.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumption pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

**6.24     Payments Related to The Assumption of Executory Contracts And Unexpired Leases.**

(a)     <u>Payment of Claims Arising From Assumed Contracts And Leases</u>.  Any Allowed Claims arising from the assumption of an executory contract or unexpired lease will receive, in full and complete satisfaction, settlement, release and discharge of such Claims, payment in the ordinary course of business as and when such Allowed Claims become due pursuant to such executory contract or unexpired lease.

(b)     <u>Disputed Claims and Bar Date</u>.  If there is a dispute regarding (i) the amount of any claim arising from the assumption or rejection of an executory contract or unexpired lease, (ii) the ability of the applicable Debtor or any assignee to provide "adequate assurance of future performance," within the meaning of Section 365 of the Bankruptcy Code, under a contract or lease to be assumed, or (iii) any other matter pertaining to the assumption or assumption and assignment of any contract or lease, the payment of any Claim related to the foregoing will be made following entry of a Non-Appealable Order resolving the dispute and approving the assumption.

**6.25    Rejection Damage Claims.**

If the rejection of an executory contract or unexpired lease by the Debtors results in a Claim by the other party or parties to such contract or lease, any claim for damages, if not previously evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estates, the Reorganized Debtors and their respective properties, agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors on or before thirty (30) days following the later to occur of: (a) the rejection of such executory contract or unexpired lease, and (b) the Confirmation Date.  Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim are timely filed will be treated as General Unsecured Claims subject to the provisions of the Plan.  The Debtors or the Reorganized Debtors, as the case may be, shall have the right to object to any such Claim for rejection damages in accordance with the Plan.

**6.26    Discharge.**

Except as otherwise expressly provided in Section 1141 of the Bankruptcy Code or the Plan, the distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final discharge as against the Debtors and the Reorganized Debtors of any debt or obligation of the Debtors that arose before the Effective Date, and any debt of the Debtors of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims against the Debtors or their Estates of any nature, including, without limitation, any setoff claims and/or any interest accrued on any Claim from and after the Petition Date, whether or not: (a) a proof of claim based on such debt, obligation or Equity Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (b) such Claim is Allowed under Section 502 of the Bankruptcy Code, or (c) the holder of such Claim has accepted the Plan; provided that, JMC's discharge is subject to the limitations set forth in Section 1141(d)(5) of the Bankruptcy Code requiring, among other things, an individual debtor to complete payments under a plan before receiving his discharge.  Since the Plan may involve payments to creditors for up to ten (10) years following the Effective Date, JMC may not receive his discharge for up to ten (10) years.

**6.27    Injunction Relating to the Plan.**

As of the Effective Date, all Persons are hereby permanently enjoined from commencing, continuing or enforcing in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtors, their Estates or the Reorganized Debtors, on account of, or respecting any Claims, debts, rights, obligations, Causes of Action or liabilities discharged pursuant to the Plan, except to the extent expressly permitted under the Plan.

**6.28    Releases.**

Except as otherwise set forth in the Plan, as of the Effective Date, in consideration for, among other things, the obligations of the Debtors under the Plan and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection

with the Plan, (a) each holder of a Claim or Interest that votes in favor of the Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each Person that has held, holds or may hold a Claim or Equity Interest or at any time was a creditor or equity holder of any of the Debtors and that does not vote on the Plan or votes against the Plan, in each case will be deemed to forever release, waive and discharge all claims (including any derivative claims), obligations, suits, judgments, damages, demands, rights, causes of action and liabilities (other than the right to enforce the Reorganized Debtors' obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered, or that remain in effect, under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to a Debtor, the Bankruptcy Cases or the Plan that such entity has, had or may have against any Debtor, the Estates, the Estate's Assets, the Reorganized Debtors and/or the Reorganized Debtors' Assets.  Nothing in Section 9.3 of the Plan shall be deemed to provide a release to a non-Debtor third party.

### 6.29    Cancellation of Existing Indebtedness and Liens.

Except as is otherwise provided in the Plan, on the Effective Date: (a) all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements and any other documents or instruments evidencing Claims against the Debtors, together with any and all Liens securing same, including without limitation any rights of setoff, any of the foregoing held by the Collateral Agent, securing the Retained Proceeds Claims and Agent Claims, and/or securing a Claim that is not an Allowed Claim, shall be canceled, discharged and released without further act or action by any Person under any applicable agreement, law, regulation, order or rule, (b) the obligations of the Debtors thereunder shall be deemed cancelled, discharged and released, and (c) all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the Reorganized Debtors.  To the extent deemed necessary or advisable by the Reorganized Debtors, any holder of a Claim shall promptly provide the Reorganized Debtors with an appropriate instrument of cancellation, discharge or release, as the case may be, in suitable form for recording wherever necessary to evidence such cancellation, discharge or release, including the cancellation, discharge or release of any Lien securing such Claim. Notwithstanding the foregoing, this Section 9.4 of the Plan shall not apply to the Loan Documents of any Lender with an Allowed Secured Claim, the effectiveness of which is governed by Section 4.1(c) of the Plan, until such Allowed Secured Claim has been paid in full. The homestead exemption claimed by JMC on real property located at 72 Jericho Road, Dennis, Massachusetts, shall not apply to any voluntary mortgages, security agreements, deeds of trust, liens or other security interests filed of record or recorded against that property prior to JMC's filing of a homestead declaration with respect to that property.

### 6.30    Exculpation.

Except as otherwise set forth in the Plan, neither the Debtors, the Reorganized Debtors, the Committee nor any of their respective present or former members, managers, officers,

directors, employees, general or limited partners, advisors, attorneys, agents, successors or assigns, shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the administration of these Bankruptcy Cases, the pursuit of confirmation of the Plan, the Disclosure Statement, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan occurring prior to the Effective Date, provided that the terms of Section 9.5 of the Plan shall not apply to any liability for willful misconduct or ultra vires acts.

### 6.31    Setoffs.

Except as otherwise provided in the Plan, nothing contained in the Plan shall constitute a waiver or release by the Debtors, the Estates and/or the Reorganized Debtors of any rights of setoff each may have against any Person.

### 6.32    Tax Consequences of the Plan.

The following is a general summary of certain material federal income tax consequences of the Plan and the distributions provided under the Plan.  This summary does not discuss all aspects of federal taxation that may be relevant to a particular creditor in light of its individual investment circumstances or to certain creditors or shareholders subject to special treatment under the federal income tax laws (for example, tax-exempt organizations, financial institutions, broker-dealers, life insurance companies, foreign corporations or individuals who are not citizens or residents of the United States).  This summary does not discuss any aspects of state, local or foreign taxation.  The impact on foreign holders of claims and equity interests is not discussed.

This summary is based upon the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury regulations (including temporary regulations) promulgated thereunder, judicial authorities and current administrative rulings, all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision.  Moreover, due to a lack of definitive judicial or administrative authority or interpretation and the complexity of the transactions contemplated in the Plan, substantial uncertainties exist with respect to various tax consequences of the Plan.  The Debtors have not requested a ruling from the Internal Revenue Service (the "IRS") with respect to these matters and no opinion of counsel has been sought or obtained by the Debtors with respect thereto.  There can be no assurance that the IRS or any state or local taxing authorities will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained.  **FOR THE FOREGOING REASONS, CREDITORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) TO THEM OF THE PLAN.  THE DEBTORS ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR, NOR ARE THE DEBTORS RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.**

### A.     Federal Income Tax Consequences to the Debtors.

Cancellation of Indebtedness.  Generally, the Debtors will realize cancellation of debt ("COD") income to the extent, if at all, that the Debtors pay a creditor pursuant to the Plan an amount of consideration in respect of a Claim against the Debtors that is worth less than the amount of such Claim.  For this purpose, the amount of consideration paid to a creditor generally will equal the amount of cash or the fair market value of property paid to such creditor.  Because the Debtors will be in a bankruptcy case at the time the COD income is realized (if any is realized), the Debtors will not be required to include COD income in gross income, but rather will be required to reduce tax attributes by the amount of COD income so excluded.

### B.     Tax Consequences to Creditors.

In General.  The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether such Claim constitutes a debt or a security for federal income tax purposes, (b) whether the holder of the Claim receives consideration in more than one tax year, (c) whether the holder of the Claim is a resident of the United States, (d) whether all the consideration received by the holder of the Claim is deemed to be received by the holder of the  Claim as part of an integrated transaction, (e) whether the holder of the Claim reports income using the accrual or cash method of accounting, and (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

Gain or Loss on Exchange.  Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his or her Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest or accrued market discount, as described below) if the Claim was a capital asset in the hands of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

### C.     Information Reporting and Backup Withholding.

Under the backup withholding rules of the Internal Revenue Code, holders of Claims may be subject to backup withholding at the rate of 31 percent with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer

identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income.  Any amount withheld under these rules will be credited against the holder's federal income tax liability.  Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OWN TAX ADVISOR REGARDING SUCH TAX CONSEQUENCES.**

## VII.   MISCELLANEOUS

### 7.1   Exemption from Transfer Taxes.

As is described above, the Plan is predicated on the sale or transfer of Property to satisfy the Allowed Claims of creditors.  Section 1146(c) of the Bankruptcy Code provides that transfers of property pursuant to a confirmed plan are not subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.  Sales of Property after the Confirmation Date, including any sales of Residences and Real Property owned by the Debtors will not, therefore, be subject to any such tax or assessment.

## VIII.   FEASIBILITY AND LIQUIDATION ANALYSES

### 8.1   Feasibility of the Plan

The Debtors and their advisors have prepared the Projections, attached as <u>Exhibit D</u>, showing the income and expenses and the payment of creditors' claims based on the Plan.  The Plan is premised upon the continued sale and charter of vessels by the Debtors to service and satisfy the claims of creditors under the Plan.  In response to the downturn in the oil and gas industry, the Debtors have taken a number of measures to improve their operations and finances, including:

- Selling Vessels;
- Increasing charter rates;
- Creating and chartering a new Floatel;
- Deploying the existing Floatels;
- Negotiating and completing heavy haul charters;
- Relocating vessels to increase utilization;
- Introducing the purchase option charter program;

- Laying up their tugboats and the Mystic;
- Consolidating employee positions;
- Reducing salary and benefits;
- Reducing overhead costs.

Among the cost saving efforts implemented by the Debtors are the following. CEC closed its marine construction division at a savings of over $50,000 per month. The Debtors renegotiated their insurance program and by changing carriers realized a savings of over $40,000 per month. SMS has limited its tug business to offering Tugs on a bareboat basis until they can be sold, creating a savings in overhead of over $100,000 per month. CEC restructured its West African operations, its Singapore operations and its Mexican operations by closing its offices in those locations and consolidating its sales functions with its United States based sales agents, achieving a savings of over $124,000 per month. Cashman Equipment restructured its headquarters operation achieving a savings of over $58,000 per month, and CSS restructured its headquarters operation achieving a savings of over $18,000 per month. In all, the Debtors' efforts have resulted in costs savings of over $390,000 per month.

The Debtors' finances have improved markedly during the Chapter 11 cases. In 2017, charter and Vessel sale revenue totaled approximately $32.5 million, consisting of charter revenue of approximately $23.6 and sale revenue of approximately $8.9 million. For 2018, the Debtors project charter and Vessel sale revenue totaling approximately $35.4 million, consisting of charter revenue of approximately $26.1 million and sale revenue of approximately $9.2 million. The Debtors' Cash Collateral and liquidity have also substantially increased during the Chapter 11 cases. On the Petition Date, the Debtors' Cash Collateral was approximately $5,978,000, excluding any cash from Vessel sales. As of September 26, 2018, the Debtors' Cash Collateral totals approximately $13,839,000, an increase of approximately $7,861,000 since the Petition Date.

Based upon their improved operations and financial condition, the Debtors have developed a repayment plan for secured creditors that includes fixed monthly payments over time and variable payments from Vessel sales and the Excess Cash Payment. General Unsecured Claims will be paid in full, with interest at a rate of five percent (5%).

The Projections are based on Vessel charter and Vessel sale revenue of $36.0 million in 2019, $38.3 million in 2020, $37.2 million in 2021 and approximately $33 million each year thereafter during the term of the Plan. The Debtors believe that the Projections are achievable based on their historical charter and Vessel sales revenue:

|  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| Charter Revenue (in $000's) | $ 69.2 | $ 72.2 | $ 71.4 | $ 68.6 | $ 28.6 | $ 23.6 |
| Vessel Sale Revenue (in $000's) | $ 4.4 | $ 5.1 | $ 3.8 | $ 6.7 | $ 15.5 | $ 8.9 |
| Total | $ 73.6 | $ 77.3 | $ 75.2 | $ 75.3 | $ 44.1 | $ 32.5 |

Based upon the Projections, the Excess Cash Payments would be as follows: 2022 – $3.0 million; and 2024 – $800,000.[10]  On or before the sixth (6th) anniversary of the Effective Date, the Debtors will re-finance the balance of the Lenders' Allowed Secured Claims.  Based on the reduction in the principal balance of such Claims that will be achieved prior to the sixth (6th) anniversary of the Effective Date, the value of the Fleet and the Debtors' projected financial performance, the Debtors believe they will be able to re-finance the balance of the Lenders' Allowed Secured Claims, projected to be approximately $101 million.  The Projections show that Debtors will be able to service the Allowed Secured Claims and satisfy other Allowed Claims in full at or before the scheduled maturities.

As a result of the Mediation, the Projections assume that all of the Lenders will elect to become Agreed-Claim Lenders.

If the total amount of Allowed General Unsecured Claims is $5.5 million, the holders of such Claims will be paid in full by approximately the seventh (7th) anniversary of the Effective Date.  If the total amount of Allowed General Unsecured Claims is $15.5 million, the holders of such Claims will be paid in full by the tenth (10th) anniversary of the Effective Date.  If the total amount of Allowed General Unsecured Claims is $20.5 million, the holders of such Claims will be paid approximately sixty percent (60%) of their Claims, with interest, by the tenth (10th) anniversary of the Effective Date and the balance, approximately $8.0 million, will be paid on the tenth (10th) anniversary of the Effective Date.

### 8.2    Best Interests of Creditors And Comparison With Chapter 7 Liquidation

As a condition to confirmation of the Plan, Section 1129(a)(7)(A)(ii) of the Bankruptcy Code requires that each holder of a claim or an interest in an impaired Class of Claims or Equity Interests must either accept the Plan or receive or retain at least the amount or value it would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.

Attached as <u>Exhibit E</u> is: (a) a consolidated liquidation analysis for the corporate Debtors, and (b) a liquidation analysis for Mr. Cashman.  If the Plan is not confirmed, the Debtors' cases would be converted to Chapter 7 proceedings.  Because of the Debtors' dominant position in the international barge industry, the liquidation of all of the Debtors' barges at once would flood the market, reducing the amount realized from the sale of the Debtors' barges.  Under these circumstances, the Fleet, which has an aggregate forced liquidation value of approximately $162,000,000, would suffer a fifteen percent (15%) and twenty percent (20%) reduction in value.  The bulk forced liquidation of the Fleet in Chapter 7 would not be sufficient to pay the Lenders,

---

[10]  The Plan provides that Excess Cash is determined using a baseline cash number of $10 million.  The Projections have yearly, not quarterly, projections for years 2021 through 2025.  In order to determine the Excess Cash sweep in these years, which is measured at the end of the third quarter, the Projections use the cash projected at calendar year end and sweep cash over $12 million, instead of cash the $10 million Excess Cash figure.  This protocol is used because cash is projected to increase by approximately $2.0 million in the fourth quarter of each year, and by adding this number to the $10 million Excess Cash figure the Projections can produce an Excess Cash sweep number for the third quarter of each year.

other than RTC, PacWest, MARAD and Radius, in full, resulting in Lender unsecured deficiency claims of approximately $38.8 million.  In a Chapter 7 proceeding, the anticipated dividend to General Unsecured Claims, including the Lenders' deficiency claims, would be approximately twenty-eight percent (29%), and creditors would not likely receive any dividend for at least two (2) years.

In contrast, the Plan provides for the continued operation of the Debtors and the use of the income from those operations, as well as the orderly sale of certain Vessels, for values in excess of their MDP, to pay creditors in full.  The Plan provides for non-priority unsecured creditors to receive the payment in full of their Allowed Claims, with interest at a rate of five percent (5%) per annum, over a period of not more than ten (10) years, with payments commencing on the Effective Date.  Confirmation of the Plan will therefore result in a substantially more certain and greater return to unsecured creditors than might be realized if these cases were converted to cases under Chapter 7 of the Bankruptcy Code.

Cashman Equipment Corporation,                    Cashman Scrap & Salvage, LLC,


/s/ *James M. Cashman*                             /s/ *James M. Cashman*
By: James M. Cashman                               By: James M. Cashman
Its: President                                     Its: Manager

Servicio Marina Superior, LLC,                     Cashman Canada, Inc.,


/s/ *James M. Cashman*                             /s/ *James M. Cashman*
By: James M. Cashman                               By: James M. Cashman
Its: General Manager                               Its: President

Mystic Adventure Sails, LLC,                       James M. Cashman,


/s/ *James M. Cashman*                             /s/ *James M. Cashman*
By: Servicio Marina Superior, LLC
By: James M. Cashman
Its: General Manager


[signatures cont'd on next page]

Counsel for Corporate Debtors,                     Counsel for James M. Cashman,


/s/ D. Ethan Jeffery                               /s/ Jeffrey D. Sternklar
Harold B. Murphy, Esq. (BBO #362610)               Jeffrey D. Sternklar, Esq. (BBO# 549561)
D. Ethan Jeffery, Esq. (BBO #631941)               JEFFREY D. STERNKLAR, LLC
MURPHY& KING, P.C.                                 225 Franklin Street, 26th Floor
One Beacon Street                                  Boston, MA 02110
Boston, MA  02108                                  Telephone: (617) 396-4515
Telephone:  (617) 423-0400                         Facsimile:  (617) 507-6530
Facsimile:   (617) 423-0498                        Email:  jeffrey@sternklarlaw.com
Email:  EJeffery@murphyking.com

Dated: November 2, 2018

IN RE: CASHMAN EQUIPMENT CORP., *ET AL.*
BANKRUPTCY NO. 17-12205
(JOINTLY ADMINISTERED)

EXHIBIT A TO

MODIFIED THIRD AMENDED DISCLOSURE STATEMENT WITH RESPECT
TO JOINT PLAN OF REORGANIZATION OF CASHMAN
EQUIPMENT CORP., CASHMAN SCRAP & SALVAGE, LLC,
SERVICIO MARINA SUPERIOR, LLC, CASHMAN CANADA, INC.,
MYSTIC ADVENTURE SAILS, LLC, AND JAMES M. CASHMAN

The Debtors' *Modified Third Amended Joint Plan of Reorganization of Cashman Equipment Corp., Cashman Scrap & Salvage, LLC, Servicio Marina Superior, LLC, Cashman Canada, Inc., Mystic Adventure Sails, LLC, And James M. Cashman* has been filed separately.

IN RE: CASHMAN EQUIPMENT CORP., *ET AL.*
BANKRUPTCY NO. 17-12205
(JOINTLY ADMINISTERED)

EXHIBIT B TO

MODIFIED THIRD AMENDED DISCLOSURE STATEMENT WITH RESPECT
TO JOINT PLAN OF REORGANIZATION OF CASHMAN
EQUIPMENT CORP., CASHMAN SCRAP & SALVAGE, LLC,
SERVICIO MARINA SUPERIOR, LLC, CASHMAN CANADA, INC.,
MYSTIC ADVENTURE SAILS, LLC, AND JAMES M. CASHMAN

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)**

<table>
<tr><td>

In re

**CASHMAN EQUIPMENT CORP.,**[1]

Debtor

</td><td>

**Chapter 11**

**Case No. 17-12205-MSH**

**Jointly Administered**

</td></tr>
</table>

**DEBTORS' ACKNOWLEDGEMENTS AND RETAINED CHALLENGE RIGHTS**

Cashman Equipment Corp. ("CEC"), Cashman Scrap & Salvage, LLC ("CSS"), Servicio Marina Superior, LLC ("SMS"), Cashman Canada, Inc. ("CCI"), and Mystic Adventure Sails, LLC ("Mystic", and together with CEC, CSS, SMS and CCI the "Debtors") set forth their acknowledgements and retained challenge rights with respect to the claims and/or liens asserted against the Debtors and/or their assets by Fifth Third Bank, Banc of America Leasing and Capital, LLC, Citizens Asset Finance, Inc, Key Equipment Finance, a division of KeyBank, National Association, Pacific Western Bank, Radius Bank, Rockland Trust Company, Santander Bank, N.A., and Wells Fargo Equipment Finance, Inc., Equitable Bank and U.S. Bank, National Association, acting through its division, U.S. Bank Equipment Finance (collectively the "Lenders" and individually a "Lender"):

1.      Subject to paragraph 5, below, the Debtors acknowledge that, as of June 9, 2017 the "Petition Date"), the Lenders were owed principal and interest in the amounts set forth on Exhibit C to the *Eighth Interim Order Granting (1) Use of Cash Collateral, (2) Replacement Liens, (3) Additional Adequate Protection, And (4) Other Relief* (the "Cash Collateral Order"). The Debtors reserve the right to challenge any other amounts claimed to be owed by any or all of the Lenders.

2.      The Debtors acknowledge the validity and perfection of: (i) the mortgages held by the particular Lender against the particular vessels described on Exhibit A to the Cash Collateral Order (collectively the "Vessels"), and (ii) the Lenders' respective liens on cash collateral (as that term is defined in the Bankruptcy Code) existing and identifiable as of the Petition Date and generated from Vessels against which they held valid and perfected liens, except for the following:

---

[1] The Debtors in these jointly administered Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Cashman Equipment Corp. (7969), Cashman Scrap & Salvage, LLC (6088), Servicio Marina Superior, LLC (6919), Mystic Adventure Sails, LLC (2137) and Cashman Canada, Inc. (1296).

733328

1

a.  Any lien asserted against a vessel listed as "Unencumbered" on <u>Exhibit A</u> to the Cash Collateral Order (collectively the "<u>Unencumbered Vessels</u>");

b.  Any Lenders' lien on cash collateral (as that term is defined under the Bankruptcy Code) generated by the Unencumbered Vessels or by a Vessel against which they do not have a valid and perfected lien;

c.  The extent of any lien asserted by a Lender on cash existing as of the Petition Date;

d.  Any lien asserted by Santander Bank, N.A. on cash collateral (as that term is defined under the Bankruptcy Code);

e.  Any lien asserted by Citizens Bank, N.A. on cash collateral generated by JMC-148, JMC-163 and/or JMC-3334;

f.  Any lien first perfected by a UCC-1 financing statement filed within ninety (90) days of the filing of the Debtors' bankruptcy cases, including the UCC-1 financing statement filed by Rockland Trust Company on or about March 17, 2017; and

3.  The Debtors acknowledge the validity and perfection of: (i) the liens held by the particular Lenders against the particular items of equipment (not including the Vessels) described on <u>Exhibit A</u> to the Cash Collateral Order; and (ii) the security interest held by Rockland Trust Company on the Debtors' personal property, except for the following:

a.  All challenge rights reserved under paragraph 2, to the extent applicable to personal property;

b.  Any lien asserted by a Lender on commercial tort claims;

c.  The extent of any lien asserted by Rockland Trust Company in the amounts recovered from Micoperi SRL.

4.  The Debtors reserve the right to challenge, for any reason, any claim or lien asserted by any Lender on the Debtors' assets other than those acknowledged to be valid in paragraphs 1, 2(i) and (ii), and 3(i) and (ii), above.

5.  Without limiting paragraph 4, above, the Debtors reserve the right to challenge, for any reason, the following additional amounts of principal and/or non-default interest claimed to be owed, as of the Petition Date and above and beyond the amounts acknowledged in the Cash Collateral Order, by the following Lenders:

a.  Fifth Third Bank:  $7,906.34;

b.  Pacific West Bank: $23,489.34;

2

     c.        Citizens Asset Finance, Inc.: $9,428.05;

     d.        Rockland Trust Company: $21,530.50.

     6.        Without limiting paragraph 4, above, the Debtors and Radius Bank are currently reconciling the application of a portion of the JMC 77 sale proceeds in the amount of $109,737.31 received by Radius on May 2, 2017.  The Debtors and Radius expect that this reconciliation will be concluded on or before October 27, 2017, but in the interim both parties reserve their rights to modify the acknowledged principal and interest numbers to reflect the agreed reconciliation of these proceeds.

3

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____
                                                    )
In re:                                              )
                                                    )
CASHMAN EQUIPMENT CORP.,[1]        )        Chapter 11
                                                    )        Case No. 17-12205-MSH
                        Debtor.                     )        Jointly Administered
_____)

**NOTICE OF RETAINED CHALLENGES
OF OFFICIAL COMMITEE OF UNSECURED CREDITORS**

The Official Committee of Unsecured Creditors (the "Committee") of Cashman

Equipment Corp. and its affiliated debtors in possession (the "Debtors"), acting pursuant to

paragraph 16.b of the *Eighth Interim Order Granting (1) Use of Cash Collateral, (2)*

*Replacement Liens, (3) Additional Adequate Protection, and (4) Other Relief* [Docket No. 546]

(the "Eighth Interim Cash Collateral Order"), hereby provides written notice to the Lenders[2] of

the Committee's following stated exceptions to the Acknowledgements that hereby constitute the

Committee Retained Challenges:

**A.        Incorporation and Restatement of Debtor Retained Challenges**

The Committee incorporates by reference and restates as Committee Retained Challenges

all of the Debtors' stated exceptions to the Acknowledgements, as set forth in Exhibit D to the

Eighth Interim Cash Collateral Order, that constitute the Debtor Retained Challenges.

---

[1] The affiliated debtors in these jointly administered cases are:  Cashman Scrap & Salvage, LLC, Servicio Marina Superior, LLC, Cashman Canada, Inc., Mystic Adventure Sails, LLC, and James M. Cashman.

[2] Capitalized terms used but not specifically defined herein shall have the meanings ascribed to such capitalized terms in the Eighth Interim Cash Collateral Order or (as appropriate) in the *Order Authorizing Sales of Certain Assets Free and Clear of All Liens, Claims and Interests* [Docket No. 545].

**B.      Statement of Additional Committee Retained Challenges as to All Lenders**

The Committee hereby states as additional Committee Retained Challenges the following

additional exceptions to the Acknowledgements with respect to each and every Lender:

a.      any lien or other interest claimed or asserted by a Lender in any of the Unencumbered Vessels other than a Retained Proceeds Lien held by or for the benefit of such Lender (if any) on account of an allowed Retained Proceeds Claims of such Lender (if any);

b.      any lien or other interest claimed or asserted by a Lender in any cash, cash equivalents, proceeds, and/or accounts (however denominated in any underlying agreement, contract, or document) held by, due to, or to become due to any Debtor on account of any charter, hire, rent, lease, or other use (however denominated in any underlying agreement, contract, or document) of any Vessel on and after the Petition Date ("Postpetition Revenues"), including without limitation any Postpetition Revenues generated through any charter, hire, rent, lease, or other use of any Vessel that has been the subject of  improvements, accessions, or other appurtenances made or effected on or after the Petition Date;

c.      the amounts of the claim of any Lender set forth in Par. 13 of the Eighth Interim Cash Collateral Order, including any claim for additions to those amounts pursuant to 11 U.S.C. § 506(b); and

d.      any lien or other interest claimed or asserted by a Lender as adequate protection for the Debtors' use of Postpetition Revenues.

**C.      Statement of Additional Committee Retained Challenges as to Specific Lenders**

The Committee hereby states as additional Committee Retained Challenges the following

additional exceptions to the Acknowledgements with respect to the specific Lenders listed

below:

1.      **Rockland Trust Company ("RTC")**:

a.      any lien or other interest claimed or asserted by RTC in any cash, cash equivalents, proceeds, and/or accounts (however denominated in any underlying agreement, contract, or document) held by, due to, or to become due to any Debtor on account of any charter, hire, rent, lease, or other use (however denominated in any underlying agreement,  contract, or document) of the three (3) Vessels owned by the Debtor Cashman Canada Inc., namely, JMC-47, JMC-48, and JMC-185.

b.      to require RTC to first marshal any security interest or mortgage interest held by RTC in property of others than the Estate and apply the proceeds thereof against the

2

Debtors' obligations to RTC before seeking to recover those obligations from Estate property.

2.      **Santander Bank, N.A ("Santander")**:

a.      any lien or other interest claimed or asserted by Santander in any cash, cash equivalents, proceeds, and/or accounts (however denominated in any underlying agreement, contract, or document) held by, due to, or to become due to any Debtor on account of any charter, hire, rent, lease, or other use (however denominated in any underlying agreement, contract, or document) of the Vessels subject to Santander's vessel mortgages.

3.      **Citizens Asset Finance, Inc. ("Citizens")**:

a.      any lien or other interest claimed or asserted by Citizens in any cash, cash equivalents, proceeds, and/or accounts (however denominated in any underlying agreement, contract, or document) held by, due to, or to become due to any Debtor on account of any charter, hire, rent, lease, or other use (however denominated in any underlying agreement, contract, or document) of the following three (3) Vessels subject to Citizens' vessel mortgages:  JMC-148, JMC-163, and JMC-3334.

4.      **Key Equipment Finance, a division of KeyBank National Association ("KeyBank")**:

a.      any lien or other interest claimed or asserted by KeyBank in any Postpetition Revenues generated through any charter, hire, rent, lease, or other use of the Vessel JMC-3330 to the extent generated as a result of, or otherwise allocable to, such Vessel having been the subject of improvements, accessions, or other appurtenances made or effected on or after the Petition Date.

5.      **Radius Bank ("Radius")**:

a.      any lien or other interest claimed or asserted by Radius in any cash, cash equivalents, proceeds, and/or accounts (however denominated in any underlying agreement, contract, or document) held by, due to, or to become due to any Debtor on account of any charter, hire, rent, lease, or other use (however denominated in any underlying agreement, contract, or document) of the Vessels subject to Radius's vessel mortgages.

6.      **Equitable Bank ("Equitable")**:

a.      any lien or other interest claimed or asserted by Equitable in any cash, cash equivalents, proceeds, and/or accounts (however denominated in any underlying agreement, contract, or document) held by, due to, or to become due to any Debtor on account of any Debtor's operation of the crane equipment subject to Equitable's security interest, namely, JMC-58.

3

7.      **Banc of America Leasing and Capital, LLC ("BOA")**:

a.      any lien or other interest claimed or asserted by BOA in any cash, cash equivalents, proceeds, and/or accounts (however denominated in any underlying agreement, contract, or document) held by, due to, or to become due to any Debtor on account of any Debtor's operation of the Vessel Miss Nora (JMC-4003).

OFFICIAL COMMITTEE OF
UNSECURED CREDITORS,

By its attorneys,

/s/ Michael J. Fencer

_____
Michael J. Fencer (BBO No. 648288)
John T. Morrier (BBO No. 628624)
A. Davis Whitesell (BBO 551462)
CASNER & EDWARDS, LLP
303 Congress Street
Boston, Massachusetts 02110
Telephone:  617-426-5900
Facsimile:  617-426-8810
Email: fencer@casneredwards.com
Email: morrier@casneredwards.com
Email: whitesell@casneredwards.com

Dated:      October 30, 2017

IN RE: CASHMAN EQUIPMENT CORP., *ET AL.*
BANKRUPTCY NO. 17-12205
(JOINTLY ADMINISTERED)


EXHIBIT C TO


MODIFIED THIRD AMENDED DISCLOSURE STATEMENT WITH RESPECT
TO JOINT PLAN OF REORGANIZATION OF CASHMAN
EQUIPMENT CORP., CASHMAN SCRAP & SALVAGE, LLC,
SERVICIO MARINA SUPERIOR, LLC, CASHMAN CANADA, INC.,
MYSTIC ADVENTURE SAILS, LLC, AND JAMES M. CASHMAN

| In re Cashman Equipment Corp., Case No. 17-12205, et al. | | | | Exhibit B to Stipulation of Settlment by and between Debtors and Insurers | | |
|---|---|---|---|---|---|---|
| BARGE | DESCRIPTION | SIZE | YEAR | BASE | **INSURED** | Annual |
| NUMBER | | | BUILT | | **VALUE** | Premium |
| JMC-4 | Deck Barge | 110x34x7.5 | Unk | CA | 130,000 | $ 1,041.00 |
| JMC-5 | Bean Dredge | 149x45x8 | Unk | LA | 300,000 | $ 1,689.62 |
| JMC-12 | ABS Deck | 220x54x14 | 1992 | NY | 700,000 | $ 3,213.78 |
| JMC-24 | Floatel | 261x48x15.2 | 1944 | KZ | Cash/Caspian | $ - |
| JMC-44 | Floatel | 260x49x15 | 1944 | KZ | Cash/Caspian | $ - |
| JMC-46 | ABS Deck | 220x60x14 | 1998 | VA | 1,600,000 | $ 4,953.47 |
| JMC-47 | ABS Deck | 185x60x14 | 1998 | LA | 1,600,000 | $ 1,843.43 |
| JMC-48 | ABS Deck | 220x60x14 | 1998 | LA | 1,600,000 | $ 1,885.73 |
| JMC-50 | ABS Deck | 220x60x14 | 1998 | LA | 1,600,000 | $ 5,577.41 |
| JMC-51 | ABS Deck | 220x60x14 | 1998 | LA | 1,600,000 | $ 4,712.88 |
| JMC-67 | Hull Deck Bridge | 145x68x8 | | | 50,000 | $ 737.01 |
| JMC-73 | Deck Barge | 231x40x12 | 1954 | NJ | 400,000 | $ 1,891.65 |
| JMC-74 | Deck Barge | 231x40x12 | 1954 | LA | 400,000 | $ 2,070.66 |
| JMC-75 | w/JMC-56 - Steam Barge | 130x60x12 | 1979 | VA | 1,950,000 | $ 5,660.47 |
| JMC-76 | Steam Barge | 130x60x12 | 1983 | VA | 550,000 | $ 1,962.94 |
| JMC-77 | Inland Deck | 150x49x9 | 1979 | MA | 400,000 | $ 1,663.59 |
| JMC-79 | Inland Deck | 90x30x8 | 2010 | NY | 350,000 | $ 1,127.33 |
| JMC-80 | Inland Deck | 90x30x8 | 2010 | NY | 350,000 | $ 853.09 |
| JMC-85 | ABS Spud | 134x50x10 | 2000 | VA | 667,250 | $ 2,640.74 |
| JMC-86 | w/JMC-29 - Inland Spud | 250x72x16 | 1980 | MA | 2,400,000 | $ 7,888.52 |
| JMC-87 | Inland Spud | 250x72x16 | 1979 | CT | 50,000 | $ 158.60 |
| JMC-92 | Inland Qtr | 130x34x7 | Unk | LA | 100,000 | $ 858.97 |
| JMC-105 | Breaker Barge | 120x48x11 | Unk | LA | 100,000 | $ 927.53 |
| JMC-106 | Breaker Barge | 120x48x12 | Unk | LA | 100,000 | $ 927.53 |
| JMC-107 | Breaker Barge | 120x48x13 | Unk | LA | 100,000 | $ 927.53 |
| JMC-108 | Breaker Barge | 120x48x14 | Unk | LA | 100,000 | $ 927.53 |
| JMC-110 | Breaker Barge | 120x48x16 | Unk | LA | 100,000 | $ 927.53 |
| JMC-120 | Inland Spud | 120x54x7 | 2004 | VA | 600,000 | $ 2,005.48 |
| JMC-121 | Inland Spud | 120x57x7 | 2004 | MA | 600,000 | $ 2,086.85 |
| JMC-122 | Inland Deck | 120x48x17 | Unk | VA | 500,000 | $ 1,846.40 |
| JMC-123 | Inland Deck | 120x48x9 | Unk | VA | 500,000 | $ 1,776.33 |
| JMC-124 | Inland Spud Barge | 120x30x7 | 2008 | NJ | 225,000 | $ 990.21 |
| JMC-125 | Deck Barge | 120x30x7 | 1991 | NJ | 100,000 | $ 686.44 |
| JMC-126 | Deck Barge | 120x30x7 | 1991 | NJ | 100,000 | $ 697.74 |
| JMC-127 | Deck Barge | 120x30x7 | 1981 | NJ | 100,000 | $ 927.53 |
| JMC-128 | Deck Barge | 120x30x7 | 1981 | NJ | 110,000 | $ 714.90 |
| JMC-130 | Inland Spud Barge | 135x55x7 | 2003 | VA | 600,000 | $ 2,832.74 |
| JMC-137 | Deck Barge | 130x40x12 | 1990 | ME | 80,000 | $ 851.33 |
| JMC-138 | Deck Barge | 130x40x12 | | ME | 80,000 | $ 422.64 |
| JMC-139 | Deck Barge | 130x40x12 | | ME | 80,000 | $ 422.64 |
| JMC-140 | ABS Spud Barge | 140x48x9 | 2003 | FL | 700,000 | $ 2,524.70 |
| JMC-141 | ABS Spud | 140x40x9 | 2003 | MA | 700,000 | $ 2,276.22 |
| JMC-142 | Inland Spud Barge | 140x48x7 | 2003 | NY | 500,000 | $ 1,960.02 |
| JMC-144 | ABS Deck | 140x54x7 | 2006 | VA | 1,000,000 | $ 3,624.08 |
| JMC-145 | ABS Deck | 140x54x7 | 2007 | MA | 1,000,000 | $ 3,117.59 |
| JMC-146 | ABS Deck | 140x54x8 | 2008 | LA | 1,000,000 | $ 3,115.77 |
| JMC-147 | ABS Deck | 140x54x7 | 2008 | VA | 1,000,000 | $ 3,751.62 |
| JMC-148 | w/JMC-52 - ABS Deck | 140x54x9 | 2011 | VA | 1,525,000 | $ 5,439.86 |
| JMC-150 | ABS Spud | 150x55x9 | 2002 | VA | 790,500 | $ 3,538.78 |
| JMC-151 | Deck Barge | 150x55x9 | 2003 | VA | 700,000 | $ 2,286.47 |
| JMC-152 | Inland Spud Barge | 150x55x7.5 | 2003 | VA | 500,000 | $ 1,734.74 |
| JMC-153 | w/ JMC-59 - ABS Deck | 150x54x10 | 2005 | VA | 2,570,000 | $ 8,793.02 |
| JMC-154 | JESSE BARGE | 150x60x8 | 2013 | WA | 1,875,000 | $ 5,457.42 |
| JMC-157 | w/ JMC-35 - ABS Deck | 150x54x10 | 2005 | MA | 1,775,000 | $ 6,043.09 |

| In re Cashman Equipment Corp., Case No. 17-12205, et al. | | | | Exhibit B to Stipulation of Settlment by and between Debtors and Insurers | | |
|---|---|---|---|---|---|---|
| BARGE | DESCRIPTION | SIZE | YEAR | BASE | INSURED | Annual |
| NUMBER | | | BUILT | | VALUE | Premium |
| JMC-158 | Inland Spud Barge | 150x50x8 | 2004 | FL | 493,000 | $ 2,314.57 |
| JMC-159 | w/JMC-49 - ABS Spud | 150x60x10 | 2002 | NY | 2,550,000 | $ 8,062.11 |
| JMC-163 | ABS Spud | 160x60x10 | 2011 | LA | 1,300,000 | $ 8,816.52 |
| JMC-164 | ABS Spud | 160x60x10 | 2011 | VA | 1,300,000 | $ 3,905.13 |
| JMC-171 | Hopper Barge | 171x46x16 | 2002 | VA | 850,000 | $ 3,511.10 |
| JMC-180 | ABS Deck | 180x54x12 | 2002 | LA | 1,600,000 | $ 5,098.88 |
| JMC-182 | ABS Deck | 180x54x12 | 2007 | MX | 1,700,000 | $ 5,620.43 |
| JMC-184 | w/JMC-42 - ABS Spud | 180x54x9 | 2001 | MA | 1,475,000 | $ 4,915.95 |
| JMC-185 | ABS Spud | 18x54x12 | 2007 | CN | 1,700,000 | $ - |
| JMC-186 | ABS Deck | 180x54x12 | 2007 | LA | 1,800,000 | $ 6,173.47 |
| JMC-187 | ABS Deck | 180x54x12 | 2007 | LA | 1,700,000 | $ 5,940.22 |
| JMC-188 | ABS Deck | 173x54x12 | 2008 | LA | 1,800,000 | $ 6,266.84 |
| JMC-190 | ABS Deck | 190x60x12 | 2008 | LA | 2,100,000 | $ 6,845.51 |
| JMC-191 | ABS Deck | 195x60x12 | 2009 | LA | 2,100,000 | $ 6,955.36 |
| JMC-192 | | 190x60x12 | 2001 | VA | 740,000 | $ 2,384.52 |
| JMC-231 | ABS Deck | 250x48x10 | 2015 | LA | 900,000 | $ 3,523.36 |
| JMC-232 | ABS Deck | 125x48x9 | 2015 | LA | 450,000 | $ 2,261.18 |
| JMC-244 | ABS Deck | 250x72x16 | 2009 | KZ | Cash/Caspian | $ - |
| JMC-245 | ABS Deck | 250x72x17 | 2009 | KZ | Cash/Caspian | $ - |
| JMC-250 | ABS Deck | 250x72x18 | 1998 | LA | 2,750,000 | $ 9,370.60 |
| JMC-251 | ABS Deck | 250x72x19 | 1999 | LA | 2,750,000 | $ 8,463.48 |
| JMC-252 | ABS Deck | 239x72x16 | 2012 | LA | 3,500,000 | $ 10,733.11 |
| JMC-253 | ABS Deck | 250x72x16 | 2011 | LA | 3,500,000 | $ 11,777.18 |
| JMC-254 | ABS Deck | 250x72x16 | 1999 | LA | 2,750,000 | $ 9,227.15 |
| JMC-255 | ABS Deck | 250x72x22 | 1999 | LA | 2,750,000 | $ 1,531.95 |
| JMC-256 | ABS Deck | 250x72x16 | 2008 | LA | 3,500,000 | $ 11,278.75 |
| JMC-257 | ABS Deck | 250x72x16 | 2010 | LA | 3,500,000 | $ 13,662.93 |
| JMC-258 | ABS Deck | 250x72x16 | 2010 | LA | 3,500,000 | $ 11,777.18 |
| JMC-259 | ABS Deck | 250x72x16 | 2011 | LA | 3,500,000 | $ 12,735.63 |
| JMC-260 | ABS Deck | 260x72x16 | 2011 | LA | 3,700,000 | $ 10,862.14 |
| JMC-261 | ABS Deck | 260x72x16 | 2013 | LA | 3,700,000 | $ 11,674.47 |
| JMC-263 | ABS Deck | 250x72x16 | 2011 | LA | 3,700,000 | $ 12,603.28 |
| JMC-264 | ABS Deck | 250x72x16 | 2012 | LA | 3,700,000 | $ 11,513.56 |
| JMC-265 | ABS Deck | 250x72x16 | 2012 | LA | 3,700,000 | $ 11,972.30 |
| JMC-300 | ABS Deck | 300x100x18 | 2000 | LA | 4,450,000 | $ 14,007.02 |
| JMC-304 | ABS Deck | 288x100x18 | 2000 | LA | 4,450,000 | $ 14,498.11 |
| JMC-2508 | Mexico | 250x80x16 | 2006 | MX | 2,900,000 | $ - |
| JMC-2509 | Mexico | 250x80x17 | 2006 | MX | 2,900,000 | $ - |
| JMC-2510 | ABS Deck | 250x80x18 | 2007 | AF | 3,500,000 | $ 11,771.93 |
| JMC-2511 | Colombia / Mexico | 250x80x19 | 2007 | MX | 2,900,000 | $ - |
| JMC-2514 | ABS Deck | 250x80x20 | 2007 | AF | 3,500,000 | $ 11,777.18 |
| JMC-2515 | Mexico | 250x80x21 | 2007 | MX | 2,900,000 | $ - |
| JMC-2516 | Mexico | 250x80x16 | 2007 | MX | 2,900,000 | $ - |
| JMC-2600 | GPS / ABS Deck | 250x80x16 | 2012 | UAE | 3,000,000 | $ 8,685.70 |
| JMC-2601 | ABS Deck | 282x90x18 | 2012 | UAE | 3,000,000 | $ 8,822.55 |
| JMC-2602 | former 54 ABS Deck | 250x72x16 | 2015 | LA | 1,800,000 | $ 6,322.27 |
| JMC-2820 | ABS Deck | 282x90x18 | 2011 | UAE | 3,000,000 | $ 8,986.77 |
| JMC-2821 | ABS Deck | 282x90x18 | 2011 | UAE | 3,000,000 | $ 10,127.18 |
| JMC-2822 | ABS Deck | 282x90x18 | 2011 | CN | 3,000,000 | $ 2,529.30 |
| JMC-2823 | ABS Deck | 282x90x18 | 2011 | SG | 3,000,000 | $ 9,985.77 |
| JMC-2824 | ABS Deck | 282x90x18 | 2016 | SG | 3,200,000 | $ 10,403.52 |
| JMC-2825 | ABS Deck | 282x90x18 | 2016 | SG | 3,200,000 | $ 10,814.55 |
| JMC-3003 | GPS / ABS Deck | 300x100x18 | 2006 | MX | 5,000,000 | $ - |
| JMC-3004 | ABS Deck | 300x100x18 | 2006 | AF | 5,000,000 | $ 16,531.92 |

| In re Cashman Equipment Corp., Case No. 17-12205, et al. | | | | | Exhibit B to Stipulation of Settlment by and between Debtors and Insurers | |
|---|---|---|---|---|---|---|
| BARGE NUMBER | DESCRIPTION | SIZE | YEAR BUILT | BASE | INSURED VALUE | Annual Premium |
| JMC-3005 | ABS Deck | 300x100x18 | 2011 | UAE | 3,500,000 | $ 10,740.84 |
| JMC-3006 | ABS Deck | 300x100x18 | 2011 | DXB | 3,500,000 | $ 868.81 |
| JMC-3007 | ABS Deck | 300x90x18 | 2008 | AF | 3,500,000 | $ 11,681.34 |
| JMC-3008 | ABS Deck | 300x90x19 | 2008 | AF | 3,500,000 | $ 11,457.14 |
| JMC-3009 | ABS Deck | 300x90x20 | 2008 | MX | 5,000,000 | $ - |
| JMC-3010 | ABS Deck | 300x100x18 | 2013 | DXB | 4,000,000 | $ 11,704.40 |
| JMC-3011 | ABS Deck | 300x100x18 | 2013 | SG | 4,000,000 | $ 13,381.56 |
| JMC-3012 | ABS Deck | 300x100x18 | 2012 | AUS | 4,000,000 | $ 13,406.26 |
| JMC-3013 | ABS Deck | 300x100x18 | 2012 | SG | 4,000,000 | $ 13,381.56 |
| JMC-3014 | ABS Deck | 300x100x18 | 2013 | UAE | 4,000,000 | $ 12,729.10 |
| JMC-3015 | ABS Deck | 300x100x18 | 2013 | UAE | 4,000,000 | $ 1,062.23 |
| JMC-3080 | ABS Deck | 300x80x18 | 2010 | | 3,000,000 | $ 10,172.79 |
| JMC-3330 | ABS Deck | 330x100x20 | 2007 | MX | 5,000,000 | $ 14,582.46 |
| JMC-3331 | ABS Deck | 330x100x21 | 2007 | LA | 4,000,000 | $ 11,750.40 |
| JMC-3332 | ABS Deck | 330x100x22 | 2008 | UAE | 4,000,000 | $ 11,459.76 |
| JMC-3333 | ABS Deck | 330x100x23 | 2008 | UAE | 4,000,000 | $ 11,347.06 |
| JMC-3334 | ABS Deck | 330x100x18 | 2011 | UAE | 4,000,000 | $ 11,210.64 |
| JMC-3335 | ABS Deck | 330x100x18 | 2011 | AF | 4,000,000 | $ 13,328.18 |
| JMC-3336 | ABS Deck | 330x120x20 | 2012 | MX | 5,000,000 | $ 15,779.88 |
| JMC-3337 | ABS Deck | 330x120x20 | 2012 | AF | 5,000,000 | $ 16,217.96 |
| 2 Shugart | Sakonnet River Bridge | | | RI | 37,163 | $ 688.10 |
| 14 Cutillo | Sakonnet River Bridge | | 2010 | RI | 336,000 | $ 1,826.79 |
| 18 Cutillo | Sakonnet River Bridge | | 2010 | RI | 513,000 | $ 2,501.23 |
| Miss Mary | ABS Deck | 400x120x25 | 2011 | SG | 10,000,000 | $ 32,605.86 |
| Miss Hannah | ABS Deck | 400x120x25 | 2012 | AUS | 10,000,000 | $ 30,101.19 |
| Miss Nora | ABS Deck | 400x120x25 | 2014 | IDN | 12,000,000 | $ 37,396.44 |
| JMC-4004 | CSS - ABS Deck | 400x25x105 | 1979 | LA | 2,500,000 | $ 8,207.88 |
| JMC-20001 | Hopper Barge | 200x35x12 | 1998 | LA | 150,000 | $ 1,117.15 |
| JMC-20003 | Hopper Barge | 200x35x12 | 1998 | LA | 150,000 | $ 1,117.15 |
| JMC-20004 | Hopper Barge | 200x35x12 | 1998 | LA | 150,000 | $ 1,118.05 |
| JMC-20005 | Hopper Barge | 200x35x12 | 1998 | LA | 150,000 | $ 1,118.05 |
| JMC-20006 | Hopper Barge | 200x35x12 | 1998 | LA | 150,000 | $ 1,117.15 |
| JMC-20007 | Hopper Barge | 200x35x12 | 1998 | LA | 150,000 | $ 1,117.15 |
| JMC-20008 | Hopper Barge | 200x35x12 | 1998 | LA | 150,000 | $ 1,118.05 |
| JMC-20009 | Hopper Barge | 200x35x12 | 1998 | LA | 150,000 | $ 1,117.15 |
| JMC-20010 | Hopper Barge | 200x35x12 | 1998 | LA | 150,000 | $ 1,117.15 |
| JMC-20011 | Hopper Barge | 200x35x12 | 1998 | LA | 150,000 | $ 1,118.05 |
| JMC-20012 | Hopper Barge | 200x35x12 | 1998 | LA | 150,000 | $ 1,118.05 |
| JMC-20013 | Hopper Barge | 200x35x12 | 1998 | LA | 150,000 | $ 1,118.05 |
| RE-RENT | TERAS 3716 | | | | 9,000,000 | $ 495.86 |
| | | | | | | |
| 26 Flexi Floats | 26 at $30,000 each | | | | 780,000 | $ - |
| 12 Flexi Floats | 12 at $20,000 each | | | | 240,000 | $ - |
| | | | | | | |
| 14 Flexi Floats | 14 at $ 28,000 | | | | 392,000 | $ - |
| 3 Flexi Floats | 03 at $ 18,000 | | | | 54,000 | $ - |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | Total Annual Premium | | $ 856,491.77 |

| | Up to $ 1MM | Over $ 1MM |
|---|---|---|
| Port Risk Rates | 0.0038 | 0.0032 |
| Navigating Rates | 0.0070 | 0.0057 |
| Contingent Navigating Rate | 0.0027 | 0.0027 |

IN RE: CASHMAN EQUIPMENT CORP., *ET AL.*
BANKRUPTCY NO. 17-12205
(JOINTLY ADMINISTERED)

EXHIBIT D TO

MODIFIED THIRD AMENDED DISCLOSURE STATEMENT WITH RESPECT
TO JOINT PLAN OF REORGANIZATION OF CASHMAN
EQUIPMENT CORP., CASHMAN SCRAP & SALVAGE, LLC,
SERVICIO MARINA SUPERIOR, LLC, CASHMAN CANADA, INC.,
MYSTIC ADVENTURE SAILS, LLC, AND JAMES M. CASHMAN

**Cashman Equipment Company & Affiliates**
**Financial Projection Model**
**Major Assumptions**

| | Assumption / Note |
|---|---|
| 1 | The model is constructed using real 2018 (as opposed to nominal) dollars.  No inflation is factored into the revenue or cost projections. |
| 2 | The Effective Date is December 31, 2018. |
| 3 | Fresh-Start accounting is not implemented, therefore asset values and depreciation continue using current amounts. |
| 4 | Total interest rate for secured lenders is 90-Day LIBOR plus 5%.  Cash pay is 5.50% increasing to 6.0% at month 54, to 6.25% at month 60 and 6.5% at month 66. |
| 5 | The lender loans are refinanced before the 60th month following the Effective Date into a fixed-principal-reduction loan with a 12 year term at 6.5% all-cash interest.  62.5% of the Additional Interest is waived, and the balance is capitalized into the principal balances.   The cash sweep ceases and any cash surplus will accumulate. |
| 6 | Proceeds from vessel sales flow 100% to the lender, and for the first two years are applied 80% towards the secured creditor's principal balance and 20% towards monthly payments due to the secured creditor, with the 20% amount capped at 4 months of payments.  After the first two years, 100% of the proceeds are applied to principal. |
| 7 | The monthly debt service payment amount is calculated as the sum of the interest on the prior month's outstanding principal while the principal amortization amount is fixed based on the 22.5-year schedule.  After year 5, the monthly debt service is based on a refinanced loan. |
| 8 | Upon emergence, outstanding unpaid attorneys' fees and costs are capitalized into the respective loan balance and will be amortized over 22.5 years.  For Agreed Claim lenders, outstanding unpaid contract interest is held on the balance sheet until paid in cash in 2020, which relieves any remaining default interest. |
| 9 | For years 1 through 5, cash greater than $10 million on September 30th and March 31st will be swept the first day of the second month following and paid pro-rata to participating lenders to be applied to such lenders' outstanding principal amounts. |
| 10 | The Casualty Insurer claim ($631K) is treated the same as all other secured claims, with the exception of earning Additional Interest, with a 22.5 year amortization schedule at 5.5% interest. |
| 11 | Vessel sales occur at the beginning of each year after 2020, and interest is calculated on post-sale principal balance. |
| 12 | A $3 million Initial Payment is made to Agreed-Claim Lenders upon emergence, which is modeled as a pro-rata distribution amongst the eligible lenders.  The remainder of the pre-emergence accrued contract interest remains as an accrual on the balance sheet, along with a pro-rated portion of default interest.  The remainder of pre-emergence accrued contract interest is paid in December 2020, which cancels the remaining accrued default interest. |
| 13 | General Unsecured Claims, with exception of the Convenience Class and BP, are paid out in full via fixed quarterly payments of $233,750.  The claims receive interest (paid as part of the quarterly installments) at a rate of 5%. |
| 14 | The Cardi claim is modeled at $9.6 million.  This serves as in increase to Liabilities Subject to Compromise and joins the GUC payment scheme described above. |

Cashman Equipment Company and Affiliates
Annual Financial Projection Summary - Quarterly
*Amounts in millions USD*

**Income Statement**

| | | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 | 4Q19 | 1Q20 | 2Q20 | 3Q20 | 4Q20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | Rental Revenue | $ 10.0 | $ 6.4 | $ 5.4 | $ 4.4 | $ 5.8 | $ 6.6 | $ 8.6 | $ 7.0 | $ 6.6 | $ 7.5 | $ 9.2 | $ 7.4 |
| | Equipment Sale Revenue | 2.7 | 0.4 | 1.1 | 5.0 | 2.0 | 4.1 | 1.1 | 0.8 | 1.2 | 2.8 | 2.8 | 0.7 |
| | Total Revenue | 12.7 | 6.8 | 6.5 | 9.4 | 7.8 | 10.7 | 9.7 | 7.8 | 7.8 | 10.3 | 12.0 | 8.2 |
| **Cost of Sales** | Cost of Equipment Sales | 1.9 | 0.3 | 0.8 | 1.9 | 1.1 | 2.7 | 0.6 | 0.5 | 0.3 | 1.7 | 1.5 | 0.0 |
| | Depreciation | 4.7 | 4.6 | 4.6 | 4.5 | 4.4 | 4.2 | 4.1 | 4.1 | 4.0 | 4.0 | 3.9 | 3.8 |
| | Other COS - Rental | 5.0 | 3.0 | 2.4 | 3.2 | 3.2 | 2.5 | 2.1 | 3.3 | 3.2 | 2.4 | 2.2 | 3.3 |
| | Total Cost of Sales | 11.6 | 7.9 | 7.8 | 9.7 | 8.7 | 9.4 | 6.8 | 7.9 | 7.6 | 8.1 | 7.6 | 7.1 |
| **Total SG&A** | SG&A | 1.5 | 1.6 | 1.3 | 1.7 | 1.5 | 1.4 | 1.4 | 2.1 | 1.4 | 1.4 | 1.5 | 2.2 |
| **Other** | Interest | 1.4 | 1.4 | 1.4 | 3.5 | 2.7 | 2.8 | 2.9 | 2.9 | 2.9 | 2.8 | 2.8 | 2.7 |
| | Professional Fees & Other | 0.6 | 0.7 | 0.8 | 9.5 | 0.2 | 0.2 | 0.1 | 0.0 | 0.1 | 0.1 | 0.1 | (2.1) |
| | Total Other | 2.0 | 2.0 | 2.1 | 13.0 | 2.8 | 3.0 | 2.9 | 3.0 | 2.9 | 2.9 | 2.9 | 0.6 |
| Net Income | | (2.4) | (4.7) | (4.8) | (15.0) | (5.2) | (3.1) | (1.4) | (5.2) | (4.2) | (2.1) | 0.1 | (1.7) |
| EBITDAR | | 4.3 | 1.9 | 1.9 | 2.5 | 2.0 | 4.0 | 5.6 | 1.8 | 2.8 | 4.8 | 6.9 | 2.7 |
| **EBITDAR Excl. Asset Sales** | | **3.5** | **1.8** | **1.6** | **(0.6)** | **1.1** | **2.7** | **5.1** | **1.6** | **2.0** | **3.6** | **5.6** | **2.0** |
| Ending Cash | | 12.3 | 12.5 | 12.3 | 8.1 | 5.5 | 4.7 | 5.5 | 7.5 | 7.4 | 7.6 | 8.6 | 8.9 |
| Total Debt + Accrued Contract Interest | | 141.9 | 141.3 | 140.4 | 145.3 | 143.0 | 138.9 | 137.2 | 135.7 | 133.7 | 130.6 | 127.5 | 122.5 |
| Additional Interest | | - | - | - | - | 0.7 | 1.5 | 2.5 | 3.5 | 4.5 | 5.5 | 6.4 | 7.4 |
| Total Debt + Total Accrued Interest | | 141.9 | 141.3 | 140.4 | 145.3 | 143.7 | 140.4 | 139.6 | 139.2 | 138.2 | 136.1 | 133.9 | 129.9 |

**Cash Sources / Uses**

| | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 | 4Q19 | 1Q20 | 2Q20 | 3Q20 | 4Q20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **EBITDAR excl. Asset Sales** | 3.5 | $ 1.8 | $ 1.6 | $ (0.6) | $ 1.1 | $ 2.7 | $ 5.1 | $ 1.6 | $ 2.0 | $ 3.6 | 5.6 | $ 2.0 |
| Changes in Due from Affiliates | - | 0.4 | 0.4 | - | - | 1.3 | - | 1.0 | - | 1.0 | - | - |
| Restructuring Professionals | (0.7) | (0.8) | (0.9) | (1.4) | - | (0.1) | - | (0.1) | - | (0.1) | - | - |
| Taxes/Other (excl. COD) | - | - | - | (0.3) | (0.2) | (0.2) | (0.0) | (0.1) | (0.1) | (0.1) | (0.1) | (0.0) |
| Changes in Working Capital | (0.5) | 0.2 | (0.3) | 1.3 | (0.2) | (1.6) | (1.3) | 2.4 | 1.2 | (1.4) | (1.6) | 2.5 |
| Proceeds from Asset Sales | 2.7 | 0.4 | 1.1 | 5.0 | 2.0 | 4.1 | 1.1 | 0.8 | 1.2 | 2.8 | 2.8 | 0.7 |
| Lender Proceeds from Sales | (2.2) | (0.3) | (0.9) | (3.3) | (1.6) | (3.3) | (0.9) | (0.6) | (1.1) | (2.3) | (2.3) | (0.6) |
| Loan Payment Credits | - | - | - | - | (0.4) | (0.8) | (0.2) | (0.2) | (0.0) | (0.6) | (0.6) | (0.1) |
| Cash Sweep | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest | (1.4) | (1.4) | (1.4) | (1.3) | (2.0) | (2.0) | (1.9) | (1.9) | (1.9) | (1.8) | (1.8) | (1.8) |
| Change in Accrued Contract Int. | (0.2) | (0.3) | 0.0 | (3.0) | - | - | - | - | - | - | - | (1.4) |
| Amortization of Loan Principal | - | - | - | - | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.9) | (0.9) | (0.9) |
| Payment of Accrued Settlement | - | - | - | (0.3) | (0.4) | - | - | - | (0.4) | - | - | - |
| Payment of Unsecureds / Cardi / Western | - | - | - | (0.4) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) |
| **Total Change in Cash** | 1.3 | $ (0.0) | $ (0.3) | $ (4.2) | $ (2.6) | $ (0.8) | $ 0.8 | $ 2.0 | $ (0.1) | $ 0.2 | $ 1.0 | $ 0.3 |

Cashman Equipment Company and Affiliates
Annual Financial Projection Summary
*Amounts in millions USD*

**Income Statement**

| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
| Revenue | | | | | | | | | | | | |
| | Rental Revenue | $ 26.1 | $ 28.0 | $ 30.8 | $ 30.8 | $ 30.8 | $ 30.8 | $ 30.8 | $ 30.8 | $ 30.8 | $ 30.8 | $ 30.8 |
| | Equipment Sale Revenue | 9.2 | 8.0 | 7.6 | 8.6 | 5.2 | 4.2 | 2.0 | 2.3 | 2.2 | 2.1 | 2.0 |
| | Other | - | - | - | - | - | - | - | - | - | - | - |
| | Total Revenue | 35.4 | 36.0 | 38.3 | 39.3 | 36.0 | 35.0 | 32.8 | 33.1 | 33.0 | 32.9 | 32.8 |
| Cost of Sales | | | | | | | | | | | | |
| | Cost of Equipment Sales | 4.8 | 5.0 | 3.6 | 3.3 | 2.3 | 0.8 | 0.6 | 0.0 | 0.2 | 0.0 | 0.2 |
| | Wages | 0.5 | 1.2 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 |
| | Depreciation | 18.5 | 16.7 | 15.7 | 14.4 | 12.4 | 10.8 | 9.3 | 8.7 | 7.0 | 5.8 | 3.9 |
| | Equipment Rental | 0.2 | - | - | - | - | - | - | - | - | - | - |
| | Inspection & Survey | 1.2 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 |
| | Insurance | 1.7 | 2.6 | 2.6 | 2.6 | 2.6 | 2.6 | 2.6 | 2.6 | 2.6 | 2.6 | 2.6 |
| | Slip rental | 1.8 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| | Repairs/Maintenance | 3.3 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 |
| | Tug/Tow | 0.9 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| | Other | 4.0 | 2.1 | 2.1 | 2.1 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| | Total Cost of Sales | 37.0 | 32.8 | 30.4 | 28.9 | 25.8 | 22.6 | 20.9 | 19.7 | 18.3 | 16.8 | 15.1 |
| SG&A | | | | | | | | | | | | |
| | Wages | 3.5 | 3.6 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| | Professional Services | 0.1 | 1.3 | 1.2 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| | Bad Debt Expense | 0.1 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| | Other | 2.5 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 |
| | Total SG&A | 6.1 | 6.4 | 6.5 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 |
| Other | | | | | | | | | | | | |
| | Interest | 7.6 | 11.2 | 11.2 | 10.1 | 9.9 | (1.9) | 6.7 | 6.2 | 5.6 | 5.0 | 4.4 |
| | Professional Fees | 11.4 | - | - | - | - | - | - | - | - | - | - |
| | Taxes & Other | 0.2 | 0.4 | (1.8) | 10.0 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| | Total Other | 19.2 | 11.6 | 9.4 | 20.1 | 10.1 | (1.6) | 6.8 | 6.3 | 5.7 | 5.1 | 4.5 |
| Net Income | | (27.0) | (14.9) | (8.0) | (15.5) | (5.8) | 8.1 | (0.8) | 1.2 | 3.2 | 5.1 | 7.3 |
| EBITDAR | | 10.7 | 13.5 | 17.1 | 19.0 | 16.7 | 17.3 | 15.3 | 16.2 | 15.9 | 16.0 | 15.7 |
| EBITDAR Excl. Asset Sales | | 6.3 | 10.5 | 13.2 | 13.7 | 13.8 | 13.8 | 13.9 | 13.9 | 13.9 | 13.9 | 13.9 |
| Ending Cash | | 8.1 | 7.5 | 8.9 | 11.5 | 12.0 | 10.0 | 10.1 | 10.6 | 11.7 | 13.3 | 15.6 |
| Total Debt (Debt Only - No Accrued Interest) | | 141.8 | 132.2 | 122.5 | 111.6 | 101.8 | 100.0 | 91.4 | 82.6 | 73.9 | 65.2 | 56.7 |
| Total Net Debt | | 133.8 | 124.7 | 113.6 | 100.1 | 89.8 | 90.0 | 81.4 | 72.0 | 62.2 | 51.9 | 41.2 |

Cashman Equipment Company and Affiliates
Annual Financial Projection Summary
*Amounts in millions USD*

| Balance Sheet | | | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | Current Assets | Accounts Receivable | $ 5.3 | $ 7.8 | $ 8.4 | $ 8.1 | $ 8.1 | $ 8.1 | $ 8.1 | $ 8.1 | $ 8.1 | $ 8.1 | $ 8.1 |
| | | Cash | 8.1 | 7.5 | 8.9 | 11.5 | 12.0 | 10.0 | 10.1 | 10.6 | 11.7 | 13.3 | 15.6 |
| | | Loan Payment Credits | - | - | - | - | - | - | - | - | - | - | - |
| | | Due from Affiliates | 6.3 | 4.0 | 3.0 | 2.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| | | Due from Officers | - | - | - | - | - | - | - | - | - | - | - |
| | | Investments | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | | Prepaid Expenses | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| | | Inventory | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 |
| | Current Assets Total | | 22.2 | 21.8 | 22.8 | 24.1 | 23.6 | 21.6 | 21.7 | 22.2 | 23.3 | 25.0 | 27.2 |
| | PP&E | Accumulated Depreciation | (144.6) | (148.9) | (157.2) | (165.5) | (173.1) | (178.4) | (185.6) | (191.4) | (196.0) | (199.7) | (201.5) |
| | | Machinery & Equipment | 285.3 | 267.9 | 256.9 | 247.5 | 240.4 | 234.1 | 231.4 | 228.5 | 225.8 | 223.7 | 221.5 |
| | PP&E Total | | 140.7 | 119.0 | 99.7 | 82.0 | 67.3 | 55.7 | 45.8 | 37.1 | 29.8 | 24.1 | 20.0 |
| | **Total Assets** | | $ 162.9 | $ 140.8 | $ 122.5 | $ 106.1 | $ 90.9 | $ 77.3 | $ 67.4 | $ 59.3 | $ 53.1 | $ 49.0 | $ 47.2 |
| **Liabilities & Shareholder Equity** | Current Liabilities | Accounts Payable | 1.3 | 1.5 | 1.5 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| | | Accrued Expenses | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 |
| | | Accrued Interest - Contract | 3.5 | 3.5 | - | - | - | - | - | - | - | - | - |
| | | Accrued Interest - Additional | - | 3.5 | 7.4 | 11.0 | 14.3 | - | - | - | - | - | - |
| | | Current Portion Note Payable | - | - | - | - | - | - | - | - | - | - | - |
| | | Due to Affiliate | - | - | - | - | - | - | - | - | - | - | - |
| | Current Liabilities Total | | 7.1 | 10.7 | 11.1 | 14.2 | 17.5 | 3.2 | 3.2 | 3.2 | 3.2 | 3.2 | 3.2 |
| | Long-Term Liabilities | Note Payable | 112.4 | 107.3 | 101.0 | 90.8 | 84.5 | 82.9 | 75.5 | 67.8 | 61.2 | 54.7 | 47.3 |
| | | Rockland LOC | 29.4 | 24.8 | 21.5 | 20.8 | 17.4 | 17.1 | 15.9 | 14.8 | 12.6 | 10.5 | 9.4 |
| | | Accrued Expenses - Settlement | 6.9 | 6.5 | 6.1 | 5.6 | 5.1 | - | - | - | - | - | - |
| | | Liabilities Subject to Compromise | 5.3 | 4.6 | 3.9 | 11.3 | 8.9 | 8.4 | 7.9 | 7.3 | 6.8 | 6.2 | 5.5 |
| | Long-Term Liabilities Total | | 154.0 | 143.3 | 132.4 | 128.5 | 115.8 | 108.4 | 99.3 | 89.9 | 80.6 | 71.4 | 62.3 |
| | Shareholder Equity | Additional PIC | 4.3 | 4.3 | 4.3 | 4.3 | 4.3 | 4.3 | 4.3 | 4.3 | 4.3 | 4.3 | 4.3 |
| | | Retained Earnings | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 |
| | | Shareholder Distributions | - | - | - | - | - | - | - | - | - | - | - |
| | | Unrealized Holding | | | | | | | | | | | |
| | | Adjustment | (7.6) | (7.6) | (7.6) | (7.6) | (7.6) | (7.6) | (7.6) | (7.6) | (7.6) | (7.6) | (7.6) |
| | | Retained Earnings - Current Year | (27.0) | (41.9) | (49.8) | (65.4) | (71.2) | (63.1) | (63.8) | (62.6) | (59.5) | (54.4) | (47.0) |
| | Shareholder Equity Total | | 1.8 | (13.1) | (21.1) | (36.6) | (42.4) | (34.3) | (35.1) | (33.9) | (30.7) | (25.6) | (18.3) |
| | **Total Liabilities** | | $ 162.9 | $ 140.8 | $ 122.5 | $ 106.1 | $ 90.9 | $ 77.3 | $ 67.4 | $ 59.3 | $ 53.1 | $ 49.0 | $ 47.2 |

Cashman Equipment Company and Affiliates
Annual Financial Projection Summary
*Amounts in millions USD*

**Cash Sources / Uses**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **EBITDAR excl. Asset Sales** | $ 6.3 | $ 10.5 | $ 13.2 | $ 13.7 | $ 13.8 | $ 13.8 | $ 13.9 | $ 13.9 | $ 13.9 | $ 13.9 | $ 13.9 |
| Proceeds from Asset Sales | 9.2 | 8.0 | 7.6 | 8.6 | 5.2 | 4.2 | 2.0 | 2.3 | 2.2 | 2.1 | 2.0 |
| Lender Proceeds from Sales | (6.7) | (6.4) | (6.2) | (7.2) | (3.1) | (4.2) | (2.0) | (2.3) | (2.2) | (2.1) | (2.0) |
| Amortization of Loan Principal | - | (3.3) | (3.5) | (3.7) | (3.9) | (4.0) | (6.5) | (6.5) | (6.5) | (6.5) | (6.5) |
| Cash Sweep | - | - | - | - | (2.8) | - | - | - | - | - | - |
| Change in Loan Payment Credit | - | - | 0.0 | - | - | - | - | - | - | - | - |
| Restructuring Professionals | (12.2) | - | - | - | - | - | - | - | - | - | - |
| Capitalization of Lender Restr. Fees | 8.4 | - | - | - | - | - | - | - | - | - | - |
| Interest | (7.6) | (7.8) | (7.2) | (6.5) | (6.5) | (6.1) | (6.7) | (6.2) | (5.6) | (5.0) | (4.4) |
| Accrual of Default Interest | 2.2 | - | - | - | - | - | - | - | - | - | - |
| Taxes / Other (excl. COD) | (0.3) | (0.4) | (0.4) | (0.4) | (0.3) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Changes in A/R | 1.7 | (2.5) | (0.6) | 0.2 | - | - | - | - | - | - | - |
| Changes in A/P (excl. Restr Prof) | (1.0) | 0.1 | 0.0 | (0.5) | - | - | - | - | - | - | - |
| Changes in Due from Affiliates | 0.7 | 2.3 | 1.0 | 1.0 | 1.0 | - | - | - | - | - | - |
| Agreed Claim Lender / Payment of Accrued Contract Inter | (3.4) | - | (1.4) | - | - | - | - | - | - | - | - |
| Satisfaction of Casualty Insurer | (0.6) | - | - | - | - | - | - | - | - | - | - |
| Capitalization of Casualty Insurer | 0.6 | - | - | - | - | - | - | - | - | - | - |
| Payment of Accrued Settlement | (0.3) | (0.4) | (0.4) | (0.5) | (0.5) | (5.1) | - | - | - | - | - |
| Payment of Unsecureds / Cardi / Western | (0.4) | (0.7) | (0.7) | (2.1) | (2.5) | (0.5) | (0.5) | (0.5) | (0.6) | (0.6) | (0.6) |
| **Total Change in Cash** | $ (3.3) | $ (0.6) | $ 1.4 | $ 2.6 | $ 0.5 | $ (2.0) | $ 0.1 | $ 0.5 | $ 1.1 | $ 1.7 | $ 2.2 |

Cashman Equipment Company and Affiliates
Large General Unsecured Creditors Payment Profile
*Figures in $000's USD*

|  |  | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Interest Amount | (250) | (216) | (193) | (567) | (444) | (420) | (394) | (367) | (338) | (308) |
| A) | Principal Amount | (685) | (719) | (742) | (368) | (491) | (515) | (541) | (568) | (597) | (627) |
|  | Total Regular Payments | (935) | (935) | (935) | (935) | (935) | (935) | (935) | (935) | (935) | (935) |
|  |  |  |  |  |  |  |  |  |  |  |  |
| B) | Plus: Vessel Sale Proceeds | - | - | (1,371) | (2,100) | - | - | - | - | - | - |
| A+B) | Total GUC Principal Reduction | (685) | (719) | (2,113) | (2,468) | (491) | (515) | (541) | (568) | (597) | (627) |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  | Opening Balance | 5,266 | 4,582 | 3,863 | 11,350 | 8,882 | 8,392 | 7,876 | 7,335 | 6,767 | 6,170 |
|  | Plus: Additions | - | - | 9,600 | - | - | - | - | - | - | - |
| A+B) | Less: Principal Reduction | (685) | (719) | (2,113) | (2,468) | (491) | (515) | (541) | (568) | (597) | (627) |
|  | Ending GUC Principal Balance | 4,582 | 3,863 | 11,350 | 8,882 | 8,392 | 7,876 | 7,335 | 6,767 | 6,170 | 5,543 |

IN RE: CASHMAN EQUIPMENT CORP., *ET AL.*
BANKRUPTCY NO. 17-12205
(JOINTLY ADMINISTERED)

EXHIBIT E TO

MODIFIED THIRD AMENDED DISCLOSURE STATEMENT WITH RESPECT
TO JOINT PLAN OF REORGANIZATION OF CASHMAN
EQUIPMENT CORP., CASHMAN SCRAP & SALVAGE, LLC,
SERVICIO MARINA SUPERIOR, LLC, CASHMAN CANADA, INC.,
MYSTIC ADVENTURE SAILS, LLC, AND JAMES M. CASHMAN

**Cashman Equipment & Debtor Affiliates**
**Liquidation Analysis - Summary**
*Amounts in $millions USD*

| | Value at Conversion | Recov % | Est. Recovery | Paid to Lenders | Available for GUC |
|---|---|---|---|---|---|
| **Asset Liquidation** | | | | | |
| Cash at Conversion | 12,779 | 100% | 12,779 | 3,554 | 9,225 |
| Accounts Receivable[1] | 6,405 | 75% | 4,804 | 2,445 | 2,359 |
| Unencumbered Vessels[2] | 15,063 | 82.5% | 11,557 | - | 11,557 |
| Encumbered Vessels[2] | 148,884 | 82.5% | 114,231 | 107,943 | 6,288 |
| Recovery from Affiliates[3] | 3,300 | 75% | 2,475 | - | 2,475 |
| Miscellaneous Assets[4] | 3,418 | 25% | 855 | - | 855 |
| **Total Proceeds** | | | 146,701 | 113,942 | 32,758 |
| | | | | | |
| Costs Associated with Chapter 11 and Chapter 7 | | | | | |
| Chapter 11 Administrative Expenses | | | | | |
| Chapter 11 Post-Petition Accounts Payable | | | | | (500) |
| Chapter 11 Professional Fees | | | | | (1,000) |
| | | | | | |
| Chapter 7 Administrative Expenses | | | | | |
| Chapter 7 Trustee Commission | | | | | (5,000) |
| Chapter 7 Counsel & Special Counsel | | | | | (5,000) |
| Chapter 7 Accountant | | | | | (500) |
| Chapter 7 Tax preparer | | | | | (150) |
| Staff Payroll | | | | | (1,396) |
| Insurance | | | | | (985) |
| Fleeting, Survey, Repair & Subcontractor | | | | | (2,488) |
| Other Wind-Down Expenses | | | | | (964) |
| Total Wind-Down Expenses | | | | | (17,982) |
| | | | | | |
| **Cash Available for Distribution** | | | | | **14,776** |
| | | | | | |
| Secured Claim Deficiency for Unsecured Pool | | | | | 38,008 |
| Trade & Other General Unsecured | | | | | 15,000 |
| Total Unsecured Claims | | | | | 53,008 |
| | | | | | |
| **Recovery %** | | | | | |
| Distribution to Unsecureds | | | | | 14,776 |
| | | | | | **28%** |

**Notes**
1) Lender Pre-Petition Lien on A/R paid at 100%
2) Recovery Percentage shown is reduction in Gross FLV; Commission is removed to show Net Total
3) Reflects expected $4 million recoverable, less two $350K payments made during Ch. 11 period
4) Value reflects 25% of Book value as of 6/30/2017

Cashman Equipment & Debtor Affiliates
Liquidation Analysis - Lender Distributions
Amounts in $000's USD

| | Claim Amount | | | | | | Cash Collateral at Filing | | | Vessel Sale Activity | | | | | | Remaining (Deficiency) Claim | Amount to Debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Principal as of 6/9/17 | Accrued Int as of 6/9/17 | Post-Filing Contract Interest at Conversion | Default Interest at Conversion | Professional Fees | Total Claim | Cash at Filing | AR at Filing | Net Adjusted Claim | Vessel Sale Payments during Case | Distribution of retained proceeds | Forced Liquidation Vessel Proceeds | Less: Mass Sale/Impact | Less: Commission | Lender Proceeds | | |
| Fifth Third Bank | 4,200 | 60 | 90 | 379 | 80 | 4,620 | (9) | (58) | 4,552 | - | - | 4,000 | (700) | (231) | (3,069) | 1,483 | - |
| BofA | 12,125 | 86 | 254 | 1,188 | 243 | 13,895 | (50) | (398) | 13,447 | - | - | 10,950 | (1,916) | (632) | (8,401) | 5,046 | - |
| Citizens | 13,813 | 139 | 231 | 1,458 | 276 | 15,917 | (139) | (376) | 15,402 | - | - | 11,746 | (2,056) | (678) | (9,012) | 6,390 | - |
| Key Bank | 6,348 | 92 | - | - | 127 | 6,567 | - | - | 6,567 | - | - | 4,758 | (833) | (275) | (3,651) | 2,916 | - |
| MARAD | 1,660 | 28 | 130 | - | 33 | 1,852 | (83) | (108) | 1,661 | - | - | 5,333 | (937) | (309) | (1,641) | - | (2,446) |
| Pacific West Bank | 685 | 3 | - | 67 | 14 | 784 | (21) | (114) | 650 | - | - | 3,050 | (534) | (176) | (650) | - | (1,691) |
| Radius Bank | 4,170 | 17 | 70 | 103 | 83 | 4,444 | (83) | (266) | 4,095 | (465) | - | 4,090 | (716) | (236) | (1,695) | - | (1,443) |
| RTC | 47,235 | 436 | 825 | 2,488 | 945 | 51,929 | (1,971) | (355) | 49,603 | (1,935) | (126) | 62,138 | (10,874) | (3,588) | (46,968) | - | (707) |
| Santander | 26,597 | 289 | 359 | 1,002 | 532 | 28,778 | (1,139) | (179) | 27,460 | (2,509) | - | 24,379 | (4,266) | (1,408) | (18,705) | 8,755 | - |
| US Bank | 2,292 | 92 | - | - | 46 | 2,430 | - | (173) | 2,257 | - | - | 1,350 | (236) | (78) | (1,036) | 1,221 | - |
| Wells Fargo | 22,191 | 282 | 479 | 2,148 | 444 | 25,544 | (56) | (361) | 25,126 | (794) | - | 16,769 | (2,935) | (968) | (12,866) | 11,310 | - |
| Equitable Bank | 1,138 | 12 | - | - | 23 | 1,173 | - | (57) | 1,116 | - | - | 300 | (53) | (17) | (230) | 885 | - |
| | 142,265 | 1,537 | 2,455 | 8,832 | 2,845 | 157,935 | (3,554) | (2,445) | 151,936 | (5,238) | (747) | 148,884 | (26,055) | (8,598) | (107,943) | 38,008 | (6,288) |

James M. Cashman
Liquidation Analysis - Summary[1]

| | Available for GUC |
|---|---|
| **Asset Liquidation** | |
| Cash at Conversion | 45,000 |
| Net Real Estate Value[2] | 1,142,361 |
| Net Personal Property Value[2] | 27,000 |
| **Total Proceeds** | 1,214,361 |
| | |
| Costs Associated with Chapter 11 and Chapter 7 | |
| Chapter 11 Administrative Expenses | |
| Chapter 11 Professional Fees | (50,000) |
| | |
| Chapter 7 Administrative Expenses | |
| Chapter 7 Trustee Commission | (36,431) |
| Chapter 7 Counsel & Special Counsel | (200,000) |
| Chapter 7 Accountant | (25,000) |
| Other Wind Down Costs | (15,000) |
| Total Wind-Down Expenses | (326,431) |
| | |
| Priority Claims | |
| Priority Tax Claims | (6,500,000) |
| | |
| **Cash Available for Distribution to General Unsecured Creditors** | - |
| | |
| Secured Claim Deficiency for Unsecured Pool | 35,026,883 |
| Trade & Other General Unsecured | 25,000 |
| Total Unsecured Claims | 35,051,883 |
| | |
| Distribution to Unsecureds | - |
| **Recovery %** | **0%** |

Notes
1) Does not take into account Debtor's exemptions, which would reduce the amount available to creditors.
2) Net of secured debt and costs of sale.

James M. Cashman
Liquidation Analysis[1]

| Real Estate | Value | Secured Debt | Liquidation Costs | Net Value |
|---|---|---|---|---|
| 72 Jericho Road, Dennis, MA | $ 4,446,700.00 | $ (9,240,913.00) | $ (444,670.00) | $ (5,238,883.00) |
| 55 Parkwood Drive, Milton, MA | $ 2,350,000.00 | $ (1,690,389.00) | $ (235,000.00) | $ 424,611.00 |
| Lots, Barataria, LA | $ 120,000.00 | $ - | $ (12,000.00) | $ 108,000.00 |
| Forest Street, Milton, MA | $ 677,500.00 | $ - | $ (67,750.00) | $ 609,750.00 |
| Total Net Real Estate Value | | | | $ 1,142,361.00 |
| Personal Property[2] | | | | |
| 1938 Packard | $ 20,000.00 | $ - | $ (2,000.00) | $ 18,000.00 |
| Misc. Personal Property | $ 10,000.00 | $ - | $ (1,000.00) | $ 9,000.00 |
| Stock and Membership Interests | $ - | $ - | $ - | $ - |
| Net Personal Property Value (excl. cash) | | | | $ 27,000.00 |
| Cash | $ 45,000.00 | $ - | $ - | $ 45,000.00 |

Notes

1) Does not take into account Debtor's exemptions, which would reduce the amount available to creditors.

2) Excludes retirement account and property held in trust for children, which are not part of Debtor's bankruptcy estate